**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **MARK CHRISTOPHER CREW,** | **Case No.:  12-CV-4259 YGR** |
| **Petitioner,** | **CAPITAL CASE** |
| **vs.** | **ORDER** |
| **RON DAVIS, Warden of San Quentin State Prison** | |
| **Respondent.** | |

## INTRODUCTION

In his Answer to the Petition for Writ of Habeas Corpus, Respondent states that Claims Five, Eight (specifically the subclaim regarding the prosecutor's commission of misconduct during his opening statement), Eleven D, Eleven F, Thirteen, Thirty and Thirty-One are procedurally defaulted and, therefore barred from federal habeas review.  Respondent also challenges Claims Three, Six, and Forty-Five on the ground that they fail to state a cognizable claim that would entitle Petitioner to federal habeas relief and Claims Nine and Eighteen as inadequately plead.  For the reasons stated herein, Claims Five, the challenged subclaim of Claim Eight Eleven D, Eleven F, Thirteen, Thirty and Thirty-One are procedurally defaulted, but will proceed to merits briefing in lieu of a determination on the cause and prejudice arguments.  Claims Three, Six, and Forty-Five are DISMISSED.  In the alternative, Claims Three and Six are DENIED on the merits, as are Claims Four and Seven, their related ineffective assistance of counsel claims.  Finally, Claims Nine and Eighteen are found to be adequately pled.

**STATEMENT**

**1.  Statement of Facts**

The following facts are taken from the October 29, 2003 opinion of the California Supreme Court on direct appeal from the jury verdict.  This summary is presumed correct.  *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir.2002); 28 U.S.C. § 2254(e)(1).

        1. Prosecution's case

        Defendant met Nancy Jo Wilhelmi Andrade (Nancy), a nurse, at the Saddle Rack bar in San Jose in 1981, shortly after Nancy's divorce.  Nancy owned a purebred horse and a Ford pickup truck.  Nancy and defendant were romantically involved until November or December of 1981, after which they did not see each other until April of 1982, when they resumed the relationship.

        In January 1982, when Nancy and defendant were not romantically involved, Nancy and her friend Darlene Bryant planned a trip across the United States for the summer, and that spring Nancy bought a yellow Corvette for the trip.  In May 1982, Richard Elander, one of defendant's best friends, began work at a ranch in Utah run by Richard Glade.  Before Elander left for Utah, defendant had talked to him about killing Nancy during a trip across the country.  While in Utah, Elander asked Glade about carrying a body into the wilderness of the Utah mountains.  Disturbed by the conversation, Glade fired Elander.

        Defendant asked Nancy to move to Greer, South Carolina, where defendant's mother and stepfather lived.  When Nancy replied she did not want to move so far away unless married, defendant agreed to marry her.  The wedding took place on June 4, 1982.

        The marriage soon floundered.  Nancy was living with Darlene at the latter's home, but defendant was rarely there.  Nancy twice saw defendant with some women at the Saddle Rack bar.  She told several friends she was thinking of an annulment of the marriage.

        Defendant had been romantically involved with Lisa Moody, to whom he proposed marriage in June 1982, the same month he married Nancy.  Defendant and Moody did not set a date for the wedding.

        In July 1982, defendant and his friend Richard Elander moved to Greer, South Carolina, where they stayed with defendant's parents and started a truck service business.  That same month, Nancy and her friend Darlene took their planned vacation trip across the country.  They stopped in Greer, South Carolina, and Nancy spent the night with defendant.

        After Nancy's visit to South Carolina, defendant and his stepfather, Bergin Mosteller, decided to return to California to kill Nancy.  Defendant discussed with Elander different ways of killing her, including suffocation, hitting her with a large wrench, and "bleeding her in the shower so she wouldn't make any mess."  They also discussed leaving her body in the Utah wilderness, where they could bury her or "hang her in a tree, let the bears eat her."

2

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

After returning to California in early August 1982, Nancy often spoke on the telephone with defendant. She decided to move to South Carolina in an effort to make the marriage work, and she began to make arrangements to do so. She gave custody of her two children from a prior marriage to their father and closed out her bank account, obtaining $10,500 in cash and a money order for $2,500. When Deborah Nordman, one of Nancy's friends, remarked that Nancy might be left in the desert during the trip with defendant to South Carolina, Nancy replied, "If you don't hear from me in two weeks, send the police."

On August 21, 1982, defendant and his stepfather came to Darlene's house, where Nancy was living, in a station wagon pulling a horse trailer. They loaded Nancy's belongings into the trailer and picked up Nancy's horse from a stable in Gilroy. The plan was for Mosteller to drive the station wagon to Texas, where he would leave the horse with relatives. Nancy and defendant would follow in Nancy's Corvette and truck. They would leave the truck in Texas, where defendant's friend, Richard Elander, would retrieve the truck, the horse, and Nancy's belongings and take them all to South Carolina. Nancy and defendant would then leave Texas in Nancy's Corvette to go on a two-week honeymoon. Mosteller, however, never went to Texas. He boarded the horse in a stable in San Jose, drove to Nevada, and finally flew to South Carolina.

On August 23, Nancy and defendant went to Nancy's parents' home in Santa Cruz, California, where they picked up Nancy's dog and some of her belongings, including a microwave, stereo components still in the original cartons, and personal documents. That same day, Nancy and defendant ostensibly left for South Carolina.

That same night, however, defendant checked into a Motel 6 in Fremont, California, where he registered to stay for two nights. The next day, he arrived at the home of Lisa Moody, the woman who had accepted defendant's marriage proposal shortly after his marriage to Nancy. Over the next two days, defendant gave Lisa a stereo and a microwave, took her to see a horse in a San Jose stable, and arranged for her to convert $5,000 in cash into a cashier's check payable to Bergin Mosteller, defendant's stepfather.

On August 28, 1982, defendant and Lisa left for South Carolina in a pickup truck with a horse in a trailer. They stopped in Texas, where they stayed at defendant's grandmother's house for a couple of days. While there, defendant became upset and agitated after receiving a phone call. After defendant and Lisa arrived in Greer, South Carolina, defendant opened a bank account in which he deposited Nancy's $2,500 money order. Elander and Mosteller sold Nancy's clothing and possessions at a flea market for about $500, burned her documents in a backyard, and sold the horse trailer and Nancy's horse.

Defendant and Lisa returned to San Jose in mid-September. Defendant then sold Nancy's truck for $4,200, giving the purchaser a certificate of title with Nancy's forged signature. On October 13, 1982, defendant told Lisa that the phone call he received in Texas while they were at his grandmother's house was about a woman who loved him and was telling people in South Carolina she was going to marry him. According to defendant, the woman went to the head of the Mafia in Arizona to complain about defendant, but the Mafia killed her instead. Defendant told Lisa that he was forced to dispose of the body to avoid being blamed for the woman's death, and

3

United States District Court
Northern District of California

that he buried it in his friend Bruce Gant's backyard. The phone call defendant had received in Texas was actually from Gant who told him that the "body was beginning to stink." That same day, defendant returned to South Carolina in Nancy's Corvette.

Richard Elander testified under a grant of immunity. He said that on the day defendant and Lisa arrived in Greer, South Carolina, defendant told him the details of Nancy's killing. According to Elander, after defendant and Nancy left San Jose, California, they stopped and walked up a hillside into the woods. While Nancy and defendant were sitting on the hillside talking, defendant shot her in the back of the head and rolled the body down a ravine where he covered it with blankets. Defendant then drove one of the cars to Bruce Gant's house in Campbell, California. Defendant and Gant returned to the scene and retrieved the other vehicle.

The next evening, defendant and Gant got drunk and returned to the site where defendant had shot Nancy. When defendant walked down to her body, it had moved. Defendant "freaked out," ran back to the truck, and told Gant. Gant went down the ravine where he tried to strangle Nancy and break her neck. He eventually cut off Nancy's head. Defendant told Elander that they put Nancy's body in a 55–gallon drum filled with cement and buried it in Gant's backyard. They put her head in a five-gallon bucket filled with cement and threw it off the Dumbarton Bridge between Alameda and San Mateo Counties, California.

A few days after defendant returned to South Carolina, Elander testified, he sold Nancy's Corvette to Marion Mitchell. When Mitchell repeatedly asked for title to the car, Elander told him that defendant had killed his wife by shooting her, cutting off her head, putting the body in a barrel filled with concrete, and burying it in a backyard. Elander then forged defendant's signature on a bill of sale and gave it to Mitchell.

In January 1983, defendant made arrangements to stay in Connecticut with Jeanne Meskell, with whom he previously had a relationship. While there, defendant told Meskell that he had killed a girl, that she was in two pieces in two drums filled with cement, and that one drum was in the San Francisco Bay and one was in a backyard. In March 1983, the San Jose police searched Bruce Gant's house, where they recovered a Tiffany lamp identical to one of Nancy's. A search of Gant's yard with steel probes in March 1983 and again in 1984 did not reveal anything. Nancy's body was never found.

2. Defense case

The defense at the guilt phase consisted primarily of challenges to the credibility of the prosecution witnesses. The defense introduced evidence that Elander was an untrustworthy drug addict who had engaged in "lying contests" with defendant and that a woman with blonde hair and a dog had come to the San Jose stable with defendant. Because Nancy had blonde hair and owned a dog, the evidence was introduced to try to show that Nancy was aware that Mosteller had taken her horse to the San Jose stable. The defense also introduced evidence to raise doubts over the burial of Nancy's body in Gant's backyard in Campbell, California. San Jose Police Officer Demowski testified that officers searched Gant's backyard three times without finding Nancy's body. District attorney investigator Ronald McCurdy testified that he could not find any records tying Gant to the crime or the disposal of the body.

//
//

4

United States District Court
Northern District of California

B. Penalty Phase

1. Prosecution case

The prosecution did not introduce any additional evidence in its case in chief at the penalty phase.

2. Defense case

The parties stipulated defendant had no prior felony convictions.

Defendant's father, William Crew, testified that defendant was born in Fort Worth, Texas in 1954. The family moved to Novato, California, in 1957 and to Petaluma, California, in 1966. During this time, defendant did well in school and was involved in sports. Defendant was never physically abused as a child.

Defendant's parents began to experience marital difficulties. His mother became noncommunicative and withdrawn. In 1969, defendant's parents divorced; defendant and his father moved to San Jose. Defendant continued to do well in school.

In 1970, when defendant was 15 years old, defendant's father married Barbara Martin. Defendant did not get along with his stepmother and one of her three children. When defendant's father and stepmother bought a home, his stepmother's children were each given a bedroom while defendant had to sleep on a couch. Defendant's grades in school began to decline. When he was 17 years old, defendant quit high school and joined the Army.

Defendant did well in the Army. He became a squad leader in charge of 12 to 14 men, rose to the rank of sergeant, and became the driver for Colonel Donald Pearce, the base commander. While he was in the Army, defendant married Patty, his high school girlfriend, and they had one daughter. When a friend and fellow-enlistee, James Gilbert, was getting in trouble because of his drinking, defendant showed concern and compassion for him. Before his honorable discharge from the Army in 1976, defendant and Patty divorced.

Thereafter, defendant married Debra Lunde and they moved to Minnesota. When his marriage to Debra ended in 1981, defendant moved to Texas, where he lived with and took care of his grandmother, Irene Watson, who was suffering from cataracts. In 1978, defendant returned to California, where he worked as a truck driver and attended junior college. He then became involved with Emily Bates, whom he treated well.

Part of the testimony of two witnesses, Richard Elander and Kathy Harper, actually given during their guilt phase testimony, was referenced at the penalty phase as well as mitigating evidence about defendant's background. That testimony consisted of Elander's testimony that defendant protected and cared for him when Elander was a young man strung out on drugs. And Kathy Harper testified that when she was financially destitute, defendant moved in with her and provided financial support for her and her son.

Emily Bates testified at the penalty phase that she had a relationship with defendant in 1977 and again in 1980. Defendant treated her well.

Defendant's father, William Crew, asked the jury to spare his son's life because as an intelligent and capable person he could lead a productive life in prison by doing assigned tasks.

Defendant's grandmother, Irene Watson, testified that defendant took care of her for two or three months in 1981 when she was in ill health.

United States District Court
Northern District of California

James Gilbert, defendant's friend whom defendant had helped while they were in the Army, described defendant as a caring and generous person.

Colonel Pearce, the base commander for whom defendant was the assigned driver while in the Army, said that defendant was intelligent, dependable, full of common sense, and mature. He described defendant as a top soldier. In his view, defendant should not be put to death because he could lead a productive life in prison by, for instance, teaching auto repair.

The defense also presented evidence from three Santa Clara County Sheriff's Deputies (Ron Yount, Toby Council, and Donald Varnado) who had daily contact with defendant during the four years he spent in the Santa Clara jail awaiting trial. According to them, defendant interacted well with prisoners and staff. Deputy Varnado mentioned that defendant prevented trouble by telling him about a plan by male inmates to overpower a female officer. All three deputies were of the view that if sentenced to life in prison, defendant could lead a productive life by helping other inmates and doing assigned tasks.

Jerry Enomoto, the former head of the California Department of Corrections and an expert on prisons, expressed the view that defendant would not be a high security risk in prison. His opinion was not changed by defendant's alleged participation in a 1985 escape attempt, because it involved an unsupervised outdoor area and was based on informant statements; because the district attorney concluded there was insufficient evidence to prosecute defendant; and because the plan did not involve weapons, violence, or the taking of hostages.

3. Prosecution rebuttal

Clinton Williams, an informant, testified that in 1985, while in the county jail with defendant, the latter discussed an escape plan, which involved cutting a hole in the surrounding fence. Defendant said he wanted to escape because he thought he would be found guilty of the first degree murder of a woman whose body was buried in an orchard outside California.

*People v. Crew*, 31 Cal.4th 822, 828-34 (2003).

Petitioner was convicted by a jury of one count of murder and the jury found true a special circumstance allegation that the murder was carried out for financial gain. The jury sentenced Petitioner to death.

**2. Procedural Background**

On August 13, 2012, Petitioner initiated the present habeas corpus action. Counsel for Petitioner were appointed on October 29, 2012. Through his appointed counsel, petitioner filed his Amended Petition for Writ of Habeas Corpus on December 6, 2013, asserting 47 claims. Respondent filed his Answer on October 3, 2014. In it, Respondent asserted affirmative defenses based on

United States District Court
Northern District of California

procedural default, cognizability, and summary dismissal.  Petitioner filed his Traverse on May 29, 2015, in which he addresses Respondent's affirmative defenses.  On June 23, 2015, Respondent filed a statement saying that he deemed any further response regarding his asserted affirmative defenses unnecessary.  The matter of Respondent's asserted affirmative defenses in now ripe for decision.

## ANALYSIS

In his Answer, Respondent has raised three categories of affirmative defenses:  procedural default, failure to state a cognizable claim, and claims subject to summary dismissal due to inadequate pleading.

### 1.    Procedural Default

Under the doctrine of procedural default, federal courts will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991), overruled on other grounds by *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012).  The doctrine of procedural default is a specific application of the general doctrine as to adequate and independent state grounds.  *Fields v. Calderon*, 125 F.3d 757, 762 (9th Cir. 1997).  It bars a federal court from granting relief on a claim when a state court declined to address the claim because the petitioner failed to meet a state procedural requirement.

In the habeas context, the procedural default rule furthers the interests of comity and federalism.  *Coleman*, 501 U.S. at 730.  It helps ensure that the state criminal trial remains the "main event" rather than a "tryout on the road" for a later federal habeas proceeding.  *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977).

The procedural default analysis proceeds in two steps.  First, the federal court must consider whether the procedural rule the state court invoked to bar the claim is both "independent" and

United States District Court
Northern District of California

"adequate" to preclude federal review.  "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law."  *LaCrosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001) (citing *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).  A state law ground is interwoven with federal law in those cases where application of the state procedural rule requires the state court to resolve a question of federal law.  *Park v. California*, 202 F.3d 1146, 1152 (9th Cir. 2000) (citing *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)).  If the state court does not make clear that it is resting its decision on an independent and adequate state ground, then the state denial is presumed to have been based at least in part upon federal grounds.  *Calderon v. U.S. Dist. Ct. for the E. Dist. of Cal.* (*Bean*), 96 F.3d 1126, 1129 (9th Cir. 1996).

For a state procedural rule to be "adequate," it must be clear, well-established and consistently applied.  *Bean*, 96 F.3d at 1129.  The issue of whether a state procedural rule is adequate to foreclose federal review is itself a federal question.  *Douglas v. Alabama*, 380 U.S. 415, 422 (1965).  The adequacy of a state procedural rule must be assessed as of the time when the petitioner committed the default.  *Fields*, 125 F.3d at 760.

The burden of proving the adequacy of a state procedural rule lies with the state.  *Bennett v. Mueller*, 322 F.3d 573, 585-86 (9th Cir. 2003).  However, once the state has adequately pled the existence of an independent and adequate procedural ground as a defense, the burden to place that defense at issue shifts to petitioner, who "may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."  *Id.* at 586.  "'The scope of the state's burden of proof thereafter will be measured by the specific claims of inadequacy put forth by the petitioner.'" *Id* at 584-85 (citation omitted).

United States District Court
Northern District of California

Second, if the procedural rule invoked by the state court is both adequate and independent, then the next step of the evaluation requires the federal court to consider whether the petitioner has established either "cause" for the default and "actual prejudice" as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 750. The "cause" standard requires petitioner to show that some factor external to the defense impeded trial counsel's efforts to raise the claim in state court. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Such objective impediments include a showing that the factual or legal basis for a claim was not available to counsel, or that "some interference by officials" made compliance with a procedural rule impracticable. *Id.* Additionally, ineffective assistance of counsel may serve as "cause" for the procedural default. *Id.* "Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

"Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *McCleskey v. Zant*, 499 U.S. 467, 494 (1991). This class of cases implicates a fundamental miscarriage of justice.

Respondent asserts that Claims Five, Eight (specifically the subclaim regarding the prosecutor's commission of misconduct during his opening statement), Eleven D, Eleven F, Thirteen, Thirty and Thirty-One are procedurally defaulted on the grounds that Petitioner failed to object to the errors complained of at trial.

//

//

9

United States District Court
Northern District of California

**A.       Adequacy and Independence of State Procedural Bar**

For Claims Eight, Eleven D[1], Thirteen, Thirty, and Thirty-One, Petitioner relies on *Smith v. Campbell*, 2011 WL 1321585 (N.D. Cal. 2010), and the cases cited therein, to support his argument that the contemporaneous objection rule has not been applied consistently to prosecutorial misconduct claims and, therefore, is inadequate.  Traverse at 22, 33, 34, 44, 48, 140 and 142.  It is noted that not all of the claims challenged by Respondent raise allegations of prosecutorial misconduct.  Specifically, Claims 11D, Thirteen, and Thirty do not contain a prosecutorial misconduct component.  As such, any argument Petitioner has raised under *Smith* is not applicable to those claims.

In *Smith*, the court determined that based on the cases cited by the petitioner there, cases which are incorporated by reference into Petitioner's response, "Petitioner has met his *Bennett* burden by showing a large number of cases demonstrating that California's contemporaneous objection rule had been applied inconsistently up to the time of petitioner's trial in 2002."  *Smith*, 2011 WL 1321585 at *6.

However, the Ninth Circuit has held repeatedly upheld the adequacy and independence of California's contemporaneous objection rule, even for prosecutorial misconduct claims.  *See Cunningham v. Wong*, 704 F.3d 1143, 1155 (9th Cir. 2013); *Rich v. Calderon*, 187 F.3d 1064, 1069-70 (9th Cir. 1999).  *See also Howard v. Campbell*, 305 Fed.Appx. 442, 444 (9th Cir. 2008); *Vigil v. Carey*, 240 Fed.Appx. 199, 201 (9th Cir. 2007).  *See generally Vansickel v. White*, 166 F.3d 953, 958 (9th Cir. 1997) (finding procedural default under the contemporaneous objection bar); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995)  ("*Bonin I*") (finding default based on failure to object at trial).

---

[1] Petitioner does not raise a challenge to the procedural default finding by the California Supreme Court as to Claim Eleven F.  Even if Petitioner were to have raised the same defense he raised for the remainder of the claims found defaulted on direct appeal, for the reasons stated herein, he would not prevail.

United States District Court
Northern District of California

Because the issue of whether a state procedural rule is adequate to foreclose federal review is itself a federal question, this Court is bound by the Ninth Circuit's determination regarding the rule's adequacy and independence.  *See Douglas*, 380 U.S. at 422 (1965).  Accordingly, these claims are barred by the independent and adequate state contemporaneous objection rule.

Petitioner's also argues that Claims Five and Thirty, which were presented in his second habeas petition, are not barred by an adequate and independent state rule because the California Supreme Court cited to *In re Seaton*, 34 Cal.4th 193, 199-200 (2004).  Petitioner says that the rule of default it announces did not come into effect fifteen years after Petitioner's trial and, therefore, is inapplicable to Petitioner's claims.  This argument is unavailing.  The passage Petitioner cites is a mere recitation of the already existing contemporaneous objection rule.  Accordingly, Claims Five and Thirty are barred by the state's adequate and independent contemporaneous objection rule.

### B.   Cause, Prejudice, and Fundamental Miscarriage of Justice

Since the determination of whether Petitioner has established exceptions to default involves an examination of the merits of Petitioner's claims, the Court defers ruling on the former until after it has considered the latter.  *See Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir. 1982) (finding that, if deciding merits of claims proves to be more efficient than adjudicating exceptions to procedural default, a court may exercise discretion to take this course of action).  The Court will consider issues of cause, prejudice and the miscarriage of justice with respect to any claims that appear to have merit at a later date.  Accordingly, Petitioner shall brief the merits of these defaulted claims.

### 2.   Cognizability And Related Claims

Violations of state law generally do not implicate federal due process concerns.  It is only when a state statute creates a protected "liberty interest" that the violation of state law raises federal constitutional concerns on federal habeas corpus.  *See Bonin*, 59 F.3d at 841.  A state law creates a

United States District Court
Northern District of California

"liberty interest" protected by the Due Process Clause if the law: (1) contains "substantive predicates" governing official decision making; (2) contains "explicitly mandatory language" specifying the outcome that must be reached if the substantive predicates are met; and (3) protects "some substantive end." *See id.* at 842. The state law must provide more than merely procedure. *See id.*; *Dix v. County of Shasta*, 963 F.2d 1296, 1299 (9th Cir. 1992).).

Several panels of our court of appeals also have required that the state law violation result in the deprivation of a substantive right protected by the Constitution. *See, e.g.*, *Bonin v. Calderon*, 77 F.3d 1155, 1161-62 (9th Cir. 1996) ("*Bonin II*") (even assuming violation of state law in setting execution date, no federal habeas claim because there is no deprivation of federal substantive right); *Bonin I*, 59 F.3d at 842 (California statute which gives defendant in capital case right to have two defense attorneys argue in his behalf does not create protected liberty interest cognizable in habeas because it contains neither "substantive predicates" nor "explicitly mandatory language," and there is no federal constitutional right to have two attorneys make closing arguments); *Moran v. Godinez*, 57 F.3d 690, 698 (9th Cir. 1995) (although post-conviction court violated Nevada law when it placed burden of proving competency on defendant, violation of state law did not result in deprivation of substantive right because state provided defendant with constitutionally adequate procedures to evaluate his competency, even with burden of proof on him).

A.     **Claim Three: Santa Clara County Lacked Jurisdiction to Try, Convict and Sentence Petitioner.**

This claim argues that Petitioner's due process rights under the Fourteenth Amendment were violated because there was insufficient evidence to confer jurisdiction and venue on Santa Clara County. Am. Pet. at 41-42. He argues that this state-created right confers a due process right, as envisioned in *Hicks v. Oklahoma*, 447 U.S. 343. *Id.* Petitioner also states that his "rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to a jury trial, to fundamental fairness, equal

protection, to a reliable guilt determination and a reliable, individualized and non-arbitrary sentencing determination were violated" by the improper venue. *Id.* at 42. Petitioner includes a subclaim arguing that all of these rights were violated by the trial court's failure to sua sponte instruct the jury that it was the jury's province to determine the issue of venue. *Id.*

On direct appeal, the California Supreme Court found that there was sufficient evidence to warrant venue in Santa Clara County. *Crew*, 31 Cal.4th at 836. The state court declined to reach the merits of any subclaims related to jury instructions or whether the matter should have been submitted to the jury at all, finding the issue waived because Petitioner failed to offer his own instruction. *Id.*

Respondent contends that the entirety of Claim Three is not cognizable on federal habeas because "the Supreme Court has never determined whether the question of venue under state law is a question for the jury to decide as a matter of federal constitutional law, much less one requiring proof beyond a reasonable doubt." Answer at 84. Respondent notes that this asserted violation of state law is not the type that was envisioned by *Hicks*. *Id.* at 83, 87. Respondent also argues that the instructional error subclaim is procedurally defaulted based on Petitioner's waiver of the issue. *Id.* at 87.

Petitioner responds that the state-created right to venue is sufficient to make the claim federally cognizable. Traverse at 12. Petitioner argues, with specific regard to the instructional error subclaim, that he cannot waive a right to *sua sponte* instruction. *Id.* at 15-16. Petitioner also asserts that the waiver rule was not independent and adequate at the time of its application to Petitioner's claim. *Id.* at 16.

### i.      Cognizability

This claim is not cognizable on federal habeas review. Petitioner's reliance on *Hicks* here is misplaced. There, the defendant had been sentenced to a mandatory 40-year sentence under a

sentencing statute that was later declared to be unconstitutional.  *Hicks*, 447 U.S. at 344-45.  The

Oklahoma Court of Criminal Appeals acknowledged the ruling, but determined that the defendant had

not been prejudiced because the 40-year sentence was within the range of what the jury could have

imposed.  *Id.* at 345.  The United States Supreme Court overturned the sentence finding:

> By statute in Oklahoma, a convicted defendant is entitled to have his punishment fixed
> by the jury. . . .  Where . . . a state has provided for the imposition of criminal
> punishment in the discretion of the trial jury, it is not correct to say that the defendant's
> exercise of that discretion is merely a matter of state procedural law.  The defendant in
> such a case has a substantial and legitimate expectation that he will be deprived of his
> liberty only to the extent determined by the jury in the exercise of its statutory
> discretion.

*Id.* at 345-46.  Hicks, therefore, had a substantive right to have his sentence determined by a jury, as

opposed to a judge.

By contrast, the venue statutes Petitioner cites do not confer jurisdiction on the superior courts

within California.  *People v. Simon*, 25 Cal.4th 1082, 1096 ("[T]he issue of venue in criminal as well

as civil cases does *not* involve a question of 'fundamental' or 'subject matter' jurisdiction over a

proceeding.") (emphasis in original).  The *Simon* court discussed the history of the venue requirement

when deciding whether a defendant could waive his right to challenge venue.[2]  That court noted, "As

a leading treatise explains: 'If the crime is one over which California can and does exercise its

legislative jurisdiction because it was committed in whole or in part within the state's territorial

borders, California courts have jurisdiction to try the defendant.'"  *Id.*  They are designed to protect a

---

[2] Petitioner challenges the California Supreme Court application of *Simon* to his appeal because the
*Simon* decision issued more than twelve years after his appeal.  In *Simon*, the California Supreme
Court held that the waiver rule they articulated therein would not be retroactive.  Thus, it would not be
applicable to Petitioner.  However, the state court's discussion about the nature of the venue statutes
and their purpose is not a statement of a new rule.  Rather it is a historical commentary.  Thus, the
general statements about the venue requirement in California are instructive, even though the new rule
announced in the case is not applicable to Petitioner.  The same holds true for *People v. Posey*, 32
Cal.4th 193 (2004).

United States District Court
Northern District of California

United States District Court
Northern District of California

defendant from being haled into court in a faraway jurisdiction.  *Id.* at 1095.  While this arguably

meets the test set out by *Bonin I*, there is no correlative federal right to venue.

Moreover, the venue requirement does not encompass a statutory right to have venue

determined by a jury.  *People v. Posey*, 32 Cal.4th 193, 201 (2004) ("In addition to concluding that

the rule that venue is a question of fact for the jury is unsound, we also conclude that this rule

properly may be reconsidered and modified by this court without awaiting action by the Legislature,

because the rule was established by judicial decision and has not been incorporated by any statute.").

While the trial court may have erred according to prevailing practice at the time of Petitioner's

trial by failing to *sua sponte* instruct the jury that it needed to find venue properly rested in Santa

Clara County, that does not necessarily give rise to a federal constitutional claim.  *See Rivera v.*

*Illinois*, 556 U.S. 148, 159 (2009) (not every state-law error rises to the level of a federal due process

violation).  Petitioner did not have a statutory right to have the venue issue determined by jury trial

like the petitioner in *Hicks*.  Nor does the state confer jurisdiction of the case onto a particular court.

Therefore, Petitioner's venue and related instructional error claims are for state law errors only and,

therefore, are not cognizable on federal habeas review.  *Rhoades v. Henry*, 611 F.3d 1133, 1142 (9th

Cir. 2010) ("In short, violations of state law are not cognizable on federal habeas review").  This

claim is, therefore, DISMISSED because it is not cognizable.

### ii.      Merits

Even if Petitioner had raised a cognizable claim, such a claim would be without merit.  Under

the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996, a district court may not grant

habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

As noted, the United States Supreme Court has not held that the failure to follow a state venue statute constitutes a deprivation of Due Process or any other constitutional right.  Therefore, the California Supreme Court's decision cannot be said to be an unreasonable application of clearly established federal law.

Moreover, the California Supreme Court evaluated Petitioner's claim that there was insufficient evidence to confer evidence in Santa Clara County and determined there was.  *Crew*, 31 Cal.4th at 835-36.  The state court's determination that there was no state law violation is binding on this court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). As a result, *Hicks v. Oklahoma* is irrelevant.

Petitioner also has failed to show prejudice.  Even if a petitioner meets the requirements of section 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.' (Citation omitted.)  There must be more than a 'reasonable possibility' that the error was harmful."  *Davis v. Ayala*, __ U.S. __, 135 S.Ct. 2187, 1297-98 (2015).  While Petitioner asserts that he was denied the right to "a reliable guilt determination and a reliable, individualized and non-arbitrary sentencing determination," he fails to put forth any argument as to how that occurred.  Nor could he make a showing.

As noted, venue is not a component of the crime, nor does it confer jurisdiction over the court. The point of the venue statutes is to allow the state to prosecute defendants for crimes committed

United States District Court
Northern District of California

within the state while providing the defendant and the counties reasonable access to witnesses. *Simon*, 25 Cal.4th at 1096-97. Petitioner has not alleged any prejudice consistent with the right he asserts and he has failed to make any showing that because his case was venued in Santa Clara County that either his trial or his sentence was fundamentally unfair. Accordingly, in the alternative, this claim is DENIED on the merits.

### iii.     Procedural Default

Because the Court finds this claim, and all subclaims within it, either not cognizable or lacking in merit, it does not need to reach the issue of procedural default for Petitioner's instructional error subclaim.

### B.     Claim Four: Trial Counsel Were Ineffective for Failing To Make Appropriate Arguments Regarding the Issue of Venue

In Claim Four, Petitioner argues, "Trial counsel unreasonably failed to request that the jury be instructed or be required to make express findings of the jurisdictional facts, and had no tactical reason for such failures." Am. Pet. at 48. Petitioner adds, "Even though the California Supreme Court found that there was sufficient evidence in the record to establish jurisdiction and venue, there was at minimum, a factual question for the jury as to whether sufficient acts occurred in Santa Clara to confer jurisdiction." *Id.* at 49. The California Supreme Court denied this claim on the merits on habeas without explanation.

Respondent does not raise an affirmative defense regarding Claim Four. However, since Claim Three, the substantive claim underlying this ineffective assistance of counsel claim, was dismissed or, in the alternative, denied on the merits, the Court will review the merits of this related claim now.

In order to prevail on a Sixth Amendment ineffectiveness of trial counsel claim, Petitioner must establish two things. First, he must show that counsel's performance was deficient, *i.e.*, that it

fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

First, Petitioner must show that trial counsel's performance was deficient. *See id.* at 688. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See id.* at 689. "Although courts may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (citations omitted). Petitioner has the burden of showing through evidentiary proof that trial counsel's performance was deficient. *See Toomey v. Bunnell*, 898 F.2d 741, 743 (9th Cir. 1990). It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test if Petitioner cannot even establish incompetence under the first prong. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

Second, Petitioner must show that trial counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 688. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by Petitioner as the result of the alleged deficiencies. *See id.* at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995).

United States District Court
Northern District of California

Furthermore, under AEDPA, the state court's determination of an ineffective assistance of counsel claim is afforded additional deference:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." . . .  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.

*Harrington*, 562 U.S. at 101.

As noted above in relation to Claim Three, Petitioner did not have a statutory right to have the issue of venue submitted to the jury.  Trial counsel did file a motion to dismiss based on insufficient evidence to support venue in Santa Clara County, which was denied by the trial court.  RT at 4474-79.  Counsel were not unaware of the potential challenge to venue and raised the issue.  Petitioner, therefore, has failed to show deficient performance.

Additionally, Petitioner has failed to show prejudice as a result of counsel's failure to request jury instructions regarding venue or to challenge the prosecutor's misstatement about what evidence is needed to show venue because the California Supreme Court found that there was sufficient evidence to support venue in Santa Clara County under state law.  As noted above, this Court is bound by that determination.

Thus, Petitioner has not shown that the state court's decision denying this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d).  Accordingly, Claim Four is DENIED.

19

United States District Court
Northern District of California

**C.      Claim Six: Petitioner's Extrajudicial Statements Were Erroneously Admitted Because There Was No Proof of *Corpus Delecti***

In this claim, Petitioner argues that in the absence of a *corpus delecti*, or evidence sufficient to permit a reasonable inference to be drawn that the victim died and the death was caused by criminal agency, the admission of his extrajudicial statements violated his "Fifth, Sixth, Eighth and Fourteenth Amendment rights to a jury trial, fundamental fairness, equal protection, proof beyond a reasonable doubt of each element of the crime charged, a fair and reliable guilt determination, and an individualized, non-arbitrary and reliable sentencing determination."  Am. Pet. at 57.  The California Supreme Court denied this claim on appeal finding that the prosecution produced sufficient evidence to satisfy the rule.  *Crew*, 31 Cal.4th at 749-50.

Respondent argues that this claim challenges a state court's adherence to a state rule and, therefore, is not cognizable on federal habeas.  Answer at 99.  Petitioner responds that his claim is cognizable, that it is nearly identical to a claim considered on the merits in *Savell v. Eps*, 2010 WL 3724549 (S.D. Miss. 2010), and that it amounts to a Due Process violation under *Hicks*.  Traverse at 25-26.

**i.      Cognizability**

Respondent is correct that this claim is not cognizable on federal habeas review.  Under California law, "the *corpus delicti* rule requires that a conviction be supported by some evidence, which need only constitute a slight or prima facie showing, but must be in addition to and beyond the defendant's untested inculpatory extrajudicial statements."  *People v. Rivas*, 214 Cal.App.4th 1410, 1428 (Cal.App. 6 Dist.2013) (internal quotation marks and citations omitted).  The California Supreme Court further explained the rule in *People v. Alvarez*, 27 Cal.4th 1161, 1171 (2002), "[O]nce the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues ."

United States District Court
Northern District of California

However, this requirement that independent evidence support a defendant's extrajudicial statements is purely a matter of state law. *See*, *e.g.*, *Alvarez*, 27 Cal.4th at 1173 ("[i]t is undisputed that the *corpus delicti* rule is not a requirement of federal law"); *Holland v. Glebe*, 2014 WL 5306674 *16 (W.D. Wa. Oct. 15, 2014); *Hicks v. Paramo*, 2014 WL 3767416, at *9 (C.D. Cal. July 31, 2014) (collecting cases); *Lopez v. Allison*, 2014 WL 3362228, at *7 (E.D.Cal. July 8, 2014) (stating that "California's *corpus delicti* rule is a matter of state law," and collecting cases); *Rodriguez v. Cate*, 2013 WL 5521997, at *13 (C.D.Cal. Oct.2, 2013) (the *corpus delicti* rule is a state rule that "is not grounded in federal law or the federal constitution"). Accordingly, as noted above for Claim Three, there is no federal relief available. Again, Petitioner's reliance on *Hicks v. Oklahoma* is unavailing. Accordingly, this claim is DISMISSED because it is not cognizable on federal habeas review.

### ii.   Merits

Even if Petitioner had stated a cognizable claim, such a claim would be meritless. The California Court of Appeal found sufficient evidence to satisfy the *corpus delicti* rule. "[T]he quantum of evidence required [to meet the rule] is not great, and 'need only be "a slight or prima facie showing" permitting an inference of injury, loss, or harm from a criminal agency, after which the defendant's statements may be considered to strengthen the case on all issues.' [Citation.]" *People v. Ledesma* 39 Cal.4th 641, 722 (2006). "The inference [that a crime has been committed] need not be 'the only, or even the most compelling, one ... [but need only be] a reasonable one.'" *Id.*, quoting *People v. Jones* (1998) 17 Cal.4th 279, 301–302 (1998).

The California Supreme Court on direct appeal cited evidence that the victim's

> contacts with her friends abruptly stopped after she left San Jose with [Petitioner]. For 20 years, Nancy had telephoned her friend Jeanette St. John on August 24, Jeanette's birthday. She promised to call another friend . . . every other week after her arrival in South Carolina. Shortly before her disappearance, Nancy told Debbie Nordman to call the police if Nordman had not heard from her in two weeks. In addition, shortly after Nancy's disappearance, [Petitioner] sold Nancy's truck, car, horse, clothes, and spent

her money.  This evidence is more than sufficient to support a reasonable inference that Nancy is dead and her death was the result of a criminal agency.

*Crew*, 31 Cal.4th at 834.  Petitioner has failed to show that this was an unreasonable application of clearly established federal law or "an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).  Accordingly, this claim is DENIED in the alternative to the dismissal for lack of cognizability.

> **D.      Claim Seven:  Trial Counsel Were Ineffective For Failing To Seek To Exclude Petitioner's Statements Based on the *Corpus Delecti* Rule**

As noted above, the California Supreme Court found that there was sufficient evidence to satisfy the California *corpus delecti* rule.  Petitioner has failed to show that any motion to exclude his statements would be successful in light of the evidence supporting their inclusion under the *corpus delecti* rule.

Because Petitioner has not shown that the state court's decision denying this claim was "contrary to, or involved an unreasonable application of, clearly established Federal law" or that it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" to it.  28 U.S.C. § 2254(d), this claim is DENIED.

> **E.      Claim Forty-Five: Petitioner Was Denied Meaningful Review of the Claims Raised in His State Habeas Petition Regarding the Modification of His Sentence Under § 190.4(e).**

Petitioner claims that his confinement is unlawful because his conviction and sentence were illegally and unconstitutionally obtained in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments "due to the California Supreme Court's failure to fully and fairly adjudicate the claims raised in Petitioner's first habeas petition . . . including, but not limited to the failure to permit Petitioner to obtain discovery, interrogatories and depositions, subpoenas, an evidentiary hearing and other mechanisms for factual development and the summary denial of the petition."  Am. Pet. at 365.

United States District Court
Northern District of California

Respondent asserts that this claim is not cognizable because habeas relief is not available for errors of state law.  Answer at 277.

As Petitioner concedes, it is well settled that "a petition alleging errors in the state post-conviction review process is not addressable through habeas corpus proceedings." *Franzen v. Brinkman*, 877 F.2d 26 (9th Cir.1989).  Therefore, Petitioner's claim that the California Supreme Court's denial of his habeas petition violated his federal constitutional rights is not cognizable in this Court.  Accordingly, this claim is DISMISSED.

### 3. Summary Dismissal

A court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975).  Habeas corpus petitions must meet heightened pleading requirements.  *McFarland v. Scott*, 512 U.S. 849, 856 (1994).  An application for a federal writ of habeas corpus filed by a prisoner who is in state custody pursuant to a judgment of a state court must "specify all the grounds for relief which are available to the petitioner ... and shall set forth in summary form the facts supporting each of the grounds thus specified."  Rule 2(c) of the Rules Governing Section 2254 Cases, 28 U.S.C. foll. 2254.  "'[N]otice' pleading is not sufficient, for the petition is expected to state facts that point to a 'real possibility of constitutional error.'"  Rule 4 Advisory Committee Notes (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).  Summary dismissal is appropriate only where the allegations in the petition are vague or conclusory, palpably incredible, or patently frivolous or false.  *See Hendricks v. Vasquez*, 908 F.2d 490, 491 (9th Cir.1990) (quoting *Blackledge v. Allison*, 431 U.S. 63, 75–76 (1977)).  Respondent asserts that Claims Nine and Eighteen are inadequately pled.

United States District Court
Northern District of California

In Claim Nine, Petitioner states that his "confinement and sentence are illegal, unconstitutional and void because trial counsel were ineffective for failing to seek appropriate instructions in response to the prosecutor's misconduct as set forth in Claim [Eight] and object to the misconduct in opening statement in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."  Am Pet. at 69.  In Claim Eighteen, Petitioner argues that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated "because the prosecution failed to disclose material, exculpatory and impeaching evidence known to the prosecution but not to the defense; misrepresented and/or suppressed material, exculpatory and impeaching evidence known to the prosecution but not the defense; knowingly presented perjured testimony; and failed to correct false statements at trial."  Am. Pet. at 131-32.  For this claim, Respondent asserts that "with the exception of petitioner's complaint about the prosecution's alleged agreement not to investigate or prosecute Elander for perjury, this claim is inadequately pled."  Answer at 157.

In his Traverse, Petitioner cites to specific facts that would support his claim, some of which are detailed more thoroughly in other claims and incorporated by reference.  Because Petitioner is required only to present a summary of supporting facts, the Court finds these two claims to be adequately pled.

## CONCLUSION

For the reasons stated above:

- The following claims are procedurally barred, but shall proceed to merits briefing: Five, Eight (specifically the subclaim regarding the prosecutor's commission of misconduct during his opening statement), Eleven D, Eleven F, Thirteen, Thirty and Thirty-One;

24

- The following claims are DISMISSED in their entirety because they are not cognizable on federal habeas review:  Three, Six, and Forty-Five.  In the alternative, Claims Three and Six are DENIED in their entirety on the merits.
- The following claims related to non-cognizable claims are DENIED:  Four and Seven.
- The following claims are deemed adequately pled and shall proceed to merits briefing: Nine and Eighteen.

The Court directs the parties to meet and confer and file a joint statement identifying which of the remaining claims in the Petition are record-based and will, therefore, not require an evidentiary hearing.  As part of the joint statement, the parties also shall submit a proposed litigation schedule for the resolution of the remaining claims.  The joint statement is due within thirty (30) days of the filing date of this order.  The Court will issue a briefing schedule for the record-based claims following receipt of the joint statement.

**IT IS SO ORDERED**.

Dated: November 30, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**