**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

<table>
<tr><td>

**MARK CHRISTOPHER CREW,**

      **Petitioner,**

      **vs.**

**RON DAVIS, Warden of San Quentin State Prison**

      **Respondent.**

</td><td>

**Case No.: 12-CV-4259 YGR**

**CAPITAL CASE**

**ORDER DENYING SECOND ROUND OF CLAIMS**

</td></tr>
</table>

**INTRODUCTION**

Petitioner Mark Christopher Crew, a California capital prisoner currently incarcerated at San Quentin State Prison, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On December 6, 2013, through his appointed counsel, Petitioner filed a second amended petition with forty-seven fully exhausted claims. Respondent Ron Davis filed an answer on October 3, 2014 and Petitioner replied on May 29, 2015.

Due to the size of the petition, the parties agreed to proceed to a merits resolution on twenty-five record-based claims in three rounds of no more than nine claims. This Order decides the second round of record-based claims. Petitioner filed an opening brief addressing claims One, Twenty-One, Twenty-Four, Twenty-Nine, and Thirty-One on December 16, 2017. Respondent filed an answer on January 25, 2018, and Petitioner filed a reply on February 16. The Court determines that these claims are suitable for decision without oral argument. Having reviewed the parties' papers and the record, and having carefully considered the relevant legal authorities, the Court DENIES the second round of claims.

\\

\\

# BACKGROUND

## I. STATEMENT OF FACTS

The following facts are taken from the October 29, 2003 opinion of the California Supreme Court on direct appeal from the jury verdict. This summary is presumed correct. *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir.2002); 28 U.S.C. § 2254(e)(1).

1. Prosecution's case

Defendant met Nancy Jo Wilhelmi Andrade (Nancy), a nurse, at the Saddle Rack bar in San Jose in 1981, shortly after Nancy's divorce. Nancy owned a purebred horse and a Ford pickup truck. Nancy and defendant were romantically involved until November or December of 1981, after which they did not see each other until April of 1982, when they resumed the relationship.

In January 1982, when Nancy and defendant were not romantically involved, Nancy and her friend Darlene Bryant planned a trip across the United States for the summer, and that spring Nancy bought a yellow Corvette for the trip. In May 1982, Richard Elander, one of defendant's best friends, began work at a ranch in Utah run by Richard Glade. Before Elander left for Utah, defendant had talked to him about killing Nancy during a trip across the country. While in Utah, Elander asked Glade about carrying a body into the wilderness of the Utah mountains. Disturbed by the conversation, Glade fired Elander.

Defendant asked Nancy to move to Greer, South Carolina, where defendant's mother and stepfather lived. When Nancy replied she did not want to move so far away unless married, defendant agreed to marry her. The wedding took place on June 4, 1982.

The marriage soon floundered. Nancy was living with Darlene at the latter's home, but defendant was rarely there. Nancy twice saw defendant with some women at the Saddle Rack bar. She told several friends she was thinking of an annulment of the marriage.

Defendant had been romantically involved with Lisa Moody, to whom he proposed marriage in June 1982, the same month he married Nancy. Defendant and Moody did not set a date for the wedding.

In July 1982, defendant and his friend Richard Elander moved to Greer, South Carolina, where they stayed with defendant's parents and started a truck service business. That same month, Nancy and her friend Darlene took their planned vacation trip across the country. They stopped in Greer, South Carolina, and Nancy spent the night with defendant.

After Nancy's visit to South Carolina, defendant and his stepfather, Bergin Mosteller, decided to return to California to kill Nancy. Defendant discussed with Elander different ways of killing her, including suffocation, hitting her with a large wrench, and "bleeding her in the shower so she wouldn't make any mess." They also discussed leaving her body in the Utah wilderness, where they could bury her or "hang her in a tree, let the bears eat her."

After returning to California in early August 1982, Nancy often spoke on the telephone with defendant. She decided to move to South Carolina in an effort to

2

make the marriage work, and she began to make arrangements to do so. She gave custody of her two children from a prior marriage to their father and closed out her bank account, obtaining $10,500 in cash and a money order for $2,500. When Deborah Nordman, one of Nancy's friends, remarked that Nancy might be left in the desert during the trip with defendant to South Carolina, Nancy replied, "If you don't hear from me in two weeks, send the police."

On August 21, 1982, defendant and his stepfather came to Darlene's house, where Nancy was living, in a station wagon pulling a horse trailer. They loaded Nancy's belongings into the trailer and picked up Nancy's horse from a stable in Gilroy. The plan was for Mosteller to drive the station wagon to Texas, where he would leave the horse with relatives. Nancy and defendant would follow in Nancy's Corvette and truck. They would leave the truck in Texas, where defendant's friend, Richard Elander, would retrieve the truck, the horse, and Nancy's belongings and take them all to South Carolina. Nancy and defendant would then leave Texas in Nancy's Corvette to go on a two-week honeymoon. Mosteller, however, never went to Texas. He boarded the horse in a stable in San Jose, drove to Nevada, and finally flew to South Carolina.

On August 23, Nancy and defendant went to Nancy's parents' home in Santa Cruz, California, where they picked up Nancy's dog and some of her belongings, including a microwave, stereo components still in the original cartons, and personal documents. That same day, Nancy and defendant ostensibly left for South Carolina.

That same night, however, defendant checked into a Motel 6 in Fremont, California, where he registered to stay for two nights. The next day, he arrived at the home of Lisa Moody, the woman who had accepted defendant's marriage proposal shortly after his marriage to Nancy. Over the next two days, defendant gave Lisa a stereo and a microwave, took her to see a horse in a San Jose stable, and arranged for her to convert $5,000 in cash into a cashier's check payable to Bergin Mosteller, defendant's stepfather.

On August 28, 1982, defendant and Lisa left for South Carolina in a pickup truck with a horse in a trailer. They stopped in Texas, where they stayed at defendant's grandmother's house for a couple of days. While there, defendant became upset and agitated after receiving a phone call. After defendant and Lisa arrived in Greer, South Carolina, defendant opened a bank account in which he deposited Nancy's $2,500 money order. Elander and Mosteller sold Nancy's clothing and possessions at a flea market for about $500, burned her documents in a backyard, and sold the horse trailer and Nancy's horse.

Defendant and Lisa returned to San Jose in mid-September. Defendant then sold Nancy's truck for $4,200, giving the purchaser a certificate of title with Nancy's forged signature. On October 13, 1982, defendant told Lisa that the phone call he received in Texas while they were at his grandmother's house was about a woman who loved him and was telling people in South Carolina she was going to marry him. According to defendant, the woman went to the head of the Mafia in Arizona to complain about defendant, but the Mafia killed her instead. Defendant told Lisa that he was forced to dispose of the body to avoid being blamed for the woman's death, and that he buried it in his friend Bruce Gant's backyard. The phone call defendant had received in Texas was actually from Gant who told him that the "body was

beginning to stink." That same day, defendant returned to South Carolina in Nancy's Corvette.

Richard Elander testified under a grant of immunity. He said that on the day defendant and Lisa arrived in Greer, South Carolina, defendant told him the details of Nancy's killing. According to Elander, after defendant and Nancy left San Jose, California, they stopped and walked up a hillside into the woods. While Nancy and defendant were sitting on the hillside talking, defendant shot her in the back of the head and rolled the body down a ravine where he covered it with blankets. Defendant then drove one of the cars to Bruce Gant's house in Campbell, California. Defendant and Gant returned to the scene and retrieved the other vehicle.

The next evening, defendant and Gant got drunk and returned to the site where defendant had shot Nancy. When defendant walked down to her body, it had moved. Defendant "freaked out," ran back to the truck, and told Gant. Gant went down the ravine where he tried to strangle Nancy and break her neck. He eventually cut off Nancy's head. Defendant told Elander that they put Nancy's body in a 55–gallon drum filled with cement and buried it in Gant's backyard. They put her head in a five-gallon bucket filled with cement and threw it off the Dumbarton Bridge between Alameda and San Mateo Counties, California.

A few days after defendant returned to South Carolina, Elander testified, he sold Nancy's Corvette to Marion Mitchell. When Mitchell repeatedly asked for title to the car, Elander told him that defendant had killed his wife by shooting her, cutting off her head, putting the body in a barrel filled with concrete, and burying it in a backyard. Elander then forged defendant's signature on a bill of sale and gave it to Mitchell.

In January 1983, defendant made arrangements to stay in Connecticut with Jeanne Meskell, with whom he previously had a relationship. While there, defendant told Meskell that he had killed a girl, that she was in two pieces in two drums filled with cement, and that one drum was in the San Francisco Bay and one was in a backyard. In March 1983, the San Jose police searched Bruce Gant's house, where they recovered a Tiffany lamp identical to one of Nancy's. A search of Gant's yard with steel probes in March 1983 and again in 1984 did not reveal anything. Nancy's body was never found.

2. Defense case

The defense at the guilt phase consisted primarily of challenges to the credibility of the prosecution witnesses. The defense introduced evidence that Elander was an untrustworthy drug addict who had engaged in "lying contests" with defendant and that a woman with blonde hair and a dog had come to the San Jose stable with defendant. Because Nancy had blonde hair and owned a dog, the evidence was introduced to try to show that Nancy was aware that Mosteller had taken her horse to the San Jose stable. The defense also introduced evidence to raise doubts over the burial of Nancy's body in Gant's backyard in Campbell, California. San Jose Police Officer Demowski testified that officers searched Gant's backyard three times without finding Nancy's body. District attorney investigator Ronald McCurdy testified that he could not find any records tying Gant to the crime or the disposal of the body.

B. Penalty Phase

1. Prosecution case

The prosecution did not introduce any additional evidence in its case in chief at the penalty phase.

2. Defense case

The parties stipulated defendant had no prior felony convictions.

Defendant's father, William Crew, testified that defendant was born in Fort Worth, Texas in 1954. The family moved to Novato, California, in 1957 and to Petaluma, California, in 1966. During this time, defendant did well in school and was involved in sports. Defendant was never physically abused as a child.

Defendant's parents began to experience marital difficulties. His mother became noncommunicative and withdrawn. In 1969, defendant's parents divorced; defendant and his father moved to San Jose. Defendant continued to do well in school.

In 1970, when defendant was 15 years old, defendant's father married Barbara Martin. Defendant did not get along with his stepmother and one of her three children. When defendant's father and stepmother bought a home, his stepmother's children were each given a bedroom while defendant had to sleep on a couch. Defendant's grades in school began to decline. When he was 17 years old, defendant quit high school and joined the Army.

Defendant did well in the Army. He became a squad leader in charge of 12 to 14 men, rose to the rank of sergeant, and became the driver for Colonel Donald Pearce, the base commander. While he was in the Army, defendant married Patty, his high school girlfriend, and they had one daughter. When a friend and fellow-enlistee, James Gilbert, was getting in trouble because of his drinking, defendant showed concern and compassion for him. Before his honorable discharge from the Army in 1976, defendant and Patty divorced.

Thereafter, defendant married Debra Lunde and they moved to Minnesota. When his marriage to Debra ended in 1981, defendant moved to Texas, where he lived with and took care of his grandmother, Irene Watson, who was suffering from cataracts. In 1978, defendant returned to California, where he worked as a truck driver and attended junior college. He then became involved with Emily Bates, whom he treated well.

Part of the testimony of two witnesses, Richard Elander and Kathy Harper, actually given during their guilt phase testimony, was referenced at the penalty phase as well as mitigating evidence about defendant's background. That testimony consisted of Elander's testimony that defendant protected and cared for him when Elander was a young man strung out on drugs. And Kathy Harper testified that when she was financially destitute, defendant moved in with her and provided financial support for her and her son.

Emily Bates testified at the penalty phase that she had a relationship with defendant in 1977 and again in 1980. Defendant treated her well.

Defendant's father, William Crew, asked the jury to spare his son's life because as an intelligent and capable person he could lead a productive life in prison by doing assigned tasks.

Defendant's grandmother, Irene Watson, testified that defendant took care of her for two or three months in 1981 when she was in ill health.

James Gilbert, defendant's friend whom defendant had helped while they were in the Army, described defendant as a caring and generous person.

Colonel Pearce, the base commander for whom defendant was the assigned driver while in the Army, said that defendant was intelligent, dependable, full of common sense, and mature. He described defendant as a top soldier. In his view, defendant should not be put to death because he could lead a productive life in prison by, for instance, teaching auto repair.

The defense also presented evidence from three Santa Clara County Sheriff's Deputies (Ron Yount, Toby Council, and Donald Varnado) who had daily contact with defendant during the four years he spent in the Santa Clara jail awaiting trial. According to them, defendant interacted well with prisoners and staff. Deputy Varnado mentioned that defendant prevented trouble by telling him about a plan by male inmates to overpower a female officer. All three deputies were of the view that if sentenced to life in prison, defendant could lead a productive life by helping other inmates and doing assigned tasks.

Jerry Enomoto, the former head of the California Department of Corrections and an expert on prisons, expressed the view that defendant would not be a high security risk in prison. His opinion was not changed by defendant's alleged participation in a 1985 escape attempt, because it involved an unsupervised outdoor area and was based on informant statements; because the district attorney concluded there was insufficient evidence to prosecute defendant; and because the plan did not involve weapons, violence, or the taking of hostages.

3. Prosecution rebuttal

Clinton Williams, an informant, testified that in 1985, while in the county jail with defendant, the latter discussed an escape plan, which involved cutting a hole in the surrounding fence. Defendant said he wanted to escape because he thought he would be found guilty of the first degree murder of a woman whose body was buried in an orchard outside California.

*People v. Crew*, 31 Cal.4th 822, 828-34 (2003).

Petitioner was convicted by a jury of one count of murder and the jury found true a special circumstance allegation that the murder was carried out for financial gain. CT 2272, AG 2353. The jury sentenced Petitioner to death. CT 2300, AG 2394.

## II. PROCEDURAL BACKGROUND

Petitioner filed a motion for modification of his sentence in the trial court. RT 5158-82, AG 10861-85. The trial court granted the motion, citing, "'1) a lack of any prior criminal activity involving violence or the threat to use force or violence; [¶] 2) the absence of any prior felony conviction; [¶] 3) the defendant's background; [¶] 4) the defendant's interpersonal relationships;

6

[¶ 5) the defendant's custodial conduct; and [¶ 6) the testimony of Jerry Enomoto, an expert witness regarding the Department of Corrections.'" *People v. Crew* ("*Crew II*"), 1 Cal. App. 4th 1591, 1598 (6th Dist. 1991). The court sentenced Petitioner to life without the possibility of parole. *Id.* It also imposed the aggravated term on Petitioner's grand theft conviction. RT 5182, AG 10885.

The state appealed the trial court's ruling, arguing that the trial judge improperly compared the facts of Petitioner's case with those of other capital cases over which he had presided. *Crew II*, 1 Cal. App. 4th at 1595. The California Court of Appeal found that the trial court's "substantial reliance on the facts of those others cases in ruling on the section 190.4(e) motion was unauthorized and therefore erroneous." *Id.* at 1604. Accordingly, it vacated the judgment and remanded the case to the trial court for "the limited purpose of redetermining the automatic modification motion pursuant to section 190.4(e)." *Id.* at 1609. The California Supreme Court denied Petitioner's petition for review on March 26, 1992. *Id.* at 1610. Following remand, the trial court reinstated the death sentence.

On August 13, 2012, Petitioner initiated the present habeas corpus action. ECF Doc. No. 1. Counsel for Petitioner were appointed on October 29, 2012. ECF Doc. No. 7. Through his appointed counsel, Petitioner filed his Amended Petition for Writ of Habeas Corpus on December 6, 2013, asserting forty-seven claims. ECF Doc. No. 20. Respondent filed his Answer on October 3, 2014. ECF Doc. No. 32. In it, Respondent asserted affirmative defenses based on procedural default, cognizability, and summary dismissal. Petitioner filed his Traverse on May 29, 2015, in which he addressed Respondent's affirmative defenses. ECF Doc. No. 38.

The Court addressed Respondent's affirmative responses on November 30, 2015. That Order found claims Five, Eight (specifically the subclaim regarding the prosecutor's commission of misconduct during his opening statement), Eleven D, Eleven F, Thirteen, Thirty and Thirty-One procedurally defaulted, but directed Petitioner to brief the merits of them anyway; dismissed claims Three, Six, and Forty-Five as not cognizable on federal habeas; and, in the alternative, denied claims Three and Six, as well as related claims Four and Seven. ECF Doc. No. 43.

Subsequently, Petitioner identified twenty-five record-based claims that could proceed to briefing on the merits without a request for an evidentiary hearing. ECF Doc. No. 47. Petitioner

was directed to brief those claims in three rounds.  ECF Doc. No. 48.  In an Order resolving the first round of merits briefing, the Court denied claims Eight, Ten, Eleven, Thirteen, Twenty-Three, Thirty-Three and Thirty-Seven, and denied without prejudice claim Thirty-Eight.  ECF Doc. No. 52.

Petitioner filed a second-round opening brief addressing claims One, Twenty-One, Twenty-Four, Twenty-Nine, and Thirty-One on December 16, 2017.  ECF Doc. No. 59.  Respondent filed an answering brief on January 25, 2018, and Petitioner filed a reply on February 16.  ECF Doc. Nos. 60 and 61.  Those five claims are now ready for disposition.

**STANDARD OF REVIEW**

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]valuating whether a rule application [i]s unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 102.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340. Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

## DISCUSSION

### 1. CLAIM 1: JURISDICTION OF CALIFORNIA COURTS OVER MURDER CHARGE

Petitioner contends that the trial court's exercise of territorial jurisdiction over the homicide in this case and the California Supreme Court denial of his claims for relief related to that exercise of jurisdiction violated his constitutional rights in four ways: (1) the state court denial of his claim constituted an unreasonable determination of the facts and an unreasonable application of clearly established federal law; (2) the state court denial constituted an *ex post facto* expansion of Petitioner's criminal liability; (3) the trial court denied Petitioner his right to have the question of jurisdiction submitted to the jury; and (4) the trial court denied Petitioner his right to have a jury instruction on the issue. Merits Br. at 1-10. Such errors, he argues, violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights. Petitioner bases him claims on several pieces of evidence that he asserts either the California Supreme Court misconstrued in denying his claim or, he argues, affirmatively show a possibility that the victim could have been murdered outside the state of California.

### A. California State Court Exercise of Territorial Jurisdiction

Petitioner argues that the trial court violated his constitutional rights by exercising territorial jurisdiction over the homicide because "no evidence that the physical acts involved in the murder occurred within the State of California." Merits Br. at 1. He asserts that evidence exists to support a finding that the victim was killed outside of California.

The California Supreme Court denied this claim in its entirety, finding the evidence sufficient to establish California jurisdiction. *Crew*, 31 Cal.4th at 834-35. The court noted that under state law, a defendant could be tried for murder in California if he committed a crime in whole or in part within the state or if he formed the requisite intent within the state and committed any act, including a preparatory one, that initiated the crime within California. *Id.* at 834. The state can establish jurisdiction through circumstantial evidence. *Id.* The state court found that the prosecution established territorial jurisdiction by showing that preliminary plans for the murder took place within the state, evidence showed the victim was killed within California, and evidence supported a finding that the victim's body was buried for a time in Bruce Gant's backyard in Campbell. *Id.* at 834-35.

Petitioner argues that the California Supreme Court's denial of his claim that the state of California lacked territorial jurisdiction rested on an unreasonable determination of the facts before it. He takes particular issue with the court's determination that the evidence supported a finding that the murder occurred in California. To counter that, he argues that the court unreasonably determined that Petitioner had gifted some of the victim's property to his girlfriend, Lisa Moody, within twenty-four hours of when the victim was last seen alive. Petitioner argues that this determination was unreasonable because Moody initially told police that the gifting has occurred within twenty-four to forty-eight hours. Merits Br. at 2. Petitioner says that the state court's failure to credit the possible forty-eight-hour gap between when Moody first saw Petitioner and when the victim was last seen alive meant that it failed to consider a sufficient period of time in which the murder could have been committed outside the state. *Id.* Moreover, he argues that the totality of the evidence that murder occurred within the state of California came from one witness, Richard Elander. *Id.* at 3. Petitioner argues that Elander's timeline conflicts with Moody's timeline of seeing Petitioner on the 24th. *Id.* These discrepancies, he asserts, led to the state court's

unreasonable determination of the facts in light of the evidence presented. Petitioner has failed to show, however, that the state court's denial of his claim constituted an objectively unreasonable determination.

Moody testified that Petitioner called her at work midday on August 23rd, the day Petitioner and the victim had left the victim's parents' house to move to South Carolina. On the phone, Petitioner told Moody that he needed to pick up a horse in Stockton and then would come to see her. RT 4132, AG009858; RT 4204, AG009929.

Moody then testified that he arrived late on the following day, August 24th. RT 4133, AG009858; RT 4203, AG009928. She indicated that she was initially unsure of the date, but then proceeded to walk through the events of her days, moving backward from August 28th when she and Petitioner departed for South Carolina. RT 4133-4139, AG009858-64.

Defense counsel cross-examined Moody about the inconsistency between her testimony and her statement to the police that Petitioner arrived on August 26th. RT 4196-99, AG009921-24. During that exchange she conceded that her memory of events was probably better at the time that she spoke with police officers than during the trial. RT 4199, AG009924. However, on redirect, Moody clarified that she remembered better by events as opposed to dates, explaining that she could "place back how things go," and had begun a similar process of trying to walk back from her South Carolina departure date when giving her statement to the police. RT 4203, AG009928.

An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence central to a petitioner's claim that was properly presented and made part of the state-court record. *See Taylor v. Maddox*, 366 F.3d 992, 1005 (9th Cir. 2004), *abrogated on other grounds by Murray v. Schriro*, 745 F.3d 984, 999-1000 (9th Cir. 2014) (state courts unreasonably determined the facts in failing to consider, or even acknowledge, and weigh relevant evidence of attorney's testimony corroborating that the petitioner, a minor, asked to speak to a lawyer during his interrogation and gave a false confession). For purposes of § 2254(e)(1), factual issues are defined as "basic, primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000) (citations and internal quotation marks omitted). A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of

11

United States District Court
Northern District of California

correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Conclusory assertions will not do. *Taylor*, 366 F.3d at 1000.

Petitioner has not provided any clear and convincing evidence to overcome the presumption of correctness of the state court's factual finding. He simply argues that the California Supreme Court failed to consider the possibility that forty-eight hours had elapsed from the time he called Moody to when he arrived. This argument is akin to that in *DeWeaver v. Runnels*, 556 F.3d 995, 1006-07 (9th Cir. 2009), where the Court of Appeals found that the petitioner there did not show the state court had made an unreasonable determination of facts because he merely disagreed with the state court's interpretation of the record but failed to point to any material fact that the court failed to consider in reaching its determination. The state court's denial of this claim does not signal that it failed to consider Moody's initial statement to the police. Rather, it indicates that it found credible her testimony that she had seen Petitioner the day after he called and her calculus of how she reached that date.

The same holds true for his argument that the details of how the homicide was completed came solely from Elander. He asserts that Elander's testimony that Bruce Gant and Petitioner returned to the crime scene on the evening of the 24th and placed the victim's body in two metal drums filled with cement, then threw the drums off the Dumbarton Bridge conflicts with Moody's testimony that Petitioner arrived at her house on the 24th.

Elander testified that Petitioner had told him of the events that had occurred on the 24th, but placed no time frame on it, other than that they occurred in the "evening." RT 3983, AG009704. Moody testified that Petitioner arrived at her house "late on the 24th." RT 4133, AG009858. Neither clarified their time frame. The events are not, as testified to, mutually exclusive of each other, particularly if they did occur within a very narrow geographic region. Thus, the California Supreme Court could have credited both Elander and Moody's testimony and found that when taken together, they further supported a finding that the murder did occur in California.

The narrow focus on Moody and Elander's testimony overlooks that California courts retain jurisdiction over murders for which preliminary acts in preparation occurred within the state. *See Crew*, 1 Cal.4th at 834 ("California courts have criminal jurisdiction over anyone who commits a crime outside California if the defendant formed the requisite intent within this state and committed

12

any act, including preparatory acts, showing that the crimes were initiated in California."). Additional evidence supports a finding that Petitioner formed the intent within California and set his plan in motion within the state.

Richard Glade testified that in 1981, Petitioner, his father, and Elander came to the dude ranch Glade had owned at the time. RT 4214, AG009939. In May 1982, the month before Petitioner married the victim, Elander obtained employment with Glade. RT 4214, AG009939. Shortly after Petitioner married the victim in California, Elander was fired for asking about the possibility of disposing of a body in the high country because Petitioner might have need to do so. RT 4215-16, AG009940-41.

Less than three weeks after he married the victim, Petitioner proposed marriage to Moody, including presenting her with an engagement ring. RT 4119-20, 4190; AG009844-45, AG009915. He even procured two attorneys for Moody to finalize her divorce from her prior husband. RT 4191, AG009916.

Petitioner has not shown that based on the record before the California Supreme Court that the denial of this claim so lacked justification "that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 101-102. Accordingly, this claim is DENIED.

## B. *Ex Post Facto* Violation

Petitioner next argues that the state court's determination that California had territorial jurisdiction over the murder prosecution because Petitioner committed sufficient preparatory acts within the state violated the *Ex Post Facto* clause. It does not appear from the record that Petitioner ever presented the California Supreme Court with this component of his claim. A district court may not grant the writ unless state court remedies are exhausted or exhaustion there is either "an absence of available state corrective process" or such process has been "rendered ineffective." *See* 28 U.S.C. § 2254(b)(1)(A)-(B). Because Petitioner has not shown an entitlement to relief on this claim, the Court may deny it. *See* 28 U.S.C. § 2254(b)(2); *Runningeagle v. Ryan*, 686 F.3d 758, 777 n.10 (9th Cir. 2012).

\\

### 1. Legal Standard

The U.S. Constitution prohibits the federal government and the states from passing any "ex post facto Law."  U.S. Const., Art. I, § 9, cl. 3 (federal government); Art. I, § 10, cl. 1 (states).  These clauses prohibit the government from enacting laws with certain retroactive effects:  any law that (1) makes an act done before the passing of the law, which was innocent when done, criminal; (2) aggravates a crime or makes it greater than it was when it was committed; (3) changes the punishment and inflicts a greater punishment for the crime than the punishment authorized by law when the crime was committed; or (4) alters the legal rules of evidence and requires less or different testimony to convict the defendant than was required at the time the crime was committed.  *See Stogner v. California*, 539 U.S. 607, 611-12 (2003) (citing *Calder v. Bull*, 3 Dall. 386 (1798)).

The *Ex Post Facto* Clause applies only to the legislative branch of government; however, there is a due process counterpart which prevents retroactive enlargement of the reach of criminal statutes by judicial interpretation.  *Rogers v. Tennessee*, 532 U.S. 451, 455-56 (2001); *Poland v. Stewart*, 117 F.3d 1094, 1099 (9th Cir. 1997).  "If a judicial construction of a criminal statute is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue, the construction must not be given retroactive effect."  *Rogers*, 532 U.S. at 457 (internal quotation marks and brackets omitted).  This rule applies when a court expands a criminal statute, as well as when it broadens an earlier judicial interpretation of a statute.  *Id.* at 459-61.

### 2. Analysis

Petitioner argues that the California Supreme Court's application of *People v. Morante*, 20 Cal.4th 403, 436 (1999), which held that a defendant could be found subject to California's territorial jurisdiction if he engaged in formed the intent to commit the murder in California and engaged in preparatory acts there, violated his constitutional rights to be free from an *ex post facto* expansion of criminal liability.  Merits Br. at 6.  Petitioner argues that prior to *Morante*, *People v. Utter*, 24 Cal. App. 3d 535 (1972) required that a defendant make an actual attempt to commit the crime within the state before territorial jurisdiction could be established.  Because *Morante* issued after his conviction, he argues that the California Supreme Court's application of it to his case improperly expanded the state's jurisdiction over murder by no longer requiring that an actual attempt occur within the state boundaries.  Merits Br. at 5.

This argument incorrectly assumes there was no evidence to show that Petitioner committed the murder within the state of California. As discussed above, such evidence existed. It also ignores the acts in furtherance of the murder for financial gain that did occur within the state, as discussed below, as well as the evidence indicating Petitioner attempted to conceal the body in Bruce Gant's back yard in Campbell. Regardless, Petitioner has failed to show an *ex post facto*-based due process violation.

The United States Supreme Court has held that a state needs the ability to evolve common law, particularly in the criminal context, and that strict adherence of *ex post facto* principles "would unduly impair the incremental and reasoned development of precedent that is the foundation of the common law system." *Rogers*, 532 U.S. at 461. In *Rogers*, the defendant had been convicted of second-degree murder following his victim's death from a kidney infection fifteen months after the defendant had stabbed the victim. *Id.* at 454. Doctors directly linked the kidney infection to the cerebral hypoxia the victim experienced as a result of the stabbing. *Id.* Defendant appealed on the ground that the victim had died more than a year and a day following the stabbing and Tennessee common law limited liability to deaths occurring within one year and one day following a criminal event. *Id.* The Tennessee Court of Appeals determined that the original reasons for the adoption of the rule no longer existed and, thus, it was invalid. *Id.* at 455. The defendant ultimately appealed to the United States Supreme Court arguing that Tennessee's failure to adhere to the "year and a day" rule constituted an *ex post facto* expansion of his criminal liability.

The United States Supreme Court upheld the defendant's conviction, finding that there is often a need "to clarify or even reevaluate prior opinions as new circumstances and fact patterns present themselves" and that the "court's decision was a routine exercise of common law decision making in which the court brought the law into conformity with reason and common sense." *Id.* at 462, 467. The same can be said of the California Supreme Court's decision in *Morante*.

*Morante* concerned a criminal drug conspiracy that began in California with the sale culminating outside the state. 20 Cal.4th at 409-413. The facts in that case presented the California Supreme Court with the "occasion to reconsider the rule enunciated in" *People v. Buffum*, 40 Cal.2d at 709 (1953), which held that a person could not be convicted of criminal conspiracy for acts that occurred outside the state of California unless the defendant had developed the intent to commit the

15

crime within the state and committed a direct, ineffectual act to accomplish the crime.  The *Morante* court determined that the *Buffum* rule was not "mandated by other doctrines or provisions constraining state jurisdiction over criminal conduct that may involve more than one jurisdiction, and does not accommodate considerations of public policy that have assumed greater importance in recent years."  20 Cal.4th at 422.

*Morante* also expressly overruled *People v. Utter*, 24 Cal. App. 3d 535, 550 (1972) in a footnote.  *Utter* applied the *Buffum* rule to a murder wherein the intent to commit the crime developed in California, but the defendant committed the murder in Europe.  As noted by Respondent, the California Supreme Court declined to restrict the retroactive application of the *Utter* overruling.

Due process protects against judicial infringement of the right to fair warning that certain conduct will give rise to criminal penalties.  *Webster v. Woodford*, 369 F.3d 1062, 1069 (9th Cir. 2004) (discussing *Bouie v. City of Columbia*, 378 U.S. 347 (1964)); *see Rogers*, 532 U.S. at 457-60 (guiding principle under *Bouie* is that a state law must give fair warning of the conduct that it makes a crime); *Clark v. Brown*, 450 F.3d 898, 911(9th Cir. 2006) (under *Bouie*, unforeseeable judicial enlargement of criminal statute violates due process right to fair warning).  *Bouie* is not violated unless judicial construction of a criminal statute represents a "radical and unforeseen" departure from former law.  *Webster*, 369 F.3d at 1069.

Petitioner does not argue that *Morante* constituted a "radical and unforeseen departure" from prior law, nor could he.  *Utter*, a case from California's second district Court of Appeal, appears to be the only case applying the *Buffum* rule to murder.  Notably, the California Supreme Court does not appear ever to have applied *Buffum* to a murder conviction.  Moreover, *Buffum* had been criticized extensively.  One of the cases Petitioner relies on to show the rule as firmly established at the time of Petitioner's conviction, *People v. Gerchberg*, 131 Cal. App. 3d 618 (1982), notes that fact.  *Morante*, like the eradication of the "year and a day" rule in *Rogers*, "was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense."  *Rogers*, 532 U.S. at 467.  For all of these reasons, the claim is DENIED.

\\

### 3. Failure to Submit the Issue of Territorial Jurisdiction to the Jury

In this claim, Petitioner raises two interrelated arguments: that the trial court deprived him of his constitutional right to a jury trial by failing to submit the question of territorial jurisdiction to the jury and it violated his due process rights by failing to *sua sponte* instruct the jury on the issue of territorial jurisdiction. Merits Br. at 7-10. He argues that the state was required to prove that "the crime was committed under the state jurisdictional rules" and that because the Constitution guarantees a defendant the right to a jury trial on the criminal charges, the jurisdictional element of the crime must be submitted the jury. *Id.* at 7-8. He also asserts that the trial court should have *sua sponte* instructed the jury on the issue of territorial jurisdiction and the failure to do so violated his due process rights.

The California Supreme Court denied this claim. It declined to decide whether the question of territorial jurisdiction must be submitted to a jury because Petitioner's theory that the crime was committed outside of California was speculative and not supported by the evidence. *Crew*, 31 Cal.4th at 835.

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).

Petitioner cites no clearly established federal law that shows an entitlement to relief on this claim. Instead, he notes that a "majority of states" have found jurisdiction to be an element to be decided by juries. Merits Br. at 9. However, California is not such a state and there is no mandate requiring it to be such. As discussed above, sufficient evidence supported a finding of territorial jurisdiction. Petitioner has failed to show that the California Supreme Court denial of this claim was an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2). Thus, the claim is DENIED.

## II. CLAIM 21: CONSTITUTIONALITY OF FINANCIAL GAIN SPECIAL CIRCUMSTANCE

In this claim, Petitioner argues that the application of California's financial gain circumstance to his case violated his constitutional rights because (1) the special circumstance as

drafted is void for vagueness and applying it to Petitioner's case would require an expansion that violates the *Ex Post Facto* Clause; (2) it cannot be construed to apply to the facts of Petitioner's case without making it unconstitutionally vague and overbroad; (3) there was insufficient evidence on which to support the financial gain special circumstance; and (4) the jury was given inadequate instructions on the financial gain special circumstance. Merits Br. at 11-22. Petitioner's arguments regarding the constitutionality of the special circumstance stem from his general assertion that there is insufficient evidence to support the financial gain circumstance. As such, the analysis commences with that factor.

### A. Sufficiency of the Evidence to Support the Financial Gain Special Circumstance

Petitioner argues that the evidence introduced in his case did not support a finding that a reasonable juror would have found beyond a reasonable doubt that financial gain motivated the murder, as opposed to being incidental to it. Merits Br. at 20. Petitioner asserts that the prosecution introduced no evidence that he killed the victim to acquire her assets and says that respondent concedes that Petitioner may have had other motivations for committing the crime. *Id.*

The California Supreme Court denied this claim. In setting out the law regarding the finding necessary to sustain a conviction for the financial gain special circumstance, the court noted that, contrary to Petitioner's assertion, the prosecution need only show that the "'purpose' of the murder was to obtain financial gain, 'whether or not achievable.'" *Crew*, 31 Cal.4th at 851, quoting *People v. Howard*, 44 Cal.3d 375, 410, fn 10 (1988). The prosecution is not required to show that murder was the only means of obtaining the financial gain or that the murder was committed solely or primarily for that purpose. *Id.*

The court went on to find sufficient evidence to support the jury's verdict. *Id.* Specifically, the California Supreme Court cited the victim's closure of her bank accounts prior to her departure to South Carolina, yielding $10,500 in cash and a $2,500 money order. Within forty-eight hours of the victim's disappearance, Petitioner arranged to have his fiancée, Lisa Moody, use $5,000 of the victim's cash to obtain a money order for Bergin Mosteller, Petitioner's stepfather. Upon his arrival in South Carolina, Petitioner opened a bank account using the victim's $2,500 money order and proceeded to sell her clothing and personal effects, her Corvette, her horse and the horse trailer, and her truck. Based on all of this, the California Supreme Court determined that a reasonable jury

18

could have found beyond a reasonable doubt that Petitioner committed the murder with an expectation of financial gain. *Id.*

The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993); *see, e.g.*, *Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under *Jackson* is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326. The court may not substitute its judgment for that of the jury. *See Coleman*, 566 U.S. at 656-657 (finding that the Third Circuit erred in finding that there was no reasonable basis for the jury's conclusion that petitioner had a specific intent to kill the victim and force was used simply because there was no testimony describing physical action by petitioner). Indeed, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam) (quoting *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011)) (finding 9th Circuit erred by substituting its judgment for that of California jury on the

19

question whether the prosecution's or defense's expert witnesses more persuasively explained the cause of death).

The *Jackson* standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16. As Petitioner notes, the financial gain special circumstance was amended in 1978 to apply to circumstances where "[t]he murder was intentional and carried out for financial gain." Cal. Pen. Code § 190.2(a)(1). Petitioner has not shown that no reasonable juror would have found that he did not meet the requirements for the special circumstance and, thus, he has failed to meet his burden.

Within three weeks of marrying the victim, Petitioner became engaged to Moody. He then convinced the victim to move to South Carolina. A reasonable juror could have deduced that Petitioner did not intend to live a life with the victim in South Carolina because he intended to return for Moody.

In preparation for the move, the victim liquidated her assets. As noted by Respondent, Petitioner advised her how to do so in a way that avoided paying capital gains taxes so that she could maximize the amount she withdrew. He boarded the victim's horse secretly in the San Jose area, despite telling the victim that a friend had started transporting the horse for them. Following the victim's disappearance, he brought Moody to see the horse and indicated he may buy the horse. Ultimately, he sold the horse, the trailer, and the truck.

Petitioner enlisted Elander to sell the victim's Corvette for him in South Carolina. Elander testified that it took extensive efforts to sell the Corvette due to the fact the victim had not and could not sign the title. Despite these issues, Petitioner did not give up in his attempts to sell the vehicle.

The only evidence that supports an inference that Petitioner murdered the victim for any reason other than financial gain is his brother's testimony that Petitioner once said he wanted to kill someone to see what it was like. The bulk of the evidence, including Petitioner's actions both before and after the victim's disappearance, indicate he intended to benefit financially from the crime. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). Petitioner has failed to show that the California Supreme Court denial of this claim was an unreasonable application of

clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2).  Accordingly, it is DENIED.

**B.      Special Circumstance as Vague Generally or as Applied to Petitioner's Case**

Petitioner raises two other interrelated claims challenging the constitutionality of the financial gain special circumstance:  the special circumstance is vague generally and overbroad as applied to his case, and the application of the special circumstance to the facts of his case constitutes an improper *ex post facto* expansion of his criminal liability.  All of these rest on the premise that the theft of the victim's items was incidental to the murder.  Merits Br. at 15, 17, 19.  As discussed above, the evidence supports a finding that the murder was committed for the purposes of financial gain.  Regardless, he has failed to show that he is entitled to relief on these claims.

**1.   Vagueness and Overbreadth**

Petitioner argues that the financial gain special circumstance is overbroad because it would make death-eligible any murder in which the defendant believes "there is some possibility of financial effect," but committed the murder for reasons unrelated to financial gain.  Merits Br. at 18.  The California Supreme Court denied this claim noting that it had denied this same claim in prior cases.  *Crew*, 31 Cal.4th at 852.  It also stated that a comparison between the 1977 and 1978 versions of the financial gain special circumstance statute belied any argument that a reasonable person would not comprehend or be on notice of the changes in the law.  *Id.*

As noted above, Petitioner's argument that the special circumstance is overbroad when applied to his case hinges on the premise that the theft was incidental to the murder in this case.  However, as the jury instructions on the special circumstance show, the special circumstance in this instance was not used in relation to an incidental theft of the victim's belongings.

The jury was instructed that to find the special circumstance true, they had to agree unanimously that the prosecution proved beyond a reasonable doubt that the murder was intentional, that "it was carried out for financial gain," and that Petitioner "believed that the death of the victim would result in the desired financial gain."  RT 4639-40, AG010368-69.  "A jury is presumed to follow its instructions."  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  Thus, there is no way that the special circumstance in this case could have been applied to encompass a murder

with an opportunistic theft or a murder done for other reasons even if Petitioner anticipated the possibility of financially benefitting from the crime.

Petitioner cites *Gregg v. Georgia*, 428 U.S. 153, 189 (1976), for the general proposition that the special circumstance should substantially narrow defendants so that it does not result in "arbitrary and capricious action." This citation does not support his claim. The *Gregg* court upheld Georgia's death penalty statute and the petitioner's conviction because it determined that Georgia's statutory system sufficiently guided juries, in part by focusing them on the "particularized nature of the crime." *Gregg*, 428 U.S. at 206. Petitioner's conviction on the financial gain special circumstance is consistent with the strictures of *Gregg*.

Petitioner's trial court issued a lengthy instruction on the special circumstance. *See* RT 4639-41, AG010368-70. It advised the jury of the very strict requirements in using circumstantial evidence to underpin the guilty finding. The conviction on the special circumstance did not constitute a "freakish" aberrance delivered by an unguided jury as prohibited by *Gregg*. 428 U.S. at 206.

To the extent Petitioner makes a vagueness argument, he has not shown that the 1978 financial gain special circumstance does not have a "common-sense core of meaning" that a jury "should be capable of understanding." *Tuilaepa v. California*, 512 U.S. 967, 973-74 (1994). Accordingly, Petitioner has failed to show that the California Supreme Court denial of this claim constitutes an unreasonable application of clearly established federal law under section 2254(d)(1) and it is DENIED.

### 2. *Ex Post Facto*

Petitioner challenges as an *ex post facto* violation the California Supreme Court's application to Petitioner's appeal of the financial gain interpretation it developed in *People v. Howard*, 44, Cal.3d. 375, 409 (1988), and subsequent cases. Merits Br. at 12. Petitioner argues that *Howard* and its progeny constitute "an unforeseeable judicial enlargement of the statute" because the California Supreme Court expanded the law such that it could apply to a defendant who "killed and subsequently committed a theft of the decedent's property." Merits Br. at 14, 17.

The California Supreme Court cited *Howard* in its evaluation of Petitioner's sufficiency of the evidence claim, discussed above. *See Crew*, 31 Cal.4th at 850-851. The court noted that while

California law did not require that financial gain be the sole or even primary motivating factor of the murder, or that murder need to be the only way to obtain the financial gain, the "'purpose' of the murder was to obtain financial gain." *Id.* at 851.

When he presented this claim to the California Supreme Court, Petitioner argued that he was entitled to a limited construction of the financial gain special circumstance based on the decision in *People v. Bigelow*, 37 Cal.3d 731, (1984), which required a limiting instruction for the jury when overlapping special circumstances existed, such as financial gain and murder in the course of a robbery, to prevent multiple circumstances from applying to the same conduct. The court denied the claim noting that *Bigelow* issued two years after the crime committed in this case. Thus, the trial court could not apply the *Bigelow* construction to Petitioner's case. *Crew*, 31 Cal.4th at 853.

Retroactivity of a rule will not be at issue where a state supreme court's interpretation of a criminal statute after the defendant's conviction "merely clarified" the statute as properly interpreted at the time of the conviction. *Fiore v. White*, 531 U.S. 225, 226 (2001); *see Bunkley v. Florida*, 538 U.S. 835, 839-40 (2003) (per *Fiore*, remanding for Florida Supreme Court to clarify whether its interpretation of statute applied at the time the defendant was convicted). But federal due process requires that a state vacate a conviction, even a final conviction that has been affirmed on appeal, where a clarification reveals that a defendant was convicted "for conduct that [the state's] criminal statute, as properly interpreted, does not prohibit." *Fiore*, 531 U.S. at 228 (reversing Third Circuit's denial of habeas relief where Pennsylvania Supreme Court's interpretation of statute made clear defendant's conduct was not criminal when he was convicted); *see also Bunkley*, 538 U.S. at 840 (retroactivity analysis will be rendered unnecessary where due process was violated because the correct interpretation of the statute makes clear the defendant did not violate the statute).

The California Supreme Court's interpretation in *Howard* of the financial gain special circumstance constituted a clarification. The court had issued the decision following confusion resulting from its decision in *Bigelow*. *Howard* explained that where there were not multiple special circumstances alleged that could explain to the same conduct, the trial court was not required to issue the *Bigelow* limiting instruction. *Crew*, 31 Cal.4th at 851. A state court's

23

United States District Court
Northern District of California

interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court on habeas review.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Petitioner was charged with only one special circumstance.  Thus, the *Bigelow* instruction, would have been inapplicable had it been in force at the time of the crime.  As discussed at length above, Petitioner's jury was instructed appropriately and would not have convicted him on the special circumstance to a theft that was not central to the murder.  Accordingly, he has failed to show the California Supreme Court's denial of this claim was an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2).  The claim, therefore, is DENIED.

### C.    Jury Instruction

Finally, Petitioner challenges his conviction of the financial gain special circumstance on the ground the court delivered inadequate instructions to the jury because the instruction did not include a definition of financial gain.  Merits Br. at 21.  Petitioner argues that without a proper definition, the jurors could have convicted him of the special circumstance even if the financial gain "was merely the result of some other aspect of the relationship between the victim and the defendant." *Id.* at 22.

The California Supreme Court denied this claim, finding that the instruction issued was proper under state law.  It also noted that, as Petitioner had acknowledged in his state filings, it had previously denied the same claim in prior cases.  *Crew,* 31 Cal.4th at 852.

In reviewing an ambiguous instruction, the inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution.  *See Estelle v. McGuire*, 502 U.S. at 72 & n.4.  To show a due process violation, the defendant must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt.  *Waddington v. Sarausad*, 555 U.S. 179, 190-191 (2009) (internal quotations and citations omitted).

The California Supreme Court previously determined that "financial gain" was not an ambiguous or vague term that required definition.  *See*, *e.g.*, *People v. Edelbacher*, 47 Cal.3d 983,

1027 ("[T]he term 'for financial gain' is not a technical one and need not be defined for the jury except in the situation where there is potential overlap with a felony-murder special circumstance."). Petitioner has provided no clearly established federal law to the contrary. Moreover, he is unable to show that the jury would have applied the instruction in a way that violates the Constitution. The trial court expressly instructed the jury on the need for a unanimous determination and the prosecution's burden of proof. There is no indication the instruction's language or lack of definition confused the jury. They did not ask for a definition. *See Weeks*, 528 U.S. at 234, quoting *Armstrong v. Toler*, 11 Wheat. 258, 279 (1826) ("Had the jury desired further information, they might, and probably would, have signified their desire to the court.").

Thus, Petitioner has failed to show that the California Supreme Court denial of this claim was unreasonable pursuant to either 28 U.S.C. 2254 §§ (d)(1) or (d)(2). Accordingly, this claim is DENIED.

## III.  CLAIM 24: INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILING TO INVESTIGATE MITIGATING EVIDENCE

In this claim, Petitioner challenges trial counsel's failure to investigate, discover, and present mitigating evidence that Petitioner's mother sexually abused him. He presented this claim to the California Supreme Court on state habeas and that court held an evidentiary hearing on the issue. Ultimately, it denied the claim finding no prejudice to Petitioner.

The court noted as an initial matter that Petitioner had failed to prove that his mother had sexually abused him because the only evidence he offered was an expert opinion based on Petitioner's statements to the expert. *In re Crew* ("*Crew III*"), 52 Cal. 4th 126, 151 (2011). California requires something more than Petitioner's statements about the abuse to establish the truth of those statements. *Id.*, citing *People v. Elliott*, 37 Cal.4th 453, 481 (2005); *People v. Gardeley*, 14 Cal.4th 605, 619 (1996).

The court then found that it was not reasonably likely that had trial counsel conducted the mitigating investigation at issue, that they would have discovered evidence of the abuse. A forensic psychologist testified that the symptoms Petitioner exhibited that were consistent with having been sexually abused by his mother also mirrored the symptoms of antisocial personality and other

25

disorders.  *Id.* at 139.  Given the rarity of a mother sexually abusing her child, the psychologist determined that a competent mental health professional would not look for such a thing and would, instead, look to more likely rationales for the symptoms.  *Id.*  The California Supreme Court determined that evidence that Petitioner had been abused may never have been discovered by trial counsel, in part because Petitioner did not mention it until seventeen years after his arrest.  *Id.* at 152.

This case parallels that in *Heishman v. Ayers*, 621 F.3d 1030 (9th Cir. 2010).  There, the petitioner argued that trial counsel rendered ineffective assistance by failing to investigate and discover sexual abuse perpetrated on the petitioner by his grandfather.  The Court of Appeals decided against Heishman, in part, because he had not disclosed the abuse prior to his habeas counsel's investigation, despite numerous opportunities to do so.  621 F.3d at 1041 ("If Heishman would not have disclosed the abuse, his attorneys could not have presented evidence of the abuse or PTSD to the jury, and no juror could have been swayed by such evidence to vote for life without parole.").

AEDPA requires a district court to presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Petitioner has failed to do so.  He, thus, is not entitled to relief for this claim and it is DENIED.

## IV.   CLAIM 29:  CONSTITUTIONALITY OF CALJIC 8.88

In this claim, Petitioner argues that California Jury Instruction (CALJIC) 8.88, as delivered to the jury deliberating in the penalty phase of his trial, is constitutionally flawed in five ways:  (1) the term "so substantial" is impermissibly vague and fails to inform the jury adequately on the findings they needed to make to impose the death penalty; (2) the term "warrants" is impermissibly vague and misleads the jury into believing it may impose death even when it is not the appropriate penalty; (3) the instruction fails to specify that the prosecution had the burden of persuading the jury that it must be convinced of the penalty determination beyond a reasonable doubt; (4) the instruction fails to require a finding beyond a reasonable doubt that aggravating circumstances outweighed mitigating ones, and that the death penalty was appropriate; and (5) the instruction fails

to require unanimous jury findings regarding the truth of the various aggravating circumstances, and to require a "statement of reasons" supporting a death verdict. Merits Br. at 34-36.

> The instruction delivered to Petitioner's jury read, in relevant part, as follows:
>
>> It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without the possibility of parole, shall be imposed on the defendant.
>>
>> After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.
>>
>> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate by considering the totality of the aggravating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.
>>
>> . . . . In order to make a determination as to the penalty, all twelve jurors must agree.

CT 2557, AG002658.

## A.    California Supreme Court Denial of Claim

The California Supreme Court denied this claim noting that it had denied each of the separate arguments Petitioner raised in prior cases. *Crew*, 31 Cal. 4th at 858. Petitioner argues that this denial constituted an unreasonable application of clearly established federal law and an unreasonable determination of the facts. Merits Br. at 34. Respondent asserts that Petitioner has failed to provide any clearly established federal law that entitles him to relief on this claim. Opp. at 27.

## B.  Legal Standard

In reviewing penalty phase instructions, the test is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). Further, a single instruction "may not be judged in artificial isolation," but must be considered in light of the instructions as a whole and the entire trial record. *Estelle*, 502 U.S. at 72.

27

### C. Analysis

#### 1. Vague Terms

Petitioner's initial challenges to the instruction argue that the terms "so substantial" and "warrants" are impermissibly vague. Whether a term in a jury instruction requires definition depends on whether the term expresses a concept within jury's ordinary experience. *United States v. Tirouda*, 394 F.3d 683, 689 (9th Cir. 2005) (no error resulting from failure to define "accomplice" in an accomplice instruction). Specifically, he argues that "so substantial" is impermissibly vague because it "'fails adequately to inform juries what they must find to impose the death penalty and as a result leave them and appellate courts with the kind of open-ended discretion which was held invalid in *Furman v. Georgia*, 408 U.S. 238 (1972)." Merits Br. at 34, citing *Maynard v. Cartwright*, 486 U.S. 356, 361-62 (1988). Similarly, he argues that "warrants" is overly permissive and "misleads the jury into believing it may impose death even when it is not the appropriate penalty." Merits Br. at 35. Finally, he asserts that the term "warrants" blurs the distinction between the preliminary determination that Petitioner was death eligible and the ultimate determination that he should be executed. *Id.*

In addition to CALJIC 8.88, the trial court also gave the jury several other instructions to guide their deliberations. The jury received CALJIC 8.85, which provided the jury with "factors for consideration" in determining which penalty to impose. CT 2550-51, AG002651-52. This instruction sets out eleven specific factors for consideration, including a catch-all provision for any "other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record . . . as a basis for a sentence less than death." CT 2551, AG002652. The trial court also instructed the jury as to the definitions of aggravating and mitigating factors, noting specifically that the "absence of mitigation would not automatically render the crime more offensive than any other murder of the same general character," CT 2552, AG002653, and with fourteen specific items of mitigating evidence as requested by Petitioner, CT 2553, AG002654. Finally, within CALJIC 8.88, the jury was instructed:

> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.

CT 2557, AG002658.

The capital punishment schemes at issue in *Furman* and *Maynard* are not comparable to California's. In *Furman*, the Supreme Court reversed capital convictions because Georgia's statute at the time did not provide a meaningful way to distinguish between those eligible to receive the death penalty for a first-degree murder and those not. *See Maynard*, 486 U.S. at 362. The jury was free to impose the death penalty on anyone, and two of the defendants at issue in *Furman* had not committed murder, but rather rape. Georgia provided nothing in the statute to guide jurors in making the penalty determination.

The U.S. Supreme Court has specifically distinguished Oklahoma's death penalty scheme analyzed in *Maynard* from California's in *Tuilaepa*: "In our decisions holding a death sentence unconstitutional because of a vague sentencing factor, the State had presented a specific proposition that the sentencer had to find true or false (*e.g.*, whether the crime was especially heinous, atrocious, or cruel)." 512 U.S. at 974. "We have held, under certain sentencing schemes, that [such] a vague propositional factor used in the sentencing decision creates an unacceptable risk of randomness, the mark of [an] arbitrary and capricious sentencing process." *Id.* Those concerns, however, "are mitigated when a factor does not require a yes or a no answer to a specific question, but instead only points the sentencer to a subject matter." *Id.* at 975. As the *Tuilaepa* Court went on to point out, the instructions given in CALJIC 8.85, which accompanied CALJIC 8.88 in Petitioner's case, directed the jury to consider the subject matter and circumstances behind the crime at issue.

In light of the totality of the instructions given, there is no "reasonable likelihood that the jury . . . applied the challenged instruction in a way that prevent[ed] the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380. The jury had been instructed explicitly within the challenged instruction that their charge was not to determine Petitioner's eligibility for the death penalty, but rather "which of the two penalties, death or confinement in the state prison for life without the possibility of parole, [should] be imposed." CT 2557, AG002658. The jury, as

discussed, also received detailed instructions regarding aggravating evidence, mitigating evidence, and the weighing of such evidence to make an informed determination regarding the penalty. As such, Petitioner has failed to show that the California Supreme Court's denial of these claims constituted an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2). Accordingly, they are DENIED.

## 2. Failure to Require Finding Beyond a Reasonable Doubt

Petitioner argues both that the instructions failed to specify that the prosecution was required to persuade the jury that it must be convinced of the penalty determination beyond a reasonable doubt and that it fails to require a finding beyond a reasonable doubt that the aggravating factors outweighed the mitigating ones. Merits Br. at 34-35.

In support of his assertion that the instruction must advise the jury that the prosecution must have persuaded it beyond a reasonable doubt as to the penalty determination, Petitioner fails to identify any clearly established federal law that would entitle him to relief. Instead, he cites California Evidence Code § 520, which he argues confers a due process right, as envisioned in *Hicks v. Oklahoma*, 447 U.S. 343 (1980).

This claim is not cognizable on federal habeas review. Petitioner's reliance on *Hicks* here is misplaced. There, the defendant had been sentenced to a mandatory 40-year sentence under a sentencing statute that was later declared to be unconstitutional. *Hicks*, 447 U.S. at 344-45. The Oklahoma Court of Criminal Appeals acknowledged the ruling, but determined that the defendant had not been prejudiced because the 40-year sentence was within the range of what the jury could have imposed. *Id.* at 345. The United States Supreme Court overturned the sentence finding:

> By statute in Oklahoma, a convicted defendant is entitled to have his punishment fixed by the jury. . . . Where . . . a state has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion.

United States District Court
Northern District of California

*Id.* at 345-46. *Hicks*, therefore, had a substantive right to have his sentence determined by a jury, as opposed to a judge.

By contrast, the only expectation that California Evidence Code § 520 creates is that, "the party claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue." Nothing in this statute requires any kind of specific jury instruction.

To the extent that Petitioner challenges the instruction's failure to require a finding beyond a reasonable doubt that the aggravating circumstances outweighed mitigating ones, this was raised in Petitioner's claim 33 and has been denied already. Nonetheless, Petitioner has failed to identify any clearly established federal law that would entitle him to relief. Moreover, the Ninth Circuit has held that "the failure of the statute to require a specific finding that death is beyond a reasonable doubt the appropriate penalty does not render it unconstitutional." *Williams v. Calderon*, 52 F.3d 1465, 1485 (9th Cir. 1995).

Petitioner cites as support *Cunningham v. California*, 549 U.S. 270 (2007); *Blakely v. Washington*, 542 U.S. 296, 303-05 (2004); *Ring v. Arizona*, 536 U.S. 584, 609 (2002); and *Apprendi v. New Jersey*, 530 U.S. 466, 478 (2000). These cases are unavailing. *Apprendi* requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 500 U.S. at 490. However, the United States Supreme Court has never held that an aggravating factor in a California death penalty sentencing determination is a fact that increases the penalty for the crime. As the Ninth Circuit explained, the expansion of a first-degree murder to capital murder comes from the special circumstance, which must be found beyond a reasonable doubt. *Webster v. Woodford*, 369 F.3d 1062, 1068 (9th Cir. 2004), citing *Ring*, 536 U.S. at 609 ("Special circumstances that make a criminal defendant eligible for the death penalty operate as 'the functional equivalent of an element of a greater offense.'").

*Ring* overruled a practice that allowed a judge, as opposed to a jury, to find elements in aggravation. The finding of any aggravating elements here was within the sole province of the jury. *Cunningham* and *Blakely*, applying *Apprendi*, found unconstitutional a trial judge, as opposed to a jury, finding an aggravating circumstance in a non-capital crime that raised the sentence above the middle term. None of these cases presents the issue here. In the present case, the jury determined

31

United States District Court
Northern District of California

beyond a reasonable doubt that Petitioner could be sentenced to death based on the special circumstance of committing the murder for financial gain.

Even if *Ring* and *Apprendi* did dictate that aggravating circumstances must be found by a jury beyond a reasonable doubt, they do not entitle Petitioner to relief because it would be barred by *Teague v. Lane*, 489 U.S. 288 (1989) (prohibiting a federal court from granting habeas relief to a state prisoner based on a constitutional rule of criminal procedure announced after his conviction and sentence became final unless he meets certain exceptions), as *Ring*, *Apprendi*, and *Jones* were decided after his conviction became final. *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004) (*Teague* bars retroactive application of *Ring* on federal habeas review); *Jones v. Smith*, 231 F.3d 1227, 1238 (9th Cir. 2000) (*Teague* bars retroactive application of *Apprendi* on federal habeas review).

Petitioner also fails to support with clearly established federal law his argument that CALJIC 8.88 is unconstitutional because it does not require unanimous jury findings regarding the truth of the various aggravating circumstances or a "statement of reasons" supporting a death verdict. Pet. at 36. The Ninth Circuit has held that "written jury findings" are not required for constitutional imposition of a death sentence. *Williams*, 52 F.3d at 1484; *see also Harris v. Pulley*, 692 F.2d 1189, 1195-96 (9th Cir. 1982), overruled on other grounds by *Pulley v. Harris*, 465 U.S. 37 (1984), ("[T]he judge must determine independently whether the death penalty is appropriate and, in so doing, weigh the evidence of aggravating and mitigating circumstances . . . . On the basis of the judge's written conclusions, the appellate court can determine whether the evidence supported the jury's finding of aggravated circumstances. While it might be preferable to have the sentencer provide a written statement concerning the basis for the decision to impose the death penalty, we cannot say that the California statute is unconstitutional because it requires only the judge to provide such a statement."). Accordingly, this claim is DENIED.

### 3. Failure to Require Unanimous Jury Findings

Petitioner challenges the failure to require unanimous jury findings regarding the veracity of any aggravating circumstance required. Petitioner's citations to *Ballew v. Georgia*, 435 U.S. 223, 232-34 (1978), and *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), however, are inapposite. The *Ballew* court addressed the unconstitutionality of a criminal conviction by a five-member jury.

32

The *Woodson* court invalidated North Carolina's mandatory death penalty law. In doing so, it said, "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305.

California's death penalty statute and the accompanying instructions have been found to provide a reliable determination. *See Pulley*, 465 U.S. at 53 ("The statutory list of relevant factors, applied to defendants within this sub-class, 'provide[s] jury guidance and lessen[s] the chance of arbitrary application of the death penalty,' *Harris*, 692 F.2d at 1194, 'guarantee[ing] that the jury's discretion will be guided and its consideration deliberate,' *id.*, at 1195. The jury's 'discretion is suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' *Gregg v. Georgia*, 428 U.S. 153, 189 (1976)."). Because Petitioner is unable to show an entitlement to relief, the claim is DENIED.

## V.    CLAIM 31:  PROSECUTORIAL MISCONDUCT AT PENALTY PHASE

Petitioner claims the prosecutor committed prejudicial misconduct during the penalty phase closing argument by (1) urging the jury to compare the aggravating circumstances of the crime with the good the jurors had done in their own lives, (2) improperly arguing the impact of the crime on the victims, (3) improperly arguing lack of remorse and future dangerousness, and (4) improperly arguing that evidence introduced in mitigation by the defense was actually aggravating. Merits Br. at 37-40.

### A.    Legal Standard

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.*; *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir.

2005); *see also Deck v. Jenkins*, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that *Darden* is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes). A prosecutorial misconduct claim is decided "on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995); *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

Factors which a court may take into account in determining whether misconduct rises to a level of due process violation are: (1) the weight of evidence of guilt, compare *United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt) with *United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury and lack of curative instruction, new trial required after prosecutor's reference to defendant's courtroom demeanor); (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to disclose information showing potential bias of witness especially significant because governments case rested on credibility of that witness); and (4) whether a prosecutor's comment misstates or manipulates the evidence, *see Darden*, 477 U.S. at 182.

In determining whether misconduct amounted to a violation of due process, the Court may also consider whether the trial court issued a curative instruction. When a curative instruction is issued, a court presumes that the jury has disregarded inadmissible evidence and that no due process violation occurred. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Darden*, 477 U.S. at 182 (the Court condemned egregious, inflammatory comments by the prosecutor but held that the trial was fair since curative actions were taken by the trial judge); *Trillo*, 769 F.3d at 1000 ("We presume that juries listen to and follow curative instructions from judges."). This presumption may be overcome if there is an "overwhelming probability" that the jury would be unable to disregard evidence and a strong likelihood that the effect of the misconduct would be "devastating" to the defendant. *See Greer*, 483 U.S. at 766 n.8; *Tan*, 413 F.3d at 1115-16 (finding trial fair where jury received

34

instructions five different times to consider only the evidence presented, and not its sympathy for the victim's life story).

## B. Misstatement Regarding the Weighing Process

In this claim, Petitioner argues that the prosecutor's discussion in his closing argument of factor (a), the facts of the crime and special circumstance, was misleading and contrary to California law because it encouraged the jurors to compare the aggravating nature of the circumstances of the crime against the good the jurors had done in their own lives. Merits Br. at 37. He also argues that it deprived him of his federally guaranteed right to an individualized sentencing determination. Pet. at 265.

In the penalty phase closing argument, the prosecutor said:

> And I would ask every one of you to think, if you intentionally, deliberately and with premeditation, that you know the law requires from your duty in the first part of this case, if any one of you deliberately took a human life for a few thousand dollars, if you did that, would you expect that a jury of your peers would impose the lesser of the two sentences here? Just in your own experience, is that what you would expect? Do you think the good in your own lives would morally outweigh that type of a crime? That's one of the factors that can be considered.

RT 5060, AG 10795.

The California Supreme Court denied Petitioner's challenges to the above statement, finding it to be proper argument. The state court initially noted that the challenged argument was coupled with a comment that the taking of a life for financial gain constituted one factor for the jury to consider, which was an appropriate consideration. *Crew*, 31 Cal.4th at 846. The court also found that the comment did not deprive Petitioner of an individualized sentencing determination because "[t]he determination of personal culpability of a defendant cannot be made in a vacuum divorced from social standards or the experiences and morality of others; it is to reflect a reasoned and moral response to the defendant's background, character and crime." *Id.* at 847. The court also cited defense counsel's argument and the trial court's instructions, both of which directed jurors to consider the mitigating evidence alongside the aggravating evidence. *Id.*

Petitioner argues that this denial is an unreasonable determination of clearly established federal law. He, however, has failed to show an entitlement to relief.

Petitioner cites *Zant v. Stephens*, 462 U.S. 862, 879 (1983), in support. While *Zant* stands for the general proposition that a capital defendant is entitled to an individualized sentencing determination, its specifics are inapposite to Petitioner's case. *Zant* concerned the validity of the petitioner's aggravating circumstances, an election for which would have made him eligible for the death penalty. It related to jury instructions as opposed to prosecutorial misconduct. Petitioner, thus, has provided a general rule, which he argues the prosecutor abridged.

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. *Yarborough v. Alvarado*, 541 U.S. 541 U.S. 652, 664 (2004). Petitioner has provided nothing else to show that the California Supreme Court's denial of this claim was unreasonable. As noted above, the trial court provided the jury with extensive instructions as to how to evaluate the various mitigating and aggravating factors. The jury is presumed to have adhered said instructions. *Weeks*, 528 U.S. at 234. Because Petitioner has not shown that the California Supreme Court's denial of this claim was an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2), the claim is DENIED.

### C.   Argument About Victim Impact

Petitioner next argues that the prosecutor's extended comments during closing argument regarding the impact of the victim's death on her family violated his constitutional rights. Specifically, Petitioner challenges the prosecutor's statement that concealing the body aggravated the crime because it denied the family the opportunity to receive the closure of a burial and the prosecutor's summary of both the victim's daughter's and mother's testimonies regarding the impact of the victim's death on their lives. Merits Br. at 38.

The California Supreme Court denied this claim on appeal finding that the argument fell within permissible bounds because it described the effect the victim's death had on her family members. *Crew*, 31 Cal.4th at 856. The court also held that the remarks were not unduly prejudicial because they were brief and constituted an accurate statement of testimony offered in the guilt phase of trial. *Id.* Petitioner argues that this denial is an unreasonable application of *Payne v. Tennessee*, 501 U.S. 808 (1991).

36

United States District Court
Northern District of California

The Court in *Payne* held that the Eighth Amendment does not bar the inclusion of victim impact evidence and prosecutorial argument on that subject. *Payne*, 501 U.S. at 827. The Court further stated, "A state may legitimately conclude that evidence . . . about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated." *Id.* Petitioner has not shown the California Supreme Court's denial of this claim abridged the strictures set forth in *Payne*.

For a prosecutorial misconduct claim, the first question is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. *Tan*, 413 F.3d at 1112. The California Supreme Court has held that victim impact evidence at the penalty phase is permissible and congruent with *Payne*. *See Crew*, 31 Cal.4th at 847, citing *People v. Fierro*, 1 Cal.4th 173, 236 (1991). Petitioner has failed to show that the state rule permitting such evidence at trial abridges *Payne*, thus he has not shown the prosecutor's remarks to be improper.

Similarly, he has not shown the prosecutor's closing argument infected his trial with unfairness. While the comments were more than a passing reference, they did not constitute a major portion of the prosecutor's closing argument. Additionally, as noted by the California Supreme Court, the prosecutor's summary of the testimony in the guilt phase was accurate.

Petitioner has failed to show that the California Supreme Court's denial of this claim was an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2). Accordingly, it is DENIED.

## D. Argument About Lack of Remorse and Future Dangerousness

This claim challenges the prosecutor's argument at the conclusion of the penalty phase that Petitioner's lack of remorse and future dangerousness could be considered in aggravation. Petitioner argues that pursuant to *Hicks v. Oklahoma*, 447 U.S. 343 (1980), he has a state-created liberty interest in a sentencing determination based solely on the statutory factors.

Specifically, the prosecutor said:
> The callousness and lack of remorse during the commission of this offense that the defendant exhibited is an aggravating factor. It goes beyond just the essential constituents of a first degree murder. The callousness, the cruelty. . . .

That callousness, the lack of remorse that he exhibited at that time goes beyond the norm. It goes beyond essential constituents of a crime like this.

Mr. Crew had a rare opportunity. He had a second chance. When he went back to the scene, she was still alive. We don't know if medical attention could have saved her at that point, but we know there was still life in Nancy. And yet, he didn't take that chance. He went ahead, and the callousness that he acted with, it is as if he killed her twice.

The fourth thing that I would suggest the evidence shows that's aggravation in this case is that the defendant poses a future threat. Now, you've heard evidence of people who have seen a side of him that's helpful and caring and kind, and you have heard people . . . talk about how he held them and how kind he was.

And yet, what is the reality of Mark Christopher Crew? Is it this kind caring person? He can be whatever he wants or whatever someone wants him to be. He can act through others, he can manipulate people to his ends.

All through the crime you see his using other people. He has charisma, you heard from people, the talents, that he has intelligence, that capability, what I consider to be a good and decent background, that he turned his back on. Love of family, ability to do things, ability to get along, leadership abilities. He had all of these things. And he used them for incredible evil. He manipulated other people. And he'll always have those abilities. Those are innate talents that exist in Mark Christopher Crew. . . .

Same man who schemes, who plots, and yet can appear as someone who is wonderful and helpful.

Jailers will come to his side in this courtroom and testify what a good prisoner he is. Those are good people, those good deputies. They are honest men giving their opinion of Mark Christopher Crew. But who really knows him? Is it the jailers who see what he wants them to see, or is it the man who lives in the sewer of the penal system, Mr. Williams? . . .

This is not aggravating evidence. It's only evidence in rebuttal of what they presented of his good character. But who really knows Mark Crew? And is he the good prisoner who's going to rise to the aid of a warden in a riot? Is he the man who wants to kill Mr. Williams because he threatened to do so when he encountered him within the jail system? . . . Will he always, wherever he is, pose a threat?

RT 5064-67, AG10799-80.

The California Supreme Court denied this claim, finding that the prosecutor focused on Petitioner's lack of remorse at the time he committed the crime, which could, pursuant to state law, be considered an aggravating circumstance of the murder. *Crew*, 31 Cal.4th at 857. The state court

38

1    also determined that the prosecutor did not commit misconduct in his statements regarding future

2    dangerousness because he specifically said, "This is not aggravating evidence. It's only evidence in

3    rebuttal of what they presented of his good character." *Id.*

4         Regarding the prosecutor's statement as to Petitioner's lack of remorse, Petitioner has failed

5    to identify any clearly established federal law that would entitle him to relief on this claim. To the

6    extent he challenges the state court's interpretation of California law, that determination binds this

7    Court. *See Bradshaw*, 546 U.S. at 76 (2005).

8         To the extent Petitioner challenges the state court's determination regarding the prosecutor's

9    statements on future dangerousness, he has not shown that the state court made an "unreasonable

10   determination of the facts in light of the evidence presented in the State court proceeding." 28

11   U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where the state court fails

12   to consider and weigh highly probative, relevant evidence, central to Petitioner's claim that was

13   properly presented and made part of the state-court record. *See Taylor v. Maddox*, 366 F.3d 992,

14   1005 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir.

15   2014), (state courts unreasonably determined the facts in failing to consider, or even acknowledge,

16   and weigh relevant evidence of attorney's testimony corroborating that petitioner, a minor, asked to

17   speak to a lawyer during his interrogation and gave a false confession). Here, the California

18   Supreme Court failed to acknowledge that the prosecutor initially said the evidence could be

19   considered in aggravation, let alone analyze the impact it had on Petitioner's trial.

20        That said, even under *de novo* review, Petitioner cannot show that the statement violated his

21   due process rights by rendering his trial "fundamentally unfair." *Darden*, 477 U.S. at 181; *Phillips*,

22   455 U.S. at 219 ("the touchstone of due process analysis in cases of alleged prosecutorial

23   misconduct is the fairness of the trial, not the culpability of the prosecutor"). At the conclusion of

24   the argument on future dangerousness, the prosecutor corrected himself and noted, "This is not

25   aggravating evidence. It's only evidence in rebuttal of what they presented of his good character."

26   RT 5066, AG010801.

27        Further, prior to closing arguments, the trial court instructed the jury, "If anything

28   concerning the law said by the attorneys in their argument conflicts with my instructions on the law,

     you must follow my instructions." RT 5085-86, AG010820-21. The trial court reiterated this

39

United States District Court
Northern District of California

instruction at the conclusion of argument. RT 5085-86; AG010820-21. Defense counsel also stressed that the penalty should be selected based on evidence, not argument. RT 5071-72; AG010806-07. Following argument, the trial court instructed the jury in the proper considerations for imposing the death penalty, including what could be considered in aggravation. RT 5091-96, AG010826-31. The list of factors to consider did not include future dangerousness. *Id.* Presumably, the jury followed the instructions. *Weeks*, 528 U.S. at 234 (2000).

Based on the prosecutor's correction of his own misstatement and the trial court's proper instruction of the jury, Petitioner has failed to show that the prosecutor's initial misstatement deprived him of due process. Accordingly, this claim is DENIED.

### E. Misstatement Regarding Mitigating Evidence

Finally, Petitioner challenges a different component of the "future dangerousness" argument addressed in the claim above. He asserts that the prosecutor's description of Petitioner's good qualities as evidence of his manipulative abilities and absence of an excuse for the crime he committed encouraged the jurors to view Petitioner's mitigating evidence as evidence in aggravation. Merits Br. at 40. Petitioner supports his claim with reference to California state law arguing that it constitutes a state-created liberty interest in his sentencing determination pursuant to *Hicks.*

The California Supreme Court denied this claim, finding the argument permissible because it argued that Petitioner's mitigating was in fact not mitigating and it placed that evidence in "the broader factual context of the case." *Crew*, 31 Cal.4th at 857-58. Petitioner has failed to show that the denial of this claim was unreasonable.

Prosecutors are allowed reasonably wide latitude in closing arguments. *See United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000), *as amended* (2001) (during closing argument "[p]rosecutors have considerable leeway to strike 'hard blows' based on the evidence and all reasonable inferences from the evidence"). As noted by the California Supreme Court and discussed above, following this argument, the prosecutor expressly stated that none of the assertions he made regarding Petitioner's character were meant to be used as aggravating evidence and, instead, were posited to counter or reframe his good character testimony. It went to the credibility of Petitioner's evidence. "Criticism of defense theories and tactics is a proper subject of closing

40

argument." *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997). As such, Petitioner has failed to show that the state court's denial was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 102. Accordingly, this claim is DENIED.

**CONCLUSION**

For the foregoing reasons, Claims 1, 21, 24, 29, and 31 are DENIED.

Within ninety (90) days of the filing date of this Order, Petitioner shall file a brief addressing the merits of the remaining record-based claims. Respondent shall file a response within forty-five (45) days of the service of the opening brief. The reply is due within fifteen days of the date of service of the response. The parties are to observe a 40-page limit for their briefs.

Subsequent to the review of records for this round of briefing, the CD of lodged state records became corrupted. Within thirty (30) days, Respondent shall lodge a new CD containing the state court records.

**IT IS SO ORDERED**.

Dated: February 8, 2019

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**