1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **MARK CHRISTOPHER CREW,**<br><br>         **Petitioner,**<br><br>    **vs.**<br><br>**RON BROOMFIELD, Acting Warden of San Quentin State Prison**<br><br>         **Respondent.** | **Case No.:  12-CV-4259 YGR**<br><br>**CAPITAL CASE**<br><br>**ORDER DENYING THIRD BRIEF ON THE MERITS OF CLAIMS** |

## INTRODUCTION

Petitioner Mark Christopher Crew, a California capital prisoner currently incarcerated at San Quentin State Prison, has filed a brief on the merits of claims 16, 25, 28, 34, 35, 39 and 41 of his habeas petition.  Respondent opposes the grant of relief on these claims.  For the reasons outlined below, petitioner's claims are DENIED.

## BACKGROUND

The following recitation of the factual background of this case is taken from the California Supreme Court's opinion on petitioner's direct appeal.  *People v. Crew*, 31 Cal. 4th 822 (2003).  The state court's factual determinations are presumed to be correct pursuant to 28 U.S.C. § 2254(e)(1).

1.  Prosecution's case
Defendant met Nancy Jo Wilhelmi Andrade (Nancy), a nurse, at the Saddle Rack bar in San Jose in 1981, shortly after Nancy's divorce.  Nancy owned a purebred horse and a Ford pickup truck.  Nancy and defendant were romantically involved until November or December of 1981, after which they did not see each other until April of 1982, when they resumed the relationship.

United States District Court
Northern District of California

In January 1982, when Nancy and defendant were not romantically involved, Nancy and her friend Darlene Bryant planned a trip across the United States for the summer, and that spring Nancy bought a yellow Corvette for the trip.  In May 1982, Richard Elander, one of defendant's best friends, began work at a ranch in Utah run by Richard Glade.  Before Elander left for Utah, defendant had talked to him about killing Nancy during a trip across the country.  While in Utah, Elander asked Glade about carrying a body into the wilderness of the Utah mountains.  Disturbed by the conversation, Glade fired Elander.

Defendant asked Nancy to move to Greer, South Carolina, where defendant's mother and stepfather lived.  When Nancy replied she did not want to move so far away unless married, defendant agreed to marry her.  The wedding took place on June 4, 1982.

The marriage soon floundered.  Nancy was living with Darlene at the latter's home, but defendant was rarely there.  Nancy twice saw defendant with some women at the Saddle Rack bar.  She told several friends she was thinking of an annulment of the marriage.

Defendant had been romantically involved with Lisa Moody, to whom he proposed marriage in June 1982, the same month he married Nancy.  Defendant and Moody did not set a date for the wedding.

In July 1982, defendant and his friend Richard Elander moved to Greer, South Carolina, where they stayed with defendant's parents and started a truck service business.  That same month, Nancy and her friend Darlene took their planned vacation trip across the country.  They stopped in Greer, South Carolina, and Nancy spent the night with defendant.

After Nancy's visit to South Carolina, defendant and his stepfather, Bergin Mosteller, decided to return to California to kill Nancy.  Defendant discussed with Elander different ways of killing her, including suffocation, hitting her with a large wrench, and "bleeding her in the shower so she wouldn't make any mess."  They also discussed leaving her body in the Utah wilderness, where they could bury her or "hang her in a tree, let the bears eat her."

After returning to California in early August 1982, Nancy often spoke on the telephone with defendant.  She decided to move to South Carolina in an effort to make the marriage work, and she began to make arrangements to do so.  She gave custody of her two children from a prior marriage to their father and closed out her bank account, obtaining $10,500 in cash and a money order for $2,500.  When Deborah Nordman, one of Nancy's friends, remarked that Nancy might be left in the desert during the trip with defendant to South Carolina, Nancy replied, "If you don't hear from me in two weeks, send the police."

United States District Court
Northern District of California

On August 21, 1982, defendant and his stepfather came to Darlene's house, where Nancy was living, in a station wagon pulling a horse trailer. They loaded Nancy's belongings into the trailer and picked up Nancy's horse from a stable in Gilroy. The plan was for Mosteller to drive the station wagon to Texas, where he would leave the horse with relatives. Nancy and defendant would follow in Nancy's Corvette and truck. They would leave the truck in Texas, where defendant's friend, Richard Elander, would retrieve the truck, the horse, and Nancy's belongings and take them all to South Carolina. Nancy and defendant would then leave Texas in Nancy's Corvette to go on a two-week honeymoon. Mosteller, however, never went to Texas. He boarded the horse in a stable in San Jose, drove to Nevada, and finally flew to South Carolina.

On August 23, Nancy and defendant went to Nancy's parents' home in Santa Cruz, California, where they picked up Nancy's dog and some of her belongings, including a microwave, stereo components still in the original cartons, and personal documents. That same day, Nancy and defendant ostensibly left for South Carolina.

That same night, however, defendant checked into a Motel 6 in Fremont, California, where he registered to stay for two nights. The next day, he arrived at the home of Lisa Moody, the woman who had accepted defendant's marriage proposal shortly after his marriage to Nancy. Over the next two days, defendant gave Lisa a stereo and a microwave, took her to see a horse in a San Jose stable, and arranged for her to convert $5,000 in cash into a cashier's check payable to Bergin Mosteller, defendant's stepfather.

On August 28, 1982, defendant and Lisa left for South Carolina in a pickup truck with a horse in a trailer. They stopped in Texas, where they stayed at defendant's grandmother's house for a couple of days. While there, defendant became upset and agitated after receiving a phone call. After defendant and Lisa arrived in Greer, South Carolina, defendant opened a bank account in which he deposited Nancy's $2,500 money order. Elander and Mosteller sold Nancy's clothing and possessions at a flea market for about $500, burned her documents in a backyard, and sold the horse trailer and Nancy's horse.

Defendant and Lisa returned to San Jose in mid-September. Defendant then sold Nancy's truck for $4,200, giving the purchaser a certificate of title with Nancy's forged signature. On October 13, 1982, defendant told Lisa that the phone call he received in Texas while they were at his grandmother's house was about a woman who loved him and was telling people in South Carolina she was going to marry him. According to defendant, the woman went to the head of the Mafia in Arizona to complain about defendant, but the Mafia killed her instead. Defendant told Lisa that he was forced to dispose of the body to avoid being blamed for the woman's death, and that he buried it in his friend Bruce Gant's backyard. The phone call defendant had received in Texas was actually from Gant who told him that the "body was beginning to stink." That same day, defendant returned to South Carolina in Nancy's Corvette.

United States District Court
Northern District of California

Richard Elander testified under a grant of immunity.  He said that on the day defendant and Lisa arrived in Greer, South Carolina, defendant told him the details of Nancy's killing.  According to Elander, after defendant and Nancy left San Jose, California, they stopped and walked up a hillside into the woods.  While Nancy and defendant were sitting on the hillside talking, defendant shot her in the back of the head and rolled the body down a ravine where he covered it with blankets.  Defendant then drove one of the cars to Bruce Gant's house in Campbell, California.  Defendant and Gant returned to the scene and retrieved the other vehicle.

The next evening, defendant and Gant got drunk and returned to the site where defendant had shot Nancy.  When defendant walked down to her body, it had moved.  Defendant "freaked out," ran back to the truck, and told Gant.  Gant went down the ravine where he tried to strangle Nancy and break her neck.  He eventually cut off Nancy's head.  Defendant told Elander that they put Nancy's body in a 55–gallon drum filled with cement and buried it in Gant's backyard.  They put her head in a five-gallon bucket filled with cement and threw it off the Dumbarton Bridge between Alameda and San Mateo Counties, California.

A few days after defendant returned to South Carolina, Elander testified, he sold Nancy's Corvette to Marion Mitchell.  When Mitchell repeatedly asked for title to the car, Elander told him that defendant had killed his wife by shooting her, cutting off her head, putting the body in a barrel filled with concrete, and burying it in a backyard.  Elander then forged defendant's signature on a bill of sale and gave it to Mitchell.

In January 1983, defendant made arrangements to stay in Connecticut with Jeanne Meskell, with whom he previously had a relationship.  While there, defendant told Meskell that he had killed a girl, that she was in two pieces in two drums filled with cement, and that one drum was in the San Francisco Bay and one was in a backyard.  In March 1983, the San Jose police searched Bruce Gant's house, where they recovered a Tiffany lamp identical to one of Nancy's.  A search of Gant's yard with steel probes in March 1983 and again in 1984 did not reveal anything.  Nancy's body was never found.

2.   Defense case

The defense at the guilt phase consisted primarily of challenges to the credibility of the prosecution witnesses.  The defense introduced evidence that Elander was an untrustworthy drug addict who had engaged in "lying contests" with defendant and that a woman with blonde hair and a dog had come to the San Jose stable with defendant.  Because Nancy had blonde hair and owned a dog, the evidence was introduced to try to show that Nancy was aware that Mosteller had taken her horse to the San Jose stable.  The defense also introduced evidence to raise doubts over the burial of Nancy's body in Gant's backyard in Campbell, California.  San Jose Police Officer Demowski testified that officers searched Gant's backyard three times without finding Nancy's body.  District attorney investigator Ronald McCurdy testified that he could not find any records tying Gant to the crime or the disposal of the body.

4

B. Penalty Phase
1. Prosecution case
The prosecution did not introduce any additional evidence in its case in chief at the penalty phase.

2. Defense case
The parties stipulated defendant had no prior felony convictions.

Defendant's father, William Crew, testified that defendant was born in Fort Worth, Texas in 1954.  The family moved to Novato, California, in 1957 and to Petaluma, California, in 1966.  During this time, defendant did well in school and was involved in sports.  Defendant was never physically abused as a child.

Defendant's parents began to experience marital difficulties.  His mother became noncommunicative and withdrawn.  In 1969, defendant's parents divorced; defendant and his father moved to San Jose.  Defendant continued to do well in school.

In 1970, when defendant was 15 years old, defendant's father married Barbara Martin.  Defendant did not get along with his stepmother and one of her three children.  When defendant's father and stepmother bought a home, his stepmother's children were each given a bedroom while defendant had to sleep on a couch.  Defendant's grades in school began to decline.  When he was 17 years old, defendant quit high school and joined the Army.

Defendant did well in the Army.  He became a squad leader in charge of 12 to 14 men, rose to the rank of sergeant, and became the driver for Colonel Donald Pearce, the base commander.  While he was in the Army, defendant married Patty, his high school girlfriend, and they had one daughter.  When a friend and fellow-enlistee, James Gilbert, was getting in trouble because of his drinking, defendant showed concern and compassion for him.  Before his honorable discharge from the Army in 1976, defendant and Patty divorced.

Thereafter, defendant married Debra Lunde and they moved to Minnesota.  When his marriage to Debra ended in 1981, defendant moved to Texas, where he lived with and took care of his grandmother, Irene Watson, who was suffering from cataracts.  In 1978, defendant returned to California, where he worked as a truck driver and attended junior college.  He then became involved with Emily Bates, whom he treated well.

Part of the testimony of two witnesses, Richard Elander and Kathy Harper, actually given during their guilt phase testimony, was referenced at the penalty phase as well as mitigating evidence about defendant's background.  That testimony consisted of Elander's testimony that defendant protected and cared for him when Elander was a young man strung out on drugs.  And Kathy Harper testified that when she was

United States District Court
Northern District of California

financially destitute, defendant moved in with her and provided financial support for her and her son.

Emily Bates testified at the penalty phase that she had a relationship with defendant in 1977 and again in 1980.  Defendant treated her well.

Defendant's father, William Crew, asked the jury to spare his son's life because as an intelligent and capable person he could lead a productive life in prison by doing assigned tasks.

Defendant's grandmother, Irene Watson, testified that defendant took care of her for two or three months in 1981 when she was in ill health.

James Gilbert, defendant's friend whom defendant had helped while they were in the Army, described defendant as a caring and generous person.

Colonel Pearce, the base commander for whom defendant was the assigned driver while in the Army, said that defendant was intelligent, dependable, full of common sense, and mature.  He described defendant as a top soldier.  In his view, defendant should not be put to death because he could lead a productive life in prison by, for instance, teaching auto repair.

The defense also presented evidence from three Santa Clara County Sheriff's Deputies (Ron Yount, Toby Council, and Donald Varnado) who had daily contact with defendant during the four years he spent in the Santa Clara jail awaiting trial.  According to them, defendant interacted well with prisoners and staff.  Deputy Varnado mentioned that defendant prevented trouble by telling him about a plan by male inmates to overpower a female officer.  All three deputies were of the view that if sentenced to life in prison, defendant could lead a productive life by helping other inmates and doing assigned tasks.

Jerry Enomoto, the former head of the California Department of Corrections and an expert on prisons, expressed the view that defendant would not be a high security risk in prison.  His opinion was not changed by defendant's alleged participation in a 1985 escape attempt, because it involved an unsupervised outdoor area and was based on informant statements; because the district attorney concluded there was insufficient evidence to prosecute defendant; and because the plan did not involve weapons, violence, or the taking of hostages.

3.  Prosecution rebuttal

Clinton Williams, an informant, testified that in 1985, while in the county jail with defendant, the latter discussed an escape plan, which involved cutting a hole in the surrounding fence.  Defendant said he wanted to escape because he thought he would be found guilty of the first degree murder of a woman whose body was buried in an orchard outside California.

*Crew*, 31 Cal.4th at 828-34.

United States District Court
Northern District of California

# PROCEDURAL HISTORY

Petitioner's trial began on April 17, 1989.  On July 26, 1989, the jury found petitioner guilty of first-degree murder and grand theft, and found the financial gain circumstance true.  AG002353.  The jury sentenced petitioner to death on August 10, 1989.  AG002394.

After the jury returned a death verdict, petitioner filed a motion for modification of his sentence in the trial court.  AG0010861-85.  The trial court granted the motion and sentenced petitioner to life without the possibility of parole.  The state appealed the trial court's ruling, arguing that the trial judge improperly compared the facts of petitioner's case with those of other capital cases over which he had presided.  *People v. Crew* ("*Crew II*"), 1 Cal. App. 4th 1591, 1595 (1991).  The California Court of Appeal found that the trial court's "substantial reliance on the facts of other cases in ruling on the section 190.4(e) motion was unauthorized and therefore erroneous." *Id.* at 1604.  Accordingly, it vacated the judgment and remanded the case to the trial court for "the limited purpose of redetermining the automatic modification motion pursuant to section 190.4(e)." *Id.* at 1609.  Following remand, the trial court reinstated the death sentence.  The trial court's judgment was ultimately affirmed by the California Supreme Court.  *Crew*, 31 Cal. 4th at 861.

On December 20, 1999, petitioner filed a state habeas petition raising three claims relating to the modification of his death sentence.  This petition was denied on June 28, 2000.

On June 26, 2002, petitioner filed a second state habeas petition.  On February 2, 2005, the California Supreme Court issued an order to show cause why relief should not be granted as a result of trial counsel's failure to investigate and present mitigating evidence adequately at the penalty phase of trial.  A reference hearing was ordered at which a Santa Clara Superior Court judge would take evidence and make findings of fact relating to petitioner's ineffective assistance of counsel claim.

A reference hearing was held before Judge Andrea Bryan in September 2007.  Judge Bryan issued her findings of fact in February 2008.  Following post-hearing briefing in the California Supreme Court, petitioner's claim of ineffective assistance was denied.  *See In re Crew*, 52 Cal. 4th 126 (2011).  On August 13, 2012, the California Supreme Court denied the remaining claims in petitioner's habeas petition.

On August 13, 2012, petitioner initiated the present habeas corpus action.  ECF Doc. No. 1. Counsel for petitioner were appointed on October 29, 2012.  ECF Doc. No. 7.  Through his appointed counsel, petitioner filed his Amended Petition for Writ of Habeas Corpus on December 6, 2013, asserting forty-seven claims.  ECF Doc. No. 20.  Respondent filed his Answer on October 3, 2014.  ECF Doc. No. 32.  Petitioner filed his Traverse on May 29, 2015, in which he addressed respondent's affirmative defenses.  ECF Doc. No. 38.

The Court addressed respondent's affirmative defenses on November 30, 2015, finding numerous claims procedurally defaulted.  ECF Doc. No. 43.  Subsequently, petitioner identified twenty-five record-based claims that could proceed to briefing on the merits without a request for an evidentiary hearing.  ECF Doc. No. 47.  Petitioner was directed to brief those claims in three rounds.  ECF Doc. No. 48.  The Court resolved the first round of merits briefing on July 18, 2017. ECF Doc. No. 52.  The Court resolved the second round of merits briefing on February 8, 2019. ECF Doc. No. 65.  The instant briefing followed.

### STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 407–09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]valuating whether a rule application [i]s unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 102.

9

United States District Court
Northern District of California

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El I*, 537 U.S. at 340. Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

In the event that a federal court "determine[s], considering only the evidence before the state court, that the adjudication of a claim on the merits resulted in a decision contrary to or involving an unreasonable application of clearly established federal law, or that the state court's decision was based on an unreasonable determination of the facts," the federal court evaluates the petitioner's constitutional claim "de novo." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014). If constitutional error is found, however, habeas relief is warranted only if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)); *accord Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015).

## DISCUSSION

**1.    Claim 16:  Erroneous Jury Instructions**

Petitioner contends that numerous jury instructions misled the jury in violation of his constitutional rights. This claim is comprised of numerous subclaims. Each shall be addressed in turn.

### A.   Unjoined Perpetrator Instruction

Petitioner alleges that the trial court erred in instructing the jury under CALJIC No. 2.11.5. This instruction directs the jury not to discuss or consider why a person who may have been

United States District Court
Northern District of California

involved in the crime is not being prosecuted.  In petitioner's case, Richard Elander, who may have

participated in the crime, testified under grant of immunity.  Petitioner alleges that because the

instruction did not specifically exclude Elander, the jury was prevented from considering the fact

that Elander testified under a grant of immunity when it assessed Elander's credibility.  Respondent

counters that the California Supreme Court reasonably denied this claim.

On direct appeal, the California Supreme Court addressed this claim as follows:

> Defendant contends the trial court erred in instructing the jury under
> CALJIC No. 2.11.5.  That instruction tells the jury not to discuss or
> consider why a person who may have been involved in the crime is not
> being prosecuted.  (Here, Richard Elander, who may have participated
> in the crime, was granted immunity from prosecution.)
>
> We have held that [CALJIC No. 2.11.5] should be clarified or not given
> when a nonprosecuted participant testifies at trial. (*People v. Lawley*
> (2002) 27 Cal.4th 102, 162, 115 Cal.Rptr.2d 614, 38 P.3d 461; *People
> v. Williams* (1997) 16 Cal.4th 153, 226, 66 Cal.Rptr.2d 123, 940 P.2d
> 710.) We have further held, however, that the giving of CALJIC No.
> 2.11.15 is not error when it is given together with other instructions that
> assist the jury in assessing the credibility of witnesses. (*People v.
> Lawley*, *supra*, at p. 162, 115 Cal.Rptr.2d 614, 38 P.3d 461.) That
> occurred here, where the trial court instructed the jury it could consider
> any evidence of witness credibility, including the existence or
> nonexistence of a bias, interest, or other motive (CALJIC No. 2.20),
> and to consider the instructions as a whole (CALJIC No. 1.01). (See
> *People v. Williams*, *supra*, at p. 227, 66 Cal.Rptr.2d 123, 940 P.2d 710.)
> In addition, in closing argument to the jury, defense counsel expressly
> mentioned Elander's grant of immunity as a ground for impugning
> Elander's testimony. (See *People v. Hardy* (1992) 2 Cal.4th 86, 190–
> 191, 5 Cal.Rptr.2d 796, 825 P.2d 781.)

*Crew*, 31 Cal. 4th at 840.

In order to challenge a jury instruction on habeas, a petitioner must prove that the ailing

instruction so infected the entire trial that the resulting conviction violates due process.  *Spivey v.

Rocha*, 194 F.3d 971, 976 (9th Cir. 1999), *citing Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  "The

instruction must be viewed in the context of the entire trial and the jury instructions taken as a

whole."  *Id*.  The relevant inquiry is "whether there is a reasonable likelihood that the jury has

applied the challenged instruction in a manner that prevents the consideration of constitutionally

relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990).

Here, petitioner has failed to demonstrate a reasonable likelihood that the jury applied

CALJIC No. 2.11.5 in an unconstitutional manner.  Instructions issued at trial instructed the jury on

how to evaluate the credibility of witnesses and to consider whether witnesses had a bias, interest or

other motive.  *See* CALJIC 2.20, AG002721.  Additionally, in closing argument, defense counsel

portrayed Elander as a liar and contended that Elander's grant of immunity made a "mockery" of

the justice system.  AG010325, AG010330.  When the court's instructions are viewed in context of

the entire trial, there is no reasonable likelihood that the jury understood CALJIC No. 2.11.5 to bar

consideration of Elander's motives for testifying.

Petitioner fails to demonstrate that the California Supreme Court's decision constituted an

unreasonable application of United States Supreme Court law or an unreasonable determination of

the facts.  For the above-mentioned reasons, petitioner's claim lacks merit and is denied.

### B.   Proximate Cause Instructions

Petitioner alleges that the "proximate cause" instructions provided to the jury were

erroneous, incomplete and improperly lessened the prosecution's burden in proving beyond a

reasonable doubt that petitioner was responsible for Nancy's murder.  Respondent counters that the

California Supreme Court reasonably denied petitioner's claim.

According to the evidence presented at trial, petitioner told his friend Elander that he shot

Nancy in the back of the head, rolled her down a ravine and covered her with blankets.  Petitioner

returned to the scene of the crime the next evening and found that Nancy's body had moved.

Petitioner "freaked out", ran back to Elander and told him what had occurred.  Elander went down

the ravine, tried to strangle Nancy and eventually cut off her head.  The prosecutor argued that there

United States District Court
Northern District of California

were two proximate causes for Nancy's death – petitioner's shot to Nancy's head and Elander's actions. AG010307-09.

Petitioner argues that the jury instructions relating to proximate and intervening causes, CALJIC No. 8.55 and CALJIC 3.41, lessened the prosecution's burden of proving beyond a reasonable doubt that petitioner was responsible for Nancy's murder.  CALJIC No. 8.55 provided:

> To constitute murder there must be, in addition to the death of a human being, an unlawful act which was the proximate cause of that death.  A proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, without which the death would not have occurred.

AG002751.

In addition, CALJJC No. 3.41 provided:

> There may be more than one proximate cause of the murder.  When the conduct of two or more persons contributes concurrently as a proximate cause of the murder, the conduct of each such persons is a proximate cause of the murder if that conduct was also a substantial factor contributing to the result.  A cause is concurrent if it was operative at the moment of the murder and acted with another cause to produce the murder.  If you find that the defendant's conduct was a proximate cause of death of another person, then it is no defense that the conduct of some other person, even the deceased person, contributed to the death.

AG002752.

On direct appeal, the California Supreme Court rejected petitioner's claim as follows:

> Richard Elander testified that defendant told him that the evening after defendant had shot Nancy, defendant and Gant got drunk and returned to the scene of the shooting. Defendant told Elander that when he walked down to the body, it had moved, and that Nancy appeared to still be alive. Defendant then "freaked out and ran back up to the truck and was telling [Gant] about it, and [Gant] went down and tried to strangle [Nancy] and break her neck, and finally ended up cutting her head off." Defendant contends that this evidence establishes that the causation instructions given the jury were erroneous, misleading, and incomplete, and created an impermissible mandatory presumption of causation.
>
> The trial court told the jury that the unlawful act must be the proximate cause of the death and that proximate cause is a cause that "in natural and continuous sequence, produces the death, and without which the death would not have occurred." The court further instructed, in the language of CALJIC No. 3.41, that there may be more than one proximate cause; that when two or more persons' acts contribute concurrently as a proximate cause, each person may be criminally liable if that person's conduct was a substantial factor contributing to

13

United States District Court
Northern District of California

the result; and that a cause is concurrent if it was "operative at the time of the murder and acted with another cause to produce the murder."

The trial court here, however, modified CALJIC No. 3.41 by adding this language: "If you are convinced beyond a reasonable doubt that Mark Crew shot his wife but you are not certain beyond a reasonable doubt that the shot was the proximate cause of her death, you must find Mark Crew not guilty of murder unless you believe the evidence proves beyond a reasonable doubt that Mark Crew directed, aided, or encouraged another to kill Nancy Crew. [¶] If the evidence shows that Nancy Crew was killed by someone other than Mark Crew, and you have reasonable doubt as to whether or not Mark Crew directly aided by act or advised this person to kill Nancy Crew, you must find Mark Crew not guilty of the crime of murder." In addition, the court instructed the jury on the criminal liability and definition of an aider and abettor. (CALJIC Nos. 3.00, 3.01, 3.03.)

Defendant contends the trial court erred in giving the then standard proximate cause instruction, CALJIC No. 8.55, because that instruction is "virtually identical" (*People v. Roberts* (1992) 2 Cal.4th 271, 313, 6 Cal.Rptr.2d 276, 826 P.2d 274) to an instruction this court disapproved in *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1 Cal.Rptr.2d 913, 819 P.2d 872. (*People v. Roberts*, supra, at p. 313, 6 Cal.Rptr.2d 276, 826 P.2d 274.) Any error was harmless. (*People v. Catlin* (2001) 26 Cal.4th 81, 156–157, 109 Cal.Rptr.2d 31, 26 P.3d 357.) Any possible jury confusion engendered by the use of the term "proximate" could only benefit defendant. This court's concern with the term "proximate" in Mitchell was that it could mislead a jury into viewing the legal requirement of causation as more limited than it is. (*Catlin*, at p. 157, 109 Cal.Rptr.2d 31, 26 P.3d 357.) Thus, here, as in *Catlin*, any ambiguity in the instruction could not have caused a juror who otherwise thought defendant's acts were not a cause of Nancy's death to conclude that defendant nevertheless proximately caused her death. (*Ibid.*)

Defendant argues the trial court should have instructed the jury that Gant's actions in strangling Nancy and then cutting off her head could be an independent intervening cause breaking the causal connection between defendant's shooting of Nancy and her death. Not so. To relieve a defendant of criminal liability, an intervening cause must be an unforeseeable and extraordinary occurrence. (*People v. Schmies* (1996) 44 Cal.App.4th 38, 50, 51 Cal.Rptr.2d 185.) The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act. (*Ibid.*) Here, a jury could not possibly have found that Gant's attempt to make sure Nancy was dead was unforeseeable.

Moreover, any error was harmless under any standard because here it is clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent any error. (See *People v. Nguyen* (2000) 24 Cal.4th 756, 765, 102 Cal.Rptr.2d 548, 14 P.3d 221.) Even if Gant's actions could be described as an independent intervening cause of Nancy's death, they would relieve defendant of criminal liability only

> if the jury found that his shooting Nancy in the head was not a concurrent cause of her death. No reasonable jury could have found that the shot defendant fired into Nancy's head was not a concurrent cause of her death.
>
> Finally, defendant contends the proximate cause instruction creates a constitutionally impermissible mandatory presumption because it tells the jury that a proximate cause is one that "in natural and continuous sequence" produces the death, thereby precluding consideration of intervening causes. Not so. When there is an intervening cause, the initial cause is not one that continues to operate in a natural and continuous sequence.

*Crew*, 31 Cal. 4th at 845-847.

Petitioner claims that CALJIC No. 8.55 places undue emphasis on the proximate cause that is physically and temporally closest to harm.  ECF Doc. No. 73 at 6.  As the California Supreme Court reasonably pointed out however, any confusion engendered by the term "proximate" could only have benefited defendant because it would have led the jury to adopt a more limited view of causation.  Thus, CALJIC No. 8.55 could not have led any juror who otherwise thought that petitioner's acts were not a cause of Nancy's death to conclude that petitioner proximately caused her death.  *Crew*, 31 Cal. 4th at 846.  Petitioner's argument to the contrary lacks merit.

Petitioner further alleges that nothing in CALJIC No. 3.41's definition of concurrent causes would have permitted the jury to find Gant's actions to be an intervening factor that could have exonerated petitioner.  To relieve a defendant of criminal liability however, an intervening cause must be unforeseeable and extraordinary.  *People v. Schmies*, 44 Cal. App. 4th 38, 50 (1996).  The California Supreme Court reasonably concluded that "a jury could not possibly have found that Gant's attempt to make sure that Nancy was dead was unforeseeable."  *Crew*, 31 Cal. 4th at 847. Moreover, even if Gant's actions could be described as intervening, they would relieve petitioner of liability only if his shooting Nancy in the head was not a concurrent cause of her death. The California Supreme Court reasonably determined that no reasonable jury could make that finding. *Id*.  For the foregoing reasons, petitioner's claim lacks merit and is denied.

### C.   Reasonable Doubt Instructions

Petitioner alleges that four standard jury instructions – CALJIC Nos. 2.01, 2.02, 8.83 and 8.83-1 – misled the jury and diluted the prosecution's burden of proving its case beyond a reasonable doubt.  Each of these instructions informed the jury that that if one interpretation of the evidence "appears to you to be reasonable and the other interpretation appears to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."  AG002714-15, 002768-69.  Petitioner argues that this directive improperly allowed the jury to convict petitioner if he reasonably appeared guilty, even if the jurors had a reasonable doubt about his guilt.  Respondent contends that the state court reasonably rejected this claim.

On direct appeal, the California Supreme Court addressed this claim as follows:

> Defendant challenges 11 standard jury instructions that the trial court gave. Four of the instructions, CALJIC Nos. 2.01, 2.02, 8.83, and 8.83.1, told the jurors that they must accept a reasonable interpretation of evidence over an unreasonable one. Defendant contends these instructions would have misled the jury into finding him guilty if it decided defendant reasonably appeared guilty, rather than finding him not guilty if it entertained a reasonable doubt about his guilt. As defendant concedes, we have previously rejected this contention. (*People v. Mendoza* (2000) 24 Cal.4th 130, 181, 99 Cal.Rptr.2d 485, 6 P.3d 150; *People v. Crittenden* (1994) 9 Cal.4th 83, 144, 36 Cal.Rptr.2d 474, 885 P.2d 887.) We do so again here.
>
> Defendant points out that four of the instructions, CALJIC Nos. 1.00, 2.01, 2.51, and 2.52, referred to "guilt or innocence." This phrase, he argues, relieved the prosecution of its burden of proof by implying that the issue was one of guilt or innocence instead of whether there was or was not a reasonable doubt about defendant's guilt. Challenges to the wording of jury instructions are resolved by determining whether there is a reasonable likelihood that the jury misapplied or misconstrued the instruction. (*People v. Clair* (1992) 2 Cal.4th 629, 662–663, 7 Cal.Rptr.2d 564, 828 P.2d 705.) Here, it is not reasonably likely that the jury would have misapplied or misconstrued the challenged instructions, one of which expressly reiterates that defendant's guilt must be established beyond a reasonable doubt. (CALJIC No. 2.01.) The instructions in question use the word "innocence" to mean evidence less than that required to establish guilt, not to mean the defendant must establish innocence or that the prosecution has any burden other than proof beyond a reasonable doubt. (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1493, 46 Cal.Rptr.2d 645.) Here, the jury was repeatedly instructed on the proper burden of proof. (E.g., CALJIC Nos. 2.90, 4.21, 8.71.)

16

Defendant contends three other jury instructions improperly lessened the prosecution's burden of proof. The first of those stated that a witness willfully false in part of his or her testimony was to be distrusted in other parts of the testimony. (CALJIC No. 2.21.2.) We have in the past rejected such a challenge when the defendant is the witness. (*People v. Beardslee* (1991) 53 Cal.3d 68, 94–95, 279 Cal.Rptr. 276, 806 P.2d 1311.) The challenge has even less force when, as here, the witness is other than the defendant. Second, defendant challenges the instruction that the jury should not decide guilt or innocence based on the number of witnesses but on the convincing force of the evidence. (CALJIC No. 2.22.) This instruction addresses the jury's evaluation of evidence, not the burden of proof. Defendant's third challenge is to CALJIC No. 8.20. This instruction requires the jury to find the killing was preceded by a clear and deliberate intent to kill that must have been formed upon preexisting reflection and not precluded by conditions that negate deliberation. There is no reasonable likelihood that any jury would misconstrue this instruction as lessening the prosecution's burden of proof in any respect.

*Crew*, 31 Cal. 4th at 847-48.

The California Supreme Court reasonably concluded that CALJIC Nos. 2.01, 2.02, 8.83 and 8.83-1 did not dilute the prosecution's burden of proof.  As noted above, the California Supreme Court previously rejected arguments similar to those raised by petitioner.  *See People v. Crittenden*, 9 Cal. 4th 83, 144 (1994); *People v. Mendoza*, 24 Cal.4th 130, 181 (2000).  Here, as in *Crittenden*, "when the questioned phrase is read in context, not only with the remaining language within each instruction but also together with related instructions, including the reasonable doubt instruction, it is clear that the jury was required only to reject unreasonable interpretations of the evidence and to accept a reasonable interpretation that was consistent with the evidence."  9 Cal. 4th at144. Petitioner's interpretation parses the language contained in the instructions at issue in contravention of United States Supreme Court authority, which directs a reviewing court to view the "instructions as a whole".  *Estelle*, 502 U.S. at 72.

For the above-mentioned reasons, petitioner's claim lacks merit and is denied.

///

17

**D.   Consciousness of Guilt Instructions**

Petitioner alleges that the trial court gave two erroneous instructions relating to the

consciousness of guilt – one based on flight, CALJIC No. 2.52, and one based on a defendant's

authorization of the fabrication of evidence by another, CALJIC No. 2.05.  Petitioner contends that

these instructions were improper pinpoint instructions that directed the jury to consider specific

pieces of evidence against him.  Respondent counters that the state court reasonably rejected this

claim.

On direct appeal, the California Supreme Court denied this claim as follows:

> The trial court instructed the jury that the flight of a person immediately
> after the commission of a crime is not sufficient to establish guilt but
> may be taken into consideration. (CALJIC No. 2.52.) It also instructed
> the jury not to consider an effort to procure false evidence for the
> defendant's benefit unless the jury finds that the defendant authorized
> the effort, and that even then the conduct by itself is not sufficient to
> prove guilt. (CALJIC No. 2.05.) Defendant contends these instructions
> are impermissible "pinpoint" instructions to consider specific pieces of
> evidence against him. We have in the past rejected such a challenge
> (*People v. Jackson* (1996) 13 Cal.4th 1164, 1223–1224, 56 Cal.Rptr.2d
> 49, 920 P.2d 1254), and we do so again here.
>
> Defendant further contends the consciousness of guilt instructions
> should not have been given here because there was insufficient
> evidence of flight or procuring false evidence. There was adequate
> evidence that after Nancy's murder defendant fled from California to
> Texas and South Carolina. With respect to the instruction on procuring
> false evidence, the Attorney General argues it was supported by
> testimony that defendant instructed his stepfather, Bergin Mosteller, to
> tell Nancy's parents that Mosteller had thrown defendant and Nancy out
> of the house for using drugs and that they had gone to Florida.
> Defendant counters that the evidence of what Mosteller said was too
> remote to be probative of procuring false evidence for trial. (See *People
> v. Rodrigues* (1994) 8 Cal.4th 1060, 1139, 36 Cal.Rptr.2d 235, 885 P.2d
> 1 [instruction on fabricating evidence does not require existence of
> judicial proceedings].) In any event, any error was harmless under any
> standard. At most, the instruction was superfluous. (*People v. Jackson*,
> *supra*, 13 Cal.4th at p. 1225, 56 Cal.Rptr.2d 49, 920 P.2d 1254.)

*Crew*, 31 Cal. 4th at 848-49.

CALJIC No. 2.52 relating to the consciousness of guilt based on flight instructed the jury

that "the flight of a person immediately after the commission of a crime . . . is not sufficient in itself

18

to establish . . . guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts." AG002729.  This instruction merely stated that flight alone is insufficient to establish guilt.  Petitioner has failed to demonstrate that CALJIC No. 2.52 violated due process and rendered his trial fundamentally unfair.  *See, e.g., Karis v. Calderon*, 283 F.3d 1117, 1131-32 (9th Cir. 2002) (flight instructions that clarified that flight alone is insufficient to establish evidence of guilt could have worked to petitioner's benefit); *see also People v. Jackson*, 13 Cal. 4th 1164, 1224 (1996).

CALJIC No. 2.05 instructed the jury that:

> If you find that an effort to procure false or fabricated evidence was make by another person for the defendant's benefit, you may not consider that effort as tending to show the defendant's consciousness of guilt unless you also find that the defendant authorized such effort. If you find defendant authorized that effort, such conduct is not sufficient by itself to prove guilt and its weight and significance, if any, are matters for your consideration.

AG002716.  This instruction merely admonished the jury that a defendant's effort to procure false evidence could not by itself be deemed sufficient to prove guilt.  Petitioner has failed to demonstrate that CALJIC No. 2.05 rendered his trial fundamentally unfair.

Finally, petitioner contends that there was insufficient evidence to support either CALJIC No. 2.52 or 2.05.  Any error in the state court's determination of whether there was sufficient evidence under state law for an instruction cannot form the basis for federal habeas relief.  *Estelle*, 502 U.S. at 67-68.  Petitioner's allegations to the contrary lack merit.

For the above-mentioned reasons, petitioner's claim lacks merit and is denied.

**2.  Claim 25: Admission of Rebuttal Evidence At Penalty Phase**

Petitioner alleges that the trial court committed constitutional error by admitting penalty phase testimony from jailhouse informant Clint Williams.  After petitioner introduced mitigating evidence of good conduct in jail, the prosecution called Williams as a rebuttal witness.  Williams

United States District Court
Northern District of California

testified that petitioner planned to escape from jail. Williams also testified that petitioner told him

that he had killed a woman and buried her body in an orchard in another state. Petitioner alleges

that the introduction of Williams' testimony was so prejudicial that it violated his right to due

process.

The California Supreme Court denied this claim on direct appeal as follows:

> After defendant introduced mitigating evidence of his good conduct in jail, the prosecution called as a rebuttal witness a jailhouse informant, Clint Williams, who testified about defendant's plan to escape from jail. Williams further testified, over defense objection, that defendant admitted killing someone whose body was then buried in an orchard in another state. Defendant contends the trial court should not have admitted the latter testimony.

> Evidence offered by the prosecution in rebuttal " 'is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt.' " (*People v. Daniels* (1991) 52 Cal.3d 815, 859, 277 Cal.Rptr. 122, 802 P.2d 906.) The testimony concerning defendant's escape plan was proper because it countered defendant's new evidence of his good conduct in jail. But Williams's testimony that defendant admitted killing Nancy and burying her body was improper rebuttal. It did not counter new evidence introduced by defendant; nor did defendant's penalty phase case set forth assertions not implicit in the denial of guilt.

> The error, however, was not prejudicial. Williams testified in rebuttal at the penalty phase, not the guilt phase, of the trial. By that time, the jury had already convicted defendant of Nancy's murder and found the truth of the financial gain special circumstance. Williams's testimony was also cumulative of the testimony of Richard Elander and of Jeanne Meskell that defendant told them he had killed Nancy and disposed of her body. Thus, it is not reasonably likely that the jury would have reached a penalty phase verdict more favorable to defendant without Williams's testimony. (*People v. Daniels*, supra, 52 Cal.3d at p. 860, 277 Cal.Rptr. 122, 802 P.2d 906.)

*Crew*, 31 Cal. 4th at 854.

Petitioner argues that because the California Supreme Court found the admission of

Williams's testimony improper under state law, it did not adjudicate the merits of petitioner's

constitutional allegations and therefore the AEDPA (or Antiterrorism and Effective Death Penalty

Act) standard does not apply to his claim. Petitioner is mistaken. To the extent that the California

United States District Court
Northern District of California

Supreme Court did not expressly address petitioner's constitutional claim, this Court must presume that petitioner's constitutional claim was adjudicated on the merits. *See Johnson v. Williams*, 568 U.S. 289, 301 (2013) (when state court rejects a federal claim without expressly addressing it, federal habeas court must presume that federal claim was adjudicated on the merits). In any event, even under a de novo standard of review, petitioner's claim lacks merit.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result constitutes a denial of the right to a fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986). Here, the admission of Williams' testimony regarding petitioner's confession that he killed a woman and buried her body was improper under state law because it did not conform with state rules requiring rebuttal evidence to be limited to issues raised by the defense. *Crew*, 31 Cal. 4th at 854. The admission of Williams' testimony however, was not prejudicial because at the time of admission, the jury had already convicted petitioner of murder and found true the financial gain special circumstance. Additionally, Williams' testimony was cumulative of other evidence. Two other people, Richard Elander and Jeanne Meskell, had already testified that petitioner admitted killing Nancy and disposing of her body. As such, the admission of Williams' testimony did not render the trial fundamentally unfair. Accordingly, this claim lacks merits and is denied.

### 3. Claim 28: Suppression of Evidence During the Penalty Phase

Petitioner alleges that the prosecutor at trial knew or should have known that petitioner's father, William Crew, molested his stepdaughter, Debbie Miller. Petitioner contends that this family history constituted material evidence during the penalty phase of trial and should have been

United States District Court
Northern District of California

1  disclosed pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).  Respondent counters that the

2  California Supreme Court reasonably rejected this claim on state habeas review.

3         According to a declaration from William Crew's second wife, Barbara Miller, Miller called

4  the San Jose Police Department in 1986 and reported to Sgt. Graves that William Crew molested

5  her daughter, Debbie.  Miller states that Sgt. Graves "was aware" that William Crew was the father

6  of Mark Crew, who was in custody awaiting trial at the Santa Clara County jail.  AG013518-19.

7  Petitioner's step-brother, Doug Thompkins, similarly attested to William Crew's molestation of

8  Debbie.  AG013548-50.

9         Petitioner alleges that evidence of William Crew's molestation of Debbie constitutes

10  material mitigating evidence, which, had it been exposed, would have "led reasonably competent

11  counsel to investigate the nature and extent of such molestation and abuse in petitioner's family

12  which would have led to the discovery of additional evidence."  ECF Doc. No. 73 at 15.  Petitioner

13  does not, in this claim, outline the nature of the additional mitigating evidence, but presumably he is

14  referring to evidence presented at the state court evidentiary hearing on his ineffective assistance of

15  counsel claim, during which petitioner alleged that his mother sexually molested him.  In denying

16  this ineffective assistance claim, the California Supreme Court stated:

> [F]amily background "is of no consequence in and of itself." (*People v. Rowland* (1992) 4 Cal.4th 238, 279, 14 Cal.Rptr.2d 377, 841 P.2d 897.) Rather, it "is material if, and to the extent that, it relates to the background of defendant himself." (*Ibid.*) Here, much of the family background evidence presented at the reference hearing was not connected to petitioner. For example, although petitioner presented evidence that his grandfather sexually abused his own children, including petitioner's mother, there is no evidence that petitioner was aware of this abuse until after his capital trial . . . .
>
> The mitigating evidence petitioner presented at the reference hearing of his dysfunctional family might have elicited some jury sympathy for him at the penalty phase of his capital trial. But petitioner showed no causal connection between his family environment and his cold-blooded and calculated decision to brutally murder his wife, Nancy, a few months after they were married, for the sole purpose of obtaining her money and possessions. Even if petitioner's upbringing was not ideal, it was not so horrible as to leave him incapable of functioning as

22

1

2

3

4

5

> a law-abiding member of society. Penalty phase evidence presented by the defense showed that he had had good relationships with women, and that he had served in the military without incident and had been honorably discharged. Petitioner was not an immature youth when he killed his wife; he was in his late 20's. For these reasons, we find no reasonable probability that, but for trial counsel's alleged failings, the result of the penalty phase would have been different. (*See Strickland v. Washington*, *supra*, 466 U.S. at p. 697, 104 S.Ct. 2052.)

6

*In re Crew*, 52 Cal. 4th 126, 152-153 (2011).

7

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence

8

favorable to an accused upon request violates due process where the evidence is material either to

9

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at

10

87. The Supreme Court has since made clear that the duty to disclose such evidence applies even

11

when there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976),

12

and that the duty encompasses impeachment evidence as well as exculpatory evidence, *United*

13

*States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is material if "there is a reasonable

14

probability that, had the evidence been disclosed to the defense, the result of the proceeding would

15

have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). "A reasonable probability does

16

not mean that the defendant 'would more likely than not have received a different verdict with the

17

evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in

18

the outcome of the trial.'" *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles v. Whitley*, 514

19

U.S. 419, 434 (1995).

20

21

Petitioner fails to establish that evidence of William Crew's molestation of Debbie was

22

material. As noted by the state court, evidence of William Crew's molestation of Debbie

23

molestation was not connected to petitioner himself, and in fact, there was no evidence that

24

petitioner was aware of this abuse until after his capital trial. *In re Crew*, 52 Cal. 4th at 152-153.

25

Petitioner fails to demonstrate a reasonable probability that had evidence of Debbie's abuse been

26

27

28

United States District Court
Northern District of California

23

United States District Court
Northern District of California

disclosed to the defense, the result of petitioner's proceedings would have been different.  *See Kyles v. Whitley*, 514 U.S. at 434.  Accordingly, petitioner's claim lacks merit and is denied.

**4.  Claim 34: Constitutionality of Penalty Phase Instructions**

Petitioner alleges that Cal. Penal Code § 190.3 and the related jury instructions given in his case were unconstitutionally vague and resulted in unreliable sentencing.  This claim was raised in petitioner's second state habeas petition and was summarily denied by the California Supreme Court.  Respondent contends that this denial was reasonable.

Petitioner contends that although the trial court issued instructions tracking the language of Cal. Penal Code § 190.3 and outlining the factors that should be considered in determining petitioner's sentence, studies have shown that juries who vote for death are likely to reach that conclusion based on an erroneous interpretation of the law.  Petitioner concludes that his death sentence is therefore unreliable.  Petitioner fails however, to city any United States Supreme Court authority in support of his claim.  In fact, the United States Supreme Court precedent rebuts petitioner's contention.  See *Tuilapea v. California*, 512 U.S. 967 (1994) (upholding constitutionality of Cal. Penal Code § 190.3).  Moreover, juries are presumed to follow jury instructions.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Petitioner raises further specific challenges based on Cal. Penal Code § 190.3(a) & (b).  He alleges that Cal. Penal Code § 190.3(a), which directs the jury to consider circumstances of the crime as an aggravating factor, fails to distinguish sufficiently between death-worthy crimes and other crimes.  The United States Supreme Court rejected this contention in *Tuilapea*, finding that Cal. Penal Code § 190(a) is not unconstitutionally vague. 512 U.S. at 976.

Additionally, petitioner contends that Cal. Penal Code § 190.3(b), which directs the jury to consider the presence or absence of petitioner's past criminal activity involving the use or attempted use of force or violence, is unconstitutionally vague because it does not require the jury to find

24

United States District Court
Northern District of California

unanimously, beyond a reasonable doubt, that petitioner committed the other crimes.  That argued, jury unanimity on the existence of an aggravating factor is not required either.  *Turner v. Calderon*, 970 F.Supp. 781, 792 (E.D. Cal.1997).  Cal. Penal Code § 190.3 (b) is not unconstitutionally vague. *Tuilapea*, 512 U.S. at 976-77.

Petitioner fails to demonstrate that the California Supreme Court unreasonably denied this claim.  Accordingly, this claim is denied.

**5.  Claim 35: Disproportionate Punishment**

Petitioner alleges that petitioner's death sentence was based on inaccurate and unreliable evidence and is a disproportionate punishment.  Petitioner raised this claim in his second state habeas petition.  It was summarily denied by the California Supreme Court.  Respondent contends that this denial was reasonable.

Petitioner claims that there was no proportionality review of his sentence, and that his sentence is disproportionate when compared to the fate of his co-participants.  Richard Elander was granted immunity from prosecution.  Bruce Gant and Bergin Mosteller were acquitted of all charges.  Petitioner fails however, to identify any United States Supreme Court law mandating proportionality review of a death sentence.  Moreover, the involvement of Elander, Gant and Mosteller paled in comparison to that of petitioner, who conceived the plan to kill Nancy, deceived her into thinking that he wanted to spend his life with her, carried out his plan to murder her and refused to reveal the location of her body.

Petitioner fails to demonstrate that the California Supreme Court's decision constituted an unreasonable application of United States Supreme Court law or an unreasonable determination of the facts.  For the above-mentioned reasons, petitioner's claim lacks merit and is denied.

///

**6.  Claim 39: Reversal of Trial Court's Grant of Modification of Penalty**

Petitioner alleges that the California Court of Appeal erroneously reversed the trial court's grant of petitioner's motion for a modification of sentence under Cal. Penal Code § 190.4(e).  He contends that this reversal violated his right to due process and his Eighth Amendment right to an independent assessment of penalty by the trial court.  Petitioner raised this claim in his state habeas petition and the California Supreme Court summarily denied it.  AG012899.  Respondent contends that this denial was reasonable.

After the jury returned a death verdict, petitioner filed a motion for modification of his sentence in the trial court.  Judge Schatz of Santa Clara Superior Court granted the motion, citing "'1) a lack of any prior criminal activity involving violence or the threat to use force or violence; [¶] 2) the absence of any prior felony conviction; [¶] 3) the defendant's background; [¶] 4) the defendant's interpersonal relationships; [¶] 5) the defendant's custodial conduct; and [¶] 6) the testimony of Jerry Enomoto, an expert witness regarding the Department of Corrections.'"  *Crew II*, 1 Cal. App. 4th at 1598.  The court sentenced petitioner to life without the possibility of parole.  *Id.*

The state appealed the trial court's ruling, arguing that the trial judge improperly compared the facts of petitioner's case with those of other capital cases over which he had presided.  *Id.* at 1595.  The California Court of Appeal found that the trial court's "substantial reliance on the facts of those other cases in ruling on the section 190.4(e) motion was unauthorized and therefore erroneous."  *Id.* at 1604.  Accordingly, it vacated the judgment and remanded the case to the trial court for "the limited purpose of redetermining the automatic modification motion pursuant to section 190.4(e)."  *Id.* at 1609.  The California Supreme Court denied petitioner's petition for review on March 26, 1992.  *Id.* at 1610.  Following remand, the trial court reinstated the death sentence.

26

Petitioner alleges that the record does not support the California Court of Appeal's finding that the trial court impermissibly compared petitioner's case to the facts of other cases. Citing *Turner v. Calderon*, 281 F.3d 851, 871 (9th Cir. 2002), respondent counters that petitioner's allegation is not cognizable on federal habeas because it involves purely state law questions.

Respondent is correct. In *Turner*, the petitioner argued that the trial court violated Cal. Penal Code § 190.4(e) by considering non-statutory aggravating factors and failing to consider mitigating factors when reviewing petitioner's application for modification of his death verdict. 281 F.3d at 871. The Ninth Circuit agreed with the district court's holding that "at most the [trial court's] error would be one of state law." *Id.* (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (federal court may not issue a writ based on a perceived error of state law)). As in *Turner*, petitioner's allegations principally raise errors of state law.

Even if petitioner's allegations were cognizable on habeas, they lack merit. Cal. Penal Code § 190.4(e) provides:

> In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section 11. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings.

The California Supreme Court has held that a trial judge's function in ruling on a § 190.4(e) motion "is not to make an independent and de novo penalty determination, but rather to independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict." *People v. Lang*, 49 Cal. 3d 991, 1045 (1989). The trial court is prohibited from

27

United States District Court
Northern District of California

considering, when ruling on a modification motion, any evidence not presented to the jury during the trial. *Id*.

Intercase proportionality review has been defined as "an examination of whether the imposition of the death penalty in [a particular] case is disproportionate to the penalties imposed on other persons for similar offenses". *Id*. at 1043. It is not one of the factors that may be presented to the jury at the penalty phase under Cal. Penal Code § 190.3. In reviewing the trial court's grant of petitioner's § 190.4(e) motion, the California Court of Appeal concluded that intercase proportionality review is neither "required nor authorized in California capital cases." *Crew II*, 1 Cal. App. 4th at 1603.

Petitioner takes issue with the California Court of Appeal's factual determination that Judge Schatz considered and relied on the facts of other capital cases in ruling on his § 190.4(e) motion. Petitioner argues that Judge Schatz did not conduct intercase proportionality review, but merely made introductory remarks about issues not relevant to his ultimate findings, including comments about other death penalty cases over which he had presided. Petitioner further contends that Judge Schatz was simply drawing on his own experiences in assessing whether the death penalty was justified in petitioner's case.

The California Court of Appeal considered and rejected petitioner's arguments. *Crew II*, 1 Cal. App. 4th at 1603-09. It found that the "judge's remarks at the hearing reveal that he actually placed great reliance on the facts of these other cases, which to him seemed to disclose 'something in addition.'" *Id*. at 1603-04. Additionally, the California Court of Appeal found that because a trial judge ruling on a Cal. Penal Code § 190.4(e) motion "is limited to reweighing the evidence presented to the penalty phase jury," the trial judge's reliance on his own experiences presiding over past capital cases was improper. *Id*. at 1605. The record supports the findings of the California

28

United States District Court
Northern District of California

Court of Appeal.  AG0010876-80.  Accordingly, the California Supreme Court's denial of this claim was reasonable.

Petitioner further argues that even if the trial court improperly compared petitioner's case to other capital cases, such error was not prejudicial.  He contends that the California Court of Appeal failed to apply a harmless error standard and instead conducted a de novo review of the aggravating and mitigating evidence presented at trial.

Petitioner is mistaken.  The California Court of Appeal discussed the harmless error standard at length, noting that the California Supreme Court had never specified a prejudice test for the erroneous grant of section 190.4(e) motion, but had adopted a "reasonable probability" test "based on the *Chapman* harmless error test" for the denial of a section 190.4(e) motion.  *See Crew II*, 1 Cal. App. 4th at 1605-1609.  It then determined that because the trial court relied on improper information and the mitigating factors did not substantially outweigh the aggravating factors, the correct procedure was to remand the case for the limited purpose of having the trial judge reconsider the section 190.4(e) motion.  *Id*. at 1607.   This procedure is the remedy for prejudicial error in the adjudication of section 190.4(e) motions.  *See People v. Lewis*, 50 Cal. 3d 262, 287 (1990); *People v. Burgener*, 223 Cal. App. 3d 427, 434-35 (1990).  In any event, even if the California Court of Appeal improperly determined the prejudice standard applicable to its review of the trial court's grant of petitioner's 190.4(e) motion, such error does not articulate a federal constitutional claim cognizable on habeas.  *See, e.g*., *Turner*, 281 F.3d at 871.

Finally, petitioner contends that the California Court of Appeal's decision to remand his case to the trial court for redetermination of his section 190.4(e) motion violated the Double Jeopardy Clause.  He asserts that the trial court's reduction of his sentence to life without parole was an implied acquittal of the death penalty that barred the imposition of the death sentence on remand.

29

United States District Court
Northern District of California

Petitioner's claim lacks merit.  Cal. Penal Code § 190.4(e) expressly authorizes the appeal of the grant of an application to modify the verdict.  *Id*. ("The granting of the application shall be reviewed on the People's appeal . . .").  Petitioner fails to cite authority holding that Cal. Penal Code § 190.4(e), which clearly contemplates the imposition of the death sentence on remand, violates the Double Jeopardy Clause.  *Cf. People v. Burgener*, 223 Cal. App. 3d 427, 435 (1990) (reversing grant of Cal. Penal Code § 190.4(e) motion, remanding for new modification hearing and finding no need to discuss appellant's double jeopardy argument).

Petitioner relies instead on several United States Supreme Court cases, none of which involve Cal. Penal Code § 190.4(e).  He cites, for example, *Bullington v. Missouri*, 451 U.S. 430 (1981), in which the United States Supreme Court established a narrow exception to the general rule that double jeopardy principles have no application in the sentencing context. There, after a capital defendant in Missouri received a life sentence and subsequently obtained a new trial, the state decided to seek the death penalty again. The United States Supreme Court imposed a double jeopardy bar, finding that the original sentencing jury's deliberations bore the hallmarks of a trial on guilt or innocence. The jury had been presented with a choice between death or life imprisonment without parole, as well as standards to guide their decision, the prosecutor had to establish facts beyond a reasonable doubt, and the evidence was introduced in a separate proceeding that formally resembled a trial.  *Id*. at 444-46.  *Bullington*'s holding has never been applied to California's Penal Code § 190.4(e) proceedings.  Moreover, *Bullington*'s holding turned on the trial-like proceedings of Missouri's sentencing scheme, which are not mirrored by California's Penal Code § 190.4(e) procedures.  Pursuant to Cal. Penal Code § 190.4(e), the trial court in California on remand is simply required to reconsider the weight that should be accorded to aggravating and mitigating factors.  *Lang*, 49 Cal. 3d at 1045.

Neither *Bullington*, nor the other related cases cited by petitioner, compel the result he seeks. The California Supreme Court reasonably rejected this claim. Accordingly, it is denied.

**7. Claim 41: Denial of Cal. Penal Code § 190.4(e) Motion After Remand**

Petitioner alleges that the trial court erred, on remand, by denying his motion for modification of judgment under Cal. Penal Code § 190.4(e). He argues that since Judge Ahern, who was assigned to petitioner's case on remand, did not see the witnesses at trial, he was required to defer to Judge Schatz's previous finding that the mitigating factors outweighed the aggravating factors, and the failure to do so violated his constitutional rights. Petitioner further asserts that Judge Ahern erred by reading the California Court of Appeal's opinion prior to ruling on the Cal. Penal Code § 190.4(e) motion, and by finding that the aggravating factors merely outweighed, rather than "substantially outweighed" the mitigating factors. Respondent contends that the California Supreme Court reasonably denied this claim.

On direct appeal, the California Supreme Court addressed this claim as follows:

> Judge John Schatz presided over defendant's trial. After the jury returned a verdict of death, the judge granted the automatic motion to modify that verdict, and he reduced the penalty to life without possibility of parole. (§ 190.4, subd. (e).) The prosecution appealed. The Court of Appeal reversed, and remanded the case to the trial court for the limited purpose of redetermining the motion. (*People v. Crew* (1991) 1 Cal.App.4th 1591, 1609, 2 Cal.Rptr.2d 755.) Because Judge Schatz was unavailable, the matter was assigned to Judge Ahern. (*People v. Lewis* (1990) 50 Cal.3d 262, 287, 266 Cal.Rptr. 834, 786 P.2d 892 [different judge may decide automatic motion after appeal if trial judge is unavailable].)
>
> After twice reviewing the transcripts of the trial, reading the Court of Appeal decision, and hearing argument of counsel for both parties, Judge Ahern denied the automatic motion to modify the penalty verdict. His findings as to each of the aggravating and mitigating factors led him to conclude that the weight of the evidence supported the jury's finding that the aggravating circumstances outweighed the mitigating circumstances, and that the verdict was not contrary to the law or the evidence.
>
> Defendant faults Judge Ahern's ruling for not taking into consideration Judge Schatz's previous findings in the prior ruling on the automatic

31

motion to modify. We find no error. The Court of Appeal remanded the case to the trial court for the limited purpose of redetermining of the motion. Section 190.4, subdivision (e) requires the judge ruling on the motion to review the evidence and to take into account and be guided by the statutory aggravating and mitigating evidence. Judge Ahern did so.

Defendant next asserts that in reading the Court of Appeal decision before ruling on the motion, Judge Ahern got guidance from that decision, which defendant maintains improperly reviewed de novo the aggravating and mitigating factors and described Nancy as having been executed in a callous and gruesome manner. We reject the contention. When an appellate court remands a matter to the trial court for redetermination of a matter, the trial judge should read the appellate decision to determine the reviewing court's reasons and holding. In addition, Judge Ahern here stated that he reviewed the evidence presented to the jury and did not consider any evidentiary matter that was not before the jury.

We also reject defendant's contention that Judge Ahern erred when, in denying the modification motion, he said that "the aggravating circumstances ... outweigh the mitigating circumstances," instead of saying that the evidence in aggravation was "so substantial" in comparison to the mitigating evidence that death was the appropriate penalty. Judge Ahern used the language of section 190.4, subdivision (e), which says that the trial court should determine whether the jury properly found that "the aggravating circumstances outweigh the mitigating circumstances." "As a general rule, we presume that the trial court has properly followed established law." (*People v. Diaz*, supra, 3 Cal.4th 495, 567, 11 Cal.Rptr.2d 353, 834 P.2d 1171.) Here we find no indication that the trial court did not understand or properly apply the controlling legal principles in ruling on the motion.

*Crew*, 31 Cal. 4th at 858-59.

To the extent that petitioner alleges that Judge Ahern failed to carry out his duties properly as a trial judge adjudicating a Cal. Penal Code § 190.4(e) motion, he fails to state a constitutional claim cognizable on federal habeas. *See Turner*, 281 F.3d at 871. Even assuming that petitioner's claim is cognizable on federal habeas, it lacks merit, as discussed below.

As mentioned in the discussion of claim 39, *supra*, Judge Schatz based his grant of petitioner's Cal. Penal Code § 190.4(e) motion, in part, on a comparison of the facts of petitioner's case to those of other capital cases he had presided over during his years on the bench. AG10877-79. After the California Court of Appeal reversed Judge Schatz's ruling because he had improperly

conducted an intercase proportionality review, Judge Ahern was appointed to handle petitioner's case.  AG002864.  Judge Schatz was unavailable because he had retired.  AG002905.  Judge Ahern read the entire transcript of petitioner's trial twice.  AG003058, AG003068, AG003071.  He also heard argument from the parties.  AG0011788-827.  On July 22, 1993, Judge Ahern denied petitioner's Cal. Penal Code § 190.4(e) motion and imposed a judgment of death.  AG011828-51, AG003131-40.  Judge Ahern stated, "I wish to make clear for the record, I have limited my review of the evidence to that which was available to the jury and have not considered any evidentiary matter not presented to the jury."  AG003132.

Petitioner fails to cite authority for the proposition that in ruling on his Cal. Penal Code § 190.4(e) motion, Judge Ahern was bound by Judge Schatz's findings.  To the contrary, the California Supreme Court has held that the court's task under Cal. Penal Code § 190.4(e) is to "independently reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, the weight of the evidence supports the jury verdict."  *People v. Millwee*, 18 Cal. 4th 96, 166 (1998).  Clearly, Judge Ahern was required to base his ruling on his own review of the evidence.

Furthermore, Judge Ahern did not err by reading the California Court of Appeal's opinion reversing Judge Schatz's ruling on petitioner's original modification motion.  The California Supreme Court has acknowledged that it is inevitable that in the course of capital proceedings, the trial court will become aware of information that is not before the jury.  *People v. Coddington*, 23 Cal. 4th 529, 644-45 (2000), overruled on other grounds by *Price v. Superior Court,* 25 Cal. 4th 1046. 1069 n.13 (2001). The California Supreme Court presumes however, that "a judge is aware that a § 190.4(e) ruling is to be based solely on the evidence before the jury."  *Id*. at 645.  In his ruling, Judge Ahern emphasized that he was basing his decision only on evidence that was before the jury and was exercising his independent judgment.  Petitioner has not rebutted the California

33

United States District Court
Northern District of California

1  Supreme Court's presumptively correct factual finding that Judge Ahern relied only on proper

2  factors in ruling on the § 190.4(e) motion.  *See* 28 U.S.C.§ 2254(e)(1).

3          Finally, Judge Ahern did not err by finding that the aggravating factors outweighed the

4  mitigating factors instead of finding that the aggravating factors were "so substantial" in

5  comparison to the mitigating ones that the jury's recommendation of death was supported by the

6  evidence.  The "so substantial" standard cited by petitioner derives from CALJIC No. 8.88 and

7  outlines the jury's task in determining the penalty.  A judge's task under Cal. Penal Code § 190.4(e)

8  however, is to decide "whether the jury's findings and verdicts that the aggravating circumstances

9  outweigh the mitigating circumstances are contrary to law or the evidence presented."  *See* Cal.

10  Penal Code § 190.4(e).  Petitioner fails to cite any authority for the proposition that the judge must

11  find that the aggravating factors substantially outweighed the mitigating factors.  Judge Ahern did

12  not err by formulating his conclusion to mirror the language of Cal. Penal Code § 190.4(e).

13          Petitioner has failed to demonstrate that the California Supreme Court denial of this claim

14  was contrary to or an unreasonable application of United States Supreme Court law or an

15  unreasonable determination of the facts.  Accordingly, this claim lacks merit and is denied.

16                                    **CONCLUSION**

17          For the foregoing reasons, claims 16, 25, 28, 34, 35, 39 and 41are DENIED.  Within 45 days

18  of the filing date of this Order, the parties shall submit a joint statement outlining a proposed

19  litigation schedule for the remaining claims in petitioner's petition.  A case management conference

20  will be scheduled if necessary.

21          **IT IS SO ORDERED**.

22  **Dated: August 21, 2020**

23                                    **Yvonne Gonzalez Rogers**
                                      **United States District Judge**