1  ANDREW PARNES
Attorney at Law
2  State Bar No. 83291
P.O. Box 5988
3  671 First Avenue North
Ketchum, ID  88340
4  Telephone: (208) 726-1010
Fax: (208) 726-1187
5  E-mail: aparnes@mindspring.com

6  EVAN YOUNG
Attorney at Law
7  State Bar No. 11201
2625 Alcatraz Ave., PMB #252
8  Berkeley, CA  94705
Telephone: (510) 910-4811
9  Fax: (510) 652-0443
E-mail: eeyoung8@gmail.com
10
11  Attorneys for Petitioner

12

13              IN THE UNITED STATES DISTRICT COURT

14           FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                      OAKLAND DIVISION

16

17

18  **MARK CHRISTOPHER CREW,**          C 12-4259 YGR

19                        Petitioner, **PETITIONER'S MOTION FOR
                                       EVIDENTIARY HEARING**

20      **v.**

21

22  **RON BROOMFIELD, Acting Warden
    of San Quentin State Prison,**

23                        Respondent.

24

25

26

27                              Petitioner's Motion for Evidentiary Hearing

28                              *Crew v. Broomfield* (C 12-4259-YGR)

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING . . . . . . 1

A.  Evidentiary hearing standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.  Petitioner is Entitled to an Evidentiary Hearings. . . . . . . . . . . . . . . . . 5

III.  CLAIMS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Claim 5:      THE PROSECUTION IMPROPERLY TAINTED THE
              JURY VENIRE BY EXPOSING IT TO
              INFLAMMATORY INFORMATION . . . . . . . . . . . . . . 7

Claim 15:     TRIAL COUNSEL RENDERED INEFFECTIVE
              ASSISTANCE OF COUNSEL AT THE GUILT
              PHASE OF PETITIONER'S TRIAL . . . . . . . . . . . . . 12

      A.      Failure to Impeach Elander's Testimony With Available
              Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          1.      Phone Call to Lisa Moody . . . . . . . . . . . . . . . . . 12

          2.      Mixing Cement and Blisters on Petitioner's
                  Hands . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          3.      Elander's Prior Testimony did not Name Andrade
                  as the Subject of Petitioner's Threat. . . . . . . . . 18

          4.      Failure to Establish Facts to Undermine
                  Credibility of Jeanne Meskell. . . . . . . . . . . . . . 21

Claim 17:     TRIAL COUNSEL RENDERED INEFFECTIVE
              ASSISTANCE BY STIPULATING TO NOT
              PROVIDING THE JURY ACCOMPLICE
              INSTRUCTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      A.      Facts Supporting This Claim . . . . . . . . . . . . . . . . . . . 25

      B.      This Error Denied Petitioner His Sixth Amendment
              Right to the Effective Assistance of Counsel Presenting a
              Colorable Claim for Relief . . . . . . . . . . . . . . . . . . . . . . 26

Claim 18:    THE PROSECUTION FAILED TO DISCLOSE
IMPEACHING AND EXCULPATORY
EVIDENCE AND KNOWINGLY PRESENTED
FALSE TESTIMONY AT THE GUILT PHASE . . . . . 28

    A.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    B.    Failure to Disclose Exculpatory Impeaching Material
Regarding the Prosecution's Critical Witness Requires
Reversal of Petitioner's Conviction and Sentence . . . . 29

Claim 19:    TRIAL COUNSEL RENDERED INEFFECTIVE
ASSISTANCE BY FAILING TO DISCOVER AND
PRESENT EVIDENCE TO IMPEACH RICHARD
ELANDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Claim 26:    TRIAL COUNSEL WERE INEFFECTIVE FOR
FAILING TO INVESTIGATE AND PRESENT
AVAILABLE IMPEACHMENT EVIDENCE OF
THE PROSECUTION'S REBUTTAL WITNESS . . . 35

    A.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    B.    Trial Counsel Failure to Present Available Evidence
Regarding Williams's Credibility Was Ineffective and
Prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Claim 27:    THE PROSECUTOR COMMITTED MISCONDUCT
AT THE PENALTY PHASE OF PETITIONER'S
TRIAL REGARDING REBUTTAL WITNESS CLINT
WILLIAMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Claim 30:    THE PROSECUTION'S DECISION TO CHARGE
PETITIONER WITH CAPITAL MURDER AND
SEEK THE DEATH PENALTY WAS ARBITRARY
AND CAPRICIOUS. . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Claim 40:    THE TRIAL JUDGE WAS PRECLUDED FROM
RESENTENCING PETITIONER AS A RESULT OF
PROSECUTORIAL MISCONDUCT AND/OR
JUDICIAL MISCONDUCT . . . . . . . . . . . . . . . . . . . . 60

    A.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    B.    The Misconduct by the Prosecution and the Judicial
Officials Denied Petitioner the Due Process of Law and

Requires Setting Aside the Death Sentence. . . . . . . . .  72

Claim 46:     THE REFUSAL OF THE STATE COURTS TO ORDER
              DISCLOSURE TO PETITIONER OF THE FORMER
              PROSECUTOR'S COMMENTS WHICH RESULTED
              IN THE DISQUALIFICATION OF THE REFEREE
              VIOLATED PETITIONER'S RIGHTS TO DUE
              PROCESS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  79


CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  84

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alcorta v. Texas,* 355 U.S. 28 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 50

*Allen v. Woodford,* 395 F.3d 979 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Alloy Intern. Company v. Hoover-NSK Bearing Co, Incorporated,* 635 F.2d 1222 (7th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Baja v. Ducharme,* 187 F.3d 1075 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Batson v. Kentucky,* 476 U.S. 79 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Beck v. Alabama,* 477 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Benn v. Lambert,* 283 F.3d 1040 (9th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Berger v. United States,* 295 U.S. 75 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Bernal-Obeso,* 989 F.2d 331 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Bracy v. Gramley,* 520 U.S. 899 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Brady v. Maryland,* 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*California v. Green,* 399 U.S. 149 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Carriger v. Stewart,* 132 F.3d 463 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 55

*Cruz v. Abbate,* 812 F.2d 571 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Earp v. Ornoski,* 431 F.3d 1158 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6, 38

*Woodson v. North Carolina,* 428 U.S. 280 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 77

*Furman v. Georgia,* 408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Giglio v. United States,* 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 60

*Gonzalez-Soberal v United States,* 244 F.3d 273 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . 21

*Harris v. Wood,* 64 F.3d 1432 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hicks v. Oklahoma,* 447 U.S. 343 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81, 82

*Horton v. Mayle,* 408 F.3d 570 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 58

*Insyxiengmay v. Morgan,* 403 F.3d 657 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Irvin v. Dowd,* 366 U.S. 717 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kyles v. Whitley,* 514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Michael Williams v. Taylor,* 529 U.S. 420 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5

*Mooney v. Holohan,* 297 U.S. 103 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Moore v Marr,* 254 F.3d 1235 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Napue v. Illinois,* 360 U.S. 264 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*Ohio Adult Parole Authority v. Woodard,* 523 U.S. 272 (1998). . . . . . . . . . . . . . . . . 88

*Ortiz v. Stewart,* 149 F.3d 923 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 45

*Pennsylvania v. Ritchie,* 480 U.S. 39 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88, 89

*Mak v. Blodgett,* 970 F.2d 614 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Phillips v. Ornoski,* 673 F.3d 1168 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Phillips v. Woodford,* 267 F.3d 966 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Schriro v. Landrigan,* 550 U.S. 465 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Schweiker v. McClure,* 456 U.S. 188 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Silva v Woodford,* 279 F. 3d (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Siripongs v. Calderon,* 35 F.3d 1308 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Smith v. Phillips,* 455 U.S. 209 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Strickland v. Washington,* 466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Taylor v. Maddox,* 366 F.3d 992 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Townsend v. Sain,* 372 U.S. 293 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Turner v. State of Louisiana,* 379 U.S. 466 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*United States v Butler,* 504 F.2d 220 (D.C. Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v Orr,* 636 F.3d 944 (8th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v Tucker,* 716 F.2d 576 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Hernandez,* 862 F.2d 17 (2nd Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 84

*United States v. Agurs,* 427 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 50, 58

*United States v. Bagley,* 473 U.S. 667 (1985). . . . . . . . . . . . . . . . . . . . . . . 31, 49, 50, 59

*United States v. Brown,* 823 F.2d 591 (D.C.Cir. 1987). . . . . . . . . . . . . . . . . . . . . . 84, 86

*United States v. Lucas,* 841 F.3d 796 (9th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Oliveros,* 275 F.3d 1299 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Pearson,* 203 F.3d 1243 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Thomas,* 116 F.3d 606 (2nd Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . 84

*United States v. Young,* 17 F.3d 1201 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Zuno-Arce,* 44 F.3d 1420 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 33

*Woodford v. Garceau,* 538 U.S. 202 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Wright v Gramley,* 125 F.3d 1038 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

STATE CASES

*Board of Prison Terms v. Superior Court,* 130 Cal.App.4th 1212 (2005) . . . . . . . . . . . 88

*Hampton v. Superior Court,* 38 Cal.2d 652 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

*In re Avena,* 12 Cal.4th 694 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*In re Scott,* 29 Cal.4th 783 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*In re Seaton,* 34 Cal.4th 193 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 61

*People v. Brown,* 45 Cal.3d 1247 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 79

*People v. Crew,* 1 Cal.App.4th 1591 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*People v. Dickey,* 35 Cal. 4th 884 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*People v. Lewis,* 26 Cal.4th 334 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*People v. Sheldon,* 48 Cal.3d 935 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

## FEDERAL STATUTES

28 U.S.C. § 2254 (e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 4, 5

28 U.S.C. § 2254(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89


## STATE STATUTES

Penal Code section 128 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Penal Code section 190.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Penal Code Section 190.4 subdivision (e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Penal Code section 1203.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Penal Code section 1484 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

# I. INTRODUCTION

In this pleading, petitioner moves for an evidentiary hearing on Claims 5, 15, 17, 18, 26, 27, 30, 35, 40, 44 and 46. These claims present a strong case for a federal evidentiary hearing. Petitioner presented his claims to the California state courts, supported the claims with significant factual material and requested discovery and an evidentiary hearing to further develop the claims. With the exception of Claim 46[1], the California Supreme Court summarily denied his claims without an opinion, and without authorizing discovery, an evidentiary hearing or additional pleadings (an answer and a traverse).

In the federal habeas answer, Respondent has denied Petitioner's claims and many of the facts supporting them. Although Petitioner believes that he is entitled to relief on his proposed hearing claims based on the present record, to the extent the Court disagrees, or believes that material facts need to be further established or material factual disputes resolved, then an evidentiary hearing is required on Petitioner's claims.

Petitioner has not moved for an evidentiary hearing on Claims 19, 20, 35, 36, 43, 44 and 47 at this time. However, he respectfully requests that the Court not rule on those claims until after any evidentiary hearing has occurred as they are claims of cumulative error and necessarily require consideration of evidence not yet presented.

---

[1] A hearing was held on Claim 46 in the superior court, but Petitioner's request for discovery was denied.

1

# I. PETITIONER IS ENTITLED TO AN EVIDENTIARY HEARING

## A. Evidentiary Hearing Standards

Petitioner filed his initial federal habeas petition after April 24, 1996, the effective date of the Antiterroism and Effective Death Penalty Act of 1996 ("AEDPA"), and therefore AEDPA applies to this case. *Woodford v. Garceau*, 538 U.S. 202 (2003). 28 U.S.C. § 2254 (e)(2) is the provision of AEDPA that addresses federal evidentiary hearings. It states:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that – (A) the claim relies on – (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

The Supreme Court analyzed this provision in *(Michael) Williams v. Taylor*, 529 U.S. 420, 429-30 (2000). The Court explained that "[by] the terms of its opening clause the statute applies only to prisoners who have 'failed to develop the factual basis of a claim in State court proceedings.'" *Id*. at 430. The Court held that a "failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel. *Id*. at 432.

The Court explained that "[d]iligence for purposes of the opening clause depends on whether the prisoner made a reasonable attempt, in light of the

information available at the time, to investigate and pursue claims in state court."

*Id.* at 435. "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id*. at 437. "[C]omity is not served by saying a prisoner 'has failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort. In that circumstance, an evidentiary hearing is not barred by §2254 (e)(2)." *Id.* Thus, "[i]f there has been no lack of diligence at the relevant stages of the state proceedings, the prisoner has not 'failed to develop' the facts under § 2254 (e)(2)'s opening clause, and he will be excused from showing compliance with the balance of the subsection's requirements." *Id*.; *see also id*. at 435 ([O]nly a prisoner who has neglected his rights in state court need satisfy th[o]se conditions [of §2254 (e)(2)(A) and (B).").

The Court addressed the availability of evidentiary hearings under AEDPA again in *Schriro v. Landrigan*, 550 U.S. 465 (2007). The Court explained that "[i]n cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. §2254 (e)(2), the decision to grant such a hearing rests in the discretion of the district court." 550 U.S. at 468; *see id*. at 473 (prior to AEDPA, "the decision to grant an evidentiary hearing was generally left to the sound discretion of district courts . . . . That basic rule has not changed." (internal citations omitted)).

The Court further explained that "[i]n deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petitioner's factual allegations, which, if true, would entitle the applicant to federal habeas relief," taking into account 2254(d)'s limits on the grant of habeas relief. *Schriro v. Landrigan*, 550 U.S. at 474.

In *Earp v. Ornoski*, 431 F.3d 1158, 1166-67 (9th Cir. 2005), decided after *Williams* but before *Landrigan*, the Ninth Circuit stated that "[b]ecause a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts."

The *Earp* court explained that Supreme Court authority

> Establishes that a defendant is entitled to an evidentiary hearing if he can show that: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; *or* (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

*Id*. at 1166 (emphasis added) (citing *Townsend v. Sain*, 372 U.S. 293, 313 (1963).

The *Earp* court explained that "[i]f the defendant can establish any one of those circumstances, then the state court's decision was based on an unreasonable determination of the facts and the federal court can independently review the merits of that decision by conducting an evidentiary hearing." *Id*. at 1167; *see also Taylor*

*v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ("If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts").

The *Earp* court concluded: "Accordingly, where the petitioner establishes a colorable claim for relief and has never been afforded a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing." 431 F.3d at 1167 (internal footnote omitted). Thus, under AEDPA, an evidentiary hearing is required on a claim if: 1) the petitioner did not fail to develop the factual basis of the claim in state court; 2) the state court denied the petitioner a full and fair opportunity to develop the facts in support of the claim; and 3) the petitioner's allegations present a colorable claim for relief. *Id*. at 1166-67; *Insyxiengmay v. Morgan*, 403 F.3d 657, 699-70 (9th Cir. 2005).

## B. Petitioner is Entitled to an Evidentiary Hearing

Petitioner meets all three of these requirements on the claims for which he seeks an evidentiary hearing.

First, petitioner has not "failed to develop the factual basis of [his] claim[s] in the State court proceedings." 28 U.S.C. §2254 (e)(2). As the Supreme Court has held, "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. at 432. As long as the petitioner

5

"made a reasonable attempt, in light of the information available at the time, to investigate and pursue his claims in state court," the diligence requirement is satisfied. *Id.* at 435. Ordinarily, a petitioner fulfills his obligation by requesting an evidentiary hearing in the manner prescribed by state law. *Horton v. Mayle*, 408 F.3d 570, 582 n.6 (9th Cir. 2005); *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999); *see also Williams*, 529 U.S. at 437 ("Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law").

Petitioner diligently pursued his claims in state court. Each of the claims on which he seeks an evidentiary hearing was presented in state court; all of the evidence in support of this motion was presented in state court; petitioner requested discovery and an evidentiary hearing on his claims in the state supreme court, but the court dismissed his claims with "postcard" denials without affording him a hearing, discovery, or other means to develop the facts in support of his claims. Because petitioner did not fail to develop the facts in state court, section §2254 (e)(2) does not preclude a hearing.

Second, as shown above, the state courts did not give petitioner a full and fair opportunity to develop the facts in support of his claims.

Third, as shown in the First Amended Petition for Writ of Habeas Corpus ("Petition") and established further below, petitioner has alleged colorable claims for relief. At this stage of the proceedings, petitioner need not prove anything.

*Earp*, 431 F.3d at 1173 ("Earp is not required to conclusively establish in this appeal that counsel was prejudicially deficient. Rather, Earp must demonstrate by his evidence the potential of a *colorable claim* . . . ."); *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001). Instead, he need only "allege specific facts which, if true, would entitle him to relief." *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998); *see Siripongs v. Calderon*, 35 F.3d 1308, 1310 (9th Cir. 1994). As the Ninth Circuit has repeatedly emphasized, "[a]lleging a colorable claim for relief is a relatively 'low bar.'" *Earp*, 431 F.3d at 1170; *see Phillips*, 267 F.3d at 979 (noting that requirement for obtaining an evidentiary hearing is "far less onerous" than establishing entitlement to habeas relief). Petitioner's claims clearly meet this standard.

## II.   CLAIMS

**CLAIM 5:   THE PROSECUTION IMPROPERLY TAINTED THE JURY VENIRE BY EXPOSING IT TO INFLAMMATORY INFORMATION**

Petitioner has alleged that his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated, because of actions of the Santa Clara County District Attorney's Office in exposing the potential jurors to inflammatory, inaccurate and prejudicial information about Petitioner, the decedent and the alleged crimes, in a manner which prevented

Petitioner from obtaining an impartial jury drawn from a fair cross-section of the community and rendered the trial fundamentally unfair.

The California Supreme Court held this claim was procedurally defaulted under *In re Seaton*, 34 Cal.4th 193, 199-200 (2004). This Court upheld the default, but ordered briefing on the merits before ruling on cause and prejudice. *Crew v. Davis*, 2015 WL 7720737 at *8 (2015).

Four days into jury selection in Petitioner's trial, and after several groups of prospective jurors had been sworn, filled out questionnaires and been ordered to return for additional questioning, an article entitled "Charmed to Death" was published on Sunday, April 23, 1989, in the San Jose Mercury News.

The article was a sensationalized account of the alleged crime with an extremely derogatory portrayal of Petitioner and included inflammatory, inaccurate and prejudicial facts which would not be admissible at trial, and which were not presented at trial.

While the prospective jurors who appeared before the article was published may have been admonished not to read anything in the media, new panels of prospective jurors were called on or after April 24, 1989, and prior to that time they had not appeared in the courtroom, and therefore were not so admonished.

Counsel brought the article to the attention of the court and stated their concerns about its content. AG 6441-50. Many prospective jurors were excused because they had read the article and were prejudiced by it. *See* Petition at 54 n. 7.

Petitioner has alleged that the District Attorney's Office and the San Jose Mercury News had a very friendly and cooperative relationship. *See, e.g.,* Correspondence from Delia Rios to Assistant D.A. Alan Nudleman, June 22, 1984, AG 13793. Had Assistant D.A. Davies or others in the District Attorney's Office requested that the article be delayed until jury selection was completed and/or that any inflammatory and prejudicial information be deleted from the article, it is reasonably likely that the request would have been honored.

Respondent has previously questioned these assertions, and claimed Petitioner has provided no foundation for them. Answer Memo at 96-97. On the contrary, Petitioner has made a colorable claim for relief, and the disputed facts demonstrate the need for an evidentiary hearing. There is strong support for such a finding: first, Assistant D.A. Davies acknowledged before the trial court that he had a conversation about the article with the author and he never denied that he had been the source of the information. Davies admitted that he spoke with the reporter about the timing of the article and indicated that he told her that the article could be published "after last Friday [April 21st], so that [the court] could admonish the prospective jurors . . . ." However, as the prosecutor knew, while four panels of prospective jurors had been sworn and admonished, additional panels would need to be added to the jury venire subsequent to April 21st, and those potential jurors would be exposed to the article without having first been admonished to avoid media reports about the case. *See* CT 2141, AG 2254, CT 2153, AG 2266; second,

9

Assistant District Attorney Nudelman had received prior information about this very case from the newspaper before the trial in this case; and third, the article contained a reference to plea negotiations between the prosecution and Petitioner.

Thus, members of the Office of the District Attorney committed misconduct by: a) knowingly providing inaccurate, inflammatory and inadmissible information to the reporter of the article in order to present a misleading and negative portrait of Petitioner to the public which they knew or should have known would unduly influence and bias the jury venire; b) encouraging publication of the article before all prospective jurors had been admonished to avoid media reports of the case; and c) doing nothing to ensure that inaccurate, inflammatory and inadmissible information would not be published in the article.

Because the article itself contained much information that could only have come from the government and a large part of that information was inflammatory and inadmissible, a fact acknowledged by the prosecutor in the trial court, providing this information to the paper at a critical juncture in the jury selection process constitutes prosecutorial misconduct, even though no "gag order" was in place at that time. Moreover, a large number of jurors who read the article were ultimately excluded from the panel solely because of the inflammatory nature of the article.

"Due process means a jury capable and willing to decide the case solely on the evidence before it . . . ." *Smith v. Phillips*, 455 U.S. 209, 217(1961). The

prosecutor's actions violated Petitioner's rights under the Sixth and Fourteenth Amendments to a "fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722 (1961). Petitioner is entitled to an evidentiary hearing at which to further develop the factual basis for the claim.

//

//

//

//

**Claim 15:** **TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT PHASE OF PETITIONER'S TRIAL**

Trial counsel failed to provide effective assistance of counsel by their acts and omissions at trial relating to impeachment of several prosecution witnesses during the guilt phase of the trial.

This claim was raised in Petitioner's habeas corpus petition, during which he requested discovery and an evidentiary hearing. The California Supreme Court summarily denied the claim without granting the request for an evidentiary hearing and without setting forth reasons for the denial of the claim.

Because Petitioner did not fail to develop this claim in state court, but was denied a hearing by the state court, and because he presents a colorable claim for relief, this Court should grant a hearing on this claim as the decision of the state court summarily denying this claim was unreasonable.

A. **Failure to Impeach Elander's Testimony with Available Evidence**

1. **Lisa Moody's Phone Records**

Richard Elander was the prosecution's key witness, and was the only witness to testify about the alleged manner in which Andrade was killed. Elander testified that: a) Petitioner discussed with him that he planned to kill Andrade; and b) after Petitioner left for California, Elander called him when Petitioner was at Lisa Moody's to tell him not to kill Andrade, "because it was the wrong thing to do," and Petitioner told him he had already done it. AG 9697-98.

However, Lisa Moody's phone records demonstrate that there were no such telephone calls from Elander at the time in question and Petitioner's counsel failed to impeach Elander with this critical fact. In contrast, counsel in the Gant/Mosteller trial – which resulted in acquittals for both of those defendant – brought out these facts during Elander's cross-examination:

Q.     You also told us yesterday in direct examination that you called Mark Crew when he was in California, correct?

A.     Yes, sir.

Q.     Okay. And that you called him to tell him not to do it, not to kill Nancy Jo, correct?

A.     Correct, sir.

Q.     Okay. And you told us that his response was, it's already done, correct?

A.     Correct, sir.

Q.     Okay. Where did you call Mark Crew at?

A.     I – I don't recall for sure, sir. I made a few calls, I mean in that general vicinity.

Q.     Did you call him collect?

A.     I can't remember for sure. If I used a phone booth, I probably did.

Q.     You've testified about this conversation on other occasions, correct?

A.     Yes, sir.

Q.     You've had an opportunity to review your testimony about this conversation on other occasions, correct?

A.     Yes, sir.

Q.     Okay. Do you recall – Do you recall being asked the following questions and giving the following responses on September 23, 1986

13

[which was the preliminary hearing in *People v. Mosteller*]. "Question by Mr. Davies: before he showed up at the Mosteller's with Lisa Moody and the truck and the horse, had he called you by telephone from anyplace to give you any word as to what had happened, whether he had done it or not done it, anything like that? Any information? Answer: No. I called him, sir. Question: Where did you call him? Answer: At Lisa Moody's house. Question: What did you ask him when you called there, or why did you call? Answer: I called him to tell him not to do it. That's why I called him. And he said, it's too late, it's already done. Question: when you called him at Lisa Moody's house, had Mr. Mosteller already gotten back to South Carolina? Answer: I don't recall, sir. Question: Did you get a hold of him at Lisa Moody's house and he said, it had already been done? Answer: Yes. Question: Did you make that call from Mr. Mosteller's residence? Answer: No, sir. From a phone booth. Question: And did you pay for it or place it collect? Answer: It was collect."
Do you recall Mr. Davies asking you those questions and you giving those responses?

A. I do now, sir, what you just read to me.

Q. And that's what you told us under oath; is that correct?

A. Yes, sir.

Q. And that call was made from South Carolina, correct?

A. Yes, sir.

Q. Okay. And you went even further on September the 23rd, 1986, when you were asked the following questions: "The time that you called from a pay phone had you called to California collect? Answer: Lisa Moody, yes, sir. Question: Well, I'm talking about the one

| | |
|---|---|
| 1 | conversation in particular, did Lisa Moody answer the phone? |
| 2 | Answer: Yes, sir.  Question: And she accepted the charges when you |
| 3 | called collect?  Answer: Oh, yeah.  Question: Did you talk to her for |
| 4 | awhile?  Answer: I – I don't recall.  No, sir.  Question:  You don't |
| 5 | recall if you did, or you did not?  Answer: I don't recall if I talked to |
| 6 | her.  Question: Was Mark there when you called?  Answer: Yes, sir." |
| 7 | You remember that? |
| 8 | A.    Yes, sir. |
| 9 | Q.    Okay.  So, your testimony was that you called collect, you called from |
| 10 | California [sic], Lisa Moody answered the phone, she accepted the |
| 11 | charges, and you talked to Mark Crew and that's when this statement |
| 12 | was made when you told him, don't do it, correct? |
| 13 | A.    I called from South Carolina. . . . |
| 14 | [Lisa Moody's subpoenaed phone records were moved into evidence as |
| 15 | People's Exhibit 63] |
| 16 | Q.    Mr. Elander, would you look at – you would have made this telephone |
| 17 | call sometime between August 15th and August the 30th of 1982, |
| 18 | correct? |
| 19 | A.    Yes, sir. |
| 20 | Q.    Okay.  Would you look at the records between August the 15th and |
| 21 | August the 30th, 1982, and tell me if there are any collect telephone |
| 22 | calls to Lisa Moody from South Carolina? |
| 23 | A.    I don't see any on this one sheet, sir.  But there was a few other sheets |
| 24 | that had August bills on it. |
| 25 | Q.    Take your time Mr. Elander. |
| 26 | A.    Pardon me? |
| 27 | Q.    Take your time.  If you need more time, we've got it. |
| 28 | |

A.    No sir, I don't see any.

AG 13736-41.

Elander's testimony regarding the telephone call was critical evidence in that it not only provided evidence of an admission to the crime by Petitioner, but also showed that the killing was planned, since Elander knew about it beforehand.  It further was self-serving as it put Elander in a good light by showing that he reconsidered whether the crime should have been committed.

Impeachment of Elander's trial testimony in this manner at Petitioner's trial would have undermined the remainder of his testimony and negated his credibility.  Although Elander admitted that he had previously lied to law enforcement and in prior testimony, he insisted that he was telling the truth in Petitioner's trial.  The prosecution made this very argument in contending that Elander was a credible witness.  AG 10337-39.

Because other counsel were able to locate and use Lisa Moody's telephone records as part of their effective cross-examination of Elander in their successful defense of Gant and Mosteller, there can be no excuse for Petitioner's counsel's failure to investigate and present this evidence.  In fact, Petitioner's counsel cannot recall why they did not investigate this evidence and there can be no reasonable tactical reason to fail to do so.

The failure to cross-examine Elander on this critical aspect of his testimony was prejudicial.  By not developing this line of examination, trial counsel did not

bring evidence forward which would have greatly assisted their cross-examination of the prosecution's key witness and thereby denied Petitioner the ability to fully employ his right of confrontation embodied in cross-examination which has been called the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970), citing *5 Wigmore* §1367. There is more than sufficient proof that there was a reasonable probability of a different result as Gant and Mosteller were acquitted even though Elander was the main prosecution witness in their case. This Court's confidence in the outcome of the trial must be undermined and the summary dismissal of this claim by the California Supreme Court was contrary law and an unreasonable application of the facts. An evidentiary hearing is thus warranted on this claim.

### 2.    Mixing Cement and Blisters on Petitioner's Hands

Elander claimed that Petitioner told him that Andrade's head was put in a five- gallon bucket, that he filled it with cement and threw it off a bridge, and that her body was put in a fifty-five-gallon drum, which Petitioner also filled with cement. Elander testified at the preliminary hearing that Petitioner told him that his hands were blistered and calloused from the mixing of this quantity of cement and showed Elander those blisters when Petitioner returned with Lisa Moody to South Carolina. AG 255-56. According to Lisa Moody, however, Petitioner did not have any blisters on his hands, which demonstrated that Elander was lying and that Petitioner had not mixed any cement. Trial counsel, however, unreasonably failed

17

to elicit statements from Elander regarding the blisters and present evidence that Elander was lying because Petitioner had no blisters on his hands.

By contrast, in the Gant/Mosteller trial, Elander reiterated his preliminary hearing testimony that Petitioner had blisters on his hands from mixing the concrete that he put Andrade's remains in, and that Petitioner showed him the blisters at the time he told him how Andrade had been killed. AG 13733 ("He told me he had never mixed that much cement ever again [sic]. He showed me his hands, and they were all blistered"); *see also* AG 13734-35. This testimony was contradicted by Lisa Moody who testified that she saw no blisters and that there was nothing wrong with Petitioner's hands. AG 13131-32. Gant's counsel was thus able to argue to the jury that Elander was lying with regard to critical facts. AG 13744-48.

There was no reason for Petitioner's counsel to fail to elicit this testimony and the result of their deficient performance was prejudicial to Petitioner.

### 3. Elander's Prior Testimony did not Name Andrade as the Subject of Petitioner's Threat

Elander testified that prior to Petitioner and Mosteller leaving for California, Petitioner told him that he was going to California to kill Andrade. AG 9694. However, at the preliminary hearing, Elander testified that Petitioner indicated he was going to kill someone or something, but never mentioned Andrade's name:

Q. And what are his exact words that he spoke to you as you remember them now?

A.     "I'm not certain how I'm going to do it, sharp blow to the head,

strangle her or shoot her."

Q.     Did he say anything else?

A.     I don't recall.

Q.     Are you sure that you don't recall?

A.     Yes, I don't recall if he said anything else or not.

Q.     So what you've told us is exactly what he said and you don't recall

him saying anything else, correct?

A.     That's fair to say, yes, sir.

Q.     And how did you know he was talking about Nancy?

A.     I guess it was my assumption that he was.

Q.     So he never even mentioned the name of this individual to you; is that

right?

A.     Not that I recall, sir, no.

***

Q.     So he never told you that he was coming to California to kill Nancy,

right?

A.     I don't recall, sir.

Q.     In fact, he never told you that he was coming to California to kill

anybody, did he?

A.     I don't recall, sir.

Q.     In fact, he never indicated to you if he was talking about a human being, did he?

A.     I don't recall sir.

AG 510-11.

Trial counsel unreasonably failed to impeach Elander with this prior sworn testimony.  Such impeachment was critical to establish that Elander was lying under oath, and that there was no plan to kill Andrade.  By contrast, Mosteller's counsel did impeach Elander in this manner. AG 13742-43.

This abject failure to present this evidence to the jury violated Petitioner's Sixth Amendment rights.  *See, e.g.,United States v Butler*, 504 F.2d 220, 224 (D.C. Cir. 1974) (failure to impeach witness with inconsistent pre-trial testimony constituted ineffective assistance); *United States v Tucker*, 716 F.2d 576, 585-87 (9th Cir. 1983) (counsel's failure to impeach witness with prior inconsistent statements); *Gonzalez-Soberal v United States*, 244 F.3d 273 (1st Cir. 2001) (failure to use documentary evidence to impeach witness); *Wright v Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997) (failure to cross-examine two witnesses based on pre-trial statements was error).

Here, the summary decision of the California Supreme Court was contrary to law and an unreasonable application of the facts.  Unlike many other cases where a court must totally speculate about the possible outcome had counsel provided effective assistance, this Court must consider the acquittals of Gant and Mosteller

20

which were based in large part on the rejection of Elander's testimony.  This Court

should conduct an evidentiary hearing on this claim as Petitioner did not fail to

develop the evidence in state court and was denied a hearing by the state court.

### 4.     Failure to Establish Facts to Undermine Credibility of Jeanne Meskell

In August 1981, Jeanne Meskell's car broke down on the

Connecticut/Massachusetts border.  Petitioner, who was driving a truck, picked her

up and she decided to return to California with him.  Meskell stayed with Petitioner

for approximately two months, returning to her home in Connecticut in October

1981. AG 9586-87.

In January 1983, Petitioner called Meskell and told her he wanted to come to

Connecticut.  AG 9589.  When Petitioner arrived, according to Meskell, he told her

that he had killed a girl; that the body was in two pieces in two 55-gallon drums,

one in the bay and the other buried in someone's yard.  AG 9590.

Meskell was a critical witness for the prosecution because other than Elander,

she was the only person who testified that Petitioner admitted to committing the

murder.  AG 9590.

This testimony was particularly important because there was no evidence

connecting Meskell to Elander, other than the fact that when Meskell was staying

with Petitioner in California, Elander was Petitioner's roommate.  AG 9586.  Thus,

according to the evidence, Petitioner had admitted the crime to two independent

sources, making it much more credible than if it had only come from Elander and witnesses who had heard the admission directly from Elander, such as Marion Mitchell.

But, in fact, there was evidence of a much stronger connection between Elander and Meskell that reasonably competent counsel would have presented at trial to create at least the inference that Elander had influenced Meskell's testimony. There was also available evidence that competent counsel would have used to impeach Meskell's testimony and undermine her credibility.

At the preliminary hearing, Meskell testified that in September 1981, she and Elander traveled together for a week. They drove from California to Connecticut, where Elander was going to help Meskell get her car back from her husband who had hidden it. They had also intended to obtain cocaine while in Connecticut, but they did not have enough time. AG 611-14, 639.

Meskell also testified at the preliminary hearing that when she was staying with Petitioner, she and Elander went to the Saddle Rack together, alone, on a couple of occasions. AG 637-38.

Yet, the jury in Petitioner's trial was not made aware of these critical facts regarding the relationship between two key witnesses.

Meskell also testified at the preliminary hearing that she told her friend Cami Bieri that Petitioner told her he killed a woman. According to Meskell's preliminary hearing testimony, she discussed Petitioner's alleged statement with

Ms. Bieri more than once.  AG 628-39.

However, Petitioner presented a sworn affidavit from Cami Bieri that Meskell never told her that Petitioner killed a woman and she had the impression that Meskell thought Petitioner was innocent.  AG 13451.

Meskell and Bieri were close friends.  Meskell asked Bieri if she and her husband would let Petitioner stay at their house for a few months, and they agreed.  AG 13451.  According to Meskell's testimony, she found Petitioner a place to stay *after* Petitioner told her about the murder.  AG 9589-90.  As Ms. Bieri would have testified: "Jeanne and I were close friends and worked in the same office every day. If [Petitioner] had told Jeanne that he killed someone, I do not think Jeanne would then ask me if he could stay at my house."  AG 13451.

Reasonably competent counsel would have been aware or would have discovered the above-described facts with regard to Ms. Bieri and would have called her to testify at the guilt phase of the trial in order to impeach Meskell.

Counsel had no tactical reasons for these errors and omissions.  While counsel does not recall why he did not inform the jury of a closer connection between Elander and Meskell and/or call Ms. Bieri at the guilt phase to testify that Meskell never told her about Mark's alleged statement, his failures could not have been the product of sound trial strategy.  AG 13260-61.

Each of the above instances must also be considered cumulatively in determining the prejudice to Petitioner. *Mak v. Blodgett*, 970 F.2d 614, 622 (9th

Cir. 1992), *Harris v. Wood*, 64 F.3d 1432, 1435 (9th Cir. 1995). Here counsel's failure kept critical information about the two witness to whom Petitioner allegedly "confessed." However, both witnesses should have been impeached with information that easily could have been developed with a proper investigation.

These errors, both individually and cumulatively, demonstrate that the summary decision of the California Supreme Court was contrary to law and an unreasonable application of the facts. Because Petitioner has made a colorable claim for relief and the state court denied him the opportunity to develop these claims through discovery and an evidentiary hearing, this Court should grant Petitioner's motion for a hearing on this claim.

**Claim 17:     TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY STIPULATING TO NOT PROVIDING THE JURY ACCOMPLICE INSTRUCTIONS**

This claim is based on trial counsel's failure to request the standard jury instructions which inform the jury that accomplice testimony must be independently corroborated (CALJIC 3.11) and that the jury must view accomplice testimony with caution (CALJIC 3.18), in light of their failure to seek modification of other jury instructions which essentially informed the jury that the witness was an accomplice.

This claim was raised in Petitioner's habeas corpus petition, during which he requested discovery and an evidentiary hearing. The California Supreme Court summarily denied the claim without granting the request for an evidentiary and

without setting forth reasons for the denial of the claim.

Because Petitioner did not fail to develop this claim in state court, but was denied a hearing by the state court, and because he presents a colorable claim for relief, this Court should grant a hearing on this claim as the decision of the state court summarily denying this claim was unreasonable.

### A.    Facts Supporting This Claim

During the instructional conference, trial counsel informed the court that they were not requesting instructions for a "tactical" reason, namely their belief that acknowledging that Elander was an accomplice would undermine the defense that Petitioner did not commit the murder.  AG 10291.  Despite this request, the jury was instructed pursuant to CALJIC 2.11.5 that

> *There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial.* [¶] Do not discuss or give any consideration to why the other person is not being prosecuted in this trial or whether he has been or will be prosecuted.

AG 2719 (emphasis added).

This instruction also similarly used language implying that Petitioner and Elander participated in a crime as did the instruction on proximate cause.  AG 2752. Moreover, counsel unreasonably failed to require that CALJIC 2.11.5 explicitly refer only to those witnesses who did not testify at trial (as required by the CAJLIC Use Note), such as Gant and Mosteller, and not to those who did, such as Elander. When asked about the failure to modify these other instructions in light of the

"tactical" decision regarding the accomplice instructions, trial counsel had no

explanation.  AG 13257.

### B. This Error Denied Petitioner His Sixth Amendment Right to the Effective Assistance of Counsel Presenting a Colorable Claim for Relief

Under *Strickland*, trial counsel have a duty to investigate the law and the

facts of the case on which to base any tactical decisions.  In this case, the failure to

provide the standard accomplice jury instructions on the sole basis that such an

instruction might imply that Petitioner was guilty was uninformed and not the

product of sound trial strategy.  Counsel acted unreasonably, because they failed to

consider that the lack of accomplice instructions together with other instructions

given, including CALJIC 2.27 (Sufficiency of Testimony of One Witness) and

CALJIC 2.11.5 (Unjoined Perpetrators of Same Crime) would lead the jury to

consider Elander's testimony without the need for corroboration, without viewing it

with distrust, and without even considering that his being given immunity by the

prosecution was a basis for bias.

Furthermore, the ostensible tactical reason for not giving accomplice

instructions (that the instruction would make it appear that Petitioner and Elander

committed a crime together) made no sense in view of the fact that CALJIC 2.11.5

was given, which similarly used language implying that Petitioner and Elander

participated in a crime.

Petitioner was prejudiced by counsel's acts as counsel's arguments to the

jury that Elander was not credible are no substitute for proper jury instructions as counsel's arguments lack the force of proper instructions from the court. *Alloy Intern. Co. v. Hoover-NSK Bearing Co, Inc.*, 635 F.2d 1222 (7th Cir. 1980). It is one thing for counsel to argue that Elander should not be believed; it is quite another for the trial court to instruct the jury that *as a matter of law his testimony should be viewed with distrust*.

Nor was the prejudice mitigated by the general instruction on the credibility of witnesses, CALJIC No. 2.20, CT 2607, AG 2721. In fact, the jurors were told that they should *not* consider why Elander was not or would be prosecuted. Additionally, the prosecutor explicitly told the jury that the fact that Elander received immunity did not matter in judging his credibility. AG 10299. Finally, the prosecutor argued that the instruction regarding willfully false testimony was inapplicable, because Elander did not testify falsely as to any "material" points. *See, e.g.*, AG 10337-39.[2]

The failure to provide the instruction allowed the jurors to reach their verdict without the directive from the court to view Elander's testimony with distrust, and to consider his immunity agreement in assessing his credibility. Petitioner's constitutional rights were violated by counsel's unreasonable and prejudicial decision to forego these critical jury instructions and to fail to modify the other

---

[2] Of course, had trial counsel acted effectively with regard to impeaching Elander, *see* Claim 15, the prosecutor would not have been able to make this argument.

27

instructions.

Petitioner has thus made a colorable claim that the summary decision of the California Supreme Court was contrary to established law and an unreasonable application of the facts. Given the state court's denial of an evidentiary hearing on this claim, this Court should order a hearing in this case.

**Claim 18 :** **THE PROSECUTION FAILED TO DISCLOSE IMPEACHING AND EXCULPATORY EVIDENCE AND KNOWINGLY PRESENTED FALSE TESTIMONY AT THE GUILT PHASE**

This claim is based on the prosecutor's failure to disclose that Richard Elander, in addition to a grant of immunity, was given other promises, consideration, favors, leniency, assistance from law enforcement and prosecutorial agencies in exchange for his cooperation and testimony that was not disclosed to the defense, including but not limited to an agreement not to investigate or prosecute Elander for perjury or any other crimes.

This claim was raised in Petitioner's habeas corpus petition, in which he requested discovery and an evidentiary hearing. The California Supreme Court summarily denied the claim without granting the request for an evidentiary hearing and without setting forth reasons for the denial of the claim.

Because Petitioner did not fail to develop this claim in state court, but was denied a hearing by the state court, and because he presents a colorable claim for relief, this Court should grant a hearing on this claim as the decision of the state court summarily denying this claim was unreasonable.

## A. Factual Background

While the jury was informed that Richard Elander received immunity in exchange for his testimony, (AG 9802), the prosecutor told the trial court that the immunity agreement did not cover the crime of perjury. AG 9811. Yet, the prosecutor did not tell the court or defense counsel that the prosecution had no intention of investigating or charging Elander for his perjured testimony at the preliminary hearing, at Petitioner's trial and/or at the trial of Gant and Mosteller.

Elander's testimony that he called Petitioner at Lisa Moody's house to tell him not to kill Andrade was directly contradicted by phone records introduced at the Gant/Mosteller trial. Thus, Elander's testimony at Petitioner's trial – which was highlighted by the prosecutor in his closing argument – that he was finally telling the truth, was also false.

Elander testified falsely under oath about material matters at Petitioner's and Mosteller's preliminary hearing, at Petitioner's trial, and at the Gant/Mosteller trial. Elander admitted lying at Petitioner's preliminary hearing. In addition, the prosecution knowingly presented false testimony and failed to correct false testimony when it allowed Elander to testify that he was telling the truth at Petitioner's trial.

## B. Failure to Disclose Exculpatory Impeaching Material Regarding the Prosecution's Critical Witness Requires Reversal of Petitioner's Conviction and Sentence

It is well settled that the prosecution's failure to disclose exculpatory

impeachment evidence mandates reversal of a conviction. "The prosecution is obligated by the requirements of due process to disclose material exculpatory evidence on its own motion, without request." *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997) (citing *Kyles v. Whitley*, 514 U.S. 419, 432-34 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985)). This includes inducements made to witnesses in exchange for favorable testimony. *See Carriger*, 132 F.3d at 479.

When the prosecution knowingly presents perjured testimony, *Mooney v. Holohan*, 297 U.S. 103, 112 (1935), allows a witness to give a false impression of the evidence, *Alcorta v. Texas*, 355 U.S. 28, 31 (1957), or allows false evidence to go uncorrected, *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the State also violates due process: "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see also Napue v. Illinois*, 360 U.S. at 271.

The critical question was whether *Elander* viewed the prosecutor's forbearance as a benefit for testifying against Petitioner, and whether knowing this, the jurors would view Elander's testimony accordingly. *United States v. Oliveros*, 275 F.3d 1299, 1307 (11th Cir. 2001) ("When it comes to a witness' motive to lie . . . what counts is not the actual extent of the benefit the witness has received or will receive, but the witness' belief about what he is getting"). The error could only be

30

corrected by having the jury informed that the witness believed that he would not be prosecuted for lying during his prior testimony; by failing to tell the jury about this agreement, jurors could well have believed that the prosecution would charge Elander with perjury after Petitioner's trial. But while Elander may have understood the existence of this agreement and therefore willingly acknowledged that he had lied under oath before, the jurors should have been informed of the agreement in order for them to judge the credibility of this critical witness.

Unlike other cases, where the question of whether the witness actually committed perjury was at issue, here the witness himself admitted that he had lied during his prior sworn testimony. In this instance, the prosecutor had a constitutional mandate to inform the jury that Elander was not going to be prosecuted for his admitted perjury. *Cf. Allen v. Woodford*, 395 F.3d 979, 995 (9th Cir. 2004)(court found that the defendant failed to establish either that the witness's testimony was false, or that the State had any reason to believe it was false); *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995)(mere discrepancies between the witness's statements at different proceedings does not support claim prosecution should have known the testimony was false). But of course, here, the witness admitted to several instances of perjury and the prosecutor affirmatively told the judge there was no immunity from perjury; however, the witness was never charged with his perjured statements in a capital trial.

Indeed, our system of justice relies on witnesses telling the truth and not

perjuring themselves in every case, but especially capital cases, where there is a heightened requirement that the proceedings be reliable, as guaranteed by the Fifth and Eighth Amendments. *Woodson v. North Carolina*, 428 U.S. 280 (1976). The significance of perjury in a capital case is marked by the legislature's decision to more severely punish perjury in a capital case than in all other criminal cases. California Penal Code section 128 states "Every person who, by willful perjury or subornation of perjury procures the conviction and execution of any innocent person, is punishable by death or life imprisonment without possibility of parole." The jury should have been informed that Elander was receiving immunity from a possible death sentence for his admittedly perjurious testimony.[3]

Petitioner has presented a colorable claim that the state court summary dismissal on the merits of this claim was contrary to law and an unreasonable

_____

[3]The California Supreme Court has stressed the normal deterrent impact the legislature intended this statute to have in capital cases:

> We decline to second-guess the Legislature, which in enacting the section, clearly believed it would have a meaningful deterrent effect. Admittedly, the delay between conviction and execution has grown exponentially since section 128 was enacted in 1872. However, by 1997, when the Legislature amended and thereby reaffirmed the section, the notion of swift justice in capital cases was already a thing of the past. Moreover, with the advent of DNA testing, "the prospect of conclusive exonerating evidence being discovered after an execution" is, if anything, less "remote." In any event, the stakes under section 128, "death or life imprisonment without possibility of parole," are so high a potential perjurer may well decide it is not worth the risk, however small.

*People v. Dickey*, 35 Cal. 4th 884, 912 (2005).

But of course, here, Elander had no risk at all because he believed that he had received immunity from prosecution for his perjury.

application of the facts. Because Petitioner was denied an evidentiary hearing on this claim in state court, an evidentiary hearing before this Court is warranted.

**Claim 19:    TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE BY FAILING TO DISCOVER AND PRESENT EVIDENCE TO IMPEACH RICHARD ELANDER**

Trial counsel were ineffective because counsel failed to discover and present evidence that the prosecutor had no intention of prosecuting Richard Elander for perjury. If this Court finds that the prosecutor's actions alleged in Claim 18 did not violate Petitioner's constitutional rights, trial counsel violated Petitioner's Sixth Amendment rights by failing to present evidence to the jury that the prosecutor was in effect providing immunity to Elander for his admitted perjury during the proceedings.

This claim was raised in Petitioner's habeas corpus petition, during which he requested discovery and an evidentiary hearing. The California Supreme Court summarily denied the claim without granting the request for an evidentiary and without setting forth reasons for the denial of the claim.

Because Petitioner did not fail to develop this claim in state court, but was denied a hearing by the state court, and because he presents a colorable claim for relief, this Court should grant a hearing on this claim as the decision of the state court summarily denying this claim was unreasonable.

As set forth above in Claim 18, there was sufficient evidence that Elander believed that he would not be charged with perjury when he freely admitted his

numerous instances of providing false testimony under oath. Whether or not the prosecution should have provided this information, trial counsel had a duty to investigate the issue and question Elander about it, at the very least during the trial proceedings. *See*, *Strickland*, 466 U.S. at 691 (trial counsel has a duty to investigate unless prior investigation permits counsel to determine that no further investigation is necessary). Failure to investigate critical impeachment evidence has been held to violate a defendant's Sixth Amendment rights even if counsel otherwise cross-examined the witness. *See*, *Moore v Marr*, 254 F.3d 1235, 1241 (10th Cir. 2001) ("Counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls outside the wide range of professionally competent assistance."); *United States v Orr*, 636 F.3d 944, 951-52 (8th Cir. 2011); *Silva v Woodford*, 279 F. 3d 825, 833 (9th Cir. 2002) (attorney's failure to prepare for and challenge the testimony of a critical witness may be so unreasonable as to violate both prongs of the *Strickland* test).

The prejudice from trial counsel's error is significant. Elander provided the critical testimony on which Petitioner's conviction was based. Had the jury been informed that Elander was being provided full immunity, not only for his crime but also for his actual testimony at trial, it is reasonably probable that there would have been a different outcome, both at the guilt and penalty phases of the trial. The summary decision of the California Supreme Court, made without providing Petitioner discovery or an evidentiary hearing, was contrary to law and an

34

unreasonable application of the facts.  Therefore, this Court should grant Petitioner an evidentiary hearing on this claim.

**Claim 26:  TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE AND PRESENT AVAILABLE IMPEACHMENT EVIDENCE OF THE PROSECUTION'S REBUTTAL WITNESS**

A significant aspect of the case in mitigation presented at the penalty phase of Petitioner's trial was his good conduct in jail awaiting trial.[4]  The defense called jail officials to testify that Petitioner had no disciplinary issues, that he was a valuable leader in the jail and that his behavior in jail suggested that he would be an exemplary prisoner, were he to be sentenced to LWOP instead of death.

As the penalty phase was about to begin, counsel learned of evidence that could – and did – undermine their efforts to portray Petitioner as a model prisoner. Despite their knowledge of the nature of the evidence, counsel did little to prevent the admission of the evidence, or to challenge the credibility of the testimony once the court allowed it to come in.  Counsel's failures undermine confidence in the outcome of the case.  *Strickland v. Washington*, 466 U.S. 668, 694-95 (1984).

Petitioner has made factual allegations, denied by respondent, which set forth a colorable claim for relief, one that is not refuted by the state court record, and he is therefore entitled to an evidentiary hearing at which he can further develop the factual basis for the claim.  *Earp v. Ornoski*, 431 F.3d at 167.

---

[4] Because Petitioner had no prior criminal record, this was the only time he had been in custody.

## A. Factual background

The prosecution presented no evidence in aggravation at the penalty phase. On August 1, 1989, the first day of the penalty phase, defense counsel told the court that they had learned the night before of a report in Petitioner's custody file about a suspected escape plot from Santa Clara County's North County Jail in December 1985 in which Petitioner was implicated. AG 10426-27.

The prosecutor believed that evidence of the escape plot was proper rebuttal if the defense put on evidence of Petitioner's good conduct in jail, but agreed not to mention the escape attempt until he had verified the identity of the informant referred to in the report, whose name was redacted. AG 10432.

On Wednesday, August 2, the prosecutor stated he would present his rebuttal case the following Monday. Counsel did not ask what the rebuttal evidence would be or object to its admission. AG 10581.

On August 3, during his cross-examination of Donald Vandaro, a sheriff's deputy who was testifying for the defense about Petitioner's good conduct in jail, the prosecutor attempted to question the officer about the report of the escape attempt. Counsel's objection led to a hearing outside of the jury's presence during which trial counsel reminded the court that the prosecutor had agreed not to raise the escape issue without notice to counsel. AG 10628-30. According to counsel, the defense had not yet been provided with the informant's name or with any discovery. AG 10631, 10633. The prosecutor admitted that he knew the

36

informant's name and hoped to call him as a witness, but had concerns about the witness's safety if he were to be called to testify. AG 10634. Once the prosecutor established that Office Vandaro had no knowledge of the report of the alleged escape plot, he agreed he could not question the witness about it. AG 10642-43.

At the end of the court session on that day, the prosecutor again said he would present rebuttal testimony at the next court session on Monday, after the defense completed their case. AG 10646. Trial counsel asked for any discovery and the prosecutor agreed to provide it. AG 10643, 10645.

On Monday, August 7, 1989, during his examination of defense witness Jiro Enomoto, the former Director of the California Department of Corrections, trial counsel Mr. Morehead asked to approach the bench. AG 10681. At the sidebar conference, counsel asked the court to rule on his objection to the prosecutor questioning the witness about the alleged escape plot because if it was admissible, counsel wanted to question Mr. Enomoto about it first. AG 10682. When the court asked why it would not be admissible, counsel could not say, telling the court that he had not received all the information about the alleged incident. The court called a short recess to discuss the issue. AG 10683. In response to counsel's request for an offer of proof of the proposed rebuttal evidence, the prosecutor said the witness mentioned in the jail report would testify that Petitioner told him of an escape plan, and enlisted his help in carrying it out. The witness would also testify that

Petitioner's motive for escaping was that he was charged with murder and "he killed the broad." AG 10684.

Counsel's objection: "I don't want him [the informant] testifying at all," was summarily overruled by the court, as was counsel's objection to admission of Petitioner's statements about the offense as improper rebuttal evidence. AG 10685-86. Beyond these perfunctory objections, trial counsel made no other arguments against admission of the informant's testimony.

Mr. Enomoto was questioned about the alleged escape plot. AG 10686-92.

After the defense case, the prosecution presented the testimony of an informant, Clint Williams, about Petitioner's alleged plan to escape from county jail to rebut mitigating evidence presented of Petitioner's good conduct in jail. When he encountered Petitioner at the county jail, Williams was serving a one-year sentence for grand theft. Williams testified that at that time he was a trustee in the jail and was working as an informant for deputies Todd Dischinger and Paul Jones. AG 10710-11.

Williams was also permitted to testify that Petitioner told him he committed the murder: "He told me that the police came to his place, I believe it was in Campbell that he lived, and that he got rid of the body, buried it in an orchard out of state." AG 10713. Williams further testified that Petitioner threatened to kill him. AG 10718. The prosecutor also presented the testimony of Deputy Sheriff Todd

Dischinger that Williams was a reliable informant who received no benefits for providing this information.  AG 10722-23 and 10734.

### B. Trial Counsel's Failure to Present Available Evidence About Williams's Credibility Was Ineffective and Prejudicial

Trial counsel made virtually no effort to prevent admission of Williams's testimony.  Their belated objections were vague and unsupported by law or evidence.  Once the court cleared the way for admission of the evidence, no attempt was made to mitigate the testimony.

Counsel failed to investigate Williams's credibility to determine his history as an informant and whether or not he received any benefits for his cooperation with law enforcement and/or for testifying for the prosecution.  As trial counsel, Mr. Morehead acknowledges: "We obtained from the prosecution a listing of Mr. William's extensive prior record which I used to impeach him.  We did not have the time to conduct an independent investigation of Mr. Williams and did not obtain the court files from his various prior cases."  Morehead Dec., AG 13255.

Reasonably competent counsel would have: a) investigated the allegations by interviewing other inmates (as counsel indicated they would [AG 10427]) and would have obtained readily available evidence of Williams's criminal history; b) made specific discovery requests for potentially relevant and impeaching information pertaining to Williams; c) sought to exclude the evidence prior to its presentation to the jury; and d) presented evidence to the jury to undermine

39

Williams's credibility and refute the allegations if the motion to exclude the evidence was denied. Petitioner's counsel did none of these things, even though they knew of the existence of an informant who reported the alleged escape plot at the beginning of the penalty phase. Instead of insisting on a ruling from the court about the admissibility of the evidence, learning the identity of the informant and asking the court for adequate time to investigate, counsel did nothing.

Had counsel reviewed Williams's Santa Clara County records, they would have discovered at least two significant pieces of information. First, contrary to the prosecution's representation of Williams's as reliable, there was evidence that the District Attorney's Office considered Williams to be untrustworthy. In 1976, then-Deputy District Attorney George Kennedy, told the court who was sentencing Williams: "He will never be a law-abiding citizen. He is a sneaky, hard-core, professional con man." *People v. Clinton James Williams,* Santa Clara Superior Court No. 60910, Penal Code section 1203.01 Statement by Deputy District Attorney George Kennedy. *See* AG 13750.

Additionally, after Williams informed jail deputies in December 1985 of Petitioner's alleged escape plan, a motion to modify probation was filed in Williams's case at the request of Deputy Paul Jones in May 1986.[1] The motion was

---

[1] Paul Jones was the deputy sheriff who conducted the investigation of the alleged escape plan. AG 10427. Williams testified in Petitioner's trial that Paul Jones and Todd Dischinger were the two deputy sheriffs he "worked for" at the North County Jail. AG 10711.

granted and Williams was released from custody.  *People v. Clinton James*

*Williams,* Santa Clara Superior Court No. 102014, Declaration in Support of

Motion to Modify Probation, Order and Disposition, AG 13753.  Petitioner has

alleged that Deputy Jones's request was made in exchange for Williams's

cooperation in Petitioner's case and in other cases.  However, this material and

impeaching information which was known or should have been known by the

prosecution was not disclosed to the defense.  Morehead Dec. AG 13255-56.

Respondent has claimed it is "speculative to assume the request was based on the

information Williams supplied about petitioner, as opposed the anyone else," and

faults Petitioner for not including declarations from Williams, Deputy Jones or

Williams's attorney.  Answer Memo at 206 n. 64.

Given the timing of Williams's informing on Petitioner to Deputy Jones and

the officer's efforts on Williams's behalf, it is more than reasonable to believe that

the two were related.  Petitioner's attempts to obtain discovery and conduct further

factual development were denied by the California Supreme Court; but at this stage

of the proceedings, he has met his burden by "alleg[ing] specific facts which, if

true, would entitle him to relief."  *Ortiz v. Stewart*, 149 F.3d at 934.  If the Court

does not find that Petitioner has sufficiently proved this claim based on the

evidence already presented, he respectfully requests an evidentiary hearing to

further develop the factual basis of the claim.

Reasonably competent counsel would also have interviewed inmates incarcerated with Petitioner at the North County Jail, particularly those named in the reports in trial counsel's possession. Had counsel done so, they would have found inmates who were willing to testify that: North County Jail was known as a "snitch tank," where law enforcement and the D.A.'s Office placed inmates to procure or manufacture incriminating information through the use of informants; Clint Williams, an informant who was housed at North County, was known by the other inmates for being an informant and for being untrustworthy; Petitioner did not talk about the facts of his case to others, and it was extremely unlikely that Petitioner would have confided in Clint Williams about his case or about any alleged escape plot; and Petitioner was not involved in any escape plan with Earthy Young and Marcus Cato, or any other inmate. Witnesses could also have testified that Williams had access to other prisoners' cells and could have learned the facts of Petitioner's case from looking through papers in his cell. *See, e.g.*, Declaration of Peter Fan, AG 13764-65; Declaration of Benigno Garza, AG 13767-68; Declaration of Earthy Young, AG 13774; Declaration of Marcus Cato, AG 13761; Declaration of Robert Glover, AG 13772.

Respondent has argued that the inmates' testimony as to whether Petitioner would have talked to Williams about the alleged escape plan was speculative and would not have been admissible. Answer Memo at 207. The only authority cited by respondent for this assertion, *People v. Lewis*, 26 Cal.4th 334, 373 (2001),

42

involved a third-party culpability issue, and has no application to this case. The testimony of the inmate witnesses was clearly relevant and admissible to cast doubt on Williams's claim that Petitioner confided in him, and further, would have directly contradicted Deputy Dischinger's opinion of Williams as reliable. Finally, testimony that Williams had access to other prisoner's cells was relevant to explain how he knew some of the facts of Petitioner's case. The prosecutor placed Williams's reputation squarely at issue and Petitioner had the right to rebut the evidence. Without this testimony, the jurors were deprived of significant impeachment evidence.

Trial counsel knew who the witnesses were and even told the court when the issue of the alleged escape attempt was first broached, that if the prosecution was going to present evidence, they would present the testimony of inmate witnesses who would say Petitioner was not involved. AG 10427. Despite this pronouncement, and the availability of such testimony, counsel did nothing.

Trial counsel established that Petitioner was transferred from the North County Jail to the Main Jail prior to an attempt by inmates to cut the screen on the sun deck at North County, allegedly part of the escape plan (AG 10728-33), and was never prosecuted for an escape attempt due to insufficient evidence. AG 10733. Trial counsel unreasonably failed to obtain and present the testimony of the other inmates, which together with facts they did present, that Petitioner was no longer housed at the North County Jail when the acts to further the alleged escape

43

were committed, would have established that there was insufficient evidence of Petitioner's involvement in an escape plot, and that the testimony of Williams was irrelevant, inherently unreliable and far more prejudicial than probative.

Trial counsel unreasonably failed to seek a hearing on the admissibility of Williams's testimony pursuant to Evidence Code section 402, and had they done so and presented the above-described information, it is reasonably probable that the evidence would have been excluded. Instead, counsel waited until the middle of Mr. Enomoto's testimony, on the last day of the defense case, and during a ten-minute recess, to ask the court to make a ruling on their objection to admission of the escape evidence. Counsel admitted at the time that he did not have all the information about the incident. AG 10682.

Assuming the trial court refused to exclude Williams's testimony, reasonably competent counsel would have used the above-described evidence at trial to impeach Williams and Deputy Sheriff Dischinger, undermine Williams's credibility, and cast serious doubt that Petitioner was involved in an escape plan. Without such evidence, counsel's cross-examination of Williams was wholly ineffective and the jury was permitted to discount Petitioner's exemplary conduct in jail as a factor in mitigation.

Trial counsel further failed to mitigate the damage caused by the prosecution rebuttal evidence by failing to request a jury instruction on the inherent unreliability of jailhouse informants or a limiting instruction which would have informed the

jury that the testimony of Clint Williams was rebuttal to mitigating evidence and could not be considered in aggravation.

Williams and the deputy who vouched for his reliability were the only penalty phase witnesses presented by the prosecution, and their testimony negated evidence of Petitioner's good conduct while incarcerated which formed one of the pillars of the penalty phase case. Williams's testimony also undermined any residual doubt the jury may have had by providing further evidence that Petitioner admitted the crime. Had counsel undertaken a reasonably competent investigation they could have successfully moved to suppress Williams's testimony or negated the impact of his testimony by undermining his credibility and presenting further evidence of Petitioner's lack of involvement in the alleged escape plan. Had they done so, it is reasonably probable that the outcome of the proceeding would have been different.

Counsel had no tactical reasons for their errors and omissions, Morehead Dec., AG 13255-56, and such failures undermine confidence in the outcome of the case. Petitioner has alleged colorable claims for relief; claims which were diligently pursued in state court, and for which he has not been afforded a hearing. This Court should grant an evidentiary hearing.

//

//

//

**Claim 27:** **THE PROSECUTOR COMMITTED MISCONDUCT AT THE PENALTY PHASE OF PETITIONER'S TRIAL REGARDING REBUTTAL WITNESS CLINT WILLIAMS**

In criminal cases, the prosecution has the duty to disclose all material evidence that is favorable to the accused. *Brady v. Maryland*, 373 U.S. 83 (1963). This duty extends not only to exculpatory evidence but also to "evidence that the defense might have used to impeach the Government's witnesses by showing bias or interest." *United States v. Bagley*, 473 U.S. at 676. Here, the prosecution failed to disclose material exculpatory and impeaching evidence regarding Williams's credibility and the favorable treatment he received in exchange for his cooperation and testimony. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. To prove materiality, a defendant need not demonstrate that it is more likely than not that he would have received a different verdict with the evidence, rather, "[a] 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

In addition, the prosecution may not use false evidence to obtain a criminal conviction. The government is obligated to correct any evidence introduced at trial that it knows to be false, regardless of whether it solicited the evidence. *See Alcorta v. Texas*, 355 U.S. 28, *Napue v. Illinois*, 360 U.S. at 269.

46

At Petitioner's penalty phase trial, the prosecution elicited testimony which it knew or should have known was false and misleading, and allowed it to go uncorrected. *Giglio v. United States*, 405 U.S. 150 (1972); *United States v. Agurs*, 427 U.S. at 103. Even if the presentation of false evidence was unwitting, Petitioner is entitled to a new trial. *See e.g., United States v. Young*, 17 F.3d 1201, 1203-04 (9th Cir. 1994) ("A conviction based in part on false evidence even false evidence presented in good faith, hardly comports with fundamental fairness."); *see also Beck v. Alabama,* 477 U.S. 625 (1980) (heightened degree of reliability required in capital case).

The prosecutor here violated both the *Brady* and *Napue* line of cases. The prosecutor failed in his *Brady* obligation to provide the defense with evidence that would have impeached Clint Williams – Mr. Kennedy's statements to the court in a prior proceeding that Williams was untrustworthy, and evidence of the benefits Williams received in exchange for his information against Petitioner. The jury was told that Clint Williams received no benefits for giving information against Petitioner. AG 10733-34. This was not true and the prosecutor knew it, but did nothing to correct the false testimony in violation of *Napue*. Because of the prosecutor's actions, the jurors were not able to adequately assess the credibility of the only penalty phase witnesses called by the prosecution at the penalty phase.

As set forth in Claim 26, Clint Williams was released from custody in May 1986, after providing information to Deputy Paul Jones about the alleged escape

47

attempt.  AG013753.  By the time of Petitioner's penalty phase, Williams was back

in custody.  He testified that he was serving time in state prison at CMC West

Facility, and had sixty days remaining on his sentence.  AG 10709.  After his

testimony, he wrote a letter to Judge Schatz stating that he had made an

arrangement with the prosecutor, Dave Davies, that he would be able to serve his

remaining time in protective custody in the county jail:

> I was brought down from state prison with the promise I
> would spend my remainder of time in protective custody
> at Palo Alto County Jail.  This was the understanding I
> got from Mr. Davies, the District Attorney . . . . Mr.
> Davies told me personally that I would get to serve the
> rest of my time here.

Correspondence from Clinton Williams to Judge Schatz, AG 13578-79.

The prosecutor did not disclose to the defense that he had any meeting or

communication with Williams, that he had told Williams that he would be able to

serve the rest of his time in county jail, or that Williams had requested that he serve

the rest of his time in county jail in exchange for testifying.  Not only did the

prosecutor fail to provide this material and impeaching information but he

permitted Deputy Dischinger to testify falsely that Williams received no benefit in

exchange for providing information.  Morehead Dec., AG 13256.

Respondent has challenged the truth of Williams's allegations regarding the

prosecutor's promise.  In its answer, citing Williams's "suspect" credibility, and his

long career of "working the system" respondent states, "[i]t is reasonable to

conclude that Williams would not be above fabricating such a promise by the prosecutor if he preferred serving time in county jail." Answer Memo at 210-11. Respondent also faults Petitioner for failing to submit a declaration from Williams or from prosecutor Davies as part of his habeas filing to establish the existence of Davies's promise. *Id.* at 210 n. 68.

Setting aside the inability of Petitioner to conduct discovery in state court and thus procure any statements from the prosecution, it would seem more likely that *respondent* would have provided a statement from Mr. Davies if he had not made a deal with Williams. In the end, though, the state court record proves the existence of the deal. On August 21, 1989, an order prepared by the Office of the District Attorney, directing the Santa Clara County Jail to retain Clint Williams in its custody until further notice, was signed by Judge Schatz. AG 2399. The Clerk's minute from that day states that Williams "[h]aving testified in . . . People v. Crew is to be retained in Santa Clara County until a further order of the Court." AG 2398. Respondent has never addressed this evidence, despite it being part of the state court record.

Contrary to respondent's assertion, Petitioner has made a prima facie case that Williams was promised county jail time in exchange for his testimony against Petitioner and that this evidence was not disclosed to the defense. Indeed, based on the record, Petitioner believes the existence of the undisclosed deal with Williams has been conclusively established. At the very least, Petitioner has alleged a

49

colorable claim for relief, and if the Court requires further development of the

factual basis for the claim, it should order an evidentiary hearing.

The prosecutor knew that Williams's credibility was key to the jury crediting

the rebuttal evidence. During discussions about the then-unidentified informant,

the prosecutor said "if that person does exist and would so testify, then it would be

an issue of that person's credibility as to what conversations were had with Mr.

Crew." AG 10426. The prosecutor was obviously concerned that Williams's

testimony alone might be met with some skepticism by the jury, given the lack of

any corroborating evidence and the refusal of the District Attorney's office to bring

charges against Petitioner due to lack of evidence. Therefore, in addition to

concealing the benefits Williams reaped from his informing, the prosecutor sought

to bolster Williams's credibility by having Officer Dischinger vouch for him. Even

before he was asked about the information Williams provided about Petitioner,

Dischinger was asked if Williams had provided him with reliable information in the

past. AG 10722-23.

To drive the point home, after Dischinger acknowledged on cross-examination

that Petitioner was not in the facility at the time the cuts in the screen were

discovered, and that other inmates were ultimately implicated in the escape plot, the

prosecutor asked Dischinger if any of that information caused him to doubt that

what Williams told him was true. It did not. AG 10733. The message to the jurors

was clear – despite the lack of anything except Williams's word to tie Petitioner to

the plot[5], and the existence of evidence pointing to other inmates – they, like Officer Dischinger, should believe William because he was a proven, reliable informant, whose testimony they could trust.

What the jurors did not know, however, was that the prosecutor's own office considered Williams to be untrustworthy. In 1976, then-Deputy District Attorney George Kennedy, told a sentencing judge about Williams: "He will never be a law-abiding citizen. He is a sneaky, hard-core, professional con man." This material and impeaching information was known or should have been known by the prosecution but was not provided to the defense. AG 13750; Morehead Dec., AG 13255; O'Sullivan Dec., AG 13261.

Deputy Jones's efforts on behalf of Williams and Mr. Kennedy's assessment of his character should have been disclosed to the defense. The prosecutor's "actual awareness (or lack thereof) of exculpatory evidence in the government's hands is not determinative of the prosecutor's disclosure obligation." *Carriger v. Stewart*, 132 F.3d 463, 479 (9th Cir. 1997), citing *Kyles*, 514 U.S. at 435-40.

Respondent has previously argued that the suppressed evidence was not material because "it is unlikely the jury gave any weight to Williams's testimony." Resp. Answer at 208. This is so, according to respondent, because of the weakness of the evidence of Petitioner's involvement in the alleged escape plot and the jury's

---

[5] Dischinger testified that Williams was the only source of information of the escape plan. AG 10725.

knowledge of Williams's extensive criminal record. Williams was so thoroughly impeached, Respondent has argued, that neither Judge Schatz nor Judge Ahern credited his testimony. *Id.*

Respondent cites Judge Schatz's reliance on Petitioner's lack of criminal activity and good conduct in custody as mitigating factors in reducing the death sentence to LWOP, which respondent interprets as an implied rejection of Williams's testimony. Answer Memo at 205. Judge Ahern also cited Petitioner's lack of history of force or violence and good behavior in custody as mitigating factors, but nevertheless imposed the death penalty on resentencing and found Williams's credibility "questionable." AG 3136.

However, as Respondent concedes, the correct test is not viewed from the hindsight of the two Superior Court judges, but whether the trial jury was properly able to assess the credibility of the witness. Answer Memo at 212 n. 70. The critical question for this Court is whether the suppression of impeachment evidence at the penalty phase prejudiced Petitioner, not whether two superior court judges not considering the issues presented here might have discounted the informant's testimony, if such a conclusion is even supported in the record.

Moreover, if the judges did reject Williams's testimony, it was likely because they had far more experience assessing the credibility of a jailhouse informant than the jurors did. In fact, Judge Schatz's decision to reduce the sentence to LWOP could have been made precisely because he *did* reject Williams's testimony, and

52

without it, found the evidence insufficient to sustain the death penalty. It follows, then, that had the jurors been provided with the impeachment evidence suppressed by the prosecution, there is a reasonable probability they would have come to the same decision and rejected the death sentence.

Respondent has also argued that the evidence showing that the District Attorney's Office believed Williams was untrustworthy was not material because the jury was aware of Williams's extensive criminal record. Answer Memo at 206. According to Respondent, "[t]hat Williams would never be a law-abiding citizen and was a professional thief was obvious to the jury." *Id*. There are two problems with this argument. First, the prosecutor went out of his way to establish that, notwithstanding his long criminal history, Williams should be believed because he was considered reliable by law enforcement. Evidence that the prosecutor's colleagues considered the witness to be a "sneaky, hard-core, professional con-man," would have destroyed the image of Williams as a trusted man on the inside. Second, and equally important, Williams's criminal record was used by the prosecutor not so much to impeach him as it was to establish his bona fides as someone to whom a would-be escapee would confide his plans. Williams said it himself: When asked by the prosecutor how he came to have a discussion with Petitioner about the alleged escape plot, Williams answered, "Well, he knew I was an ex-convict, and I presume that is why he put some trust in me, as far as talking to me." AG 10710. The prosecutor echoed this point when he argued to the jury that

53

the testimony of the jail guards who testified about Petitioner's good conduct should not carry as much weight as Williams's because, as a criminal who inhabited the same world as Petitioner, his information was more real. "But who really knows him? Is it the jailers who see what he wants them to see, or is it the man who lives in the sewer of the penal system, Mr. Williams? We can't have anything good to say about Mr. Williams. He's an informant. He's had a record as long as your arm. He survives in the society. *For reasons of his own, he gives information.* He's a snitch, informant, call it what you will." AG 10801-02 (emphasis added).

Williams's "reasons of his own" for giving information, were, of course known to the prosecutor, but not to the jury. He gave information to garner benefits, like early release or being housed in county jail instead of prison. Evidence of the deals that were made with Williams in exchange for his informing and testifying against Petitioner "was a wholly different kind of impeachment evidence," from that of evidence of Williams's criminal past. *Horton v. Mayle*, 408 F.3d at 580. Further, "that the jury had other reasons to disbelieve [Williams] does not render the suppressed evidence of the deal immaterial." *Id.*

The Ninth Circuit has held that the prosecution cannot satisfy its *Brady* obligation to disclose exculpatory evidence by making some evidence available and claiming the rest would be cumulative. *See Bernal-Obeso*, 989 F.2d 331, 335 (9th Cir. 1993). Rather, the government is obligated to disclose "*all* material evidence

casting a shadow on a government witness's credibility." *Id*. at 334 (emphasis in original).

The prosecutor's actions violated both *Brady* and *Napue*. The test for materiality is different under the two doctrines: a *Napue* violation is material when there is "any reasonable likelihood that the false testimony *could* have affected the judgment of the jury." *Agurs*, 427 U.S. at 103 (emphasis added). A *Brady* violation is material to a jury's verdict when "there is a reasonable probability that . . . the result of the proceeding *would* have been different" but for the violation. *United States v. Bagley*, 473 U.S. at 682 (emphasis added). This Court must consider the *Napue* violations collectively, and if it finds there is a reasonable likelihood that the false testimony *could* have affected the judgment of the jury, habeas relief must be granted. If the *Napue* violations are not sufficient on their own to warrant relief, then the Court considers the *Napue* and *Brady* violations collectively and asks if there is a reasonable probability that, but for the errors, the result of the proceeding *would* have been different. *Phillips v. Ornoski*, 673 F.3d 1168, 1189 (9th Cir. 2012).

Here, the facts the prosecutor was obligated to provide to the jury under *Napue* were that Williams received benefits in exchange for giving information against Petitioner. After he told jail officials about Petitioner's alleged involvement in an escape plot, he was released from custody. And in exchange for his testimony against Petitioner at the penalty phase, he was allowed to serve the remainder of his

55

sentence in county jail instead of prison.  There is a reasonable likelihood that this false testimony *could* have affected the judgment of the jury.

The United States Supreme Court has consistently held that when the prosecution fails to disclose evidence of a deal or promise that would be valuable in impeaching a witness whose testimony is central to the prosecution's case, it violates the defendant's due process rights and undermines confidence in the outcome of the trial.  *Napue*, 360 U.S. at 270; *Giglio*, 405 U.S. at 154, *Kyles*, 514 U.S. at 444.

Where, as here, the witness is central to the prosecution's case – testimony about the alleged escape was the only evidence presented by the prosecutor – the fact that the jury voted for death demonstrates that the impeachment evidence did not convince the jury that Williams lacked credibility.  In that case, the suppressed impeachment evidence "takes on an even greater importance."  *Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir.2002).

If the jurors had been informed of the undisclosed benefits and the District Attorney's Office assessment of Williams's character, Williams's credibility would have been significantly damaged.  Given his role as the only witness to rebut one of the central portions of Petitioner's case in mitigation, the suppressed impeachment evidence must be deemed material.  The due process violations undermine confidence in the death verdict.  Petitioner is entitled to an evidentiary hearing at which to prove the allegations in the habeas petition.

56

**Claim 30:** **THE PROSECUTION'S DECISION TO CHARGE PETITIONER WITH CAPITAL MURDER AND SEEK THE DEATH PENALTY WAS ARBITRARY AND CAPRICIOUS**

Petitioner has alleged the violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because of actions of the Santa Clara County District Attorney's Office in determining to charge petitioner with special circumstance murder, and seeking to obtain a death penalty judgment against him in an arbitrary, capricious and discriminatory manner.

The California Supreme Court held this claim was procedurally defaulted under *In re Seaton*, 34 Cal.4th 193, 199-200 (2004). This Court upheld the default, but ordered briefing on the merits before ruling on cause and prejudice. *Crew v. Davis*, 2015 WL 7720737 at *8.

From 1984-1989, the Santa Clara County District Attorney's Office did not have standardized guidelines, protocol or criteria for determining when to charge a case capitally and to pursue the death penalty, a fact which the prosecutor in Petitioner's case, has confirmed. AG 13776-80 and 13782. In the absence of mandated selection procedures the Santa Clara County District Attorney's Office exercised discretion in a discriminatory, arbitrary and capricious manner based on inconsistent, undisclosed and improper criteria.

The decision to charge and pursue the death penalty was made on the basis of improper considerations, including, but not limited to the following:

      a.     The race of the victim;

b.    The socio-economic status, political influence and prominence, and persistence of the victim's family;

c.    The pressure brought to bear by those with political influence;

d.    The publicity generated by the case;

e.    The political aspirations of members of the District Attorney's Office;

f.    The personal proclivities of the Deputy District Attorney assigned to the case.

Petitioner has set forth substantial facts to show that the decision to charge Petitioner, who had no prior criminal record and who was subject to a possible death sentence solely because of a questionable theory to support a financial gain special circumstance, was arbitrary and capricious.

Respondent does not deny the facts set forth in the Petition, but wants this Court to disregard their significance. It is undisputed that Andrade's parents hired a private investigator after their daughter disappeared, called witnesses on their own, were in frequent contact with the police and District Attorney's Office, and were otherwise extremely involved in bringing petitioner to trial. Further, in 1983, then-Congressman Leon E. Panetta, inquired of the San Jose Police Department as to the status of the investigation into Andrade's disappearance, writing two letters to the Chief of Police. AG 13789-90. Finally, a reporter from the local paper sent clippings regarding Andrade's disappearance to a member of the prosecutor's office in June 1984. AG 013793.

It was only after this constant pressure that the prosecutor filed charges against Petitioner and sought the death penalty, indeed going so far to seek recusal

of the sentencing judge after reduction of the sentence to life without the possibility of parole. Moreover, as set forth in Claim 40, the prosecution then engaged in unwarranted and unconstitutional steps to assure that Judge Schatz would not have the opportunity to consider the sentence on remand.

But tellingly, Judge Schatz noted the incredible efforts made by the family to have charges brought in this case.

> This case I think is special in the sense that to me it indicates the love of parents. And I don't think that this case would have ever gotten to trial if it hadn't been that the deceased had parents who loved her. And it was through that love that his case was ultimately brought to trial. And without that, I don't think it would have been brought to trial.

AG 010877.

Respondent faults Petitioner for lack of proof to support the claim. But this claim relies on evidence primarily in the hands of the District Attorney's Office, and Petitioner's efforts to obtain discovery and a hearing were repeatedly denied by the state courts before rejecting this claim on the merits. Nevertheless, Respondent, whose access to information from the government is greater than Petitioner's, has pointed to no other case where the Santa Clara District Attorney's Office sought death in a similar factual situation – a defendant with no prior record and only one special circumstance charged.

In Petitioner's case, the Santa Clara County District Attorney's Office determined to charge petitioner with a special circumstance in order to seek the death penalty, and pursued the death penalty against petitioner for reasons which

59

were irrelevant to the nature of the crime or the character of the defendant. *Furman v. Georgia*, 408 U.S. 238 (1972). Petitioner is entitled to an evidentiary hearing on this claim.

**Claim 40:    THE TRIAL JUDGE WAS PRECLUDED FROM RESENTENCING PETITIONER AS A RESULT OF PROSECUTORIAL MISCONDUCT AND/OR JUDICIAL MISCONDUCT**

This claim is based upon the actions of the Santa Clara District Attorney's Office and the Santa Clara judiciary to bar Judge Schatz from conducting the Penal Code section 190.4 hearing on remand following the reversal of the grant of the motion by Judge Schatz by the California Court of Appeal. When the prosecution's attempt to have the appellate courts order the matter be heard by a different judge failed and the courts ordered Judge Schatz to hear the matter "if available," the prosecution, with the apparent help of the judiciary, resorted to extra-legal efforts to make sure that Judge Schatz did not hear the reconsideration of the section 190.4 motion.

This Claim was raised in Petitioner's first state habeas petition. AG 12695-725. The California Supreme Court summarily denied the claim on the merits, without allowing discovery or holding an evidentiary hearing.

Because Petitioner did not fail to develop this claim in state court, but was denied a hearing by the state court, and because he presents a colorable claim for relief, this Court should grant a hearing on this claim as the decision of the state court summarily denying this claim was unreasonable.

60

## A. Factual Background

The time line of events demonstrates the extra-legal efforts taken to assure that Judge Schatz did not hear the motion on remand. Petitioner incorporates fully his allegations put forth in detail in the First Amended Petition at pages 332-54 in support of his motion for evidentiary but will not repeat them here.

The jury convicted Petitioner of first degree murder with one special circumstance of financial gain. After the penalty phase of the trial, the jury delivered a verdict of death on August 10, 1989. AG 2395. At no time in the proceedings during or before trial did the prosecution allege that Judge Schatz was not able to hear the matter or be an impartial and fair judge, even when Judge Schatz was reprimanded for improperly interfering on his son's behalf in December 1989.

Prior to Judge Schatz's modification of Petitioner's sentence, he was a well-respected judge. He had been a top homicide prosecutor and chief trial attorney in the district attorney's office during the 1950's and 1960's, before becoming first a municipal court judge and then a superior court judge. AG 2914, 2986-87.

Prior to Petitioner's case, Judge Schatz had heard seven capital cases to verdict. In six of those cases, he denied the motion to modify the death verdict and the State did not appeal the one other case he granted the 190.4 motion. *See* Exhibit 2 to Motion, p. 3 n. 4.

The 190.4 motion for modification of the death sentence was litigated during

the latter part of 1989.  AG 2417.  The prosecution made no challenge to Judge

Schatz's ability to decide the motion, and the motion was heard, argued and

thereafter denied

in February 1990.  AG 2514.

The prosecution filed an appeal of this decision, but did not allege as a basis

for its appeal that Judge Schatz was not competent or was biased against the

prosecution.  The basis for relief was that he applied an incorrect standard in

considering the motion to modify the death verdict.  During this appeal, the

prosecution was represented by the Santa Clara District Attorney's Office, not the

State Attorney General's Office.

During oral argument, the appellate court inquired of counsel whether the

matter should be remanded to Judge Schatz if his decision was reversed.  At that

argument, counsel for the prosecution candidly stated that the matter should be

returned to Judge Schatz.  However, in subsequent letter briefing filed on October

31, 1991, the prosecution argued that the matter should be remanded to an

alternative judge primarily on the grounds that it would provide the appearance of

fairness to the parties.  AG 11399-111401.  No mention was made of Judge

Schatz's competency to hear the matter.

Petitioner responded, citing numerous cases where the California Supreme

Court remanded to the prior judge after a decision on the court's motion to modify

the sentence was reversed on appeal.  *See, e.g.*, *People v. Brown*, 45 Cal.3d 1247,

62

1264 (1988); *People v. Sheldon,* 48 Cal.3d 935, 62-963 (1989); AG 11403-420.

On December 23, 1991, the Court of Appeal vacated the penalty judgment in Petitioner's case and remanded the matter to the trial court for redetermination of the 190.4(e) motion. *People v. Crew*, 1 Cal.App.4th 1591, 1609 (1991). The Court of Appeal rejected the prosecution's request to remand to another judge and ordered that the "trial judge should rehear the motion personally, on the basis of the record certified to this court. If, however, he is unavailable, the motion may be heard before another judge of the same court." *Id*. at 1610 (citations omitted). The District Attorney's request that the motion be heard by a different judge was rejected by the Court of Appeal. *Id*. at 1608-09 n. 13.

After Petitioner filed a petition for review, the District Attorney's Office again challenged the remand to Judge Schatz in its answer to the petition for review filed on February 24, 1992, and referenced a separate motion filed with the answer. AG 11522.

The motion was received by the Supreme Court but apparently not considered and the State has not included the motion and Petitioner's response to it as part of the state record before this Court. Copies of these pleadings are attached as Exhibits to this Motion for the convenience of the Court.

In that motion, the District Attorney's Office first mentioned Judge Schatz's potential competency but did not claim that he would be incompetent to hear the case, only that such issues might affect the appearance of fairness. *See*, Exhibit 1 to

63

Motion, p.15, n. 3. The petition for review was denied in full on March 26, 1992, and the Court of Appeal order remanding the case to Judge Schatz remained in place. AG 11555.

Upon remand, the District Attorney's Office filed no legal motion to remove Judge Schatz from rehearing the case. When the matter was first on calendar again in the Superior Court on April 10, 1992, the parties appeared before Judge Schatz without objection. He ordered Petitioner to be returned to Santa Clara County and reset the matter for May 1, 1992.

At this point the District Attorney's Office renewed their extra-legal and behind the scenes efforts to have Judge Schatz removed from Petitioner's case. The Santa Clara District Attorney's Office and Assistant District Attorney David Davies, in particular, orchestrated a campaign to impugn Judge Schatz's integrity and challenge his competency in order to ensure that he did not handle the resentencing of Petitioner. This included making disparaging statements about Judge Schatz to the press and using peremptory challenges to prevent Judge Schatz from hearing serious cases. AG 12737-44, 12746, and AG 12750-54.

Within weeks of the appellate court's decision, prosecutors were quoted in newspapers questioning the competency of Judge Schatz. The articles related complaints, mostly by prosecutors, that Judge Schatz, although only 68 years old, was no longer competent, and indicated that prosecutors had been steering complex and important cases away from Judge Schatz because they believed he was no

64

longer able to handle them.   *See, e.g.*, AG 2799, 2986, 2996, 2998 and 3001; *see* First Amended Petition for the details of these statement,

These statements made by the District Attorney's Office regarding Judge Schatz's performance were in stark contrast to earlier statements of respect and admiration, and only arose in the wake of the appellate court's ruling in Petitioner's case, which ordered that the 190.4(e) motion be heard upon remand by Judge Schatz if available.

The use of peremptory challenges by the District Attorney's Office to excuse Judge Schatz from most serious felony cases was a strategy that was instituted only after Judge Schatz's ruling in Petitioner's case.

Judges on the Santa Clara County Superior Court bench were involved in forcing Judge Schatz to retire and not hear Petitioner's resentencing, and in precluding Petitioner from obtaining evidence to bring the circumstances surrounding Petitioner's retirement to light.  AG 12737-54.

On March 27, 1992, the day after the California Supreme Court denied review, sending the matter back to Judge Schatz, The Recorder newspaper reported that Judge Schatz had been on medical leave for two months.  In another article, it was reported that although on medical leave, Judge Schatz made occasional appearances at hearings.  AG 3004.  According to two "high level prosecutors," the state Commission on Judicial Performance was investigating Judge Schatz's competency, although such investigations are supposedly confidential.  Assistant

65

District Attorney Davies was quoted as stating that he was not sure Petitioner's case

would remain with Judge Schatz: "If he's unavailable, the case should be

reassigned to another judge." AG 2997. Davies added that he might challenge

Judge Schatz should the judge decide to preside over the hearing, further stating,

"there's a lot of questions [and] not many answers at this time." *Id*.

At the initial hearing on remand before Judge Schatz, Petitioner's counsel

indicated that it would take an hour at most, and that "basically it's a question of the

articulation of reasons, whatever the reasons the court happens to have in the

order." AG 10928. Neither the judge nor the prosecutor disputed this

characterization of the proceedings. The prosecutor merely asked if Judge Schatz

was intending to hear the matter, to which Judge Schatz stated, "I will still be in

court. I'm going to retire the end of the year, so if we – within this year, I'll be

here." *Id*. Without objection, the matter was then calendared for May 1, 1992. AG

2862, 10928-32.

At the April 10th hearing, Judge Schatz appeared perfectly lucid and rational,

and he in no way appeared unaware of his further responsibilities in Petitioner's

case. There was no indication that he was either physically or mentally unable to

proceed with Petitioner's resentencing. AG 12737-44. The claim that prosecutors

believed Judge Schatz was not competent to handle criminal cases – other than

Petitioner's – is belied by the actions of the prosecutor in this case, Assistant

Deputy District Attorney Davies, who, on this same date, did not object to Judge

66

Schatz hearing the case of another defendant at the same time he was challenging

the judge's competence to handle Petitioner's resentencing.  AG 3094.

On April 13, 1992, the Recorder reported that Judge Schatz intended to retire

at the end of the year but would hear Petitioner's resentencing.  The article noted

that Judge Schatz's plan to retire and to hear resentencing were "intertwined" since

it was Judge Schatz's reduction of the death sentence "that in part led the district

attorney's office to keep high profile criminal cases out of Schatz's courtroom."

AG 3002.  Assistant Deputy District Attorney Davies reportedly stated that he

might still try to disqualify Schatz from the case.  *Id*.  Davies said the Crew case

was too closely linked to questions about Judge Schatz's competency.  *Id*.

On April 14, 1992, a letter addressed to Judge Edwards, purportedly from

Judge Schatz, announced Judge Schatz's intention to retire on August 2, 1992.  The

letter stated that "As of this date, April 14, 1992, I will no longer be available to

conduct any judicial proceedings.  Presently I am taking medical leave and have

been authorized to do so until commencement of my retirement on August 2,

1992."  The letter thanked Judge Edwards for his "assistance and cooperation."  CT

2793, AG 2905.  This letter was a forgery, written and signed by Judge Schatz's

wife, Jacqueline Schatz.

On April 15, 1992, an article appeared in The Recorder, entitled: "Schatz

Moves Up Retirement; Drops Crew Case."  The article reported that Judge Edwards

believed Judge Schatz's submission of the retirement letter required immediate

67

reassignment of Petitioner's case.   AG 3003.

On April 22, 1992, Petitioner's trial counsel met with Judge Schatz's wife, Jacqueline Schatz, who stated that Judge Schatz was forced off Petitioner's case. AG 12737-44; AG 2960.  The details of counsel's affidavit are set forth in the First Amended Petition at pp. ** and alleged gross judicial misconduct in removing Judge Schatz from this case.

On May 1, 1992, the date the hearing before Judge Schatz was to be held, the matter was before a different judge, Judge Murphy.  AG 2863.  Two weeks later, Judge Murphy assigned the case to Judge Ahern, for all motions, including a determination of Judge Schatz's availability.  AG 2865; 2835-37, AG 2959-61.

On July 7, 1992, Petitioner filed a motion to have Judge Schatz hear the motion for modification based on the belief that Judge Schatz was in fact available to hear the case.  AG 2868.  This motion was opposed by the district attorney.

Judge Ahern failed to permit counsel to determine Judge Schatz's availability and impeded Judge Schatz's ability to hear the case.

On July 16, 1992, Judge Ahern appointed a special master to determine Judge Schatz's availability.  AG2881.  However, Judge Ahern ordered that no attorney should make any contact with Judge Schatz or members of his family.  AG 11593.

The special master filed a report on August 18, 1992.  The report stated that Judge Schatz did not meet with the special master because Schatz was out of town

past the deadline of the report. Further, the report indicated that Presiding Judge Edwards stated that statutes precluded him (Judge Edwards) from discussing the situation. The special master concluded that Judge Schatz would be available to rehear the case if: 1) the Chief Justice reappointed him for this purpose; and 2) Judge Schatz consented to the assignment. AG 2902-04.

The special master filed a supplemental report on August 27, 1992. After the first report, Judge Edwards spoke with the special master. Judge Edwards stated that based on his investigation, he would require Judge Schatz submit to a medical examination before asking the Judicial Council to reappoint him. Judge Edwards also provided the special master with newspaper clippings related to the competency probe. *See* AG 2910-16. The special master then concluded that "I do not believe that I can do anything further to determine Judge Schatz's availability. Based upon my inquiry in this matter, I believe that he is not available." AG 2908.

On September 16, 1992, Judge Ahern received a letter purportedly from Judge Schatz which made explicit that the terms of his retirement were contingent upon not hearing Petitioner's resentencing: "It is appropriate for me to call your attention to the terms agreed upon relative to my retirement. [¶] Therefore, it is incumbent upon me to recuse myself from the case of People of the State of California v. Mark Crew." AG 2921. Judge Ahern indicated his belief that the signature on the letter was not that of Judge Schatz, and asked the special master to see if he could determine the letter's authenticity. The special master was unable to

69

do so. 9/22/92 RT at 49-50, AG 11631-32. As alleged below, the recusal letter was signed by Ms. Schatz.

Petitioner's trial counsel sought discovery and/or an evidentiary hearing. Trial counsel filed a motion for an evidentiary hearing which argued that "a prima facie case has been presented to this Court, that in the very least demands an examination of the circumstances underlying Judge Schatz's retirement." AG 2949-61; AG 11659-65.

On December 15, 1992, Judge Ahern denied the request for an evidentiary hearing and ordered stricken as hearsay the statements of Ms. Schatz. Treating the request as a petition for reassignment of the case to Judge Schatz, Judge Ahern referred the matter to the presiding judge, Judge Edwards, the very judge alleged to have been complicit in Judge Schatz's removal. AG 11667-68; AG 3020.

On December 18, Judge Edwards issued an order:

> This court declines to reassign this case to Judge Schatz. That would be beyond the power of the court. Judge Schatz has retired . . . this court declines to request an appointment for Judge Schatz from the Judicial Council. Based on Judge Schatz's communications to the court, I am satisfied that he is not available for further reassignments.

AG 3021. The case was returned to Judge Ahern who eventually considered and denied the motion to modify the verdict. AG 11672-74.

On May 10, 1993, John Duby, an employee of Thomas Lundy, who represented Petitioner before the Court of Appeal, received a telephone call from Ms. Schatz. In that call, Ms. Schatz acknowledged writing and signing the recusal

letter without Judge Schatz's knowledge. She told Mr. Duby that Judge Edwards had pressured her to influence her husband to retire and had indicated that Judge Schatz's income would be higher by collecting his retirement, which turned out not to be true. Ms. Schatz also suggested that the fact that her son was being tried on narcotics charges was also used by Judge Edwards and the District Attorney's Office to pressure Judge Schatz to resign. AG 12737-54.

On May 12, 1993, Petitioner requested an *in camera* hearing based on the additional information that Ms. Schatz related to Mr. Lundy's office. Once again, despite a substantial showing of malfeasance on the part of the District Attorney and/or the Superior Court bench, Judge Ahern refused to hold a hearing or to consider the evidence prior to his ruling on the 190.4(e) motion. He also reiterated his order that there must be no contact with Ms. Schatz by defense counsel. AG 3067 and 3098-3100; AG 11744-64.

On June 5, 1993, Petitioner moved to disqualify Judge Ahern and the entire Superior Court bench from participating in any aspect of the resentencing of Petitioner. AG 3091-108.

On June 16, 1993, Judge Robert Foley, who was at that time the presiding judge, and Judge Ahern both issued orders that did not merely deny the motion for disqualification but ordered it to be stricken, AG 3115-16. The motion was struck on the ground that none of the judges were personally served pursuant to Code of Civil Procedure section 170.3(c)(1).

71

On July 22, 1993, Judge Ahern denied the 190.4(e) motion, finding that the aggravating circumstances outweighed the mitigating circumstances, and that the jury's death verdict was supported by the evidence. He then imposed the judgment of death. CT 3004, AG 3130.

### B. The Misconduct by the Prosecution and the Judicial Officials Denied Petitioner the Due Process of Law and Requires Setting Aside the Death Sentence

Due process of law requires fundamental fairness, i.e., a fair trial in a fair tribunal. *Turner v. State of Louisiana*, 379 U.S. 466 (1965). Both fairness from the prosecution and fairness from the judiciary are critical components of this due process guarantee of fundamental fairness, especially in a capital case. See, *Berger v. United States*, 295 U.S. 75 (1935); *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997); and *Woodson v. North Carolina*, 428 U.S. 280 (1976).

The Ninth Circuit has noted the critical rule of a fair judge:

> The selection of a judge to preside at a criminal trial is a matter of considerable significance to the criminal defendant. . . . While a defendant has no right to any particular procedure for the selection of the judge -- that being a matter of judicial administration committed to the sound discretion of the court -- he is entitled to have that decision made in a manner free from bias or the desire to influence the outcome of the proceedings. While the judicial officer making the assignment decision may do so for almost any reason, however efficient or intelligent, he may not do so for an impermissible reason. Even the broadest discretion is capable of abuse if exercised in a manner that impairs rights guaranteed by the constitution. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986) (prosecution may not exercise right to peremptory challenges in such a way as to systematically exclude blacks from juries).

*Cruz v. Abbate*, 812 F.2d 571, 573-74 (9th Cir. 1987).

Here, the misconduct of the prosecution in combination with the errors of the Superior Court denied Petitioner his constitutional right to a tribunal not selected by the prosecution. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982) (noting that the Supreme Court "repeatedly has recognized [that] due process demands impartiality on the part of those who function in judicial or quasi-judicial capacities"). The Tenth Circuit has held that allowing the prosecutor to select the assignment of a judge to a particular case "raises substantial due process concerns." *United States v. Pearson*, 203 F.3d 1243, 1257 (10th Cir. 2000).

By ignoring the ruling of the Court of Appeal and never providing Petitioner or Judge Schatz an opportunity to determine his ability to hear the case, the prosecution and the Santa Clara court system evaded their constitutional responsibilities and improperly forced the removal of Judge Schatz from Petitioner's case on remand in contradiction to the guarantee of due process of law.

The California Supreme Court has made clear in the cases that have been remanded for new 190.4(e) hearings, the "correct procedure wherever possible" is to have the judge who tried the case to personally consider the matter upon remand. *People v. Brown*, 45 Cal.3d 1247, 1264 n. 7 (1988). The Court of Appeal had ordered that the "trial judge should rehear the motion personally" if available. *People v. Crew*, 1 Cal.App.4th at 1610.

Petitioner has presented a colorable claim that the documents relied on by the

court in determining Judge Schatz's unavailability were forged (which Judge Ahern himself acknowledged), and that Judge Schatz was ready, willing and able to accept an appointment to hear the 190.4(e) motion, but had been improperly prevented from doing so as a result of a campaign orchestrated by the District Attorney's office and pressure from the Santa Clara bench. While Judge Edwards unilaterally decided not to seek appointment of Judge Schatz after his retirement, it is routine for retired judge to return to handle matters in capital cases throughout California. In this instance, by handling this matter "behind closed doors" without Petitioner's access to a full and fair hearing, the prosecution and the court denied Petitioner his due process rights in determining whether Judge Schatz was able to handle the motion on remand. As late as April 10, 192, Judge Schatz was fully capable of presiding in this and all other cases.

The Superior Court's involvement in pressuring Judge Schatz to be removed, impeding efforts to determine Judge Schatz's availability, and then imposing a death judgment, was in excess of the court's jurisdiction and violated Petitioner's right to due process under the federal Constitution.

Where there has been an appellate decision in a case, "the trial court is reinvested with jurisdiction of the cause, but only such jurisdiction as is defined by the terms of the remittitur. The trial court is empowered to act only in accordance with the direction of the reviewing court; action which does not conform to those directions is void." *Hampton v. Superior Court*, 38 Cal.2d 652, 655 (1952).

74

The Court of Appeal ordered that the "trial judge should rehear the motion personally, on the basis of the record certified to this court. If, however, he is unavailable, the motion may be heard before another judge of the same court." *People v. Crew*, 1 Cal.App.4th at 1610. Yet, the judges of the Superior Court acted contrary to the Court of Appeal's mandate by preventing Judge Schatz who was otherwise available, from hearing the matter.

The trial judge was available, but was coerced from the bench. Petitioner was prevented from establishing his availability or whether he was improperly removed. In the absence of a credible finding that Judge Schatz was not available to handle Petitioner's resentencing, this Court must find that Judge Ahern, the substitute judge, lacked jurisdiction to hear and decide the 190.4(e) motion, thereby violating Petitioner's right to due process of law under the federal constitution and this deprived him of a state-created liberty interest. *Hicks v. Oklahoma*, 447 U.S. 343 (1980).

The 190.4(e) procedure ensures that death verdicts imposed by juries are reliable and not arbitrary and capricious. The refusal of the Santa Clara Superior Court to permit Petitioner to establish Judge Schatz's availability and/or the pattern of conduct by the court and the District Attorney's Office alleged herein which resulted in the removal of the trial judge and the replacement by a substitute judge who denied the 190.4(e) motion and imposed death violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to due process, equal

75

protection, to a fair trial, to a jury trial, to confront and cross-examine witnesses, and to a reliable, non-arbitrary and individualized sentencing determination.

The combined conduct of the District Attorney's Office and Superior Court bench in pressuring Judge Schatz to retire and/or preventing Petitioner from discovering and presenting facts relevant to Judge Schatz's availability arbitrarily deprived Petitioner of his state-created liberty interest in having the trial judge, when available, hear upon remand the 190.4(e) motion in violation of Petitioner's statutory rights, and his federal constitutional rights.

Not only is a defendant entitled to the due process guaranteed by the federal constitution, a state court's misapplication of its capital sentencing statute implicates the Fourteenth Amendment right to due process, where there has been a deprivation of a state-created liberty interest. *Hicks v. Oklahoma*, 447 U.S. 343.


Penal Code Section 190.4 subdivision (e) created that state right:

In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to Subdivision 7 of Section 11[81]. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reason for his finding. The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes.

The unmistakable mandatory character of these statutory provisions,

outlining a review of the jury's verdict that is automatic, creates an expectation protected by the Due Process Clause that the presiding trial judge will safeguard defendants from jury verdicts not based on law or fact. Fundamental fairness requires that this statutorily guaranteed judicial review of a capital jury's verdict truly serve as the safeguard intended rather than a mere rubber stamp approval of the jury's actions.

The substitute judge who denied the motion and pronounced the sentence of death in Petitioner's case had no familiarity with the circumstances of the case other than what he read in the transcripts and the appellate court opinion (which improperly conducted its own weighing of the factors). Despite this lack of familiarity, he chose to ignore the implicit and explicit findings of the judge who had presided throughout the entire penalty phase trial and to opine on the validity of the jury's verdict in a vacuum. This result is contrary to the rights guaranteed by the state sentencing statute and the federal constitutional requirement for a reliable, individualized, non-arbitrary and non-capricious sentence.

The actions of the District Attorney's office constitute prosecutorial misconduct that so infected the proceedings with unfairness as to violate Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to due process, equal protection, to a fair trial, to a jury trial, to confront and cross-examine witnesses, and to a reliable, non-arbitrary and individualized sentencing determination.

77

The actions of the members of the Superior Court bench alleged herein constitute judicial misconduct in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to due process, equal protection, to a fair trial, to a jury trial, to confront and cross-examine witnesses, and to a reliable, non-arbitrary and individualized sentencing determination.

The removal of Judge Schatz through the actions of the District Attorney's Office and/or the Superior Court bench is akin to the unconstitutional removal of a holdout juror who refused to accede to the majority's determination of guilt. *See United States v. Thomas,* 116 F.3d 606 (2nd Cir. 1997); *United States v. Hernandez*, 862 F.2d 17 (2nd Cir. 1988).

The Superior Court compounded the errors by failing to allow a meaningful inquiry to determine whether Judge Schatz was available to hear Petitioner's 190.4(e) motion and if not, whether he was improperly removed and whether the prosecutor or members of the bench were complicit in his improper removal.

There was a substantial likelihood that Judge Schatz was removed because of his inclination to rule against the State and again reduce the death sentence to life without possibility of parole. *United States v. Brown*, 823 F.2d 591 (D.C.Cir. 1987).

The improper and unconstitutional actions by the District Attorney's Office and the Superior Court bench were prejudicial. Judge Schatz was ready, willing and able to hear Petitioner's resentencing upon remand from the appellate court,

78

and had scheduled the hearing for May 1, 1992. In view of Judge Schatz's stated

findings that the aggravating factors in Petitioner's case were outweighed by the

mitigating factors, it is virtually certain that he intended to grant the 190.4(e)

motion and sentence Petitioner to life without possibility of parole. But for the

actions of the District Attorney's Office and the Superior Court bench, Judge

Schatz would have been available to resentence Petitioner and Petitioner would not

have been sentenced to death.

Because Petitioner has presented a colorable claim for relief and was denied

at every turn in state court the opportunity to obtain discovery, including being

ordered not to contact key witnesses, and for an evidentiary hearing, this Court

must grant an evidentiary hearing on this claim. The state should not be able to

obtain the result desired – having an alternative judge hear the matter on remand –

through the devious means when the appellate court had rejected their arguments

prior to remand.

**Claim 46:** **THE REFUSAL OF THE STATE COURTS TO ORDER DISCLOSURE TO PETITIONER OF THE FORMER PROSECUTOR'S COMMENTS VIOLATED PETITIONER'S RIGHTS TO DUE PROCESS**

On October 12, 2005, a reference hearing was ordered at which a Santa Clara

Superior Court judge would take evidence and make findings of fact relating to

Petitioner's ineffective assistance of counsel claim. On December 14, 2005, the

California Supreme Court appointed Hon. Brian Walsh to preside over the

reference hearing.

On March 22, 2006, Judge Walsh recused himself from presiding over the reference hearing, stating that he had been the object of "an inadvertent disclosure concerning this case." Reporter's Transcript of Proceedings, March 22, 2006, Petition for Review, Supreme Court No. S143693, Attachment A., AG 16765-68. Judge Walsh went on to state that, "[a] Judge of our court made statements to me about this case and then I learned from him that while a deputy district attorney several years ago, he had some involvement with the prosecution of the case. As the result of this disclosure here, I believe the interest of justice would be furthered by my recusal from this case." *Id*.

On March 27, 2006, counsel for Petitioner requested that Judge Walsh disclose the basis for the disqualification and provide the parties an opportunity to waive the disqualification, as provided by California Code of Civil Procedure, section 170.1, *et seq*. In a letter dated April 26, 2006, Judge Walsh denied Petitioner's request. AG 16770.

A petition for a writ of mandate seeking to vacate Judge Walsh's order of disqualification was denied by the Court of Appeal, Sixth Appellate District. AG 16772. A petition for review was denied by the California Supreme Court. AG 16774.

On September 13, 2006, the California Supreme Court vacated the order appointing Judge Walsh and appointed Hon. Andrea Y. Bryan as referee. Petitioner

filed a motion with the Referee that sought discovery of the information provided by the ex-prosecutor/judge that resulted in Judge Walsh's recusal.

The Referee denied the motion, even though she agreed that Petitioner's contention that he was entitled to this information under the principles of *Brady v. Maryland,* 373 U.S. 83, "has some merit."  Order, Mar. 26, 2007, at 2, AG 17215. As the Referee put it: "If the disclosure (which was of such significance that it caused Judge Walsh to recuse himself) was in substance favorable to the accused, then it probably also rises to the level of *Brady* material and should be disclosed to Petitioner."  *Id*.  The Referee found, however, that *Brady's* due process requirements are "self-executing" and because there was no "voluntary disclosure" by either Judge Walsh or the judge who gave him the information that resulted in recusal, "we must conclude that the information was not *Brady* material."  *Id*.

The California Supreme Court has held that discovery is available in habeas corpus proceedings once an order to show cause has issued.  *In re Scott*, 29 Cal.4th 783, 814 (2003); *In re Avena*, 12 Cal.4th 694 (1996).  The statutory authority for discovery in habeas proceedings is conferred by Penal Code section 1484, which provides that after the issuance of an order to show cause, the court has the "full power and authority to require and compel the attendance of witnesses, by process of subpoena and attachment, and to do and perform all other acts and things necessary to a full and fair hearing and a determination of the case."  The judge presiding over the reference hearing, therefore, has "the power to order discovery

81

when requested by a party . . . once the order to show cause has issued and discovery jurisdiction has been conferred." *Board of Prison Terms v. Superior Court,* 130 Cal.App.4th 1212, 1242 (2005).

Once a state determines that a postconviction petitioner is entitled to discovery under Penal Code section 1484, the petitioner's due process rights have been violated if the procedure for access to that information is inadequate. "[I]f a State establishes postconviction proceedings, these proceedings must comport with due process." *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 293 (1998) (Stevens, J., concurring and dissenting).

The United States Supreme Court has held, "[i]n the typical case where a defendant makes only a general request for exculpatory material under *Brady* [] it is the State that decides which information must be disclosed." *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987). The Court in *Ritchie* explained that the prosecutor's decision on disclosure is final, "*unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention.*" *Id*. (footnote omitted) (emphasis added). Petitioner did not make a general request for exculpatory material under *Brady*, and was not asking to "sift through information held by the government to determine materiality." *United States v. Lucas*, 841 F.3d 796, 807 (9th Cir. 2016). It bears repeating that the referee found that the "If the disclosure (which was of such significance that it caused Judge Walsh to recuse himself) was in substance favorable to the accused,

82

then it probably also rises to the level of *Brady* material and should be disclosed to Petitioner." AG 17215. Clearly, then, Petitioner has met the threshold for materiality and the decision whether or not to disclose the evidence is out of the prosecution's hand. The state court's determination to the contrary is an unreasonable interpretation of clearly established federal law. 28 U.S.C. § 2254(d)(1).

The judge who was presiding over the reference hearing had a conversation with a fellow judge, a former deputy district attorney who was involved in the prosecution of Petitioner at trial. The information provided by the former prosecutor was deemed so significant that the hearing judge determined that he must recuse himself in the interest of justice. In such a situation, where a prosecutor – or former prosecutor – is in possession of information that is relevant to Petitioner's ability to obtain post-conviction relief, due process demands that the information be disclosed.

Petitioner is entitled to an evidentiary hearing on this claim. He has pursued his claim with diligence, by seeking discovery and a hearing, but has been consistently denied the means to develop the facts in state court. And he has alleged a colorable claim for relief, namely, that he has been denied due process by the refusal of the state courts to determine whether the information imparted to Judge Walsh was exculpatory evidence that should have been disclosed to the defense.

**CONCLUSION**

For the foregoing reasons, Petitioner requests the Court grant an evidentiary hearing on the listed claims.

Dated:  March 19, 2021         /s/_____

Andrew Parnes

/s/_____

Evan Young
Attorneys for Petitioner
Mark Christopher Crew

CERTIFICATE OF ELECTRONIC FILING AND SERVICE

I HEREBY CERTIFY that on March 19, 2021, the foregoing Petitioner's

Motion for Evidentiary Hearing  was electronically filed with the Clerk of the

Court, and the following person was served electronically, using the CM/ECF

system:

Alice Lustre
Deputy Attorney General
Alice.Lustre@doj.ca.gov


/s/
Andrew Parnes
Attorney for Petitioner

EXHIBIT 1

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, ) | No. |
| ) | |
| Plaintiff, Appellant, and Respondent ) | (Related Pending |
| ) | Petition for Review |
| ) | No. S025032) |
| ) | |
| v. ) | Crim. H006959 |
| ) | |
| ) | (Santa Clara Co. |
| ) | Superior Court |
| ) | No. 101400) |
| MARK CREW, ) | |
| ) | |
| Defendant, Respondent, and Appellant. ) | |
| ) | |

**NOTICE OF MOTION FOR REMAND TO A DIFFERENT TRIAL JUDGE
AND TO REQUEST JUDICIAL NOTICE**

TO THE HONORABLE MALCOM M. LUCAS, CHIEF JUSTICE, AND TO THE

HONORABLE ASSOCIATE JUSTICES OF THE CALIFORNIA SUPREME COURT:

Notice is hereby given that the People will move to request

the Court to direct that the new hearing pursuant to Pen. Code

section 190.4, subdivision (e), ordered by the Sixth District Court

of Appeal in <u>People v. Crew</u> (1991) ___ Cal.App.4th ___,

2 Cal.Rptr.2d 755, be remanded to a trial judge other than the

Honorable John Schatz, Judge of the Superior Court.  This motion is

made pursuant to Code of Civil Procedure section 170.1, subdivision

(c) as well as the Court's inherent authority to direct that a new

judge conduct resentencing on remand.

1

The People also respectfully request this Court to take judicial notice of the following matters pursuant to Evidence Code section 452: 1) the record of People v. Crew, Case No. H006959, in the Sixth District Court of Appeal (a copy of the court of appeal's opinion is attached hereto as Exhibit 1); 2) the petition for writ of habeas corpus in In re David Allen Raley, No. S025138, filed with this Court on February 11, 1992 (a copy of the pertinent portions of the petition is attached hereto as Exhibit 2); 3) an eleven-page San Jose Mercury News' West magazine story about this case, dated April 23, 1989, and entitled "Charmed to Death" (a copy of which is attached hereto as Exhibit 3); 4) a San Jose Mercury News article about the jury verdict in this case, dated October 11, 1989, and entitled "Jury: Execute Killer" (a copy of which is attached hereto as Exhibit 4); 5) an article in The Recorder about the People's appeal, dated October 16, 1991, entitled "Santa Clara DA's Office Prepares To Argue Rejected Death Verdict" (a copy of which is attached hereto as Exhibit 5); 6) an article in The Recorder reporting the result of the People's appeal, dated December 24, 1991, and entitled "Sixth District Remands Rejection of Death Verdict" (a copy of which is attached hereto as Exhibit 6); 7) a San Jose Mercury News article about the result of the People's appeal, dated December 24, 1991, entitled "Wife killer to be resentenced, may face death" (a copy of which is attached hereto as Exhibit 7); 8) an article in The Recorder dated January 16, 1992, and entitled "Santa Clara Judge Schatz Faces Competency Probe" (a copy of which is attached hereto as Exhibit 8); 9) a San

2

Jose Mercury News article dated January 24, 1992, and entitled "Investigation probes judge's competence" (attached hereto as Exhibit 9); and 10) a San Jose Mercury News article dated January 25, 1992, and entitled "Judge Schatz to take medical leave" (a copy of which is attached hereto as Exhibit 10).

The People's motion will be based on the attached memorandum of points and authorities, the items subject to judicial notice, and further briefing and oral argument as may be required by the Court.

DATED:  February 23, 1992.


Respectfully submitted,

GEORGE W. KENNEDY, DISTRICT ATTORNEY


By: _____
THANG NGUYEN BARRETT
DEPUTY DISTRICT ATTORNEY

Attorneys for the People

3

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>    Plaintiff, Appellant, and Respondent<br><br><br><br>            v.<br><br><br><br>MARK CREW,<br><br>    Defendant, Respondent, and Appellant. | No.<br><br>(Related Pending<br>    Petition for Review<br>    No. S025032)<br><br>Crim. H006959<br>(Santa Clara Co.<br>Superior Court<br>No. 101400) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR REMAND TO A DIFFERENT TRIAL JUDGE AND TO REQUEST JUDICIAL NOTICE

### STATEMENT OF THE ISSUES

1.  Judicial notice of the requested items is appropriate as these items are directly relevant to this motion and are within the permissive scope of judicial notice.

2.  The Court has the authority to remand before a different judge pursuant to Code of Civil Procedure section 170.1, subdivision (c) as well as pursuant to the Court's inherent authority to direct that a new judge conduct resentencing on remand.

3.  Remand to a different trial judge is warranted because the original trial court in this case failed to adhere to statutory and case law instructions.

4. Remand to a different trial court is warranted because a person aware of the facts might reasonably entertain a doubt that the original judge would be able to be impartial.

5. A different judge could fairly and competently reweigh the evidence in this case.

## STATEMENT OF THE CASE

On July 26, 1989, Mark Christopher Crew (defendant) was convicted by a jury of the first degree murder of Nancy Jo Andrade Crew (Pen. Code, section 187.) A special circumstance allegation was found true: that the murder was intentional and was carried out by defendant for financial gain. The jury further found defendant guilty of grand theft (Pen. Code, section 487).

On August 10, 1989, the jury fixed the penalty at death. On February 23, 1990, the trial court granted defendant's automatic motion for modification of sentence (Pen. Code section 190.4, subdivision (e)). Accordingly, the trial court vacated the death verdict and imposed a sentence of life in prison without possibility of parole.

On March 5, 1990, the People filed a timely notice of appeal of the trial court's ruling to set aside the jury's death verdict. The People seek reversal because the trial court in ruling on the motion for modification erred as follows: 1) The trial court conducted an impermissible intercase proportionality review; 2) the trial court erred in considering evidence not before the jury; 3) the trial court's ruling was contrary to the evidence and was inconsistent with the court's stated belief beyond a reasonable

5

doubt that defendant was guilty of murdering Nancy Jo for financial gain; and 4) the trial court failed to adequately state on the record the reasons for its ruling.

Accordingly, the People requested that the court of appeal reweigh the evidence and reinstate the death verdict or, in the alternative, remand the case for a new hearing on defendant's motion for modification of sentence. Following oral argument, the court of appeal requested the parties brief the issue whether, in the event it were to remand for reconsideration of the section 190.4(e) motion, it would be appropriate for the court of appeal to direct that another judge entertain the motion. The People submitted a letter brief urging the court of appeal to remand the case to a different judge. Defendant, on the other hand, asked for same-judge remand.

On December 23, 1991, the court of appeal issued its decision vacating the penalty judgment and remanding to the same trial court for the limited purpose of redetermining the automatic modification motion. On February 4, 1992, defendant filed with this Court a petition for review of the court of appeal's decision.

In conjunction with this motion, the People have filed an answer to defendant's petition for review. The answer invites this Court to grant review for the sole purpose of determining whether this Court or the court of appeal should conduct the reweighing of the evidence, thereby foregoing a remand to the trial court.

In the alternative, the answer requests the Court to grant review for the sole purpose of retaining jurisdiction to hear this

motion. The People are filing this motion apart from their answer because the arguments in the motion require consideration of evidence outside of the record on appeal.

**STATEMENT OF FACTS**

A. <u>Facts Of The Case</u>

For purposes of this motion the People adopt the facts set forth in the opinion of the court of appeal. (Exhibit 1.)

B. <u>Facts Pertaining To This Motion</u>

The following facts are premised upon the Court granting the People's request for judicial notice of items 1 through 10.

From the beginning of the trial this case has received considerable public attention through both the legal and general media. While the trial was ongoing, the <u>West</u> magazine (a component of the <u>San Jose Mercury News</u>) featured an eleven-page story on the case, entitled "Charmed to Death." (Exhibit 3.) When the jury rendered its verdict imposing the death sentence, the <u>San Jose Mercury News</u> reported the event in an article entitled "Jury: Execute killer." (Exhibit 4.)

Almost two years later, interest in the case has not subsided. As the People were preparing for oral argument before the court of appeal, <u>The Recorder</u>, a bay area legal newspaper, featured a front-page article entitled "Santa Clara DA's Office Prepares to Argue Rejected Death Verdict." (Exhibit 5.) Both <u>The Recorder</u> and the <u>San Jose Mercury News</u> reported the court of appeal's decision reversing the trial court. (Exhibits 6 & 7.)

On January 16, 1992, _The Recorder_ features a front-page article entitled "Santa Clara Judge Schatz Faces Competency Probe." (Exhibit 8.) The article discussed cases heard by Judge Schatz, with specific references to the case at bar and the reversal by the court of appeal. The _San Jose Mercury News_ also ran the story on the competency probe in an article entitled "Investigation probes judge's competence." (Exhibit 9.) The _San Jose Mercury News_ article alleged that "[p]rosecutors acknowledge they don't like Schatz's rulings in at least three murder cases he handled in 1989 and 1990." Finally, on January 25, 1992, the _San Jose Mercury News_ reported that Judge Schatz would take a medical leave. (Exhibit 10.) This article referred at length to the competency probe.

On February 11, 1992, David Allen Raley, convicted of murder and sentenced to death before Judge Schatz, filed in this Court a petition for writ of habeas Corpus. (Exhibit 2, [[_Petition for Habeas Corpus_, Case No. S025138].) One of the allegations in the petition was that "Petitioner's rights under the Fifth, Sixth, Eight and Fourteenth Amendments to the United States Constitution and article I, sections 1, 7, 13, 15, 16 and 17 of the California Constitution were violated by the trial judge was not competent to conduct the trial and failed to render Petitioner a fair and impartial trial." (Exhibit 2, [_Petition for Habeas Corpus_, Case No. S025138, pp. 16-17].) Among the facts alleged to substantiate this claim, petitioner Raley refers to the reversal of Judge Schatz in _People v. Crew_. (Exhibit 2, [_Petition for Habeas Corpus_, Case No. S025138, pp. 16-17].)

8

## STATEMENT OF LAW AND ARGUMENT

### I.

### JUDICIAL NOTICE OF THE ITEMS REQUESTED IS APPROPRIATE

Evidence Code section 452 provides, in relevant part, that "[j]udicial notice may be taken of the following matters ...:  (d) Records of (1) any court of this state ...." (See Safeco Insurance Co. v. Tholen (1981) 117 Cal.App.3d 685, 696.)  Further, an appellate court may take judicial notice of newspaper articles although they were not presented in the lower court.  (People v. Jurado (1981) 115 Cal.App.3d 470, 487.)

Here, one of the primary grounds of this motion is that the notoriety of this case and the extensive publicity Judge Schatz received following the court of appeal's decision mandate a remand to a different judge in order to preserve public confidence in the impartiality of the judicial system.  Therefore, in reviewing the People's motion the Court must necessarily consider the extent and nature of the publicity concerning this case.  Also, the newspaper articles relative to Judge Schatz appeared following the court of appeal's decision and thus there was no opportunity for the People to present them to the court below.

The People respectfully request the Court to take judicial notice of items 1 through 10, as they are directly relevant to this motion and are within the permissive scope of judicial notice,

## II.
## THIS COURT SHOULD REMAND THE CASE FOR A NEW HEARING
## BEFORE A DIFFERENT TRIAL JUDGE IN THE INTEREST
## OF JUSTICE AND TO AVOID THE APPEARANCE
## OF UNFAIRNESS

A.  Introduction.

In the proceedings before the court of appeal, the People requested that the court of appeal order the section 190.4(e) motion be heard by a judge other than the Honorable John Schatz. Upon review of arguments by both parties, the court of appeal declined the People's request.  (People v. Crew (1991) ___ Cal.App.4th ___, 2 Cal.Rptr.2d 755, 766, fn. 13.)

For the reasons presented to the court of appeal, which the People will reiterate here, and in light of the publicity subsequent to the filing of the court of appeal's decision, the People respectfully request the Court to remand the case to a different trial court.

B.  This Court Has The Authority To Remand The Case To A Different Judge.

The People respectfully urge this Court to exercise its discretionary power to direct that the section 190.4(e) motion be heard by a different judge pursuant to Code of Civil Procedure section 170.1, subdivision (c) as well as the Court's inherent authority to direct that a new judge conduct resentencing on remand.

Code of Civil Procedure section 170.1, subdivision (c), enacted in 1984, provides:  "At the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be

heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court."

Independent of Code of Civil Procedure section 170.1, subdivision (c), a reviewing court has the inherent discretion to direct that a new judge resentence the defendant on remand. (See, e.g., People v. Swanson (1983) 140 Cal.App.3d 571, 574, ["the record raises the distinct possibility the judge based his sentence choice on his subjective belief about the length of sentence he wanted to impose..." Consequently, to avoid the appearance of unfairness to appellant, we have decided to order resentencing by a different judge"]; People v. Williams (1986) 180 Cal.App.3d 57, 64-65 [relying on People v. Swanson, supra, to remand for resentencing before a different judge].)

In the specific context of the penalty phase in death penalty cases, both the United States and the California Supreme Courts have held that a court other than the original sentencing judge could constitutionally reweigh the aggravating and mitigating evidence to uphold a jury-imposed death sentence. (Clemons v. Mississippi (1990) 494 U.S. ___, 108 L.Ed.2d 725, 731; People v. Allison (1989) 48 Cal.3d 879, 911; People v. Heishman (1989) 45 Cal.3d 147, 147; People v. Lewis (1990) 50 Cal.3d 262, 287.)

C.  Remand To A Different Trial Judge Is Warranted Because Judge Schatz Failed To Adhere To Statutory And Case Law Instructions.

In People v. Williams, the court remanded for resentencing before another judge without specifying why a different judge was appropriate.  The reason for the remand itself, however, was because "[t]he sentencing transcript unequivocally demonstrates the

sentencing judge's unawareness of statutory and case law requirements in sentencing for multiple sex offenses." (People v. Williams, supra, 180 Cal.App.3d at 64.)

Similarly here, by making specific factual comparisons between the instant case and other cases he had heard, Judge Schatz did not adhere to the clear instructions from the Supreme Court prohibiting proportionality review and consideration of evidence not before the jury. (See People v. Crew, supra, ___ Cal.App.4th ___, 2 Cal.Rptr.2d at 761-765; see also People v. Lang (1990) 49 Cal.3d 991, 1044 ["Thus, quite apart from any constitutional prohibition, the trial court is prohibited by statute from considering, when ruling on the modification motion, any evidence not presented to the jury during the trial"; People v. Marshall (1990) 50 Cal.3d 907, 939 [An intercase proportionality review "by a trial court is not required; indeed, it is not authorized"].)

Judge Schatz, for example, compared the facts of this case with those of the other cases he had tried, this defendant's prior felony record and the records of the other capital defendants who were previously before the judge. Judge Schatz apparently also attached some weight to the fact that the death penalty cases he had tried were still on appeal. (see People v. Crew, ___ Cal.App.4th ___, 2 Cal.Rptr.2d at 763.) The evidence presented in Judge Schatz's prior capital cases, the felony records of the other defendants, and the appellate posture of those cases, of course, were not presented to the jury for consideration.

Further, in <u>People v. Swanson</u>, the court remanded to a different judge "to avoid the appearance of unfairness to appellant," because "the record raises the distinct possibility the [original] judge based his sentencing choice on his subjective belief about the length of sentence he wanted to impose" and because there was a possibility the original sentencing judge had reasoned "backward to justify a particular length sentence which he arbitrarily determines." (<u>People v. Swanson</u>, <u>supra</u>, 140 Cal.App.3d 571, 574.)

Here, the case similarly raises the distinct possibility that Judge Schatz based his decision on his subjective and preconceived determination to impose life without possibility of parole rather than death, regardless of the evidence. This appears to be the only explanation for Judge Schatz's action of vacating the death penalty, despite the absence of any of the traditional reasons for maintaining a check on a jury verdict; "lingering doubt" about guilt, evidence that the jury imposed the death penalty "capriciously or in a freakish manner," or a trial conducted in such a way that "'... the flames of emotion'" had sentenced a man to die.[1]

---

[1]    At the hearing on defendant's motion for modification, Judge Schatz recognized the jury as outstanding and declared that the People had proved the murder and the special circumstance beyond a reasonable doubt.  (See <u>People v. Crew</u>, <u>supra</u>, ___ Cal.App.4th ___, 2 Cal.Rptr.2d at 758, fn. 1.)

Further, Judge Schatz seemed to have concluded that imposition of the death penalty is a futile act because "every case that the court has tried in which the death penalty has been imposed is still on appeal." (See People v. Crew, supra, ___ Cal.App.4th ___, 2 Cal.Rptr.2d at 763.) If this is the case, then there exists a real issue whether Judge Schatz can disassociate himself from this personal apprehension about the death penalty.[2]

D. **Remand To A Different Trial Court Is Warranted Because A Person Aware Of The Facts Might Reasonably Entertain A Doubt That The Judge Would Be Able To Be Impartial.**

In pertinent part Code of Civil Procedure section 170.1 provides: "(a) A judge shall be disqualified if any one or more of the following is true: ... (6) For any reason (A) the judge believes his or her recusal would further the interests of justice, (B) the judge believes there is a substantial doubt as to his or her capacity to be impartial, or (C) a person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial. ...." (emphasis added.)

In United Farm Workers of America v. Superior Court (1985) 170 Cal.App.3d 97, the court interpreted subdivision (a)(6)(C) of section 170.1 as providing for disqualification when a judge's impartiality might reasonably be questioned. The statute changed

_____

[2]    Aside from the concern that Judge Schatz might harbor a subjective apprehension about the futility of imposing the death penalty, his consideration of the fact that death penalty cases he tried were still on appeal is also improper.  (cf. People v. Burgener (1990) 223 Cal.App.3d 427, 434-435 [trial court erred in considering a "most likely reversal" by the Supreme Court, the length and expense of a retrial of the penalty phase, and any future legal problems].)

previous law which had been construed to require bias in fact. The legislative purpose for the change in law is that "public perceptions of justice are not furthered when a judge who is reasonably thought to be biased in a matter hears the case." (Id. at 103.)

"The standard for disqualification provided for in subdivision (a)(6)(C) of section 170.1 is fundamentally an objective one. It represents a legislative judgment that due to the sensitivity of the question and inherent difficulties of proof as well as the importance of public confidence in the judicial system, the issue is not limited to the existence of actual bias. Rather, if a reasonable [person] would entertain doubts concerning the judge's impartiality, disqualification is mandated." (United Farm Workers of America, supra, 170 Cal.App.3d at 104.) Thus, the decision on disqualification is based upon an objective consideration of how the participation of a particular judge in a given case appears to the average person on the street. (Id. at 104; accord Leland Stanford Junior University v. Superior Court (1985) 173 Cal.App.3d 403.)

Here, the importance of public confidence in the judicial system took on an added dimension in light of the publicity regarding Judge Schatz following the reversal.[3] This case has received sustained public interest from the start of trial. The

---

[3]     It is important to note that the People do not address the merits or veracity of the allegations made against Judge Schatz. Rather, it is the impact of the publicity on public perception that is of concern to the People.

15

decision to be made is literally one of life and death. Two parents have lost a daughter and two children have lost a mother as a result of Nancy Jo's murder. From defendant's perspective, he is facing the death penalty. The stakes are high, and so is the need for the appearance of fairness and impartiality. The judge's decision at the new hearing, no matter what it will be, will undoubtedly receive extensive coverage in the media.

It is the People's belief that the appearance of fairness and impartiality can be preserved only by a remand to a different judge. If the case were remanded to Judge Schatz, his objectivity will be questioned no matter what his decision will be. For example, should Judge Schatz deny the section 190.4(e) motion on remand, the public might feel the sting of the remand and the adverse publicity concerning his competence had stripped the judge of his judicial fortitude. On the other hand, should Judge Schatz grant the section 190.4(e) motion, the public might perceive an inability or unwillingness on the judge's part to disassociate himself from the errors which warranted a remand in the first place.

## C. A Different Judge Could Fairly And Competently Reweigh The Evidence In This Case.

The only discernible concern for <u>not</u> remanding the case to a different judge would be because the new judge did not hear the evidence and observe the demeanor of the witnesses.

However, the statute and cases discussed above allowing remand to a different judge make it plain that it is not a requirement to have the same judge who had listened to the evidence do the

sentencing. Implicit in the appellate court's power to remand to a different judge is the acknowledgment that a different judge could competently and fairly make a decision based on the records.

Also, this case presents no factual conflict for the new judge to resolve, thereby negating the preference of having a judge who had first-hand observation of the evidence. Indeed, the People do not dispute the accuracy of the mitigating evidence as testified to by the witnesses. For example, the People do not dispute that defendant's parents were divorced when he was very young, that Colonel Pearce thought of defendant as an outstanding soldier, that the other witnesses believed defendant was kind and considerate towards them, or that it was expert witness Enomoto's opinion that defendant would be a valuable asset to the penal system if sentenced to life without parole.

On the other hand, defendant had presented no evidence discrediting the informant who testified about defendant's escape plans.

Thus, the new judge will not have to settle any credibility problems which may require him or her to have observed the witnesses. Rather, the new judge's function will be limited to exercising his or her independent judgment as to the weight he or she would accord to each evidence presented to the jury, and then "make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented." (Penal Code section 190.4(e).)

17

## CONCLUSION

Based on the aforementioned reasons, the People strongly believe that both parties would be more fairly and reasonably served by another judicial view of the facts, and therefore respectfully pray for a remand to a different trial judge.

DATED: February 23, 1992.


Respectfully submitted,

GEORGE W. KENNEDY, DISTRICT ATTORNEY


By: _____
    THANG NGUYEN BARRETT
    DEPUTY DISTRICT ATTORNEY

    Attorneys for the People

**EXHIBIT 1**

(Copy of the court of appeal's opinion in
People v. Crew (1991) ___ Cal.App.4th ___,
2 Cal.Rptr.2d 755)

the conversation were
by the trial court.

*of the Trial Court's
Questions From the*

contends that the trial
ling to provide an ade-
two questions asked by
deliberations. It is not
ere was error in the in-
it that the court failed to
assistance.

cts that the trial court, in
the jury, correctly de-
sed a deadly weapon" as
ay a deadly weapon in a
intentionally to use it, or
rike or hit a human being
LJIC No. 17.19.1; *People*
2) 7 Cal.3d 666, 102 Cal.
d 1024.) During delibera-
st inquired "What is the
f use in referring to using
ommission of rape?" The
to this question by refer-
he above instruction. The
ry asked: "In deffinition
deadly weapon does the
nean physically visible or
interpretation apply. If so
n." The court responded
is self explanatory" and
y again to the instruction
defining the terminology
weapon."

ding to questions from a
liberations, the trial judge
provide clarifying instruc-
ate. (*People v. Thompkins*
App.3d 244, 240 Cal.Rptr.
"[t]his does not mean the
ays elaborate on the stan-
s.... Indeed, comments
the standard are often
e v. Beardslee* (1991) 53
79 Cal.Rptr. 276, 806 P.2d

respect to the first jury
for a definition of use of a
the court's response refer-

ring the jury to the definition previously
given was entirely appropriate. Concern-
ing the second question which essentially
asked whether "displayed" meant to be
physically visible, the answer to that ques-
tion was also contained in the instruction
previously given, i.e., "to display a deadly
weapon *in a menacing manner.*" (Em-
phasis added.) Referring the jury to that
instruction was, again, entirely appropriate.
The fact that the jury found no use of a
deadly weapon in connection with the sec-
ond rape, which finding was apparently
based upon the conclusion that the victim
could not actually see the knife at that
particular time, tends to suggest that the
trial court's response in fact assisted the
jury.

We find no error in the trial court's re-
sponses to the jury.

### CONCLUSION

The judgment of conviction is affirmed.

ANDERSON, P.J., and PERLEY, J.,
concur.



---

The PEOPLE, Plaintiff and Appellant,

v.

Mark CREW, Defendant
and Respondent.

No. H006959.

Court of Appeal, Sixth District.

Dec. 23, 1991.

After jury found defendant guilty of
murder and imposed death penalty, auto-
matic defense motion to modify verdict to
one of life without possibility of parole was
granted by the Santa Clara County Superi-
or Court, No: 101400, John Schatz, J., and
People appealed. The Court of Appeal,
Capaccioli, Acting P.J., held that: (1) trial

judge impermissibly considered and relied
on facts of other capital cases with which
he had been involved in granting defense
motion, despite disclaimer by trial judge
that he only cited prior cases for purpose
of showing that they indicate that, when
death penalty had been imposed, "there
was always something in addition"; (2) tri-
al court's error in conducting intercase pro-
portionality review required remand and
reconsideration; and (3) trial judge would
be in best position to conduct requisite re-
weighing in ruling on motion on remand,
and thus, Court of Appeal declined to re-
mand matter to a different judge.

Vacated and remanded with instruc-
tions.

1. Criminal Law ⟐996(3)

Trial court stated adequate reasons on
record for granting automatic defense mo-
tion to modify jury's verdict of death to one
of life without possibility of parole in capi-
tal murder prosecution, by transcript of
trial court's statements, coupled with min-
ute order specifying reasons for modifica-
tion; court indicated in colloquy that it had
not been involved in murder case in which
there was not a body found and that court
was impressed by evidence adduced by de-
fense in connection with determining penal-
ty to be imposed and lack of prior criminal
activity. West's Ann.Cal.Penal Code
§§ 190.4, 190.4(e).

2. Criminal Law ⟐996(3)

Trial judge impermissibly considered
and relied on facts of other capital cases in
which he had been involved in granting
automatic defense motion to modify jury
verdict of death to one of life without possi-
bility of parole, despite disclaimer by trial
judge that he only cited prior cases for
purpose of showing that they indicate that,
when death penalty had been imposed,
"there was always something in addition";
trial judge compared facts of present case
with facts of other capital cases in deter-
mining whether death penalty was war-
ranted. West's Ann.Cal.Penal Code
§§ 190.4, 190.4(e).

### 3. Criminal Law ⬉996(3)

In ruling on automatic defense motion to modify jury verdict of death, "intercase proportionality review," defined as examination of whether imposition of death penalty in instant case is disproportionate to penalties imposed on other persons for similar offenses, is not factor trial court may consider. West's Ann.Cal.Penal Code §§ 190.4, 190.4(e).

> See publication Words and Phrases for other judicial constructions and definitions.

### 4. Criminal Law ⬉1134(3)

Although intercase proportionality review is not constitutionally required absent a showing that a State's capital punishment system operates in arbitrary and capricious manner, such review by state appellate courts tends to prevent arbitrary and capricious imposition of death penalty.

### 5. Criminal Law ⬉996(3)

Trial court's error in relying on other cases in granting automatic defense motion to modify jury's verdict of death was not invited by prosecution's argument on motion asking judge to look at all of his experience and decide that jury was not wrong; at most, statement reminded court to exercise its independent judgment in ruling on motion, as required by law. West's Ann.Cal.Penal Code §§ 190.4, 190.4(e).

### 6. Criminal Law ⬉996(3)

Trial court, which, in granting automatic defense motion to modify jury verdict of death, took note that one capital case which it had decided about nine or ten years previously was still on appeal, should not have given any weight or consideration to subsequent procedural histories of other capital cases in ruling on motion. West's Ann.Cal.Penal Code §§ 190.4, 190.4(e).

### 7. Criminal Law ⬉1181.5(8)

Trial court's error in conducting intercase proportionality review in granting automatic defense motion to modify jury's verdict of death to one of life without possibility of parole required remand and reconsideration. West's Ann.Cal.Penal Code §§ 190.4, 190.4(e).

### 8. Criminal Law ⬉1192

Trial judge, who committed error in granting automatic defense motion to modify jury verdict of death to one of life imprisonment without possibility of parole, would be in best position to conduct requisite reweighing in ruling on motion on remand, and thus, Court of Appeal declined to remand matter to a different judge. West's Ann.Cal.C.C.P. § 170.1(c); West's Ann.Cal.Penal Code § 190.4(e).

---

Leo Himmelsbach, Dist. Atty., David N. Davies, Asst. Dist. Atty., Thang Nguyen Barrett, Deputy Dist. Atty., for plaintiff and appellant.

Thomas Lundy, Santa Rosa, for defendant and respondent.

CAPACCIOLI, Acting Presiding Justice.

### Summary

The People appeal after the trial court granted an automatic motion to modify the jury's verdict of death to one of life without possibility of parole. (Pen.Code, § 190.4, subd. (e), hereafter, § 190.4(e).) In ruling on the motion the judge compared the facts of the present case with the facts of other capital cases he had heard in which the death penalty had been imposed. Based in part on this comparison the judge concluded the death penalty was not warranted in the present case. The People argue that this comparison, known as intercase proportionality review, was unauthorized because the facts of the other capital cases were not presented to the penalty jury herein. The People also contend the court's remaining statement of reasons for granting the motion was inadequate. As the first contention has merit we will reverse and remand so that the court may reconsider the motion based solely on the evidence presented to the penalty jury.

### Facts and Proceedings

Defendant met the victim at a bar in San Jose during the fall of 1981. After a brief affair the two separated in the winter of 1981. They reconciled in the spring of 1982 and were married in Reno in June 1982.

The marriage soon soured as defendant began to stay out late at night and frequent the bar where he had met the victim. During the first month of marriage the victim twice returned to the bar and saw defendant with a different woman each time. That same month defendant proposed marriage to a woman named Lisa, who agreed but only after her divorce was final. Defendant and the victim separated before June had passed.

Freed from the confines of marriage, defendant and his friend Richard Elander travelled to South Carolina in June 1982 to visit defendant's mother and his stepfather, Bergin Mosteller. During the trip defendant renewed his conversation (commenced in May 1982) with Elander regarding ways to kill the victim and dispose of her body so it would never be found. After arriving in South Carolina, defendant and Elander included Mosteller in their discussion.

In July 1982 the victim and a friend took their own cross-country trip. Their journey led them to South Carolina, and eventually they happened upon the town where defendant was staying. The victim telephoned defendant and the two spent the night together. This encounter persuaded the victim to reconcile with defendant by moving to South Carolina to live with him. The victim returned to California and scheduled her departure for August 1982.

Defendant returned to California in August 1982 to escort the victim to South Carolina. The ostensible itinerary called for defendant to drive the victim's pickup truck loaded with personal possessions while the victim would follow in her Corvette. Mosteller would drive the victim's horse to Texas, and Elander would fly to Texas to drive the horse to South Carolina. Mosteller would drive the victim's pickup truck to South Carolina while defendant and the victim would take a two-week belated honeymoon tour of the South in the Corvette. In order to make their initial few months in South Carolina as easy as possible, the victim would give custody of her two children to her former husband until her anticipated return to California for Christmas 1982. To finance their trip

and initial stay in South Carolina, defendant persuaded the victim to cash out her $8,000 savings account.

The real itinerary, however, called for defendant to murder the victim while en route to South Carolina and to dispose of her body so it would never be found. The victim's personal possessions would be sold and the proceeds divided. Thereafter defendant would disclaim any knowledge of the victim's whereabouts.

Mosteller departed first with the horse, but rather than driving to Texas he boarded the horse at a San Jose barn and drove to Reno. He left his car at the airport and reported it stolen to the police. He then flew back to South Carolina.

Defendant and the victim planned to leave on August 23, 1982, from the home of the victim's parents in Santa Cruz. The morning of the 23rd defendant told the victim's mother that the horse had arrived safely in Texas. That afternoon defendant telephoned Lisa (who was ignorant of the whole affair) and told her he was stuck in Stockton picking up a horse but that he would arrive soon afterward. The rest of the afternoon was spent loading the victim's vehicles. After a tearful departure the victim and defendant headed east.

That night the victim and defendant stopped in a rural area. The victim was sitting peacefully when defendant approached her from the rear, shot her in the back of the head, rolled her body down a ravine, and left her for dead.

The next day, August 24th, defendant and a friend, Bruce Gant, got drunk and returned to the site of the shooting to dispose of the body and take the Corvette. To defendant's surprise, the victim's body appeared to have moved from where he had last seen it. Defendant screamed at Gant who, thinking the victim might still be alive, strangled her and cut off her head. Defendant and Gant then buried the body in Gant's backyard.

On the 25th defendant showed up at Lisa's with the victim's pickup truck. Defendant showered her with gifts, drove her to the barn to see the victim's horse, and then stopped by Gant's house.

On the 26th defendant gave Lisa $5,000 of the victim's cash so that a friend of hers who worked at a bank could prepare a cashier's check payable to Mosteller.

Several days later defendant and Lisa departed on a cross-country trip to South Carolina. While in Texas defendant received a telephone call from Gant, who reported that the odor from the decomposing corpse was causing him some concern. As a result of his discussion with defendant, Gant eventually dug up the corpse, placed the body in a 55-gallon drum and the head in a 5-gallon paint bucket, filled them with cement, and dumped them off a bridge. Neither the drum nor the bucket was ever recovered.

While in South Carolina defendant deposited two checks made out to the victim totalling $2,075 in a joint account. Eventually defendant withdrew and spent the money. The $5,000 from the cashier's check was split among defendant, Mosteller and Elander. Defendant sold the victim's pickup truck for $3,200 and the Corvette for approximately $8,000 in cash and a trade-in. The victim's personal possessions fetched $500 to $600 at a local flea market.

The victim's parents and friends became suspicious after they became aware she was missing. After an extensive investigation, the heinous tale came to light.

The jury found defendant guilty of first degree murder. (Pen.Code, §§ 187, 189.) A special circumstance was found to be true in that defendant had intentionally committed the murder for financial gain. (Pen.Code, § 190.2, subd. (a)(1).)

The People presented no evidence at the penalty phase. Defendant called as witnesses his father, his grandmother, a family friend, a high school classmate, an Army lieutenant colonel under whom defendant had served, three correctional officers at the main jail, and an expert in the field of corrections. These witnesses testified to defendant's fine character, his background, his good behavior while incarcerated, and his probable positive contributions to the state prison system if he were allowed to live.

On rebuttal the People called a jail inmate who testified that defendant had told him of his plans to escape. After the informant reported defendant's plans to the authorities defendant threatened to kill him. The People also called a jail deputy who testified that the inmate was a reliable informant.

The jury found that the aggravating factors outweighed the mitigating factors and imposed the death penalty. (Pen.Code, § 190.3.)

The court, however, concluded that the mitigating factors outweighed the aggravating factors and hence granted the section 190.4(e) motion.[1]

---

1. The following colloquy encompasses the court's statement of reasons given at the hearing on the section 190.4(e) motion.

"THE COURT: ... In connection with the case, Mr. Davies [the prosecutor] is quite right. I had not had any experience in a murder case where there was not a body that the court's—whether there was some proof of it, by virtue of the deceased being found. And when I came into the case, that did bother me.

"However, that tended to fade as Mr. Davies went forward with the evidence and ultimately convinced the court beyond a reasonable doubt the defendant did willfully, unlawfully kill the deceased. That he did so for a financial gain and that the special circumstance is true.

"........................

"In connection with the court's experience relative to special circumstance—special circumstance cases, in the cases that the court had ruled on before—and when I first came into this superior court, it was with a murder case to be

tried. Young man who had killed six people, random killing. And the jury in that case returned a death penalty verdict. And the court upheld that verdict. And I do believe that the death penalty is a proper penalty in certain cases. I don't think it is a penalty that should be imposed in every case.

"But I have great confidence in the jurors. And I think in this county particularly, we've had jurors who are outstanding. And I think we had a jury in this case that the jurors were outstanding in every respect.

"During the course of going over these cases, one of the cases that I tried a number of years ago came to my attention. A defendant who had raped and killed the wife of a friend of his, stabbing her some twenty-one times. The jury in that case imposed the death penalty. The court agreed with the penalty. What was of interest to me at this juncture was that that has been some nine or ten years ago and that case is still on appeal. And every case that the court

ound defendant guilty of first
er.  (Pen.Code, §§ 187, 189.)
cumstance was found to be
defendant had intentionally
e murder for financial gain.
190.2, subd. (a)(1).)

presented no evidence at the
e. Defendant called as wit-
:her, his grandmother, a fami-
gh school classmate, an Army
lonel under whom defendant
three correctional officers at
and an expert in the field of
These witnesses testified to
character, his background,
avior while incarcerated, and
positive contributions to the
system if he were allowed to

the People called a jail in-
tified that defendant had told
s to escape. After the infor-
defendant's plans to the au-
ndant threatened to kill him.
lso called a jail deputy who
the inmate was a reliable

ound that the aggravating
ighed the mitigating factors
he death penalty. (Pen.Code,

however, concluded that the
tors outweighed the aggra-
and hence granted the sec-
otion.[1]

man who had killed six people,
. And the jury in that case re-
penalty verdict. And the court
rdict. And I do believe that the
is a proper penalty in certain
think it is a penalty that should
every case.

great confidence in the jurors.
this county particularly, we've
are outstanding. And I think
in this case that the jurors were
every respect.

course of going over these cases,
s that I tried a number of years
y attention. A defendant who
killed the wife of a friend of his,
me twenty-one times. The jury
posed the death penalty. The
/ith the penalty. What was of
t this juncture was that that has
or ten years ago and that case is
And every case that the court

The minute order reflecting the court's decision stated: "The Court, having sentenced the defendant in the above-entitled cause, sets down the following reasons for its ruling: [¶] 1) a lack of any prior criminal activity involving violence or the threat to use force or violence; [¶] 2) the absence of any prior felony conviction; [¶] 3) the defendant's background; [¶] 4) the defendant's interpersonal relationships; [¶] 5) the defendant's custodial conduct; and [¶]

has tried in which the death penalty has been imposed is still on appeal.

"Another case that was really an execution type, robbery case of a liquor store, with three employees in the liquor store, were forced in the back room and made to lie face down, and the defendant fired three shots. Under the grace of God, only one person was killed out of the three shots. Each [of] those cases, there has been something more than there was in this case.

"In the Caro case, for example, Caro shot and killed two young people. They were cousins. Mr. Caro had previously been convicted of a rape, I believe there was a kidnapping, perhaps both, and served a term thereafter. He committed the crimes of which he was convicted here, and the jury imposed the death penalty, and the court agreed.

"I only cite those cases for the purposes that they do indicate to me, at least in those cases where the death penalty has been imposed in other cases, there was always something in addition. And only once during the course of sitting as a judge in these cases have I found the verdict of a jury to be unacceptable, and the court instead of imposing the death penalty, imposed life in prison without possibility of parole. But that was for totally different reasons than exist or are present in the case here.

"And I think the reasons that have been presented by counsel are particularly unique to this case. I wanted to mention that I was certainly impressed by the defense's presentation in the penalty phase.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"As I was saying, that the penalty phase, I was impressed by the evidence that was ad[d]uced by the defense in connection with determining the penalty to be imposed. And counsel indicated in his pleadings that evidence in mitigation, the lack of prior criminal activity involved or threatening the use of violence. And I don't recall having had a case where that was absent in a murder case. The absence of a prior felony conviction. And that has not been consistent. Some cases, couple of cases it was true. In most cases, it wasn't a factor. And the defendant's background is certainly a factor in this case.

"And the defendant's interspousal—

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"Interpersonal relationships.

6) the testimony of Jerry Enomoto, an expert witness regarding the Department of Corrections".

## Analysis

**[1]** We are unpersuaded by the People's initial contention that the court failed to state adequate reasons on the record for granting the section 190.4(e) motion. The above-quoted transcript of the trial court's

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"And the court received some letters mostly from people who had already testified in the case.

"Did you see those, Mr. Davies?

"MR. DAVIES: I did, Your Honor. I don't know—I don't know if its proper to consider them at this stage, if they didn't testify. But I have decided not to make any objection to them.

"THE COURT: As I hadn't reviewed them with any particular aspect to find out what they wanted to say or what they did say, because they had, most of them, as far as I can see at a glance, had testified at trial; isn't that correct?

"MR. MOREHEAD: That is correct.

"MR. DAVIES: Most of them had, Your Honor.

"THE COURT: One that I wanted to indicate in the record, was a letter from Mr. Crew's former wife, which was a letter indicating that the former wife's views, which were, as far as I was concerned, in favor of Mr. Crew's receiving something other than the death penalty. I do agree in this case, and I grant the defendant's motion in arrest of judgment. And the court sets aside the death penalty that was returned by the jury and imposes a sentence of life imprisonment without possibility of parole.

"And the court is mindful of the jurors that spent their time and efforts, and I meant no disrespect for those jurors because I thought they were outstanding, and I would be happy to have them as jurors in any case.

"However, after review of the mitigating circumstances and aggravating circumstances, the court has concluded that the mitigating circumstances outweighs the aggravating circumstances. And the court is prepared to proceed with the sentencing of the defendant.

"Counsel is in a position to proceed?

"MR. MOREHEAD: Yes, Your Honor. We're ready to proceed. We thank the court.

"MR. DAVIES: Your Honor, the court had indicated you were granting the motion in arrest of judgment. I think the court misspoke. Is that—there was a motion in arrest of judgment. The court denied that.

"THE COURT: Oh, thank you. Thank you.

"MR. DAVIES: This would be the automatic motion to modify the verdict under 190.4.

"THE COURT: That was the court's intention."

statements, coupled with the minute order specifying reasons for the modification of the death verdict, comply with the requirement in section 190.4(e) that "[t]he judge shall state on the record the reasons for his findings." While greater detail in trial court rulings is almost always beneficial to an appellate court, here the trial court's explanation why the mitigating factors outweighed the aggravating factors is "sufficient 'to assure thoughtful and effective appellate review.' [Citation.]" (*People v. Rodriguez* (1986) 42 Cal.3d 730, 794, 230 Cal.Rptr. 667, 726 P.2d 113; accord *People v. Hernandez* (1988) 47 Cal.3d 315, 373, 253 Cal.Rptr. 199, 763 P.2d 1289; *People v. Bonillas* (1989) 48 Cal.3d 757, 801, 257 Cal.Rptr. 895, 771 P.2d 844; *People v. Burgener* (1990) 223 Cal.App.3d 427, 434, 272 Cal.Rptr. 830.) Therefore we see no error in this respect.

[2] We are, however, persuaded by the People's principal argument that the trial judge erred by considering and relying on the facts of other capital cases with which he had been involved in deciding the section 190.4(e) motion.[2]

The trial judge's function in ruling on a section 190.4(e) motion is "independently to reweigh the evidence of aggravating and mitigating circumstances and then to determine whether, in the judge's independent judgment, *the weight of the evidence supports the jury verdict.* [Citations.]" (*People v. Lang* (1989) 49 Cal.3d 991, 1044–1045, 264 Cal.Rptr. 386, 782 P.2d 627, original emphasis.)[3] In fulfilling its duty under section 190.4(e), the trial court's review of the evidence is limited to that which was presented to the penalty jury. (§ 190.4, subd. (e); *People v. Jennings* (1988) 46 Cal.3d 963, 994–995, 251 Cal.Rptr. 278, 760 P.2d 475; accord *People v. Lang, supra,* 49 Cal.3d 991, 1044, 264 Cal.Rptr. 386, 782 P.2d 627; *People v. Marshall, supra,* 50 Cal.3d 907, 942, 269 Cal.Rptr. 269, 790 P.2d 676.) Thus, the specific statutory requirement that the jury weigh the aggravating and mitigating factors in considering the

---

2. Section 190.4(e) provides: "In every case in which the trier of fact has returned a verdict or finding imposing the death penalty, the defendant shall be deemed to have made an application for modification of such verdict or finding pursuant to subdivision 7 of Section 11[81]. In ruling on the application, the judge shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings.

"The judge shall set forth the reasons for his ruling on the application and direct that they be entered on the Clerk's minutes. The denial of the modification of the death penalty verdict pursuant to subdivision (7) of Section 1181 shall be reviewed on the defendant's automatic appeal pursuant to subdivision (b) of Section 1239. The granting of the application shall be reviewed on the People's appeal pursuant to [section 1238, subdivision (a) [ ] (6)." (Bracketed material added, see *People v. Rodriguez, supra,* 42 Cal.3d 730, 790, 792, fns. 23 and 25, 230 Cal.Rptr. 667, 726 P.2d 113 [noting draftperson's errors]; *People v. Bonillas, supra,* 48 Cal.3d 757, 799, fn. 13, 257 Cal.Rptr. 895, 771 P.2d 844 [using brackets to correct errors].)

3. Stated another way, "the trial judge is required by section 190.4(e) to 'make an independent

determination whether imposition of the death penalty upon the defendant is proper in light of the relevant evidence and the applicable law.' [Citations.] That is to say, he must determine whether the jury's decision that death is appropriate under all the circumstances is adequately supported. [Citation.] And he must make that determination independently, i.e., in accordance with the weight he himself believes the evidence deserves. [Citation.]" (*People v. Marshall* (1990) 50 Cal.3d 907, 942, 269 Cal.Rptr. 269, 790 P.2d 676.)

This standard mirrors the long-established trial court standard of review of new trial motions based on insufficiency of the evidence. (See *People v. Allison* (1989) 48 Cal.3d 879, 913–916, 258 Cal.Rptr. 208, 771 P.2d 1294 (conc. op. of Kaufman, J.) and *People v. Frierson* (1979) 25 Cal.3d 142, 193, fn. 7, 158 Cal.Rptr. 281, 599 P.2d 587 (conc. op. of Mosk, J.) [construing similar provision of 1977 death penalty law], cited with approval in *People v. Lang, supra,* 49 Cal.3d 991, 1045, 264 Cal.Rptr. 386, 782 P.2d 627 and *People v. Marshall, supra,* 50 Cal.3d 907, 942, 269 Cal.Rptr. 269, 790 P.2d 676; compare Pen.Code, § 190.4, subd. (e) [trial court to determine "whether the jury's findings and verdicts . . . are contrary to law or the evidence presented"], with Pen.Code, § 1181, subd. 7 [court may grant new trial or reduce punishment selected by the jury in lieu of granting a new trial "[w]hen the verdict or finding is contrary to law or evidence . . ."].)

appropriate penalty restricts the parties to presenting evidence that bears on one or more of those factors, which are set forth in section 190.3.[4] (*People v. Boyd* (1985) 38 Cal.3d 762, 772, 215 Cal.Rptr. 1, 700 P.2d 782; *People v. Thompson* (1988) 45 Cal.3d 86, 123, 246 Cal.Rptr. 245, 753 P.2d 37; but see *Boyde v. California* (1990) 494 U.S. 370, ——, 110 S.Ct. 1190, 1198–1199, 108 L.Ed.2d 316, 329–330 [holding that evidence of a capital defendant's background, character, and post-crime good prison behavior is relevant to penalty determination, and that former CALJIC No. 8.84.1(k) did not preclude consideration of such evidence].)

[3] Intercase proportionality review, which has been defined as "an examination of whether imposition of the death penalty in this case is disproportionate to the penalties imposed on other persons for similar offenses" (*People v. Lang, supra,* 49 Cal.3d 991, 1043, 264 Cal.Rptr. 386, 782 P.2d 627; *Pulley v. Harris* (1984) 465 U.S. 37, 43–44, 104 S.Ct. 871, 875–876, 79 L.Ed.2d 29 [stating similar definition and rejecting claim that such review was required under 1977 California death penalty law]), is not one of the factors set forth in section 190.3. It follows that the trial court should not have considered the facts of other capital cases to support its decision to grant the section 190.4(e) motion.

This conclusion is fully supported by the decisions of the California Supreme Court holding that intercase proportionality review is neither required nor authorized under California law. (See, e.g., *People v. Lang, supra,* 49 Cal.3d 991, 1043, 264 Cal. Rptr. 386, 782 P.2d 627, citing *People v. Allen* (1986) 42 Cal.3d 1222, 1285–1288, 232 Cal.Rptr. 849, 729 P.2d 115 [equal protection does not require "disparate sentence" review of death sentences under Pen.Code, § 1170, subd. (f) ]; *People v. Marshall, supra,* 50 Cal.3d 907, 939, fn. 8, 269 Cal.Rptr. 269, 790 P.2d 676 [trial court is "without authority to rule on the issue" of intercase disproportionality; thus preferred evidence was irrelevant]; *People v. Morris* (1991) 53 Cal.3d 152, 234, 279 Cal.Rptr. 720, 807 P.2d 949 ["defendant is not entitled to comparative intercase review of his sentence, whether based on statistics or on an examination of those cases in which arguably more serious murders received lesser sentences...."]; *People v. Wharton* (1991) 53 Cal.3d 522, 603, 280 Cal.Rptr. 631, 809 P.2d 290 [summary rejection of claim]; but cf. *People v. Jennings, supra,* 46 Cal.3d 963, 995, 251 Cal.Rptr. 278, 760 P.2d 475 [federal and state constitutions obligate the California Supreme Court "to set aside the penalty in any case in which it is aberrant or appears to have been imposed in an arbitrary or capricious manner"]; *People v. Hamilton* (1989) 48 Cal.3d 1142, 1187, 259 Cal.Rptr. 701, 774 P.2d 730 ["the California Constitution (art, I, § 17) prohibits imposition of a punishment disproportionate to

---

4. Section 190.3 provides in relevant part:

"In determining the penalty, the trier of fact shall take into account any of the following factors if relevant:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication.

"(i) The age of the defendant at the time of the crime.

"(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

the defendant's *individual* culpability ... [but] [i]n view of defendant's calculated murder of his pregnant wife by shotgun, for reasons of personal gain, his sentence cannot be deemed disproportionate by any applicable standard...."] (Original emphasis.) accord *People v. Bacigalupo* (1991) — Cal.3d —, —, 2 Cal.Rptr.2d 335, 820 P.2d 559.)

[4] The United States Supreme Court has also refused to require intercase proportionality review absent a showing that a state's "'capital punishment system operates in an arbitrary and capricious manner, ...'" (*Lewis v. Jeffers* (1990) 497 U.S. —, —, 110 S.Ct. 3092, 3102, 111 L.Ed.2d 606, 622, quoting *McClesky v. Kemp* (1987) 481 U.S. 279, 306–307, 107 S.Ct. 1756, 1774–1775, 95 L.Ed.2d 262; accord *Blystone v. Pennsylvania* (1990) 494 U.S. 299, 308–309, 110 S.Ct. 1078, 1084–1085, 108 L.Ed.2d 255, 265–266.)[5] The Supreme Court has also rejected challenges to both the 1977 California death penalty law (*Pulley v. Harris, supra*, 465 U.S. 37, 51–53, 104 S.Ct. 871, 879–881, 79 L.Ed.2d 29) and 1978 California death penalty law (*Boyde v. California, supra*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316; *California v. Brown* (1987) 479 U.S. 538, 541–543,

107 S.Ct. 837, 839–840, 93 L.Ed.2d 934). Consequently, the California Supreme Court takes it as given that our state capital punishment system does not operate in an arbitrary or capricious manner. (*People v. Morris, supra*, 53 Cal.3d 152, 234, 279 Cal.Rptr. 720, 807 P.2d 949.)

[5] The foregoing authorities establish that intercase proportionality review is neither required nor authorized in California capital cases. The trial court, though, conducted such a review by comparing the facts of the present case with the facts of other capital cases in determining whether the death penalty was warranted herein.[6] After reviewing the facts from these other cases, the court stated: "I only cite these cases for the purposes that they do indicate to me, at least in those cases where the death penalty has been imposed in other cases, there was always something in addition." Although the court ostensibly disclaimed reliance on the facts of these other cases in ruling on the section 190.4(e) motion, and the minute order was silent on the point, the judge's remarks at the hearing reveal that he actually placed great reliance on the facts of these other cases, which to him seemed to disclose "something in addition".[7] The court's substantial

---

5. The United States Supreme Court has noted, though, that most state capital punishment statutes "require the reviewing court, to some extent at least, to determine whether, considering both the crime and the defendant, the sentence is disproportionate to that imposed in similar cases. Not every State has adopted such a procedure. In some States, such as Florida, the appellate court performs proportionality review despite the absence of a statutory requirement; in others, such as California and Texas, it does not." (*Pulley v. Harris, supra*, 465 U.S. 37, 44, 104 S.Ct. 871, 876, 79 L.Ed.2d 29.)

Although intercase proportionality review is not required absent a showing that a state's capital punishment system operates in an arbitrary and capricious manner, the Supreme Court has indicated that such review by state appellate courts tends to prevent arbitrary and capricious imposition of the death penalty. (Cf. *McCleskey v. Kemp, supra*, 481 U.S. 279, 306, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 [implicitly approving use of proportionality review by a state supreme court on appeal]; *Walton v. Arizona* (1990) 497 U.S. —, —, 110 S.Ct. 3047, 3058–3059, 111 L.Ed.2d 511, 529–530 [same]; *Clemons v. Mississippi* (1990) 494 U.S. 738, —,

110 S.Ct. 1441, 1448–1449, 108 L.Ed.2d 725, 738–739 [proportionality review by state appellate courts is factor favoring rule allowing harmless error analysis where appellate court invalidates one of two or more aggravating circumstances].)

6. We reject defendant's contention that the People invited this error by when, during argument on the motion, the prosecutor stated: "And I think you can look at this record, your honor, and over all your experience of many years, you could see that within that framework of statute, that the jury was not wrong." At most this statement reminded the court to exercise its independent judgment in ruling on the motion, as required by law. It did not invite the trial court to undertake an intercase proportionality review.

7. Consequently, we cannot agree with defendant's assertion that the trial court's lengthy discussion of these other cases was merely prefatory to its reconsideration of the aggravating and mitigating factors, and thus, that no error occurred. The colloquy at the hearing on the motion makes clear that the trial court took the

reliance on the facts of these other cases in ruling on the section 190.4(e) motion was unauthorized and therefore erroneous.

Defendant, though, proposes that a trial judge necessarily and reasonably draws on his or her experiences in capital and non-capital cases in assessing whether a jury's death verdict in a given case is justified. By drawing on these experiences, that is, by engaging in a sort of de facto intercase proportionality review, a trial judge serves as a check on the arbitrary and capricious imposition of the death penalty. Thus, posits defendant, a trial judge cannot err by relying on his or her experiences in ruling on a section 190.4(e) motion. .

There is a certain superficial allure to this argument, particularly since we think it is hardly reasonable to assume or even expect that a trial judge will be able to put his or her experiences with other cases completely out of mind in assessing whether a verdict of death should be modified. The argument loses its lustre, however, when its premise is expanded to permit the trial court to consider and rely on the actual facts of these other cases when evaluating the jury's penalty determination. Under California law, as we explained above, the trial judge is limited to reweighing the evidence presented to the penalty jury.

[6] The People also observe correctly that the trial court should not have given any weight or consideration to the subsequent procedural histories of these other capital cases in ruling on the section 190.-4(e) motion. In its ruling from the bench

the judge took particular note that one capital case he presided over "some nine or ten years ago ... is still on appeal. And every case that the court has tried in which the death penalty has been imposed is still on appeal." The facts related to the subsequent procedural histories of these cases, like the facts of the cases themselves, were not presented to the penalty jury, and should not have been considered by the trial court in ruling on the section 190.4(e) motion. (People v. Burgener, supra, 223 Cal.App.3d 427, 434, 272 Cal.Rptr. 830 [error for trial court ruling on a section 190.-4(e) motion to consider "1) the possibility the jury could not, as it was instructed, ignore the successfully objected-to evidence at the trial, 2) a 'most likely' reversal by the Supreme Court, and 3) the length and expense of a retrial of the penalty phase."].) These facts are irrelevant in any event as they have no tendency to prove or disprove one of the statutory aggravating or mitigating factors.

[7] Turning now to the issue whether these errors require reversal, the parties note that the Supreme Court has not had occasion to specify a test for prejudice where error occurs in connection with the granting of a section 190.4(e) motion.[8] In the one reported case where such error occurred, People v. Burgener, supra, 223 Cal.App.3d 427, 435, 272 Cal.Rptr. 830, the court of appeal declined to specify a test, concluding that the trial court's consideration of factors not presented to the penalty jury "was not harmless under any standard as to the People."[9]

facts of these other cases into account in ruling on the section 190.4(e) motion, even though the subsequent minute order was silent on the point. (People v. Gonzalez (1990) 51 Cal.3d 1179, 1239, 275 Cal.Rptr. 729, 800 P.2d 1159 [where conflict between minute order and oral statement on record the latter controls].) Therefore the statutory (Evid.Code, § 664) and judicial presumptions (People v. Lang, supra, 49 Cal.3d 991, 1044, 264 Cal.Rptr. 386, 782 P.2d 627) that a judge performed his duties in accordance with law are inapposite as they are rebutted by the record.

8. Where no error occurs, the Supreme Court independently reviews the ruling on the section 190.4(e) motion. This standard was specified recently in People v. Mickey (1991) 54 Cal.3d

612, 704, 286 Cal.Rptr. 801, 818 P.2d 84, where Justice Mosk wrote: "On appeal, we subject a ruling on such an application to independent review: the decision resolves a mixed question of law and fact; a determination of this kind is generally examined de novo (see generally People v. Louis, supra, 42 Cal.3d [969] at pp. 984–988 [232 Cal.Rptr. 110, 728 P.2d 180].) Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty." (Accord People v. Ashmus (1991) 54 Cal.3d 932, 1006–1007, 2 Cal.Rptr.2d 112, 820 P.2d 214.)

9. Despite its reluctance to specify a controlling standard of review, the Burgener court's conclusion that "there is a reasonable probability that

Although the Supreme Court has not specified a test of prejudice where error occurs in the granting of a section 190.4(e) motion, it has provided some guidance recently by specifying the test of prejudice where the trial court errs by considering improper evidence before *denying* a section 190.4(e) motion. The Court has adopted a standard that reviews such error "under the so-called 'reasonable possibility' test— i.e., is there a reasonable possibility that the error affected the decision?" (*People v. Benson* (1990) 52 Cal.3d 754, 812, 276 Cal.Rptr. 827, 802 P.2d 330, citing *People v. Ramirez* (1990) 50 Cal.3d 1158, 1202, 270 Cal.Rptr. 286, 791 P.2d 965; *People v. Frierson* (1991) 53 Cal.3d 730, 751–752, 280 Cal.Rptr. 440, 808 P.2d 1197.) This reasonable possibility test appears to be based on the *Chapman* harmless error test, under which federal constitutional error will not be deemed harmless unless it is harmless beyond a reasonable doubt.[10] (See *People v. Heishman* (1988) 45 Cal.3d 147, 201, 246 Cal.Rptr. 673, 753 P.2d 629 [arguendo application of *Chapman* test using "reasonable possibility" language].)

Defendant proposes this test applies as well to assessing whether error in the granting of a section 190.4(e) motion was prejudicial.[11] Applying the test, he contends there is not a reasonable possibility that the trial judge's consideration of the improper factors in the present case affected the outcome. In support of this position the court's determination would have been different absent such error" (*People v. Burgener, supra,* 223 Cal.App.3d at p. 435, 272 Cal.Rptr. 830) suggests that the court applied the *Watson* test for prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243.)

defendant relies on Supreme Court cases holding that the trial court's consideration of improper information or evidence in ruling on a section 190.4(e) motion was harmless error. The most typical errors include consideration of the probation report (*People v. Adcox* (1988) 47 Cal.3d 207, 272, 253 Cal.Rptr. 55, 763 P.2d 906; *People v. Lang, supra,* 49 Cal.3d 991, 1042–1045, 264 Cal. Rptr. 386, 782 P.2d 627; *People v. Ramirez, supra,* 50 Cal.3d 1158, 1201–1202, 270 Cal.Rptr. 286, 791 P.2d 965; *People v. Douglas* (1990) 50 Cal.3d 468, 539–540, 268 Cal.Rptr. 126, 788 P.2d 640; *People v. Whitt* (1990) 51 Cal.3d 620, 659–661, 274 Cal.Rptr. 252, 798 P.2d 849; *People v. Medina* (1990) 51 Cal.3d 870, 912, 274 Cal.Rptr. 849, 799 P.2d 1282; *People v. Gonzalez, supra,* 51 Cal.3d 1179, 1237–1239, 275 Cal. Rptr. 729, 800 P.2d 1159; *People v. Benson, supra,* 52 Cal.3d 754, 811–813, 276 Cal.Rptr. 827, 802 P.2d 330), consideration of victim impact evidence (*People v. Jennings, supra,* 46 Cal.3d 963, 994–995, 251 Cal.Rptr. 278, 760 P.2d 475; *People v. Frank* (1990) 51 Cal.3d 718, 742, 274 Cal. Rptr. 372, 798 P.2d 1215; *People v. Benson* (1990) 52 Cal.3d 754, 811–813, 276 Cal.Rptr. 827, 802 P.2d 330; but see *Payne v. Tennessee* (1991) 501 U.S. ——, ——, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720, 736 [victim impact evidence not barred per se by Eighth Amendment] *People v. Edwards* (1991) 54 Cal.3d 787, 835–836, 1 Cal.Rptr.2d 696, 819 P.2d 436 [victim impact evidence admissible under Pen.Code, § 190.3, subd.

---

**10.** *Chapman v. California* (1966) 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705. In *Chapman,* the Court equated the two tests: "There is little, if any, difference between our statement in *Fahy v. Connecticut* [ (1963) 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171] about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (386 U.S. at p. 24, 87 S.Ct. at p. 828, brackets added.)

**11.** We question defendant's assumption that the People are entitled to a reversal upon showing that there is a reasonable possibility that an error may have affected the decision to grant the motion. Unlike *Chapman* and its progeny, the error here is not of constitutional dimension as to the People, and a less exacting standard of review usually applies to a People's appeal from an order granting a reduction of punishment in lieu of granting a new trial motion. (Cf. *People v. Sheran* (1957) 49 Cal.2d 101, 109, 315 P.2d 5 [specifying the People's burden for obtaining reversal of order reducing class of crime based on insufficiency of the evidence], cited with approval in *People v. Moore* (1960) 53 Cal.2d 451, 454, 2 Cal.Rptr. 6, 348 P.2d 584 [punishment reduction case]; but see cases cited in footnote 8, *ante.,* in which Supreme Court implied that more exacting independent review applies to *all* rulings on section 190.4(e) motions.)

n Supreme Court cases
rial court's consideration
nation or evidence in rul-
90.4(e) motion was harm-
ost typical errors include
ie probation report (Peo-
) 47 Cal.3d 207, 272, 253
'.2d 906; People v. Lang,
991, 1042–1045, 264 Cal.
.2d 627; People v. Ra-
Cal.3d 1158, 1201–1202,
791 P.2d 965; People v.
Cal.3d 468, 539–540, 268
8 P.2d 640; People v.
Cal.3d 262, 269–661, 274
P.2d 849; People v. Med-
d 870, 912, 274 Cal.Rptr.
2; People v. Gonzalez,
179, 1237–1239, 275 Cal.
d 1159; People v. Ben-
.3d 754, 811–813, 276
P.2d 330), consideration
vidence (People v. Jen-
Cal.3d 963, 994–995, 251
0. P.2d 475; People v.
Cal.3d 718, 742, 274 Cal.
l 1215; People v. Benson
4, 811–813, 276 Cal.Rptr.
but see Payne v. Ten-
J.S. ——, ——, 111 S.Ct.
.Ed.2d 720, 736 [victim
not barred per se by
it] People v. Edwards
7, 835–836, 1 Cal.Rptr.2d
[victim impact evidence
Pen.Code, § 190.3, subd.

ndant's assumption that the
to a reversal upon showing
sonable possibility that an
ected the decision to grant
: Chapman and its progeny,
of constitutional dimension
d a less exacting standard of
es to a People's appeal from
reduction of punishment in
w trial motion. (Cf. People
Cal.2d 101, 109, 315 P.2d 5
ple's burden for obtaining
ducing class of crime based
the evidence], cited with
v. Moore (1960) 53 Cal.2d
r. 6, 348 P.2d 584 [punish-
e]; but see cases cited in
which Supreme Court im-
acting independent review
gs on section 190.4(e) mo-

(a) ]; counting the absence of a mitigating factor as an aggravating factor, in violation of *People v. Davenport* (1985) 41 Cal.3d 247, 288–290, 221 Cal.Rptr. 794, 710 P.2d 861 (*People v. Brown* (1988) 46 Cal.3d 432, 456, 462, 250 Cal.Rptr. 604, 758 P.2d 1135; *People v. Karis* (1988) 46 Cal.3d 612, 651–652, 250 Cal.Rptr. 659, 758 P.2d 1189; *People v. Adcox, supra,* 47 Cal.3d at p. 272, 253 Cal.Rptr. 55, 763 P.2d 906; *People v. Hamilton* (1989) 48 Cal.3d 1142, 1186–1187, 259 Cal.Rptr. 701, 774 P.2d 730; *People v. Whitt, supra,* 51 Cal.3d 620, 660, 274 Cal. Rptr. 252, 798 P.2d 849; *People v. Marshall, supra,* 50 Cal.3d 907, 944–945, 269 Cal.Rptr. 269, 790 P.2d 676; *People v. Kaurish* (1990) 52 Cal.3d 648, 716–718, 276 Cal.Rptr. 788, 802 P.2d 278; *People v. Daniels* (1991) 52 Cal.3d 815, 892–893, 277 Cal. Rptr. 122, 802 P.2d 906), or failing to state any reasons for denying the motion (*People v. Heishman, supra,* 45 Cal.3d 147, 199–203, 246 Cal.Rptr. 673, 753 P.2d 629; *People v. Hernandez, supra,* 47 Cal.3d 315, 371–374, 253 Cal.Rptr. 199, 763 P.2d 1289; *People v. Allison* (1989) 48 Cal.3d 879, 909–912, 258 Cal.Rptr. 208, 771 P.2d 1294).

It is true that in each of these cases any error was deemed harmless. These cases are distinguishable, however. In *Benson, Douglas, Frank, Gonzalez, Jennings, Karis, Lang, Marshall, Medina, Ramirez,* and *Whitt* the Supreme Court concluded the record established the trial court placed little if any reliance on the improper material. In *Adcox, Allison, Brown, Daniels, Hamilton, Heishman, Hernandez,* and *Kaurish,* the Supreme Court concluded that any error was ameliorated because the aggravating factors substantially outweighed the mitigating factors.

In the present case, by contrast, the trial court extensively relied on improper considerations, and it cannot be said that the mitigating factors substantially outweighed the aggravating factors, if they outweighed them at all.[12] After discussing in general terms the circumstances of defendant's crime, and in fact concluding that the prosecution had proven the first-degree

murder with special circumstances true beyond a reasonable doubt, the court turned its focus to the facts of the other capital cases to assess whether the death penalty was warranted. In concluding these facts disclosed "something in addition", the court implicitly reduced the weight of the principal aggravating factor in this case, namely, "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found true...." (§ 190.3.) By essentially disregarding the callous and gruesome nature of the victim's execution, the court not only reduced the principal aggravating factor to a virtual nullity, but also necessarily increased the weight accorded the mitigating evidence.

[8] Since the trial court relied on the improper information and the mitigating factors do not substantially outweigh the aggravating factors, this case does not appear to be susceptible to the type of harmless error analysis conducted by the Supreme Court in the aforecited cases. In fact, when faced with similar circumstances, the Supreme Court has indicated the correct procedure is to remand the case for the limited purpose of having the trial judge reconsider the section 190.4(e) motion without reference to the improper information. (*People v. Lewis* (1990) 50 Cal.3d 262, 287, 266 Cal.Rptr. 834, 786 P.2d 892 [remand due to trial judge's reliance on probation report containing "prejudicial information about defendant's juvenile record and prior involvement in a homicide"].) The Court has also followed this course when the trial judge failed to state any reason for denying the motion (*People v. Sheldon* (1989) 48 Cal.3d 935, 962–963, 258 Cal.Rptr. 242, 771 P.2d 1330; *People v. Brown* (1988) 45 Cal.3d 1247, 1263, 248 Cal.Rptr. 817, 756 P.2d 204; *People v. Rodriguez, supra,* 42 Cal.3d 730, 794, 230 Cal.Rptr. 667, 726 P.2d 113; but cf. *People v. Heishman* (1988) 45 Cal.3d 147, 199–203, 246 Cal.Rptr. 673, 753 P.2d 629 [harmless error analysis undertaken despite absence of statement of reasons because judge had died and reasons

12. Indeed, a review of the cases just cited reveals that the mitigating evidence of the type

presented by defendant herein is usually accorded little weight by our high court.

were "self-evident"].) Remand for reconsideration was also ordered where the trial judge failed to make the required independent determination whether the weight of

13. At argument we requested the parties brief the issue whether, in the event we were to remand for reconsideration of the section 190.-4(e) motion, it would be appropriate for this court to direct that another judge entertain the motion, pursuant to Code of Civil Procedure section 170.1, subdivision (c), which provides: "At the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court."

We raised this issue due to a concern that the trial judge might be unable to disregard the improper factors we have identified herein. Although the cases cited in the text indicate that remand to the same judge is the preferred procedure in the case of section 190.4(e) error, it does not appear that these decisions had occasion to consider, let alone reject, application of Code of Civil Procedure section 170.1, subdivision (c), which was added in 1984. Consequently, we do not believe these cases *require* remand to the same trial judge where "the interests of justice" suggest that a different judge should hear the motion. (*In re Tartar* (1959) 52 Cal.2d 250, 258, 339 P.2d 553 [cases are not authority for propositions not considered]; accord *People v. Dillon* (1983) 34 Cal.3d 441, 473–474, 194 Cal.Rptr. 390, 668 P.2d 697; cf. *People v. Lewis, supra,* 50 Cal.3d 262, 287, 266 Cal.Rptr. 834, 786 P.2d 892, [§ 190.4(e) motion need not be heard by the same judge on remand]; *Clemons v. Mississippi, supra,* 494 U.S. 738, ——, 110 S.Ct. 1441, 1447, 108 L.Ed.2d 725, 736–737 [Eighth Amendment does not require, after a finding of error, that reweighing of aggravating and mitigating factors be conducted by original sentencing jury or judge].)

The People request that we order the motion be heard by a different judge pursuant to Code of Civil Procedure section 170.1, subdivision (c) as well as our inherent authority to direct that a new judge conduct resentencing on remand. (See, e.g., *People v. Swanson* (1983) 140 Cal. App.3d 571, 574, 189 Cal.Rptr. 547 [remand to different judge for resentencing because original sentencing judge appeared to have arbitrarily selected sentence]; *People v. Williams* (1986) 180 Cal.App.3d 57, 64–65, 225 Cal.Rptr. 498 [remand to different judge because of numerous sentencing errors].) The People propose that the trial judge's reliance on the improper factors "raises the distinct possibility" that the trial judge "based his decision on his subjective and preconceived determination to impose life without possibility of parole rather than death, regardless of the evidence." The People also argue that the appearance of fairness can be pre-

the evidence supported the jury's penalty determination. (*People v. Rodriguez, supra,* 42 Cal.3d at pp. 793–794, 230 Cal.Rptr. 667, 726 P.2d 113.)[13] We believe a like

served only by remand to a different judge. Should the same judge deny the motion on remand, the argument proceeds, "defendant might feel the sting of the remand had stripped the judge of his judicial fortitude." Should the same judge grant the motion, "the People and the victim's family might perceive an inability or unwillingness on the judge's part to disassociate himself from the errors which warranted a remand in the first place."

Defendant responds that in every case remanded for reconsideration of the section 190.-4(e) motion, the higher court has indicated that the same trial judge should hear the motion if possible. Defendant, recognizing that these cases have not expressly stated any reason for same-judge remand, infers that it has been ordered because the judge who was present at the guilt and penalty phases would be in the best position to assess the credibility and weight of the evidence presented to the jury, and thus, to decide again the section 190.4(e) motion. Defendant also contends that judicial economy favors same-judge remand. Finally, defendant argues that the trial judge herein indicated neither "an animus inconsistent with judicial objectivity" or "a whimsical disregard" of his duties under section 190.4(e) so as to justify remand to a different judge under Code of Civil Procedure section 170.1, subdivision (c). (See *People v. Gulbrandsen* (1989) 209 Cal.App.3d 1547, 1562, 258 Cal.Rptr. 75.)

Upon review of these arguments we decline to exercise our power to direct that the motion be heard by a different judge. We agree with the *Gulbrandsen* court that "the statutory power of appellate courts to disqualify sentencing judges should be used sparingly and only where the interests of justice require it." (*People v. Gulbrandsen, supra,* 209 Cal.App.3d 1547, 1562, 258 Cal.Rptr. 75.) On the record before us we cannot accept the People's assertion that the trial judge based his determination to modify the death verdict on his subjective and preconceived view as to the appropriate penalty regardless of the evidence. Rather, as we have explained above, the judge's determination appears based more on his extensive reliance on improper extraneous matters. Furthermore, remand to a different judge is not warranted due simply to the possibility that one side or the other may feel unfairly treated. The same possibility exists whenever a case is remanded for resentencing, yet the courts have routinely declined to require a different judge to conduct resentencing except in extraordinary circumstances. (*People v. Hunter* (1986) 184 Cal.App.3d 1531, 1537, 229 Cal.Rptr. 330 [remand to same judge despite sentencing errors]; *People v. Bobb* (1989) 207 Cal.App.3d 88, 98, 254 Cal.Rptr. 707

**RIES**

upported the jury's penalty
(*People v. Rodriguez,* su-
at pp. 793–794, 230 Cal.Rptr.
113.) [13] We believe a like

remand to a different judge.
ne judge deny the motion on
argument proceeds, "defendant
ting of the remand had stripped
judicial fortitude." Should the
int the motion, "the People and
nily might perceive an inability
s on the judge's part to disasso-
om the errors which warranted a
first place."

sponds that in every case re-
consideration of the section 190.-
higher court has indicated that
udge should hear the motion if
ndant, recognizing that these
expressly stated any reason for
and, infers that it has been or-
he judge who was present at the
ty phases would be in the best
ss the credibility and weight of
sented to the jury, and thus, to
e section 190.4(e) motion. De-
itends that judicial economy fa-
remand. Finally, defendant ar-
al judge herein indicated neither
onsistent with judicial obstinacy
nsical disregard" of his duties
0.4(e) so as to justify remand to
under Code of Civil Procedure
ubdivision (c). (See *People v.*
89) 209 Cal.App.3d 1547, 1562,
.)

f these arguments we decline to
ver to direct that the motion be
rent judge. We agree with the
rt that "the statutory power of
to disqualify sentencing judges
sparingly and only where the
ce require it." (*People v. Gul-*
209 Cal.App.3d 1547, 1562, 258
n the record before us we can-
'eople's assertion that the trial
determination to modify the
his subjective and preconceived
ppropriate penalty regardless of
Rather, as we have explained
's determination appears based
ctensive reliance on improper
ers. Furthermore, remand to a
s not warranted due simply to
nat one side or the other may
ated. The same possibility ex-
case is remanded for resentenc-
rts have routinely declined to
nt judge to conduct resentenc-
extraordinary circumstances.
r (1986) 184 Cal.App.3d 1531,
tr. 330 [remand to same judge
ng errors]; *People v. Bobb*
op.3d 88, 98, 254 Cal.Rptr. 707

result should obtain here, particularly since
there is no indication in the record that the
trial judge is unavailable to hear the mo-
tion.

*Disposition*

The penalty judgment is vacated and the
cause remanded to the trial court for the
limited purpose of redetermining the auto-
matic modification motion pursuant to sec-
tion 190.4(e). If the trial court, upon appli-
cation of the appropriate standards, denies
the motion, it shall reinstate the judgment
of death. If it grants the application, it
shall enter a judgment of life without possi-
bility of parole. The trial judge should
rehear the motion personally, on the basis
of the record certified to this court. If,
however, he is unavailable, the motion may
be heard before another judge of the same
court. (*People v. Lewis, supra,* 50 Cal.3d
262, 287, 266 Cal.Rptr. 834, 786 P.2d 892;
*People v. Sheldon, supra,* 48 Cal.3d 935,
963, 258 Cal.Rptr. 242, 771 P.2d 1330; *Peo-
ple v. Brown, supra,* 45 Cal.3d 1247, 1264,
fn. 7, 248 Cal.Rptr. 817, 756 P.2d 204.)

PREMO and BAMATTRE-
MANOUKIAN, JJ., concur.



[same]; *People v. Gulbrandsen, supra,* 209 Cal.
App.3d 1547, 1563, 258 Cal.Rptr. 75 [same]; but
see *People v. Kaanehe* (1977) 19 Cal.3d 1, 12–13,
15, 136 Cal.Rptr. 409, 559 P.2d 1028 [prosecutor
argued extensively for upper term in violation
of plea bargain agreement to withhold argu-
ment; remand to different judge since it was
unlikely "that any judge, however objective and
disciplined he may be, can wholly remove from
consideration the matters improperly communi-
cated to him by the prosecutor"]; *People v. Stanley* (1984) 161
Cal.App.3d 144, 156, 207 Cal.Rptr. 258 [remand
to different judge for resentencing ordered after
original judge improperly relied on highly ad-
verse and unreliable "sexual abuse team" re-
port].) We also agree with defendant that the
trial judge is in the best position to conduct the
requisite reweighing under section 190.4(e), and
that this seems to be the most likely reason why
the Supreme Court has specified that same-

Frances R. OJEDA, a minor, by
Concepcion M. Ojeda, Guardian
of her Estate, Plaintiff,

v.

SHARP CABRILLO HOSPITAL,
Defendant.

The Medical Quality Foundation, a
Virginia Corporation, Movant
and Appellant.

No. D012726.

Court of Appeal, Fourth District,
Division 1.

Dec. 23, 1991.

Medical malpractice action was
brought. Upon settlement, plaintiff ap-
plied for order approving compromise, in-
cluding payment of attorney fees, cost re-
imbursements, and fees to medical-legal
consulting service retained to assist coun-
sel. The Superior Court, San Diego Coun-
ty, No. 596019, Ross G. Tharp, J., declined
to allow payment to consulting service,
finding that contingency fee contract was
unlawful, unethical, and contrary to public
policy, and consulting service appealed.
The Court of Appeal, Wiener, J., held that:
(1) contingent fee contract with consulting
service was not per se invalid, but (2) what
plaintiff paid in attorney fees, fees to con-
sulting service, and separately identified

judge remand is the preferred disposition.
Therefore we decline to remand the matter to a
different judge.

We note, however, that if the trial judge be-
lieves that he may be unable to disregard the
improper factors identified herein in fulfilling
his duties under section 190.4(e) motion, he
retains the power to disqualify himself under
Code of Civil Procedure section 170.1, subdivi-
sion (a)(6), which provides in part that a judge
shall be disqualified if "[f]or any reason (A) the
judge believes his or her recusal would further
the interests of justice, (B) the judge believes
there is a substantial doubt as to his or her
capacity to be impartial, or (C) a person aware
of the facts might reasonably entertain a doubt
that the judge would be able to be impartial."
(See also *People v. Charles* (1967) 66 Cal.2d 330,
338, fn. 12, 57 Cal.Rptr. 745, 425 P.2d 545;
*People v. Vanbuskirk* (1976) 61 Cal.App.3d 395,
407, fn. 9, 132 Cal.Rptr. 30.)

**EXHIBIT 2**

(Pages 16-17 of petition for writ of habeas corpus
in In re David Allen Raley, No. S025138, filed
with this Court on February 11, 1992)

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re DAVID ALLEN RALEY,

   Petitioner

On Habeas Corpus.

No._____

(Related Pending
 Appeal No. S005870)

(Santa Clara Superior
 Court No. 99021)

PETITION FOR WRIT OF HABEAS CORPUS

DORON WEINBERG
DENISE KENDALL
LAW OFFICES OF DORON WEINBERG
523 Octavia Street
San Francisco, CA  94102
Telephone (415) 431-3472

Attorneys for Petitioner
DAVID ALLEN RALEY

Fourteenth Amendments to the United States Constitution and
article I, sections 1, 7, 13, 15, 16 and 17 of the California
Constitution were violated by the jurors consideration of
information not in evidence and legal principles not provided by
the court.  The following facts in addition to those to be
presented after full investigation and discovery support this
claim:

A.  During jury deliberations several members of the jury
informed the other jurors of their understanding of the law that
if Petitioner were sentenced to life in prison without
possibility of parole, that sentence nevertheless could make him
eligible for parole and that only a death sentence would prevent
Petitioner's release from custody.  (Exhibit E.)

B.  Members of the jury openly and extensively discussed
Petitioner's failure to testify and repeatedly emphasized that
this failure could be a basis for imposing a death verdict and in
fact made a death sentence more appropriate than a sentence of
life in prison without possibility  of parole.  (Ibid.)

C.  The jurors were thus exposed to extraneous information
and improper considerations that were not admissible as evidence
nor appropriate statements of the law which violated Petitioner's
right to cross-examination, confrontation, the effective
assistance of counsel, due process, sentencing reliability and
the right to a fair and impartial jury.

### XII.

Petitioner's rights under the Fifth, Sixth, Eighth and
Fourteenth Amendments to the United States Constitution and

article I, sections 1, 7, 13, 15, 16 and 17 of the California Constitution were violated because the trial judge was not competent to conduct the trial and failed to render Petitioner a fair and impartial trial. The following facts in addition to those to be presented after full investigation and discovery support this claim:

A. In January 1992 the presiding judge of the Santa Clara County Superior Court initiated an investigation into the competency of Judge John Schatz, the judge who conducted Petitioner's trial. In February of 1992 Judge Schatz began a thirty-day paid medical leave.

B. The competency investigation was initiated based on complaints by prosecution and defense trial attorneys who had appeared before Judge Schatz. Complaints included conduct by the judge wherein he unwittingly repeated himself, failed to put crucial information on the record and made bizarre rulings that contradicted standard practice. In one case the judge attempted to reduce a second-degree murder conviction to legally invalid "misdemeanor" finding. Most notably the Sixth District Court of Appeal vacated the penalty judgement in the capital case of People v. Crew ((1991) 91 C.D.O.S. 10115) because Judge Schatz had reversed the finding of the jury in the modification motion pursuant to Penal Code section 190.4(e) by considering and relying on information outside the record.

C. In the present case Judge Schatz also ruled upon the Petitioner's motion for modification of the judgment after considering and relying on information outside the record

17

**EXHIBIT 3**

(Copy of an eleven-page <u>San Jose Mercury News</u>' <u>West</u> magazine
story about this case, dated April 23, 1989, and entitled
"Charmed to Death")

Recovering from failed marriages,
**Lisa Moody** and
**Nancy Jo Andrade**
both fell under the spell of
Mark Christopher Crew's charisma.

Now the court
is trying
to find out
if one of them
was

# Charmed to Death



t the Saddle Rack,
lark Christopher Crew
ooed women with his
ivented personal history:
iles of heroism
i Vietnam and
ork for the Mafia.
ome thought he looked
ke Burt Reynolds.
ow Crew faces trial for
ie murder of one of the
omen he attracted.

**W**ITH 28,000 SQUARE FEET OF DANCE FLOORS, bandstands and bars, the Saddle Rack is the heart of the South Bay's country-and-western singles scene. Thousands pack the place every Friday and Saturday night, seeking comfort in the smoky, liquored atmosphere. The dance floor is filled with bodies lost to the comfortable rhythms and life-is-a-bitch lyrics of country music.

The Rack is especially popular with divorcees, and the crowd tends to be older than that at a disco or punk club. The uniform is cowboy boots, jeans and hats, though few have ever worn them riding the range. The Rack is their range, as they look for love but often settle for something less.

In the summer of 1981, Mark Christopher Crew was among the club's regulars. The tall, heavy-set young diesel mechanic with a soft Texas drawl had a talent for charming the pants off women. Fastidious in his cowboy boots, black jeans, white designer shirts and blue satin baseball jacket, he would draw women close to him on the dance floor, savoring their smell and the feel of their bodies. Off the dance floor, he would smother them with his attention, make them feel as if no one else existed in the world.

He developed a special fondness for divorcees, older women with the prospects of a small property settlement

or, at the least, a 280Z he could drive. Adding a half-dozen years to his age of 25, he'd inflate his personal history as well, claiming he'd been decorated in Vietnam and was a Mafia hit man. He liked to tell how he'd blown up a boat full of gangsters off Catalina Island, and the bullet holes in his '64 Cadillac were a present from the mob. People believed his stories as if their being true would add excitement to their own lives. "Charismatic" was the word women used to describe him.

**T**HE SADDLE RACK WAS THE FIRST PLACE LISA MOODY went on the July night in 1981 when she decided to end her marriage. The fresh-faced 22-year-old was hit with a dozen requests to dance, but she turned down every one. She had never been to a bar by herself and wore three sweaters—as if to hide.

Mark Christopher Crew noticed her discomfort and offered to walk her to her car so she could take off one of the sweaters.

"I won't rape you or anything," he assured her, "if that's what you're worried about."

He introduced himself as Chris Crew, and they walked out to her 280Z. When he complimented her on the car, she began to cry. Her husband had picked it out.

"God, why do all the good ones have to be married?" he said, eyes rolling heavenward.

Standing there in the parking lot, she opened up and told him everything. How she didn't want for material goods—she had diamonds, furs, a big, beautiful home with a swimming pool and a vacation home on Lake Berryessa. How despite all this she was miserable. She had realized her marriage was making her crazy.

Moody took a good look at the man who had listened so kindly. His eyes were large, blue and beautiful and his hair was black against his fair, baby skin. She thought he looked like Burt Reynolds.

Crew walked her back inside, and they danced. He told her about his truck repair business, how he was buying a house, had a boat—all the things she wanted to hear. They drove back to the house he rented with two other men not far from the Saddle Rack, on Maria Way in Campbell. A small party had gathered. Crew offered Moody a beer, then excused himself to go to the bathroom, pausing to kiss her on his way out of the room. Panicked, she left before he got back.

Two days later, she got a phone call at her house. It was Crew. He'd had to do some detective work to get her phone number, he explained. Lisa was glad to hear his voice; she hadn't stopped thinking about him since she ran out of his place. "It was kind of like Cinderella," he said. "You just took off."

A few days later, Moody decided to separate from her husband. Crew found her a divorce lawyer, became her adviser and confidant. It was months before they ever made love. When they did, the experience was so special she told her mother about it. Her husband had been the only man she'd ever known, and he had been nothing like Crew—romantic, creative, sincere. And with a seemingly insatiable appetite for sex.

Indeed, he seemed too good to be true. He didn't smoke or drink; he took her to the Los Gatos Christian Church on Sundays. He helped her move twice, rototilled her mother's yard, laid a tile floor, and put louvers on her car. Her mother wanted her to marry him.

The only time he was ever bad to her was when she showed up late one night to his house on Maria Way. She said she'd been out having a few drinks with her girlfriends after work. He became angry and slapped her hard across the face. She ran out to the garage to get into her car. "You're not going anywhere," he said, chasing after her and grabbing her by the wrist. She stayed the night.

In January 1982, he helped her move back into the house she'd been granted as part of her divorce settlement. A few weeks later, she found Crew standing on the porch. He had come to move in. After all he'd done for her, she didn't know how to turn him away.

The closeness of cohabitation caused them to fight often. Then Moody's ex-husband started harassing the couple. Sometimes he'd track them to the Saddle Rack and make a scene. He threatened that, if she didn't start dating him again, he would stop payments on the mort-

gage her mother had taken on her house to help him buy his business. Fearing her mother could lose her house, she agreed to go out with him.

Crew was furious. More than once, he had threatened to get a gun and kill her ex-husband, but this time he left his things behind and virtually disappeared. If he had started seeing someone else, Lisa was too much of an emotional wreck to care.

AFTER HER DIVORCE, THE SADDLE RACK WAS THE place Nancy Jo Andrade went when staying home would have been too lonely. She always managed to have a good time at the club, thriving on the attention she got. In her blond curls and Western wear, everybody told her she looked like Barbara Mandrell.

She was 19 when she married her high school sweetheart. After two children and 10 years working full-time as a nurse at Kaiser, she was tired of the confines of her marriage. At home her husband still wanted dinner on the table and refused to let her smoke in the house. When she wanted the added challenge of emergency room nursing —it meant more school and working the night shift—he insisted she be at home with him and the kids.

They separated in 1979 and divorced in 1980. Custody of her children had been granted to Nancy Jo, but they lived with her parents in Santa Cruz during the week. Cut loose in the South Bay singles scene, it was as if she had never been married. She fell in love with a doctor who promised to leave his wife to marry her—until his wife became



Recovering from divorce, Nancy Jo Andrade went dancing at the Saddle Rack, where people told her she looked like Barbara Mandrell. She was won over by Crew's willingness to listen to her troubles.

Crew developed a special fondness for divorcees, older women with the prospects of a small property settlement or, at the least, a 280Z he could drive. He would make them feel as if no one else existed in the world. People believed his stories as if their being true would add excitement to their own lives.

pregnant. Andrade cut off the relationship. She seemed lost and distraught by her freedom. She took a Lifespring course and began talking about starting a new life and a new career.

When Mark Crew asked her to dance at the Saddle Rack in April 1982, he was not a complete stranger. They'd danced once before the previous fall. At the time she had thought him good-looking, but nothing to pursue. This time, she was taken by how easy he was to talk to. She told him about her disillusionments and her



ANTHONY POOLS
OUR POOL AND HEATED SPA
LITTLE AS $17.99 Per Month

VE WATER
ION POLICY
N for details.

## PRICE OF $17,999 INCLUDES

et of pool
of gas line.
t health
ectors up to
equipment.
simulated

✔ Building permit.
✔ Pool cleaning accessories.
✔ On-site warranties.
✔ 2 horse pump.
✔ Normal access and excavation.
✔ 6" water line tile.

✔ 380,000 BTU heater.
✔ 52 square feet Anthony filter.
✔ Up to 100 feet of electric.
✔ 3-6 feet depth.
✔ Maintenance kit.
✔ Evaporative blanket to conserve water.

*tities.* **CALL NOW** to reserve a pool for your family.

BUILDER OF 165,000 POOLS

# ANTHONY POOLS
WORLD'S LARGEST A an Anthony Industries Company

**Weekdays** 9:00am to 6:00pm; Saturday and Sunday 9:00am to 4:30pm.

play Pool, 990 S. Winchester Blvd. **(408) 244-7550** •
, Display Pool, 1251 Civic Drive, **(415) 939-1044** •
San Ramon Rd. **(415) 828-9550** • Santa Rosa 119
**(707) 523-0157** • Navato and San Rafael, **(415) 453-**
it, Livermore, Pleasanton and Hayward **(415) 828-9550**
llejo, Danville, and Antioch, **(415) 939-1044** • Sonoma
7) **523-0157** • Santa Cruz, Monterey, Hollister, Salinas,
**(408) 244-7550** • Gilroy, Morgan Hill, Hillsborough,
, Palo Alto, Los Gatos, Burlingame, Los Altos, Menlo
toga **(408) 244-7550**.

n normal soil and access. Zone charges not included. Price may vary due to local codes.
20 years at 6.95% variable; $200 down payment, 240 months.

CA License No. 190179C-53          SJ-15

Anthony Pools
905 Commercial Street
San Jose, CA 95112

one          Name_____
Phone_____
Address_____

dreams. They slept together, and she found herself swept into his orbit.

Crew talked about South Carolina, where his mother and stepfather lived. Land was cheap there, and the people were good, simple country folk. She had always dreamed of having land enough on which to raise horses. Crew proposed they move there together and buy a piece of property. He had $50,000 to invest if she wanted to contribute the $15,000 she expected from her divorce.

Not all of Andrade's friends were as impressed as she. One of her room-

♥

**Crew talked about South Carolina, where his mother and stepfather lived. Land was cheap there, he said. He proposed they move there together and buy a piece of property. He had $50,000 to invest if Nancy Jo wanted to contribute the $15,000 she expected from her divorce.**

mates found it offensive when he arrived at their house at 7 a.m. with a beer in his hand. Andrade acknowledged that Crew was usually drunk when she was around him. It didn't keep her from considering his offer of South Carolina. But it wouldn't be enough to just move there together.

IT WAS LATE MAY WHEN SHE TOLD Crew she would go to South Carolina with him only if they were married.

"Name the date," he said, catching her off guard.

Andrade had scheduled the month of July for her vacation. They could take the month for a honeymoon trip through Nevada and Utah, then go to Greer, S.C., where Crew's mother and stepfather lived.

On Thursday, June 3, 1982, Andrade and Crew drove to Lake Tahoe in her Corvette and were married. Afterward, back in their room, Mark talked Nancy Jo into watching some pornographic videos. They were violent, ugly and abusive toward women. The new Mrs. Crew found them disturbing. She was further put on edge when Mark asked her to take out a life insurance policy and make him the beneficiary. When they drove back to the Bay Area the next day, Crew spoke of how the cold, deep waters of Lake Tahoe were perfect for disposing of bodies. It

was the beginning of Nancy Jo's serious doubts about the man she had married.

Mark and Nancy Jo returned to the San Jose apartment of her friend, Tanis Palmer, with whom they planned to live until the move to South Carolina. Crew had to excuse himself to take care of some business. Nancy Jo didn't see him again for several days.

At a family gathering a week later, Nancy Jo surprised her parents, Jake and Joan Wilhelmi, with the news: "I went to Lake Tahoe this past weekend and got married."

"To who?" her mother had blurted in shock. Mark Crew had been by their house only twice; her parents didn't know him at all. Jake, who after 20 years in the insurance business prided himself on his ability to read character, didn't like Crew the first moment he saw him.

The entire month of June, Crew spent only half a dozen nights at the apartment. He claimed he didn't feel comfortable there. He told Nancy Jo to expect a more normal relationship in South Carolina.

Nancy Jo did see Crew by accident at the Saddle Rack. She caught him there at least twice with other women; once he was kissing someone in the doorway. Both times he spotted Nancy Jo and sneaked out to the parking lot. He made a getaway in the brown Ford pickup truck she'd loaned him for his repair business. To get it back, she had to track him to his old house on Maria Way.

The first time, he handed the keys over. The second time he locked the doors, took the keys and disappeared into the house. Nancy Jo called the police. It was after that night that Nancy Jo said she was going to get an annulment.

A friend had suggested she hire a private detective to find out more about Crew. Nancy Jo said she felt it important she trust him and had gone ahead and made him a co-beneficiary with her daughter, Stacy, on her $10,000 life insurance policy. But now she decided to do some investigating on her own. She discovered the address on his business card was a vacant lot, and the phone number was an answering machine.

Toward the end of June, Tanis Palmer found Nancy Jo curled up on her bed crying. "That guy's . . . psychotic," Nancy Jo said, "and he's going to kill me."

LISA MOODY HAD NEVER STOPPED caring for Chris Crew. He was still a person she felt she could trust and confide in.

It had been weeks since she'd last seen him when Crew called and asked to take her out to celebrate her birthday. He was driving a brown Ford pickup when he arrived. They went to dinner in San Jose and then to a motel to

make love. On the drive home he produced a modest diamond engagement ring and asked her to marry him.

"I can't," she said, "I'm not ready yet. My divorce isn't even final."

He insisted she keep the ring. Consider it her birthday present.

RICHARD GLADE, OWNER OF THE Rock Creek Ranch, a dude ranch in the Uinta Mountains of northeast Utah, was disappointed with the ranch hand he'd hired that summer. The young man, Richard Elander, had been to Rock Creek on a hunting trip with friends the previous fall. All winter, he'd pestered Glade with phone calls until Glade agreed to give him a job. He'd said he wanted to be a cowboy, but in the weeks since his arrival had shown himself to be a green kid with a drinking problem.

While he was drunk one night, Elander spilled his real mission to Glade. He said the friend he'd come hunting with was planning to kill a woman, and they were looking for a rugged stretch of mountains in which to dispose of the body.

Even if the story was invented, Glade and his wife didn't feel safe having someone around who'd say such a thing. The next day, Glade told the young man to finish out the week, then collect his paycheck and go. Elander didn't understand why he was being fired, but within a few days was headed back to California and his hunting buddy, Mark Crew.

While a teen-ager in Minnesota in the mid-'70s, Richard Elander had first met Mark Crew, who was five years his senior. Crew took him out drinking, showed him the fundamentals of truck repair and told him of adventures in the outside world.

When Crew's marriage fell apart, and he returned to the Bay Area, Elander followed. Crew gave him work, a place to live, and took him along on his nightly forays into the country-and-western club scene. Elander became dependent on Crew for money and a social life. There wasn't anything Elander wouldn't do for Crew, including finding a place in which to dispose of a body. Now it looked like those plans wouldn't be necessary. Crew's bride was seeking an annulment. Crew wanted to leave for South Carolina anyway. They packed Elander's truck and that July 4 weekend the two set out for South Carolina.

WHEN LISA MOODY NEXT heard from Crew, he was calling from his grandmother's house in Euless, Texas. He told her how much he missed her, how he was on his way to South Carolina and how she really should come visit. It

took a few more phone calls, some very late at night, before she agreed to come see him there. He told her to make travel plans for the last week of August.

NANCY JO CREW AND HER FRIEND Darlene Bryant left on the first of July on a vacation trip. They were headed through Texas on their way to Knoxville when Nancy Jo asked to stop in Greer, S.C., to see Mark Crew. Bryant was surprised that her friend still wanted to see a man she considered so untrustworthy.

❤

## The friend he had come hunting with was planning to kill a woman, Elander told Glade. They were looking for a rugged stretch of mountains in which to dispose of the body. Glade fired Elander, who headed back to California and his hunting buddy, Mark Crew.

Crew and Nancy Jo spent the day together. She met his mother, Tessie Jean, and stepfather, Bergin Mosteller. Crew told her the woman she'd seen him kissing at the Saddle Rack was an old girlfriend he couldn't get out of his system. But he was ready now to love only her. They spent the night together.

"Well, you're not going to believe this," Nancy Jo told Bryant the next morning, "but I think I'm going to give it a shot with him after all."

NANCY JO SPENT THE FIRST THREE weeks of August in California making arrangements to move, with her two children, Timmy and Stacy, to Greer, S.C. She quit her job and packed her clothing, furniture, appliances and stereo. "He made me an offer I couldn't refuse," she told friends.

She dropped by the house of a close girlfriend a few days before they were scheduled to leave. "I know in my heart that I really don't love him," she said. They talked about her plans to take the kids along. "Mark said I could bring them, but I have really weird feelings," she said.

"Don't take the kids," the friend urged. "If something in fact is the matter, your children are going to be involved." She suggested Nancy Jo make arrangements for her ex-husband to keep the children.

"Mark said I could bring them," Nan-

---

♥

---

## "If you don't hear from me in two weeks," a tearful Nancy Jo said on the morning she left with Crew, "call the police."

---

cy Jo resolved. "But we'd have a better chance at starting our life together if I didn't bring them."

"If you don't hear from me in two weeks," Nancy Jo said in a tearful good-bye the next morning, "call the police."

That day, Nancy Jo made arrangements for his ex-husband to take custody of Timmy and Stacy. She wept for days after signing the papers.

On Aug. 21, Nancy Jo loaded her Morgan horse, Don Dee, into a trailer for the trip to South Carolina. Mark Crew had driven to California with his stepfather, Bergin Mosteller, in Mosteller's station wagon. Mosteller would return, towing the horse trailer with Don Dee inside. This way the newlyweds could ride together in the cab of Nancy's truck while towing her Corvette behind. Nancy Jo gave Mosteller $500 for his trouble.

The cash came from a bag she was carrying filled with $15,000 to $16,000. It was all her savings, including her divorce settlement and her pension from Kaiser. Carrying so much cash made her nervous, she told friends, but Crew told her to take the money out of state this way so the IRS couldn't trace it.

**A**FTER LEAVING CREW AND NANCY JO at the Motel 6 in San Jose that morning, Bergin Mosteller drove to the Campbell home of Crew's friend, Bruce Gant, to unload the personal property Nancy Jo had packed into the empty stall of the double trailer. Then he dropped Don Dee off at the Piedmont Stable in San Jose. He explained to the manager that he was helping a stranded motorist on the highway by leaving the horse with her. He left the owner's business card, for Mark Crew's M&C Truck Repair, and said Crew would be by in a couple of days to retrieve the animal.

Then Mosteller drove to Reno and spent the night. The next day, he parked his station wagon at the airport and flew to Las Vegas. In the early morning hours of Aug. 23, in the police station of Boulder City, a small town 30 miles outside of Las Vegas, he filed a false report that he had been robbed and his car stolen. Arrangements were made for him to fly home to South Carolina.

**M**ID-MORNING, AUG. 23, LISA MOODY took a call from Chris Crew. They were supposed to be leaving for South Carolina the next day. He was stuck in Stockton buying a horse, he said, and might be a few days late. He promised he'd make up for it with presents when he arrived.

**O**N AUG. 23, MARK AND NANCY JO went to Nancy Jo's parents' house in Santa Cruz to say good-bye. Mark drove Nancy Jo's pickup truck, its load of furniture and clothing covered by a blue tarp. Nancy Jo



## *Traditional Office Furniture*

The prestige of fine period reproductions shows up best in the home or office with the presence of an elegant Chippendale writing desk. If you find these hard to locate — then try Allen's where we have a good selection, of the finest quality, at very affordable prices.

## *Allen's* FURNITURE
Downtown San Jose
40 South Second Street

HOURS: Monday thru Saturday 9:30 to 5:30
Thursday evening til 9. Free Validated Parking

### 408/294-5854

**3 FLOORS OF FINE FURNITURE ON DISPLAY**

*Over 150 bedroom sets and dining room sets*

- White
- Unique
- Marbo
- Hickory
- Karges
- Gordon
- Fancher
- Thomasville
- Dixie
- Hekman
- Victorian
- Burlington
- Stanley
- Link-Taylor

*Check our prices — none are lower!*

*plus*
**FREE DELIVERY**

ove her Corvette with her springer
aniel, Dawn, riding by her side.

They didn't stay long at the Wilhelmis.
ley planned to drive as far as Reno that
ght. "Don't worry," Crew assured Nan-
/ Jo's mother. "I'll take care of her."

"How can you go so far away and
ave those children here?" Jake asked.

"I've shed a lot of tears," Nancy Jo said
her father, "but I'm coming back at
hristmas for Stacy." She gave him a hug
id a kiss and told her she loved him.
hen she got behind the wheel of her
orvette and drove away. Mark Crew fol-
wed her in the brown Ford pickup.

Instead of driving to Reno that night,
Nancy Jo had told her parents they
lanned to do, the couple checked into
Motel 6 in Fremont. The stay was
tended until the morning of the 25th.
rom all accounts, Mark Crew was
lone when he checked out.

**W**HEN CREW ARRIVED AT LISA
Moody's house on Aug. 26,
he was wearing a beard and
driving the bright yellow Cor-
:tte he told her he had bought. He was
carrying a sack of money he said he was
transferring to South Carolina. And there
were gifts to make up for his being two
days late, a microwave oven and a stereo.

They made love. Then he said he had
to leave to take care of some business.

"Don't worry, we won't ever have to
be apart again," he said, holding her
tight when she became upset. "I prom-
ise you that."

He said he'd be back that night but
didn't show up until the next morning.
Cleanshaven now, he asked her to take
$5,000 of the cash he was carrying and
get a cashier's check made payable to
Bergin Mosteller. She dropped it in the
mail to him in South Carolina on her
way to work at Denny's. Crew spoke
with Richard Elander in South Carolina.
"It's all over," Crew told him. "I've done
the ultimate s--tty." That night he and
Lisa went to the movies and saw *E.T.*

The next morning, Aug. 28, he told
Lisa he was going to Stockton to pick
up a horse he'd bought. At the Pied-
mont Stables he traded Nancy Jo's sad-
dle to a woman for one of lesser value.
The woman wrote him a check—leav-
ing the pay-to-the-order line blank—for
the $75 difference. As he was leaving,
he mentioned he was taking the horse
to South Carolina, adding almost casu-
ally that he was wanted by the police
for the disappearance of his wife.

Crew returned to Moody's late that
day with Don Dee towed behind the
brown Ford pickup. The Corvette
would be stored at a friend's house until
they returned from South Carolina. The
back of the truck was packed with what
Moody assumed were Crew's belong-

♥

> As he was leaving the stables,
> Crew mentioned that he was taking
> the horse to South Carolina.
> He added almost casually that
> he was wanted by the police
> for the disappearance of his wife.



**World Class Champions**

Greg Louganis

**The Leader in Price and Quality!**
- Energy Saving Hydro Clean System
- Time Proven Financial Security and Financing Programs
- International Design Award Winner
- Free Estimates and Designs
- Neighborhood Construction and Service

License No. 185102

**CALIFORNIA POOLS & SPAS**     **408-559-3885**

# dy Sculpting
# by Barrie

**RMANENT REMOVAL OF
BULGES by LIPOSUCTION**

*ay be a candidate if your are:*

lot significantly overweight
n good health
8 to 60
n expert! Gene M. Barrie, M.D.,
rtified Surgeon, Member
an Society of Liposuction Surgery,
the American College
rics & Gynecology.

R FRIENDLY STAFF OR MAIL
JPON FOR MORE INFORMATION.

_____

and more information about liposuction

_____

_____

| state | ZIP |



e M. Barrie, M.D.
lowry Ave., Suite 3A, Fremont
Ca 94538

**(15) 794-1411**

# DROUGHT *is*
# er *for* Swanpools

*l fill of your pool is included, for limited time only.*



# 4 POOLS ON DISPLAY

| rolls on Display | • Cantilever Decking on Display |
| a Spa on Display | • Booster, Blower Pumps on Display |
| rick on Display | • Grey, block & white Pools on Display |
| ) D.E. Sand Cartridge Filters working on Display |



1495 So. Winchester Blvd., San Jose

FREE
ESTIMATES
7 DAYS
A WEEK

**(408) 435-7926**

UC. #C53-421014

*of the Pick-A-Pool Prices starting at $13,250*

## CHARMED TO DEATH

ings. The couple left that same day, their journey made difficult by the fact that neither knew anything about horses. Don Dee kept them from staying in motels, and they had to catnap all the way to Crew's grandmother's house in Euless, Texas.

Crew and Moody were cuddling in bed at his grandmother's when he had to take a phone call in another room. He returned in a dark mood.

"Don't touch me," he said gruffly. "I'll explain the call some other time. I don't want to talk about it now."

Crew seemed to be a different man. He had lost his appetite for sex, and the few times they did make love, his mind was somewhere else.

The morning they arrived in Greer, S.C., Moody went to bed to sleep off the effects of driving straight through from Texas. Crew sat down with Elander and Mosteller for a few celebratory shots of Jack Daniel's. Elander then joined him for the drive to the stable where he would board Don Dee.

"Well, you want to know how I did it?" he asked Elander as he steered the truck onto the blacktop leading out of Greer. Then he proceeded to tell Elander how he had murdered Nancy Jo.

The two had started back to South Carolina, he said, each driving one of Nancy Jo's vehicles, when they stopped along the road. They were sitting on a hillside talking. Nancy Jo sat in front of Crew, who listened as she talked.

He shot her through the back of her head, he told Elander. She fell forward, back toward him, then just kind of flopped over. He rolled her body into a ravine, covered it with a blanket and drove to Bruce Gant's house. He said that Gant rode back with him to get the second car.

The next night the two friends returned, good and drunk, Crew said, to the spot. Crew shuffled down into the ravine to check on the body. Apparently still alive, Nancy Jo had managed to drag herself a few yards from where she'd been left for dead. Crew panicked and ran back up to the truck to get Gant. Gant, Crew said, came down to where she lay and began to strangle her, then tried to break her neck. Finally, to make sure she was no longer alive, he cut her head off.

They took the body to Gant's house and put it in a 55-gallon oil drum. The head went into a 5-gallon bucket. Both were filled with cement. The drum was buried in Gant's back yard; the bucket was thrown off the Dumbarton Bridge.

As Crew finished telling the story to Elander, he looked down at his red, callused hands. "I'll never mix that much cement again," he said.

There was a lot of activity in the Mosteller household that first week of September. Bergin cashed the cashier's check, and Crew deposited $2,775 of it into a bank account. Crew and Elander went to the flea market with Nancy Jo's clothes. They got about $250 for her jackets, boots and jeans. What they couldn't sell, they burned.

The Mostellers packed up and moved to another rented house. Bergin Mosteller's phone was disconnected. The phone at the new house was listed under the name of David Lindsly. The name on the mailbox was Jones.

Lisa Moody was too busy catching up on sleep and helping with the move to know what was going on around her. She swept, cleaned, and saw more of Crew's mother than she did of Crew. It wasn't her idea of a vacation. She wondered what had happened to the charming, light-hearted man she'd known.

"Sometimes I just hate myself," he told her one night, when he was in a pensive mood. "Sometimes I feel like I have no morals at all."

The couple stayed two weeks before driving back to California. Moody's plans now were to sell her house and come east to live with Crew.

I T WASN'T LIKE NANCY JO TO GO MORE than a few days without calling friends or relatives. No one had heard from her since Aug. 23. Jake and Joan Wilhelmi sent her a card for her birthday, Sept. 14, to the Bergin Mostellers in Greer. When Sept. 14 passed and still no word, Jake phoned the number Nancy Jo had given for the Mostellers. It had been disconnected with no referral.

Jake called every Mosteller he could find in South Carolina until he reached Bergin's brother. A few days later, Bergin called, collect, to tell them Nancy Jo and Mark had arrived, but had quarreled and left. He didn't know where they'd gone.

Jake Wilhelmi called the San Jose Police Department to file a missing person's report on his daughter. They refused, saying she was over 21 and free to leave with whomever she chose.

I T WAS MID-SEPTEMBER WHEN LISA Moody arrived home in San Jose with Chris Crew. They sold the brown Ford truck to a young man in Gilroy. Crew took to driving the Corvette and made ready to return to South Caro-

lina. Moody would follow as soon as she sold her house.

Moody had allowed her ex-husband to stash his property in her personal storage space on the promise he'd pay the rent. He stopped when she left for South Carolina, and by mid-October, she was informed she had to move everything out.

She and Crew towed a trailer to Fremont to retrieve her stuff. Angry with her ex-husband, she gave Crew his things, including files with personal identification papers. While driving away from the storage center, Crew decided to explain to Moody about the disturbing phone call back in Texas.

"I got involved with the wrong people," he told her. "The Mafia. I made Kaiser cards for the mob because the mob doesn't have enough protection." He showed her the Kaiser card Nancy Jo had given him.

Crew told Moody there'd been a woman who'd followed him to South Carolina and insisted he marry her. When he told her he couldn't, that he loved Lisa, she went to the mob to make trouble. The mob killed her. Then they told Crew they'd tossed the body alongside the freeway and that he had to go dispose of it, or they'd make sure he was blamed for the murder.

The call in Texas, he said, had been from his friend, Bruce Gant. He had buried the woman's body in Gant's back yard. It was beginning to smell, and Gant was asking him what to do with it.

Moody's first thought was that she didn't want to date Crew anymore. She was scared to death of the Mafia. He offered to take a load of her things back with him to South Carolina. She declined and felt great relief when he left that night to drive east.

ON OCT. 22, 1982, THE SAN JOSE POlice finally agreed to write a missing person's report on Nancy Jo Andrade Crew. Jake Wilhelmi took brief comfort in their concern for his daughter's disappearance. A month after the report was taken, he discovered no investigation had followed. He felt forced to hire a private detective, Bob Coldren, who checked into her bank and credit card accounts. All activity had ceased on Aug. 23. He talked to her friends. They told him about Nancy Jo's fears for her safety. When he discovered Crew had been made a co-beneficiary of her life insurance policy, he knew the Wilhelmis' worst nightmares might come true.

A major break in the case came one December evening with an accidental meeting at the Saddle Rack between Lisa Moody and a customer she recognized from her job at Denny's, Mike Gagliani. He looked down in the dumps. He'd been dating a woman that he'd really cared for, he explained. She'd left him to move to South Carolina with another man.

"I just got back from South Carolina with my boyfriend," Moody said.

"What's his name?" Gagliani asked.

"Chris Crew," she said.

"Don't you mean Mark Crew?" he asked.

"No," she said.

"This girl's been missing," Gagliani said.

"It's not the same person," Moody insisted. "He was here at my apartment for three weeks." She showed him a belt buckle Crew had bought her.

Gagliani excused himself and hurriedly left.

A few days later, Moody received a call on her shift at Denny's. The San Jose police wanted to talk to her about Mark Christopher Crew.

She tried not to tell them much, but when they pulled out Crew and Nancy Jo's wedding snapshots, she broke into tears. They told her the woman in the photos was missing and possibly dead.

*Continued on page 23*

♥

**Crew told Lisa Moody a woman had followed him to South Carolina and insisted he marry her. When he told her he couldn't, that he loved Lisa, the woman went to the mob to make trouble. The mob killed her. Then they told Crew they'd tossed the body alongside the freeway and that he had to go dispose of it, or they'd make sure he was blamed for the murder. A friend had buried the body in his back yard.**



winner of 6 silver meda\
design excellence

Awarded by the National Swimming Pool Institute



**3** Ste\
pro\
is w\
Lifetime F\
lifetime. E\
construct\
personall\
and own\
compan\
can offer\
written

**LIFETIME POOLS**

has long been the most recommended builder of quality pools in the Bay Area. Your new pool will not only be a great source of family fun but an excellent investment as well, so don't settle for less than the very best. Let us show you how simple it is to own a pool in which you can take a personal pride, and which will truly give you a "lifetime" of pleasure. Follow these 6 easy steps to enjoyment.



**4** Ex\
wit\
equ\
makes it\
pleasure\
a proble\
Rite ener\
system a\
Raypak\
heater b\
Pool's ga\
quality it\
"extras"\
Included\
competi

**1** **Pool planning** can be a pleasant experience when you're dealing with an expert from Lifetime. He can advise you on the best size, shape, and location.

**5** Pl\
giv\
Po\
permane\
ease of r\
selected\
to none i\
putting t\
finishing\
Lifetime



**2** **Getting started.** Excavation and hand shaping of your pool to a precise design is simple business for the Bay Area's most experienced pool builder **since 1962.**

**6** th\
st\
en\
and with\
at work\
could ad\
within a\
not start



**LIFET**\
POOL

PHONE FOR FREE ESTIMATES    SAN JOSE

When they explained that she could be considered accomplice to murder, she finally agreed to tell them everything she knew.

Nancy Jo's file was moved from missing persons to homicide. A warrant was issued for Mark Crew's arrest.

NOT LONG AFTERWARD, NANCY JO'S PROPERTY began turning up like flotsam after a wreck. The microwave oven and stereo Crew had given Moody turned out to be hers and were taken as evidence. Her truck was found in Gilroy; Don Dee and the Corvette had been sold in South Carolina.

The search for Nancy Jo's body was less fruitful. Gant's back yard was probed in February 1983, but nothing was hit.

A string of girlfriends, and Lisa Moody's ex-husband's I.D. papers, helped Crew elude the FBI and police in five states for two years. A lover's quarrel finally led to Crew's arrest, June 6, 1984, in Hartford, Conn. The woman he'd been living with had gotten angry at the man she knew under another name when she spotted a photo I.D. for Mark Crew.



**Crew was arrested in Hartford, Conn., on June 6, 1983.**

She asked a policeman to see if Crew was wanted. Indeed, there was a federal warrant for his arrest.

Crew told the arresting FBI men he was innocent of the murder charges. Nancy Jo, he said, had run off with a group of bikers.

Richard Elander was tracked down that July in Minnesota. He was granted immunity in exchange for the story Crew had told him of Nancy Jo's murder.

The next morning, Santa Clara County District Attorney's Office investigator Ron McCurdy led a group of police to Bruce Gant's home in Campbell with earth-moving equipment. A container from a semi-truck that had arrived in November or December 1982 was moved, and a circular indentation the size of a 55-gallon drum was found in the ground beneath it.

A small storage shed was also moved. Here they found the bones of a dog that appeared to be the same breed, age and sex as Nancy Jo's springer spaniel, Dawn. It had died from a blow to the side of the head.

Bruce Gant was arrested on charges of accessory, conspiracy to commit murder, grand theft and possession of stolen property. His case was dismissed in preliminary hearing.

Bergin Mosteller was arrested in Greer on charges of murder and conspiracy to commit murder. He was released on bail in South Carolina, pending Crew's trial.

Jury selection for the trial was scheduled to begin April 19. The Santa Clara County District Attorney has attached special circumstances—that he murdered Nancy Jo for financial gain—to Crew's case and is seeking the death penalty. But they have yet to



# CHARMED TO DEATH

rew resents news reports that
e's a womanizer. "I enjoyed myself;
enjoyed women," he asserts.
I was trying to find someone
could be happy with. I never felt
ecure, like this was a relationship
could put my all into."

find Nancy Jo's remains, and if the
prosecution wins it will be the first
death penalty conviction in California
for a murder in which no body has
been found.

LISA MOODY IS REMARRIED NOW, HAS
a child, and lives in Gilroy. She
won't talk to defense counsel.
When Crew wrote asking her
help, she gave the letter to the police.

"How do you take two women back to
South Carolina?" she asks. "You don't.
So one of us was not intended to make it
there. That's premeditated, isn't it?" she
says. Still, she's certain Crew did love
her. "Chris told me on the way to South
Carolina I was a bridge that wouldn't
burn."

The Wilhelmis want most of all to lay
their daughter to rest. Twice the district
attorney offered to drop the death pen-
alty for life in prison if Crew would tell
where Nancy Jo's remains could be
found. Twice the offer was rejected.

For the first six months after Nancy
Jo's disappearance, Jake Wilhelmi was
so distraught he couldn't work. The case
has brought such a strain to their mar-
riage that the Wilhelmis are now living
separately, Joan in Santa Cruz with their
youngest child, Sandy, and Jake in Wat-
sonville. Jake feels he's had to pressure
the police and bureaucrats every step of
the way. "For them, it's an everyday
job," he says. "It's the survivors and
victims that really pay the price."

Jake's frustrations are well-known. He's
told Bob Coldren and Ron McCurdy that if

Crew isn't convicted, he may take justice
into his own hands. McCurdy now makes
sure Jake is put through a weapons search
each time he enters the courtroom.

MARK CHRISTOPHER CREW IS RE-
markably complacent for a
man who has waited trial so
long for a crime he says he
didn't commit. "The newness has worn
off," he says. "I have to take each day as
it comes.

"I try to look on the bright side," he
says. If he should get the death penalty,
"maybe there's something on the other
side."

Prison life has added 35 to 40 pounds
to his already sizable frame, he admits
with a self-conscious grin, but it hasn't
caused many other problems. "I picked
up fast here," he says. "Once you know
how things work and as long as you go
with the program, you do all right."

The confinement gives him a chance
to read books and to write. "I'm getting
to know myself," he says. "No one ever
knew me. They still don't."

His lawyer won't let him discuss the



BEAUTIFUL LIVING SPACE
*is our specialty*

### DESIGN • REMODELING
*Solariums: Wood •Aluminum
• Heat Mirror Glass*
Our experienced staff can help you every step
of the way from initial planning and design to
financing and construction. Call or visit our
showroom — 8 full size models on display.

FOUR SEASONS GREENHOUSES
Design & Remodeling Centers
FOR LIVING... INDOORS

Solar Living
DESIGN & REMODELING
611 University Ave., Los Gatos
**408/395-5868**

# Santa Cruz
*a place in the* WEST

The second Sunday of
each month, WEST
features a special
Santa Cruz County
advertising promo-
tion, complete with
highlights of the
latest happenings.
It's where our 676,000
Sunday readers turn
for information about
this nearby recreation,
dining and shopping
resource.



Phone Linda Tirban
at 408/920-5405 for
an informative
advertising mailer or
reservations.



# AFFORDABLY ELEGANT





**FEATURES:**
• European Quality
• Custom Designed
• Fully Adjustable

**OPTIONS:**
• Clear Lucite for
• Drawers & Doors
• Ironing boards
• Cedar Lining, etc.

KIDS CLOSETS TOO!

## Closet
DIMENSIONS

408/971-1400     FREE IN-HOME
DESIGN CONSULTATION     415/594-1155

# AQUA·BLU·POOLS



*The finest
craftsmanship with a
personalized touch unequaled by others
and at no additional cost!*

*Own the very best.*

See us about remodeling
your existing pool!
Call for FREE ESTIMATES
San Jose 408/295-5651
408/996-0274

details of the case, but he is willing to talk about his life up to that point.

He was born on Dec. 25, 1955—hence his middle name, Christopher—in Euless, Texas. His family moved to the Bay Area when he was 3, though he'll say he's from Texas if asked and likes to talk with a drawl. His father was a pressman on the *San Francisco Chronicle*. The family lived on a small farm in Petaluma until he was in junior high school and his parents divorced. His father remarried, and they moved to Sunnyvale. To escape the home he shared with his father, stepmother and her three children, Crew dropped out of high school at 17 and joined the Army. Stationed near Augusta, Ga., he finished school in the service and became a journeyman diesel mechanic.

He was home on leave when he went to Reno and married his high school sweetheart. She left him after a year. The second Mrs. Crew was from Minnesota. They settled in her home state, a daughter was born, and Crew worked as an independent truck driver. That marriage ended when she developed a drinking problem, he says. "She was a mean drunk; I couldn't stand being around that."

When he came to California around 1980, he got into the truck-repair business. It was the bar scene, he admits, that may have done that in. He was out five or six nights a week, dancing, meeting women, drinking beer and cheap whiskey. "I was probably drinking too much for my own good," he says.

He resents news reports that he's a womanizer. "I enjoyed myself; I enjoyed women," he asserts. "I was trying to find someone I could be happy with. I never felt secure, like this was a relationship I could put my all into."

"I just tried to make people happy," he says, as the sheriff comes to signal the end of his visit. He considers a final question: What does he think makes women so attracted to him? "I don't know," he says, his blue eyes quizzical. He adjusts the chain around his waist and rises to leave. "Maybe I was just a good listener." 〰

*NANCY SPILLER is a contributing writer for West.*



**EXHIBIT 4**

(Copy of a San Jose Mercury News article about the
jury verdict in this case, dated October 11, 1989,
and entitled "Jury: Execute Killer")

# Jury: Execute killer

## 1st death verdict without a body

**By Lorenzo P. Romero**
Mercury News Staff Writer

A Superior Court jury in Palo Alto on Thursday declared that Mark Christopher Crew should die in the gas chamber for the 1982 murder of his wife, Nancy Jo.

With that, Crew, 33, became the first person in Santa Clara County this year to receive the death verdict. The truck mechanic also is believed to be the first defendant to have received it in a murder case where the body of the victim has never been found.



Mark Crew

The jury foreman, Robert Thurman, said there was ample evidence for the jurors to find Crew guilty of first-degree murder and to recommend the death penalty.

"It was a difficult, emotional decision for everybody," he said of the 16-hour deliberations. "But we had more than sufficient evidence in both phases."

Crew, dressed in a dark suit, remained stoic as he has throughout the lengthy case.

As the San Jose man was being led back to jail by deputies, he declined comment.

According to the testimony, Crew and his wife, 33, had been married two months when she told family and friends she was leaving with him for South Carolina to start a new life.

On Aug. 23, 1982, the day she said farewell to her parents in Santa Cruz, Crew is believed to have

*See JURY, Page 7B*

*JURY, from Page 1B*

shot her once in the head as she sat Indian-style in front of him at a remote mountain site. He then covered her with brush. The next day, Crew returned to the scene and panicked when he saw she was still alive.

According to testimony from Richard Elander, who was granted immunity from prosecution, Crew said another man then cut the woman's head off. The body was then placed in a 55-gallon drum and filled with cement. Investigators believe the head was put in a bucket, filled with cement and tossed off the Dumbarton Bridge.

That other man, Bruce Gant of Campbell, escaped being charged with the murder. Police and district attorney investigators twice dug up Gant's back yard in a futile search for evidence that they had hoped would lead them to the body. After a preliminary hearing, a Municipal Court judge found there wasn't enough evidence to merit a trial.

While there is no statute of limitations on murder, authorities remain pessimistic that enough evidence can be collected to charge Gant.

However, Crew's stepfather, Bergin Mosteller, is scheduled to appear in court Sept. 11 to face charges in the case. Investigators believe he conspired with Crew on the slaying.

Prosecutor Dave Davies said after Thursday's verdict that Crew's trial "went as well as could be expected."

Despite not having found the victim's body, Davies was able to provide evidence that detailed a convoluted plot by Crew and others that led investigators on a trail for witnesses and evidence from San Jose to Texas, Utah, Connecticut, Minnesota and South Carolina.

While Elander, once Crew's closest friend, provided the keystone for the prosecution, Davies used 49 witnesses to build his case. He was able to convince the jury that Crew only married the victim as part of



Nancy Jo Crew
. . . Slain in 1982

a plan to bilk her out of money, the "special circumstance" needed to impose the death penalty.

Another key witness was Lisa Moody, who testified that Crew also asked her to marry him. She said Crew gave her presents that had belonged to Nancy Crew. Nancy Crew also named Mark Crew as a beneficiary in her life insurance and he had her withdraw her life's savings.

Joseph O'Sullivan and Joseph Morehead, the two San Francisco attorneys defending Crew, left the courthouse quickly after Thursday's verdict and were unavailable for comment.

In trying to save him from the gas chamber, the attorneys called several character witnesses on behalf of Crew.

Judge John Schatz ordered Crew to return to court Oct. 19 after the judge has reviewed the case and the jury's verdict. Schatz has two options: to sustain the jury's verdict or to modify it and change it to life in prison without the possibility of parole.

The judge could not comment on the Crew case, but after court Thursday he voiced frustration with the death penalty in California.

"I've always felt there are cases in which the death penalty is proper. But I'm beginning to think it may be better to impose life in prison. It seems cruel and unusual punishment to leave a person on death row for 10 years," Schatz said. "I just don't think we're operating as we should. It's cruel for defendant, family of deceased and the defendant's family."

*Mercury News Staff Writer Nora Zamichow contributed to this report.*

## EXHIBIT 5

(Copy of an article in <u>The Recorder</u> about the People's appeal,
dated October 16, 1991, entitled "Santa Clara DA's Office
Prepares To Argue Rejected Death Verdict"

# Santa Clara DA's Office Prepares To Argue Rejected Death Verdict

## Unusual appeal in murder-for-money case scheduled for next week

**By MARK CURSI**

Santa Clara County prosecutors had won. Mark Christopher Crew would go to the gas chamber for killing his wife. Though no body was found, Assistant District Attorney David Davies had convinced a jury that Mary Jo Crew had been shot, strangled and beheaded sometime in August 1982. Her head, he maintained, was placed in a bucket of cement and dropped into San Francisco Bay.

The motive, according to the prosecution, was money, and not a lot of it. Mark Crew killed his wife of two months so that he could cash in on an estate that consisted of little more than a Corvette, a horse, and $8,000 in cash. After finding Crew guilty of first-degree murder, the jury further found on Aug. 10, 1989, that the special circumstances of murder for financial gain warranted the death penalty for Mark Crew.

But when Crew appeared for sentencing on Feb. 23, 1990, Santa Clara County Superior Court Judge John Schatz rejected the jury's recommendation in favor of life in prison without the possibility of parole. The judge cited Crew's previously clean criminal record and positive character references.

Schatz's decision enraged prosecutors. On Tuesday the Santa Clara County district attorney's office will channel that anger into action. Prosecutors will take the rare, and some say most likely unsuccessful step of asking a state appellate court to reinstate the death verdict. California judges have overturned death penalty verdicts only five



**THANG NGUYEN BARRETT:** The Santa Clara prosecutor says a trial judge has limited power to overturn a jury's death sentence. "The only leeway the judge has is to use his independent judgment as to the weight of the evidence. It still has to conform with the jury's verdict."

times in the last 14 years, only once before has the prosecution appealed such a decision. Since 1978, 398 defendants have been sentenced to death, including 29 resentencings, according to the California Appellate Project.

A motion for modification of a verdict is automatically brought to a judge whenever a jury returns a death penalty sentence. And Penal Code §190.4(e) empowers the trial judge to act as a "13th juror" in determining whether such a verdict is consistent with the evidence.

See OVERTURNED page 15

# INS Profiteering On Stay Program,

# Needle Exchange Advocates Gaining Ground Nationwide

# Overturned Death Verdict Set for Argument

Continued from page 1

But on what grounds can the judge then be reversed is unsettled. As the state Supreme Court noted in *People v. Brown*, 46 Cal.3d, 432 (1988) "we have not yet determined the applicable prejudicial error standard for reviewing trial court error in ruling on the statutory motion for modification of sentence."

The issue that will be argued Tuesday in *People v. Crew*, H006959, before the Sixth District Court of Appeal in San Jose concerns what standard should be applied in determining reversible error on an automatic motion for modification of a death penalty verdict.

Deputy District Attorney Thang Nguyen Barrett said he plans to argue that §190.4(e) does not empower a trial judge to modify a death verdict at his discretion.

"From my perspective, 190.4 is very clear; there is no discretionary power there," Barrett said. "The only leeway the judge has is to use his independent judgment as to the weight of the evidence. It still has to conform with the jury's verdict."

Defense attorneys and even other prosecutors, however, believe Barrett and his superiors are fighting a hopeless battle. The trial judge, they say, is supposed to evaluate the defendant, the witnesses and evidence independently of the jury. The statute gives the trial judge broad powers, they say.

"The judge is the 13th juror," said James Anderson, a senior homicide prosecutor for Alameda County. "Setting aside a death penalty verdict is just one of the options a judge has."

The power granted the trial judge through that section is "one of the built-in safety devices" to prevent "arbitrary and capricious" sentencing, said James Thomson, a Sacramento solo criminal attorney and past chairman of the death penalty committee for California Attorneys for Criminal Justice.

Section 190.4(e) became law in 1977, when the death penalty was reinstated by the Legislature.

The statute mandates that the trial judge "make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances [a necessary ingredient for a death verdict] are contrary to law or the evidence presented."

## UNFAIR COMPARISONS?

"I don't think that mandate is a discretionary mandate," Barrett said. "The wording is very clear." Barrett, in essence, is arguing that although Schatz has the power to reject the jury's recommendation, the basis for his decision failed to meet the statutory requirements. In briefs filed with the Sixth District, Barrett is arguing four points:

• Schatz compared the Crew case with other capital murder cases he has tried, an improper intercase proportionality test.

• By making comparisons, Schatz considered evidence not before the jury.

• Schatz's ruling was contrary to the evidence and inconsistent with his own on-the-record statements indicating the prosecution had proved its case — including the special circumstance allegation — beyond a reasonable doubt, and

• Schatz failed to adequately state on the record the reasons for his ruling.

Crew's appellate attorney, Thomas Lundy, a Santa Rosa solo practitioner, could not be reached for comment. But in reply briefs filed with the Sixth District, Lundy maintains Schatz did nothing improper.

Schatz's on-the-record comments about previous capital murder cases he had tried, Lundy wrote, were not part of a proportionality review but merely prefatory statements explaining to everyone in the courtroom why he felt mitigating circumstances outweighed aggravating circumstances in Crew's case. "By referring to



RECORDER FILE (1988)

**JOHN SCHATZ:** The Santa Clara County Superior Court judge has overturned two death penalty verdicts since 1977.

the other cases, the judge was merely explaining why he had upheld death judgments in other cases," Lundy wrote, "i.e., in other cases there had always been some aggravation beyond the single murder itself, there usually was prior violent criminal activity and/or prior felony convictions."

Indeed, in an interview with *The Recorder* immediately after sentencing Crew, Schatz noted that Crew had no prior criminal record. He said he was also impressed with the character witnesses called on behalf of Crew. Schatz could not be reached for comment regarding the appeal.

Schatz's decision was only the fifth time that a California judge had overruled a jury's death recommendation, said Joseph

O'Sullivan, a San Francisco solo practitioner and co-counsel for Crew at trial. "I think he's just a courageous judge," O'Sullivan said.

Alameda County prosecutor Anderson said not one of Alameda County's 20 death verdicts has been changed by a trial judge there.

Of the eight defendants who have been sentenced to death in Santa Clara County, just two — including Crew — have had their death sentences modified by a trial judge to life in prison, prosecutor Davies said.

The Crew case marks only the second time any prosecutor in the state has sought appellate review of a trial court's decision under 190.4(e), Barrett said.

The Fourth District Court of Appeal in San Bernardino has issued the only published opinion on the subject. *People v. Burgener*, 223 Cal. App.3d, 427 (1990).

In that case, the appellate panel concluded the trial court committed harmful error when it overturned a death penalty verdict after considering the possibility that the jury could not ignore evidence that had been objected to at trial, that the case most likely would be reversed, and the expense of retrying the penalty phase would be prohibitive.

On Aug. 24, 1990, the case was remanded to the trial court for another sentencing hearing, which has yet to occur.

The state Supreme Court has dealt with the death verdict modification issue, but only on defense appeals. In *People v. Williams*, 45 Cal.3d, 1268 (1988), the court ruled that the trial court need only review evidence presented to the jury in deciding whether a death verdict should stand.

The high court went further in *People v. Benson*, 52 Cal.3d 754 (1990), declaring that in an appellate review a death ruling "must be set aside, the penalty judgment vacated, and the cause remanded for reconsideration of the verdict-modification application if and only if the 'error' was prejudicial."

## EXHIBIT 6

(Copy of an article in <u>The Recorder</u> reporting the result
of the People's appeal, dated December 24, 1991,
and entitled "Sixth District Remands Rejection
of Death Verdict")

tody battles have jumped as bad economy wears on people

time, providers say, their begun to feel the effects of : and the slowed hiring of

some experienced people is — people who have been Joseph, whose program as-

associates busy in the past year or so doing pro bono work.

.Nonetheless, partners in charge of pro bono efforts agree their jobs were easier when business was better.

"It's a tough time for pro bono," says Jack Londen, chairman of Morrison & Foerster's pro bono committee. "I don't perceive a frontal assault on pro bono," Londen says, but he adds that lawyers are

ier with the press of work," says Zimmerman.

Nevertheless, partners say actual pro bono hours haven't declined. At Heller, Ehrman, White & McAuliffe, says partner Charles Freiberg, pro bono hours will jump in comparison to the rise in billable hours this year.

At Thelen, Marrin, Johnson & Bridges,

See PRO BONO page 7

## ne Director fornia CEB e's Leaving

### AY

oll, executive director of inuing Education of the Monday that he is resignncement caps a troubled ich included the posting of ss.

as served as executive dior 21 years. He said his was his own, and that he ed to go. He said he will anization through 1992.

was about time," Carroll surprise to the governing y did not know I was "

ion's largest provider of education, and a 34-year veen the State Bar and the alifornia, has had other r. Earlier, CEB — blamfor its $1.2 million short-Los Angeles office, laid aff and instituted a hiring

s announcement comes re Curtis Karplus, CEB's nd, leaves to take advan-tirement package offered loyees. Karplus and Carc dominant forces at the



*RECORDER FILE (1989)*
**TIME TO GO:** William Carroll said his planned departure from CEB after 21 years as executive director is his own decision.

institution for years. Carroll, who has been at CEB for 29 years, did not pursue the university early-retirement option offered last fall.

Carroll said Monday that the university will select his replacement from a panel of candidates screened by CEB's ninemember governing board. He said he gave a year's notice to give CEB ample time to search for a successor.

See LONGTIME DIRECTOR page 7

# Sixth District Remands Rejection of Death Verdict
## Judge wrong to consider other cases, panel rules

**By MARK CURSI**

A Santa Clara County Superior Court judge conducted an improper comparison of crimes when he rejected a jury's death sentence recommendation for a convicted murderer, the Sixth District Court of Appeal ruled Monday.

The court ruled that Judge John Schatz's decision to reject the death penalty and order life imprisonment for Mark Crew was "unauthorized and therefore erroneous." The court remanded the case to Schatz for reconsideration of the automatic motion for modification of the death sentence verdict.

But the Sixth District in *People v. Crew*, H006959, stopped short of granting two key prosecution requests: that it reinstate the death sentence and that, should the case be remanded, it order another judge to take over.

The case is only the second in the state in which the prosecution has appealed a trial court's decision to reject a death penalty verdict. To ensure a death verdict is not arbitrary or capricious, Penal Code §190.4(c) gives a trial judge authority to

See 6TH DISTRICT page 11

# 6th District Remands Death Verdict Rejection

Continued from page 1

act as a 13th juror who can weigh the evidence presented.

Crew was convicted for killing his wife in August of 1982. Her body was never found, and Crew wasn't charged until four years later.

Nevertheless, Assistant District Attorney David Davies was able to convince the jury that Crew killed his newlywed wife for financial gain — specifically, the value of her Corvette, a horse, and roughly $8,000 in cash.

At Crew's sentencing, Schatz said he, too, was convinced Crew killed his wife

> **'The mitigating evidence of the type presented by the defendant herein is usually accorded little weight by our high court.'**
>
> — 6th DCA ruling

for financial gain. But the judge said he rejected the jury's death recommendation because of such mitigating factors as Crew's strong character witnesses and otherwise clean record.

Schatz also noted at the Feb. 23, 1990 sentencing that in other capital cases he had presided over, a murder had been committed during the commission of another crime, such as robbery. The judge said that those cases did not influence his decision in Crew's sentencing, but the appellate court disagreed.

By concluding the other capital murder cases he tried included "something in addition" to murder, Schatz "implicitly reduced the weight" of the aggravating factor, wrote Justice Walter Capaccioli.

"The trial court extensively relied on improper considerations, and it cannot be said that the mitigating factors substantially outweighed the aggravating factors, if they outweighed them at all," said Capaccioli. The opinion was joined by Justices Eugene Premo and Patricia Bamattre-Manoukian.

In a footnote, Capaccioli wrote that "the mitigating evidence of the type presented by the defendant herein is usually accorded little weight by our high court."

Deputy District Attorney Thang Nguyen Barrett had presented evidence that Crew had shot his wife from behind and left her for dead. Crew and a friend returned the next day and fearing that the body had moved, strangled and decapitated the corpse, according to the appellate court.

The Sixth District applied the so-called reasonable possibility test in determining whether reversal was warranted. It was the first time the test, which is usually used on an appeal brought by the defense, was used after a trial judge rejected a death penalty verdict.

The appellate court rejected defense attorney Thomas Lundy's argument that there was a reasonable possibility that Schatz's decision would be no different had he not considered previous cases. Lundy, a Santa Rosa solo practitioner, also argued that Schatz's comments about previous capital cases were merely prefatory in nature.

Schatz is a 21-year veteran of the bench who has presided over several capital murder cases. He could not be reached for comment.

**LETTERS TO THE EDITOR**

The Recorder welcomes letters on matters of interest to our readers. Letters must include name, address and telephone number. Write to: The Recorder • 625 Polk Street, Suite 500 San Francisco, CA 94102

## The Bill of Ri~ the right to assem~ might still be tha~

They were a common sight Washington, D.C. and cities throughout th~

Today it's unthinkable that w~ But the suffragists used the righ~ staging marches, picket lines and dem~ to the White House fence to draw att~ Amendment to the U.S. C~

Throughout our short history. A~ guaranteed by the First Amendment—~ petition. If people could not gather tog~ what good would freedom of speech ~ demonstrations against nuclear wa~ the right of assembly c~ it did for the suffragi~



A public service message from the State B~



# 500 *Free* Minutes
## Off Peak Airtime With Any New Service Activation

FUJITSU • MITSUBISHI • MOTOROLA

**EXHIBIT 7**

(Copy of a <u>San Jose Mercury News</u> article about the result
of the People's appeal, dated December 24, 1991, entitled
"Wife killer to be resentenced, may face death")

# Wife killer to be resentenced, may face death

**By Brandon Bailey**
Mercury News Staff Writer

In an unusual ruling, a state appellate court has reversed a judge's controversial decision to show mercy to a San Jose man who was facing the death penalty for the decapitation murder of his estranged wife.

The ruling means Judge John Schatz must once again consider the evidence and decide whether 35-year-old Mark Christopher Crew should face execution or life imprisonment without parole.

A jury recommended death after convicting Crew of killing the woman he met and wooed at a popular San Jose dance hall. Prosecutors won the conviction in 1989 despite the fact that Nancy Jo Crew's body has never been found. Authorities believe an accomplice put her remains into a barrel of concrete and dumped it off the Dumbarton

Bridge.

After a long trial in Santa Clara County Superior Court, the jury said it agreed with the prosecution theory that Mark Crew killed his wife so he could steal her money, her horse and her car.

But Schatz set aside the jury's death penalty recommendation and instead sentenced Crew to life without parole. At the time he announced his decision, in February 1990, Schatz noted that Crew had no criminal record and no history of violence.

The judge also mentioned other murder trials over which he had presided, saying "there was always something in addition" that led him to impose the death penalty.

Those words led to the latest ruling in the case, issued Monday by a panel of justices from the state Court of Appeal in San Jose.

The panel said the judge should have made his decision on the facts of the Crew case alone, not by comparing the facts with other cases. The justices ordered the case sent back to Schatz for another hearing.

Attorneys say it was rare for the prosecution to challenge such a decision by the trial judge, and even more unusual for such a challenge to succeed.

"A lot of people had written us off . . . but we prevailed," said Deputy District Attorney Thang Nguyen Barrett, who handled the appeal. "We are very satisfied with the decision."

Crew's attorneys could not be reached for comment Monday.

According to court documents, the Crews were married and separated in 1982. Prosecutors believe Nancy Jo Crew was killed in August of that year after her estranged

husband approached her with a phony plea for reconciliation and convinced her to start a new life with him in South Carolina.

Jurors convicted Crew of shooting the woman at a remote mountain site the day after she said goodbye to her parents in Santa Cruz. Though he covered her body with brush, she apparently did not die right away. According to prosecution witnesses, Crew told them that he returned to the site with another man, who then strangled the victim and cut off her head.

Authorities have said they believe the second man later stuffed Nancy Jo Crew's body into a barrel, filled it with concrete and dumped it into San Francisco Bay. But the man accused of carrying out those actions, Bruce Gant, was acquitted after a separate trial last year.

Crew killing



**EXHIBIT 8**

(Copy of an article in <u>The Recorder</u> dated January 16, 1992,
and entitled "Santa Clara Judge Schatz Faces Competency Probe")

### liforno
### y Opinion
### ervice
*ns Book Inside*

**ankruptcy**

v. TIMM: Section
t allow stripping down a
icially determined value
al, because claim is se-
n and has been fully al-
t to §502 and, therefore,
sified as not an allowed
for purposes of the lien-
ision of §506(d). U.S.

**ivil Rights**

. PEARCE: Detention of
r 114 days at county jail
gment or trial is viola-
and Oregon law. 9th Cir.

**stitutional Law**

REGENTS OF THE
Y OF CALIFORNIA:
by public university of
udent activities fee not in
tudents' First Amendment
1st

**ts and Procedure**

L'FIRE & MARINE IN-
CO. v. SUPERIOR
DVALLOY, INC.): De-
for total failure to respond
for deemed admissions not
nder C.C.P. §2033. C.A.

*ries continue on page 2*

### NSIDE

### $150 Million
### Pyramid



ca Corp.
vice
nd gen-
l Chris-
cLain
the fi-
vices gi-
recently
public offering of six million
ferred stock valued at $150
today's Big Deals, Big



**JOHN SCHATZ:** Prosecution and defense attorneys are questioning whether the 13-year su-
perior court judge is fit for the bench. But one defense attorney says complaints about
Schatz come from prosecutors who are displeased with his rulings.

*RECORDER FILE (1988)*

# Santa Clara Judge Schatz
# Faces Competency Probe

**By MARK CURSI**

There was a time in Santa Clara County
when death penalty cases almost always
went to Superior Court Judge John Schatz.

Between 1979 and 1990 he handled
about a dozen of them, and he was known
for his willingness to tackle the long,
draining trials.

But for the past year, as a result of a
quiet decision by the district attorney's of-
fice, Schatz has been mired in property and
drug cases, with an occasional sex crime
tossed in. The reason: senior prosecutors
are steering important cases away from
Schatz because they believe he is no longer
competent to handle them.

"Some days he's there and some days
he's not," is how one prosecutor who had
a recent trial before Schatz described the
judge.

Concerns about Schatz aren't limited to
prosecutors. Defense attorneys, too, have

complained about memory lapses by the
68-year-old judge. Interviews with 13
lawyers on both sides of the well have
yielded stories of Schatz repeating himself
apparently unwittingly, failing to put
crucial information on the record, and
making bizarre rulings that contradict
standard practice.

Presiding Judge Leonard Edwards said
Tuesday he was beginning an in-
vestigation. "I have a duty to find out what
is going on," Edwards said. "I'm trying to
find out what's the factual basis for the
statements being made."

But Edwards, who took office in
December, said that until questioned by
*The Recorder* he was unaware there was
any concern about Schatz, even though it
appears at least one previous presiding
judge and possibly two have received
complaints about him.

Schatz has refused four requests seeking

See PJ INVESTIGATES page 4

## Consent
## Can Be C
## More Eas

### High court's r
### have impact ii

**By ALEXANDER P**

A U.S. Suprem
Wednesday making
ment officials to see
decrees may affect lo
involving prisons,
public schools.

In ruling on a Ma
high court unanimou
dard federal judges
confronted by gove
modify consent de
important, given the
cast for San Francis
the court's statemen
entity's fiscal conditi
account by a judge in
to modify a decree.

"Under its newly a
standard," the court s
cials seeking to modif
that a significant cha
makes the revision ne

"A modification
court said, when ch
tions, make complia
substantially more on
"A change also might
cree's requirements b
the public interest, t
ously, the standard fo
decree was that fail
amount to a "greviou

Writing for the ma
White said decree m
shouldn't be granted
cials should have an
cited in trying to justi

Currently, San F
partment, fire depart
schools are all ope
decrees, and could p
the court's opinion.

Dennis Aftergut,
torney, said that his
opinion to see if it h
current decrees. Th
partment decrees
promotion of minori
concerns desegregat
governs population

*See CC*

## Harris Asks High Court to Clarify Capital

# PJ Investigates as Prosecutors Ice Out Schatz

Continued from page 1

comment for this story.

In Schatz's defense, even his critics point to an otherwise distinguished career. And one defense attorney who supports the judge says the gripes from the DA's office are based on little more than the fact that prosecutors haven't been getting their way in his courtroom.

Prosecutors point to two 1990 rulings in homicide cases as turning points in their relations with the former assistant DA. In one, Schatz tried to downgrade a jury's murder verdict to a misdemeanor. In the other, he improperly attempted to overturn a death sentence.

Three senior prosecutors said Schatz is now an exception to office policy requiring trial lawyers to seek a supervisor's permission before filing a peremptory challenge to a judge's assignment. For Schatz, "We've pretty much left it up to the individual attorneys," said one supervising prosecutor.

Assistant District Attorney David Davies, the number three person in the office, said: "I know we are not sending any major cases [to Schatz's court] anymore. I heard it's real hard to get any [trial deputies] to go down there."

Another supervising prosecutor, who asked for anonymity, said his office has filed challenges against Schatz about 24 times in the past year in all types of cases. The office usually doesn't challenge a judge more than two or three times a year, he said.

District Attorney George Kennedy, who tried cases in front of the judge before taking office a year ago, expressed admiration for Schatz and refused to comment on a change in the office's policy regarding peremptory challenges.

Questions about Schatz's competence apparently have arisen only in the past two years. The same lawyers expressing concern about Schatz's demeanor note that he has distinguished himself both as a judge and a prosecutor.

"When he was in this office . . . he



RECORDER FILE (1988)

**DAVID DAVIES:** "I know we are not sending any major cases [to Schatz's court] anymore," said the number three person in the DA's office. "I heard it's real hard to get any [trial deputies] to go down there."



RUSSELL O. CURTIS

**LEONARD EDWARDS:** The Santa Clara County presiding judge said Tuesday he was starting an investigation of Schatz. "I'm trying to find out what's the factual basis for the statements being made."

supposedly was one of the best trial attorneys in the county," said one longtime prosecutor.

Schatz worked 16 years in the Santa Clara County District Attorney's office and rose to one of its top posts. He won election to municipal court in 1970 and was elected to superior court eight years later. Of seven published appellate opinions in Schatz cases since 1987, only one has been vacated.

From the start of his time in Superior Court, Schatz has handled only criminal cases, and has made a name for himself as the only judge who has sought out lengthy and gruesome murder cases. Schatz received an overall grade of 3.56 out of a possible 5 points in *The Recorder's* analysis of the Santa Clara County bar association's 1991 Judicial Poll. The grade would put him about midway between a satisfactory and very good rating but below the score of most of his peers on the bench.

that might withstand appeal. He convinced the judge to adjust the conviction to felony involuntary manslaughter.

In a Sept. 30, 1991, unpublished opinion, the Sixth District ruled that downgrading the conviction to another felony was within Schatz's discretion.

The Bartlett case wasn't the first time Schatz infuriated the DA's office.

Prosecutors say 1989's high-profile *People v. Crew* case was the first major break they had with Schatz.

After convicting Mark Crew of killing his wife and having her dismembered, a jury recommended he die in the gas chamber. But on Feb. 23, 1990, Schatz granted the defense's automatic motion for modification, sentencing Crew to life in prison without the possibility of parole.

The district attorney's office won a remand of the case from the Sixth District, which found Schatz had improperly compared the case with previous murder cases he had tried.

Relations between Schatz and prosecutors were already souring even before the Crew case.

"Schatz, sometime before the Crew case, began to make rulings and handle trials in a way that concerned us," said one homicide prosecutor who asked that he not be identified.

For the most part, the district attorney's office was pleased with Schatz until 1990. Prosecutors were particularly angered by him on Aug. 3 of that year when he reduced a second-degree murder conviction to misdemeanor involuntary manslaughter in the case of a San Jose man who shot his 11-year-old daughter. Schatz decided the shooting was accidental, ruling the evidence didn't show the defendant had the malice and intent necessary for a second-degree murder conviction.

But reducing a homicide conviction to a misdemeanor is not within a judge's discretion, and Deputy District Attorney Randy Hey, who tried the case, *People v. Bartlett*, said he protested Schatz's ruling to no avail before appealing to the Sixth District Court of Appeal.

Ironically, it was the defense counsel who convinced Schatz to upgrade the conviction from a misdemeanor. Dennis Lempert, a San Jose solo practitioner, said he wanted to get something from Schatz

## STRANGE BEDFELLOWS IN COURT

More recently, a deputy district attorney who had a trial before Schatz said he and the defense counsel in the case cooperated to keep the record complete by putting on the record matters a judge usually does.

"We were covering for each other: 'Make sure you put that on the record,'" because it was obvious that Schatz couldn't carry out that duty, the prosecutor said.

"If we were contentious, there's no telling what would have happened," The defense attorney in the case declined comment.

San Jose criminal defense attorney Guyton Jinkerson said rumors about Schatz are

See page 5

Continued from page 4

coming from prosecutors who think the judge is biased against them.

"They're not getting their way in there," said Jinkerson, a solo practitioner.

A high-ranking prosecutor, however, says that his colleagues considered Schatz one of their own and actually bent over backwards longer than they should have to accommodate the judge.

Jinkerson said Schatz appeared normal during a lengthy murder trial in the fall of 1990. "I thought he tried a good case. He had a reading difficulty, but other than that, I know of no physical impairment he has."

But two prosecutors and one defense lawyer who have appeared before Schatz said that it's common for him to repeat the same questions within the span of a few minutes.

A supervising deputy public defender, requesting anonymity, said he has had "some feedback" about Schatz from his office's trial attorneys "and I share the concern." The concerns, the supervisor said, center on the belief that Schatz "sometimes has trouble focusing or

remembering."

A San Jose criminal defense lawyer who tried a case before Schatz in 1990 said the judge should either take only simple cases or consider retirement.

The attorney, who requested anonymity, said Schatz made inconsistent rulings. Several times, Schatz ruled in favor of one side, then made a contrary ruling on nearly an identical issue a few days later, the attorney said.

The lawyer also said he took affidavits from at least six jurors who said they were "distracted by the fact that he was sleeping at times." Those same jurors, however, said Schatz's apparent dozing didn't affect their consideration of evidence, the attorney said.

Two defense attorneys related stories from separate cases in which Schatz, unable to read the jury instructions, had one of the lawyers do so rather than a clerk. In one of the cases the task was given to the prosecutor, in the other to the defense counsel.

If presiding judge Edwards finds criticisms of Schatz valid he will have the option of asking the judge to step down or go

to the Commission on Judicial Performance to take formal action. Formal removal of a judge requires the commission to conduct its own investigation and make a recommendation to the state Supreme Court. The court then would hold a hearing before it orders a judge to resign.

Victoria Henley, the commission's director and chief counsel, said the only judge to be removed by such a procedure in recent years was Marshall McComb, in 1977. The commission has refused, as is customary, to say whether it has received complaints about Schatz.

Edwards is not the first PJ to take Schatz's performance under consideration.

Two prosecutors said they passed their concerns about Schatz to various presiding judges in recent years: Deputy District Attorney Alvin Weget, who supervises the master trial calendar for the office, said he told Read Ambler and Daniel Creed, presiding judges in 1990 and 1991, respectively, of his office's concerns.

"At the time, I can't say there was any

response," Weget said.

John "Jack" Marshall, supervisor of the DA's homicide unit, said he spoke to Creed also.

Ambler declined comment, but Creed confirmed he received complaints about Schatz from Marshall.

"I was apprised and, no, I didn't look the other way," Creed said. "It was an ongoing situation that we were attempting to monitor."

One supervising prosecutor said other judges have spoken to Schatz but that he "refuses to retire."

Schatz's career is distinguished save for one blemish. In December of 1989, Schatz received a public reproval from the Commission on Judicial Performance for interfering in two criminal cases involving his son and for not coming clean during the commission's preliminary investigation of the matters.

Despite the reproval, Schatz ran unopposed for reelection in 1990.

# Bar Panel Will Review Plan to Restrict Contingency Agreements

A State Bar panel is scheduled Friday to review the Washington Legal Foundation's proposal to restrict contingency fee agreements.

The conservative group's 18-page petition is on the agenda of the Education and Competence Committee. Attention is focused on Rule of Professional Conduct 4-200, which governs fees for legal services.

The petitioners, targeting language that prohibits "illegal or unconscionable" fees and the notion that clients must have "informed consent" on financial bills and formed [...] that the Bar should require

intelligently whether the contingency rate is grossly disproportionate to the anticipated work, or whether a more reasonable hourly rate would be in the client's best interest."

The petition also recommends that the fee contract and closing fee statement be filed with the court — under seal, if necessary, to protect confidentiality.

Bar president John Seitman said Wednesday that he had no specific reaction, but noted that many of the issues have been before the Bar's board of governors in the past.

"I suspect we will send it to the Bar staff [...] on what the history is, so that

# How to find the right legal secretary with one phone call.

If you've run ads for legal secretaries, you know the in-house costs, wasted time and frustration involved. Not to mention all those third-degree phone calls and unqualified applicants.

A better way? Make one call to Margrit Paul.

Since founding PALS Agency in 1977, she's become a leading placement specialist for permanent and

temporary legal secretaries and support staff. She recruits, screens and evaluates applicants so thoroughly, you deal only with the top finalists.

PALS' fees are employer paid, lower than most, and worth every penny in results.

Call off the search! Call Margrit Paul instead – 24 hours a day, every day.

(415) 543-3197.

**PALS**
Personnel
Agency for
Legal
Secretaries

**EXHIBIT 9**

(Copy of a <u>San Jose Mercury News</u> article dated January 24, 1992,
and entitled "Investigation probes judge's competence")

(C)1992 SAN JOSE MERCURY NEWS

| Rank(R) | Page(P) | Database | Mode |
|---------|---------|----------|------|
| R 1 OF 2 | P 1 OF 7 | PAPERSWE | T |

INVESTIGATION PROBES JUDGE'S COMPETENCE PROSECUTORS' COMPLEX CASES DIVERTED FROM JURIST'S COURT

San Jose Mercury News (SJ) — Friday, January 24, 1992
By: BRANDON BAILEY, Mercury News Staff Writer
Edition: Morning Final  Section: Local  Page: 1B
Word Count: 957

TEXT:
Santa Clara County prosecutors have stopped taking most of their complex cases to a respected Superior Court judge because lawyers have complained that JOHN SCHATZ is UNPREPARED, forgetful and unable to focus on his work.

This week, the presiding judge of Superior Court confirmed that he is investigating complaints that SCHATZ may no longer be competent to serve on the bench.

It's a delicate situation that veteran attorneys describe with regret: An aging but revered judge, who once handled Santa Clara County's toughest cases, now seems to have difficulty with his job.

# Investigation probes judge's competence

## Prosecutors' complex cases diverted from jurist's court

By Brandon Bailey
Mercury News Staff Writer

Santa Clara County prosecutors have stopped taking most of their complex cases to a respected Superior Court judge because lawyers have complained that John Schatz is unprepared, forgetful and unable to focus on his work.

This week, the presiding judge of Superior Court confirmed that he is investigating complaints that Schatz may no longer be competent to serve on the bench.

It's a delicate situation that veteran attorneys describe with regret: An aging but revered judge, who once handled Santa Clara County's toughest cases, now seems to have difficulty with his job.

Schatz, 68, conducted most of the county's death penalty trials in the 1980s. Now he handles simple drug and burglary cases because most prosecutors are unwilling to take more complex matters into his courtroom.

Schatz's bailiff said the judge would not speak with a reporter.

Presiding Judge Leonard Ed-



Schatz



Edwards

wards declined to discuss details of his investigation. He said he wants to know if there is a basis for reports questioning "whether the judge has the wherewithal to do the job."

"He has trouble concentrating, as well as seeing and hearing," said a veteran deputy district attorney. "He goes totally blank, and then he has to ask one of the attorneys to assist him."

Like 10 other lawyers who expressed similar concerns, the deputy district attorney did not want to be quoted by name. Lawyers — particularly those who still have

See SCHATZ, Page 4B

# Probe under way into competence of revered Superior Court judge

cases pending in Schatz's court — said they are reluctant to criticize a sitting judge.

In more than 20 cases last year, the district attorney's office filed motions refusing assignments to Schatz's court. Officials said it's rare to file such papers more than two or three times against the same judge. While the district attorney's office does not have a blanket policy, officials say individual attorneys are steering clear of the former prosecutor's court.

Schatz's defenders, who say the judge is more than competent, dismiss the complaints as sour grapes from prosecutors unhappy with rulings that didn't go their way. "The D.A.s were always willing to go there when Schatz was willing to impose death sentences. Now they perceive he's going soft on them," said one public defender.

But another defense lawyer said Schatz's memory and skills are deteriorating. And a supervisor in the public defender's office said he is concerned by reports from his lawyers that the judge is absentminded.

Prosecutors acknowledge they don't like Schatz's rulings in at least three murder cases he handled in 1989 and 1990. But they say their complaints go beyond a difference of opinion over legal issues.

Critics say Schatz may be lucid and attentive on some days, but on others he seems confused or unable to remember how he has ruled on motions that arose only a few days before.

## Instructions to jury

Attorneys say they have provided Schatz with large-print copies of the instructions judges must read to jurors before they begin deliberating. But on at least three occasions, the judge has been unable to finish reading the lengthy directions and has asked the prosecutor or defense attorney to do it for him, attorneys say.

While this is not illegal, critics say that is highly unusual and could be confusing to jurors. Because the instructions are supposed to be neutral, critics say, it's awkward for the prosecutor or defense attorney to read them.

That concern is underscored by the statements of jurors who sat in one of the last murder trials Schatz conducted.

"I did not know if I received the entire instructions or if I missed part of them," said an affidavit signed by Charles Black, who sat on the jury that convicted Rick Todd Pham of first-degree murder in August 1990.

Black said he had trouble hearing the judge and found it confusing when the prosecutor took over reading the instructions.

"Several times during the trial, I observed that the judge appeared to be dozing," the affidavit said. "The judge would have his eyes closed and appeared to not know what was being said. When an objection arose, he had to have parts of the transcript read back to him."

The affidavits were filed in court by Pham's attorney, Charles Mesirow, as part of his request for a new trial. Mesirow declined to comment for this story.

## Respected career

Several attorneys said the situation is particularly sad because Schatz has been respected for so many years. A former FBI agent, Schatz was also a top homicide prosecutor and chief trial attorney in the district attorney's office during the 1950s and 1960s. He became a municipal judge in 1970 and moved to Superior Court eight years later.

Lawyers say the judge — recognizable by his trademark bow tie and old-fashioned, slicked-back haircut — has always been warm in person and compassionate on the bench. He was also known for his sharply focused mind and willingness to take on the tiresome and difficult cases no one else wanted.

"He was one of the premier judges in this county," said a veteran public defender.

Attorneys offered several possible explanations for the changes in Schatz. Many said they believe it is simply age. Others noted that the problems surfaced at roughly the same time Schatz suffered the only official stain on his career.

The judge was publicly scolded by the state Commission on Judicial Performance in December 1989, after an investigation revealed that he asked other officials to give his 22-year-old son favorable treatment when the son was facing misdemeanor drug and burglary charges. The commission said the judge also gave false information to state investigators who questioned his actions.

"It was almost like he'd lost his zeal," said a prosecutor who was in Schatz's court a few months later.

**EXHIBIT 10**

(Copy of a <u>San Jose Mercury News</u> article dated January 25, 1992,
and entitled "Judge Schatz to take medical leave")

JUDGE   SCHATZ   TO TAKE   MEDICAL   LEAVE
San Jose Mercury News (SJ) - Saturday, January 25, 1992
By: BRANDON BAILEY, Mercury News Staff Writer
Edition: Morning Final   Section: Local   Page: 1B
Word Count: 340

TEXT:
   JUDGE  John SCHATZ  will start a 30-day LEAVE  of absence next week, according
to  the  chief  JUDGE  of Santa Clara County Superior Court, who said Friday
that  he has completed an inquiry into complaints that SCHATZ  may no longer
be competent to serve on the bench.

   Presiding  JUDGE   Leonard Edwards said the 68-year-old SCHATZ  will TAKE  a
MEDICAL   LEAVE,  at SCHATZ'S request, but Edwards added that he doesn't know
if  SCHATZ   has  a specific MEDICAL  problem. Edwards said it's unclear what
will happen when the 30 days are over.

   SCHATZ,   a  highly  respected  JUDGE  for the past 21 years, could not be
reached  for  comment.  In  recent  weeks,  he  has  declined to speak with
reporters.

# Judge Schatz to take medical leave

**By Brandon Bailey**
*Mercury News Staff Writer*

Judge John Schatz will start a 30-day leave of absence next week, according to the chief judge of Santa Clara County Superior Court, who said Friday that he has completed an inquiry into complaints that Schatz may no longer be competent to serve on the bench.

Presiding Judge Leonard Edwards said the 68-year-old Schatz will take a medical leave, at Schatz's request, but Edwards added that he doesn't know if Schatz has a specific medical problem. Edwards said it's unclear what will happen when the 30 days are over.

Schatz, a highly respected judge for the past 21 years, could not be reached for comment. In recent weeks, he has declined to speak with reporters.

A former prosecutor and FBI agent,

*See SCHATZ, Page 2B*

*J.J. Mercury News*
*Sat. Jan. 25, 1992*

# Judge Schatz going on medical leave

## Complaints spur competency inquiry

### ■ SCHATZ

*From Page 1B*

Schatz presided over some of the county's most notorious and difficult murder trials in the 1980s. He became known for taking cases that other judges did not want to handle, including a number of death penalty cases.

But for more than a year, many veteran prosecutors in the district attorney's office have avoided taking complex cases into his courtroom. Several have said that his judicial skills seem to be deteriorating and that at times he seems unprepared or unable to focus on his work.

Some of the judge's supporters say prosecutors are just unhappy because Schatz ruled against them in two 1990 murder trials. But even some defense lawyers said they believe Schatz is having trouble handling complicated cases.

Edwards, who became the Superior Court's chief judge in December, said he launched his inquiry earlier this month after hearing rumors that Schatz might no longer be competent to do his job. Edwards declined Friday to discuss the findings of his inquiry.



Judge John Schatz
*. . . 21 years on bench*

However, other sources say Edwards has interviewed attorneys who appeared in Schatz's courtroom over the past year.

"I believe that at this time . . . I have done what I should do, but I feel I'm obligated not to discuss the results," Edwards said.

## PROOF OF SERVICE

STATE OF CALIFORNIA    )    People v. Mark Crew
                            )    No. S025032
                            )
                            )    Crim. No. H006959
                            )    (Court of Appeal
                            )
                            )    (Santa Clara Sup. Ct.
COUNTY OF SANTA CLARA  )    No. 101400)

    I am a citizen of the United States and employed in the County of Santa Clara, State of California. I am over the age of eighteen years, and not a party to the above-entitled action. My business address is: Office of the District Attorney, 70 W. Hedding Street, San Jose, California 95110.

    On February 24, 1992, I served the within NOTICE OF MOTION FOR REMAND TO A DIFFERENT TRIAL JUDGE AND TO REQUEST JUDICIAL NOTICE; and MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR REMAND TO A DIFFERENT JUDGE AND TO REQUEST JUDICIAL NOTICE to the following parties hereinafter named by depositing a true copy thereof in United States mail, postage prepaid, addressed as follows:

Thomas Lundy Esq.           Sixth District Appellate Program
115 Fourth Street, 2nd Floor  100 N. Winchester Blvd., Suite 310
Santa Rosa, CA 95401

John H. Sugiyama            Hon. Grace L. Yamakawa
Senior Assistant A.G.        County Clerk, Santa Clara County
Office of the Attorney General  Superior Court Building
455 Golden Gate Avenue      191 N. First Street
San Francisco, CA 94102     San Jose, CA 95113
                            ATTN.: JUDGE JOHN SCHATZ

    Execute on February 24, 1992, at San Jose, California.

    I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_____
        PING SANTOS

EXHIBIT 2

S025032

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

PEOPLE OF THE STATE OF CALIFORNIA,⟩  No. S025032

⟩

Plaintiff & Respondent,⟩  Crim. H006959

⟩

v.⟩  Santa Clara County
Superior Court
No. 101400

⟩

MARK CREW,⟩  **RECEIVED**

⟩

Defendant & Petitioner.⟩  MAR - 6 1992

⟩  Supreme Court

## MOTION TO STRIKE DISTRICT ATTORNEY'S "MOTION FOR REMAND TO A DIFFERENT TRIAL JUDGE AND TO REQUEST JUDICIAL NOTICE"

Concurrently with his answer to the petition for review, the district attorney lodged with this court a document entitled "Notice of Motion for Remand to a Different Trial Judge and to Request Judicial Notice." Appended to this "Motion" are copies of various newspaper articles never presented to the trial or appellate courts. This hearsay material is calculated to disparage Mark Crew and discredit Judge Schatz and there is no conceivable legal purpose for the presentation of such materials to this Court. Hence, the "Motion" and its attached hearsay documents should neither be lodged nor filed with this Court.[1]

The mere existence of publicity does not justify changing judges on remand as asserted by the district attorney. (DA's

---

[1] Petitioner understands that this Court properly refused to file this "Motion" per Rule 28(e)(5) and (6). However, for the reasons set forth herein, petitioner objects to the lodging of these materials and to any subsequent consideration of them by this Court. Petitioner requests that the motion and attachments be immediately removed from this Court's file.

1

motion, pp. 14-16.)  A rule which would require a new judge after reversal in a high publicity case is too absurd for words.[2] Disqualification of a judge after reversal should be "used sparingly" and only when case specific factors reasonably "reflect a lack of objectivity . . . ."  (<u>People v. Gulbrandsen</u> (1989) 209 Cal.App.3d 1547, 1562; CCP § 170.1(c).[3]  And, as ludicrous as the district attorney's proposed rule would be in the abstract, it would be all the more ludicrous in the present case where the remand is for a new determination of the defendant's § 190.4(e) motion -- a determination which requires familiarity with and a careful weighing of evidence presented to a jury at the guilt and penalty phases of a capital trial.  The mere existence of publicity -- which is not an unlikely occurrence in a capital case -- is a patently inadequate reason to disqualify the very judge who heard the evidence and is thus most qualified to weigh the evidence for purposes of the 190.4(e) ruling.

---

[2]Such a rule would allow a litigant to remove a judge simply by obtaining media coverage of the case.

[3]The district attorney's reliance on <u>United Farmworkers of America v. Superior Ct.</u> (1985) 170 Cal.App.3d 97, is misplaced.  In that case, there was objective evidence of potential bias -- the judge failed to disclose that his wife had worked as a "strike breaker" for the grower which the union was suing.  (<u>Id</u>. at 101.) No such case specific indicia of potential bias has been presented in the present case.

In sum, the district attorney's real complaint is not that Judge Schatz is biased but that Judge Schatz' ruling -- unlike the many other cases in which he imposed death[4] -- was not what the district attorney wanted in this case. This motive is obvious from the frivolity of the legal arguments advanced by the district attorney.

---

[4]Judge Schatz has imposed death in 6 cases: <u>People v. Ledesma</u>, S004324; <u>People v. Raley</u>, S005870; <u>People v. Walker</u>, S004350; <u>People v. Ghent</u>, S004309; <u>People v. Dennis</u>, S007210; <u>People v. Caro</u>, S004418.

Of these cases, one (Ledesma) was reversed by this Court, three were affirmed (Ghent, Walker and Caro), and two are pending.

Other than in the present case, Judge Schatz has granted the 190.4(e) motion in only one other case. (<u>People v. Sparks</u>, Santa Clara County No. 78647.)

## CONCLUSION

Judge Schatz' statements of reasons at the 190.4(e) hearing reflect a careful and considered evaluation of the evidence and an express finding that the mitigating factors outweighed the aggravating factors. (RT 5176-5179; CT 2514.) The record discloses no evidence of bias whatsoever.

The frivolity of the issues raised by the district attorney exposes what is really a transparent attempt to attack Judge Schatz and disparage Mark Crew by the use of incompetent extrajudicial hearsay. The "Motion" as well as its hearsay attachments, should neither be lodged nor filed with this Court.

Dated: March 3, 1992

Respectfully submitted,

_____

Thomas Lundy
Attorney for MARK CREW

4

# DECLARATION OF SERVICE BY MAIL

RE:    People v. Mark Crew
NO.:    H006959

      I, Cynthia Loscotoff, declare that I am over 18 years of age, and not a party to the within cause. My business address is 115 Fourth Street, Santa Rosa, CA 95401. I served a true copy of the attached:

## MOTION TO STRIKE DISTRICT ATTORNEY'S "MOTION FOR REMAND TO A DIFFERENT TRIAL JUDGE AND TO REQUEST JUDICIAL NOTICE"

on each of the following, by placing same in an envelope (or envelopes) addressed (respectively) as follows:

John H. Sugiyama
Senior Assistant Attorney General
455 Golden Gate Avenue, Suite 6200
San Francisco, CA 94102-3658

Mark Crew, E-48050
III-3B-34
P.O. Box W
Represa, CA 95671

Leo Himmelsback, District Attorney
David N. Davies, Asst. District Attorney
Thang Nguyen Barrett, Deputy District Attorney
County Government Center, West Wing
70 W. Hedding Street
San Jose, CA 95110

Honorable Grace Yamakawa
County Clerk, Santa Clara County
Superior Court Building
191 N. First Street
San Jose, CA   95113
ATTN:  JUDGE JOHN SCHATZ

Sixth District Appellate Project
100 N. Winchester Blvd., Suite 310
Santa Clara, CA 95050

      Each said envelope was then, on  March 5, 1992, sealed and deposited in the United States mail at Santa Rosa, California, Sonoma County, the county in which I am employed, with the postage thereon fully prepaid.

      I declare under penalty of perjury that the foregoing is true and correct and executed this 5th day of March, 1992, at Santa Rosa, California.

_____
Cynthia Loscotoff